20 CV 10575

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SWAIN

X----------------------------------------------------X

JLM COUTURE, INC,

                Plaintiff,

     v.

HAYLEY PAIGE GUTMAN,

                Defendant.

X----------------------------------------------------X

Case No.:

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

RECEIVED
DEC 15 2020
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, JLM Couture, Inc. ("Plaintiff" or "JLM") by its attorneys, Adelman Matz, P.C.,

for its complaint against Hayley Paige Gutman ("Gutman" or "Defendant") alleges as follows:

## NATURE OF THE CASE

1.    This is an action by Plaintiff for federal and common law dilution, federal and

common law unfair competition, conversion, breach of contract, conversion, trespass to chattels,

breach of fidelity, breach of contract, breach of fiduciary duty and unjust enrichment.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 15

U.S.C. § 1121, 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) and (b).

3.    Upon information and belief, venue is proper in the Southern District of New

York pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and

omissions giving rise to this claim, occurred in this Judicial District, Defendant is subject to

personal jurisdiction in this district.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b) because,

upon information and belief, a substantial part of the events and omissions giving rise to this

claim, occurred in this Judicial District and Defendant is subject to personal jurisdiction in this district.

5. Upon information and belief, the Court has personal jurisdiction over Defendant because Defendant conducts substantial business within the state of New York; Defendant transacts significant business within New York; Defendant regularly does or solicits business and derives substantial revenue from services rendered and goods sold in New York, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the State of New York, and as such Defendant expected or should reasonably expect their acts to have consequences within the State and Defendant derives substantial revenue from interstate commerce; Defendant resides in the State of New York; and the parties executed an agreement that provides for courts in the Southern District of New York or New York County, to have exclusive jurisdiction over all disputes arising therefrom, including but not limited to trademark and property rights.

## NATURE OF THE PARTIES

6. Plaintiff JLM Couture, Inc., is a corporation duly formed and existing under the laws of the State of Delaware, with its principal offices located at 225 West 37th Street, 5th Floor, New York 10018.

7. Upon information and belief, Plaintiff Hayley Paige Gutman is a natural person residing in the State of New York, with an address at 90 Lexington Avenue, New York, New York 10016.

## FACTUAL BACKGROUND

8. Founded in 1988, JLM is a leader in the bridal design and manufacturing industry, owning award-winning brands which include Allison Webb, Ti Adora by Allison Webb, LUCIA

by Allison Webb, Lazaro, Tara Keely by Lazaro, Hayley Paige, Blush by Hayley Paige, La Petite

Hayley Paige, and Hayley Paige Occasions. JLM's designers have won ten DEBI awards for

design distinction (couture category), and four British Bridal Buyer awards.

9.     JLM operates 12 fashion collections, nine of which are bridal collections and

three others for a bridesmaid line, a flower girl dress collection and an athleisure collection.

These fashion collections cover a broad spectrum of aspirational to luxury price points. JLM's

retail sales since for 2017 through 2020 are approximately $220,000,000.

10.    Upon information and belief, Gutman graduated from Cornell University with a

degree in fashion design.

<u>Gutman's Employment Agreement with JLM</u>

11.    Pursuant to a written employment agreement dated July 13, 2011 (the

"Employment Agreement"), Gutman was hired by JLM, on an exclusive basis, to be a designer

of bridal dresses, bridesmaid dresses, evening wear and related apparel to be sold and

manufactured by JLM.

12.    The Employment Agreement was entered into when Gutman was relatively new

to the fashion industry.

13.    Pursuant to Section 1 of the Employment Agreement, the term expired on August

1, 2016, unless it was either terminated sooner, or unless JLM exercised its option to extend the

term of the Employment Agreement for one additional year, or for an additional five years,

although as set forth below it has later been amended and extended.

14.    The Employment Agreement is still in effect as it was extended by JLM pursuant

to a written amendment on July 15, 2014 (the "Amendment Agreement") and pursuant to JLM's

notice dated February 12, 2019, in which JLM exercised its option to extend the term of the

agreement for at least an additional three years (the "Option Notice."). Pursuant to the Amendment Agreement, Gutman's duties remained the same except that she was also responsible for designing the Jim Hjelm bridal and occasions lines. *See* Amendment Agreement §2. The Employment Agreement, Amended Agreement and Option Notice are sometimes collectively referred to as the "Agreement."

15.     Pursuant to Section 2 of the Employment Agreement, Gutman's duties include but are not limited to being a designer of a line of brides and bridesmaid dresses. Further, at JLM's request, Gutman shall also design evening wear related apparel. Each of Gutman's designs are to be sold by JLM under a brand label of JLM's own choosing and Gutman was to have direct responsibility over her designs. Further, in addition to designing apparel for JLM, Gutman is also required to perform "additional duties and services commensurate with her position as a designer for [JLM], as may be assigned to her by an officer of [JLM]…" These additional duties include, but were not limited to, Gutman traveling trunk shows, traveling overseas to supervise the manufacture of apparel and assisting with JLM's "advertising programs…".

16.     Further, Gutman is to devote her full time and attention to JLM's business during business hours, and, while she is employed, she "will not, without the prior consent of the President or Board of Directors of [JLM], engage in any other business enterprise which requires the personal time or attention of [Gutman] and which would interfere with the performance of her duties hereunder." *See id.* § 3

17.     Pursuant to Section 10 (a), Gutman also granted JLM

the exclusive world-wide right and license to use her name "Hayley", "Paige", "Hayley Paige Gutman", "Hayley Gutman", "Hayley Paige" or any derivative thereof (collectively the "Designer's Name") in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including and all good will associated therewith

for the term of the Agreement, and for a period of two years thereafter, unless JLM exercised its

right to file for and obtain a federal trademark registration for any such name, as provided in

Section 10(b). *See id.* § 10(a).

18.    Pursuant to Section 10 (b), Gutman

> irrevocably [sold, assigned, and transferred] all right, title and interest to [JLM] that
> now exists or may exist during the Term (and any extensions thereof) and for a
> period of two years thereafter, to register the Designer's Name or any derivatives(s)
> thereof as trademarks or service marks (the "Trademark" or "Trademarks") with the
> USPTO and/or other authorities in the United States or abroad.

*See id.* § 10 (b).  As an additional inducement, once they were registered Gutman covenanted

that

> [t]he Trademarks shall in perpetuity be the exclusive property of [JLM]. . . and
> [Gutman] shall have no right to use [JLM's trademark, Designer's Names, or any
> confusingly similar marks or names in trade or commerce during the Term of the
> [Employment] Agreement or any time thereafter without the express written
> consent of [JLM]

*See id.* § 10(b).

19.    For good and valuable consideration, which was acknowledged by Gutman,

Gutman also agreed to the restrictive covenants set forth in the Employment Agreement.

Pursuant to Section 9 of the Employment Agreement, Gutman agreed as follows: (a) not to

compete directly, or indirectly, with JLM; (b) not to solicit any employee of JLM, or a JLM

subsidiary, for the term of the Employment Agreement and two years thereafter; and (c) in

perpetuity, not to divulge or use any of JLM's confidential information, except "for the sole

benefit of JLM."

20.    In Section 9(e) of the Employment Agreement, Gutman acknowledged that in the

event she breached of any provision of the Employment Agreement, that she consented "to the

granting of a temporary or permanent injunction against breach by her by any court of competent

jurisdiction prohibiting her from violating any provision of [the Employment Agreement]." Gutman also acknowledged that "[JLM] will not have an adequate remedy at law in the event of any breach of [Gutman] and that [JLM] will suffer irreparable damage and injury if [Gutman] breaches any of the provisions of [the Employment Agreement]." This provision, as drafted, is not limited to any breach by Gutman of Section 9 of the Employment Agreement.

21.     Pursuant to Section 11 of the Employment Agreement, all of Gutman's work product that she created while employed by JLM, including but not limited to her designs, drawings, notes, patterns, sketches, samples or improvements to existing works, and "any other works conceived of or developed by [Gutman] in connection with her employment with [JLM]" involving bridal related clothing or accessories, created during Gutman's employment with JLM (the "Designs"), including all Designs created prior the execution of the Employment Agreement, were deemed to be "works for hire". To the extent that any Designs were not deemed to be a work made for hire pursuant to the Copyright Act, all rights and renewals therein were assigned to JLM. Further, ownership of any intellectual property arising from or related to the Designs was deemed to be the sole and exclusive property of JLM.

JLM's Exercise of its Rights in the Designer's Name Pursuant to the Employment Agreement

22.     Shortly after the execution of the Employment Agreement, JLM began using the Designer's Names, as provided in the Employment Agreement, to sell and advertise clothing and apparel designed by Gutman.

23.     For example, JLM exercised its right under the Employment Agreement to use the Designer's Names to create brands or labels under which it would sell clothing and apparel designed by Gutman. The main brand name that JLM created to sell such clothing was "Hayley Paige" (the "Hayley Paige Brand"). JLM has also created additional distinct brands, under

which Gutman's clothing and apparel would be sold, called "Blush by Hayley Paige", "La Petite

Hayley Paige", and "Hayley Paige Occasions". Each of these brands, including the Hayley

Paige Brand, are sometimes collectively referred to as the "HP Brands."

24.     In order to protect JLM's rights and investment in each of the HP Brands, JLM

began taking the necessary steps to protect the Trademark Rights in the Designer's Names that it

obtained from Gutman in the Employment Agreement.  On or about September 12, 2011,

Gutman executed a trademark registration acknowledgement, which acknowledged that she had

transferred, sold and assigned all trademark rights in the Designer's Names, i.e., HAYLEY

PAIGE and any derivatives thereof, to JLM.  Gutman executed additional consents for JLM to

file trademark registrations for the Designer's Names that were subsequently filed with the

USPTO.

25.     JLM has successfully filed for 10 trademark registrations containing the

Designer's Name with the USPTO (the "HP U.S. Trademarks").  JLM first filed for trademark

protection for the Designer's Names on October 24, 2011, when it filed a trademark application

with the USPTO for HAYLEY PAIGE in International Class 25, which matured into a

registration on June 19, 2012 under Reg. No. 4,161,091   In addition to said trademark, JLM

owns 9 additional U.S. trademark registrations for the Designer's Names, which are: (i)

HAYLEY PAIGE and Design, Reg. No. 5,368,112, in International Class 25; (ii) HAYLEY

PAIGE, Reg. No. 5,858,534 in International Class 14; (iii) HAYLEY PAIGE and Design, Reg.

No. 5,858,703, in International Class 14; (iv) HAYLEY PAIGE OCCASIONS, Reg. No.

5,276,982, in International Class 25; (v) OCCASIONS BY HAYLEY PAIGE, Reg.. No.

4,914,471, in International Class 25; (vi) LA PETITE HAYLEY PAIGE, Ser. No. 5,698,436, in

International Class 25; (vii)  LA PETITE HAYLEY PAIGE and Design, Reg. No. 5,698,444 in

7

International Class 25; (viii) BLUSH BY HAYLEY PAIGE, Reg. No. 6,141,381, in International

Class 25; and (ix) JUST GOT PAIGED, Reg. No. 5,728,141, in International Class 41.

26.     In addition to the HP U.S. Trademarks, JLM owns approximately 27 foreign

trademark registrations and 2 foreign trademark applications for the Designer's Names.

27.     As part of JLM's overall marketing strategy regarding the HP Brands, JLM had

various social media accounts created related to the HP Brands, which include but are not limited

to accounts on Instagram, which includes but is not limited to @misshayleypaige ("the Main IG

Account"), as well as other social media accounts on Instagram, Facebook, Twitter, Pinterest,

YouTube and other platforms (sometimes collectively referred to as the "JLM HP Social Media

Accounts').

28.     JLM also owns several domain names which it uses to host websites relating its

various brands, which include but are not limited to the HP Brands, as well JLM's company

website (sometimes collectively the "JLM Websites."). The domain names

www.hayleypaige.com and www.misshayleypaige.com (the "JLM HP Domain Names"), are two

such domain names that are owned and controlled by JLM and are linked to a JLM owed

website, located at https://www.jlmcouture.com/Hayley-Paige. (the "JLM HP Website"), which

is used to promote and advertise the HP Brands.

29.     JLM's use of social media is an integral part of its advertising strategy, in which it

creates name recognition for and advertises each of its brands, including the HP Brands. To this

end, JLM embeds links on its various JLM HP Websites to its JLM HP Social Media Accounts.

JLM also embeds links on each of its JLM HP Social Media Accounts to JLM's other JLM HP

Social Media Accounts and JLM HP Websites. Additionally, JLM has also advertised each of its

8

HP Brands in various print and on-line advertisements in which the JLM HP Social Media Accounts and the JLM HP Websites are prominently displayed.

30.     Starting by at least 2015, if not earlier, JLM began adding the Main IG Account name, as well as other social media accounts, to its hang tags on each piece of clothing and apparel sold under the HP Brands as a source indicator of JLM's goods. Hang tags are removable tags placed on clothing and apparel for sale. Hang tags are used as source identifies for the garments themselves and are frequently used as specimens to prove use of commerce with the USPTO. *See e.g.,* 37 C.F.R. §2.56(b)(1). In fact, such hang tags were used as specimens for three of the HP U.S. Trademarks to show that the marks were being used in commerce, two of which had the Main IG Account name, i.e., @misshayleypaige, prominently displayed.

31.     JLM's advertising strategy also creates brand loyalty amongst its customers. Further, JLM's marketing strategy has increased the number of followers on each social media account. Increasing the number of followers on the JLM HP Social Media Accounts was one of the key goals of JLM's advertising strategy. The number of followers on each of JLM's Social Media Accounts, in particular the JLM HP Social Media Accounts, has significantly increased as a direct result of JLM's marketing strategy, and the significant resources JLM has expended in advertising. For example, with respect to the Hayley Paige Brand alone, JLM has expended approximately $4,068,000 on advertising since 2012.

32.     The Instagram platform is particularly important in the bridal fashion industry as Instagram posts are mainly photographs. Beautiful wedding photos, and beautifully curated images of models wearing wedding dresses and bridal dresses, which are prominently displayed on the Main IG Account, are what potential customers want to see. Women see their dream

dresses designed by Gutman on the Main IG Account, which is the primary reason why they become followers of the Main IG Account.

33.   As a direct result of JLM's marketing and advertising expenditures over the years, the number of followers of the JLM HP Social Media Accounts has steadily increased.  For example, in August of 2014, the Main IG Account had only approximately 22,000 followers.  By March 6, 2015, the Main IG Account had 49,000 followers.  By August 9, 2015, the Main IG Account had over 88,000 followers.  By October 3, 2015, the Main IG Account had approximately 113,000 followers.  By May 27, 2016, the Main IG Account had over 289,000 followers.  By November 13, 2019, the Main AG Account had over 957,000 followers.  Finally, as of November 17, 2020, the Main IG Account has over 1,100,000 followers.

34.   Plaintiff has undertaken significant effort to protect and ensure that its continued ownership and control over social media accounts that it owns and controls, including the JLM HP Social Media Accounts, and the creative content therein, used in the advertisement and promotion of its clothing and apparel.  JLM has developed a reputation among consumers as a design house for premier and upscale wedding attire.  JLM offers a variety of different designers under the JLM umbrella, including the Hayley Paige Brand, which is also among JLM's upscale brands.  To protect the value of the HP Brands and intellectual rights therein , JLM has made sure that the content its social media accounts, including the JLM HP Social Media Accounts, contain beautifully photographed images relating to the bridal industry and the designers of its brands, such as Gutman, the designer of the HP Brands.

35.   Gutman initially performed as required under the Employment Agreement, by not only providing her services as a designer, but also in assisting in the advertisement and promotion of goods created by Gutman and sold by JLM.  To that end, on or about April 6, 2012

the Main IG Account was created and, within the scope of her employment pursuant to Section 2

of the Employment Agreement, Gutman thereafter assisted in the maintenance of that account to

assist with JLM's advertising programs.  Most, if not all of the first posts on the Main IG

Account related to Gutman's JLM designs, the bridal industry and bridal trunk[1] shows.  From the

time the Main IG Account was created, JLM owned the Main IG Account.  Furthermore, until

Gutman changed the account's password, JLM had full access to the account and JLM

maintained and posted to the Main IG Account.  Sometime in 2014, a Pinterest social media

account was opened, also called misshayleypaige (the "Pinterest Account").  JLM also owned

this account and the content on the Pinterest Account has always been bridal and wedding related

to promote the HP Brands.  JLM also had access to this account until Gutman changed this

password as well.

37.     Until very recently, in furtherance of JLM's business, and to build the "Hayley

Paige" brand, JLM and JLM's employees, including Gutman, operated collaboratively to manage

and maintain the JLM HP Social Media Accounts.  Gutman was not only contractually obligated

to assist in the advertisement and marketing of her designs, but she had additional financial

incentive to do so as  she received additional compensation based on sales pursuant to the

Employment Agreement.

37.     It was agreed and understood by Gutman, at the time that the Main IG Account

was created, that the Main IG Account was owned by JLM.  Gutman was responsible to post

content on JLM's Main IG Account that related to her designs, the bridal industry and trunk

shows.  Also, Gutman was to respond to direct messages ("DMs") from people who followed the

---

[1] A trunk show is an event in which vendors, such as JLM, present merchandise directly to
buyers for stores and individual customers at venues and show rooms.

account.  The purpose of responding to the DMs' was to generate buzz brand loyalty for the

"Haley Paige" brands.  Gutman, however, was not permitted to post content related to

competitor's products, non-bridal related products and services and personal matters, unless said

posts, were endorsed by JLM or were otherwise approved by JLM.

38.      As further evidence of the importance of the Main IG Account to JLM, and that

Gutman understand that the Main IG Account belongs to IG, the signature in her business emails

indicates the Main IG Account, JLM's business address and indicates the HAYLEY PAIGE and

BLUSH BY HAYLEY PAIGE Trademarks.



@misshayleypaige

39.      It was also agreed that JLM had control over the Main IG Account.  For example,

until recently, JLM had the password to the Main IG Account.  JLM used its access to the Main

IG Account to post to the account and otherwise to maintain it.

40.      JLM has expended its own funds to maintain and update the Main IG Account.

For example, JLM employees, at JLM's expense, posted to the Main IG Account.  Some of these

postings were made at the direction of Gutman, who was responsible for making sure that up-to-

date relevant content was posted.  Other postings were made by JLM employees at the direction

of other JLM employees in JLM's marketing department.  Regardless of whether Gutman or

JLM's employees were maintaining the Main IG Account, from the date the Main IG Account was created to at least February of 2020, Gutman actively worked with JLM to improve, and add posts to the Main IG Account.  In fact, on or about June 4, 2019, Gutman sent an email to Joe Murphy, JLM's president and chief executive officer, requesting JLM to hire a social media director to run the Main IG Account.

41.     JLM also paid for items to be given away to followers of the JLM Account, such as wedding dresses.  These giveaways increased interest among the Main IG Account's followers, which in turn increased the number of followers for the account.

The Success of the HP Brands and JLM's Continued Investments in the Designer's Names

42.     Over the years that Gutman began working for JLM, sales of Gutman's clothing and apparel have continued to steadily increase.  These sales were in large part the result of JLM's marketing campaign, as well as the quality of JLM's clothing and Gutman's growing celebrity within the industry.

43.     In fact, on July 15, 2014, JLM and Gutman executed the Amended Agreement, which, although it did not supersede the Employment Agreement, it, *inter alia*, increased the amount of Gutman's consideration and required her to perform additional responsibilities. Under the terms of the Amendment, the term thereof was extended to August 1, 2019, unless terminated sooner or extended.

44.     JLM has also actively pursued and obtained lucrative cross- marketing agreements and tie-ins to capitalize on Gutman's growing recognition on social media.

45.     For example, in or about March of 2015, Joe Murphy, JLM's chief executive officer, used his connections to have Gutman and her then fiancé, Danny Wallis, placed on the cover of The Knot magazine, an important magazine in the bridal industry.  Mr. Murphy used his

connection at Kleinfeld Bridal, one of JLM's biggest customers and the location where *Say Yes to the Dress* is taped, to have Gutman become one of the regular featured designers on TLC's *Say Yes to the Dress*, which only served to increase the popularity of the HP Brand amongst consumers. Thus, resulting from Mr. Murphy's efforts, from approximately November 17, 2015 to present, Gutman has been featured on *Say Yes to the Dress*, to promote the HP Brand. Additionally, from 2018-19, Gutman was one of the two featured designers on a TLC spin-off called *Say Yes to America*. Gutman's appearances on television generated additional interest in JLM's HP Brands. This exposure was important for JLM as Gutman was the face of the HP Brands. JLM's effort was to benefit the HP Brands, not to provide Gutman a platform to sell or endorse goods or services that were unrelated to and not approved by JLM.

46.     Gutman's increased notoriety from her television appearances also resulted in collaborations and co-marketing ventures between JLM and third parties. For example, on or about August 1, 2018, JLM entered into a collaboration agreement (the "Collaboration Agreement") with a jewelry company called Hearts On Fire Company, LLC ("HOF"). Pursuant to said agreement, JLM granted HOF the right to use the names "Hearts On Fire By Hayley Paige" and "Hayley Paige for Hearts On Fire" (the "Collaboration Names') with respect to approved wedding bands and wedding rings. JLM was required to provide Gutman for marketing purposes for the products sold under the Collaboration Names.

47.     In furtherance of the Collaboration Agreement, Gutman executed a letter of inducement on August 27, 2018, whereby Gutman agreed, *inter alia*, to perform as required under the Collaboration Agreement.

48.     As a result of the Collaboration Agreement, JLM has received royalties from HOF. In addition to these payments, the joint marketing of the HAYLEY PAIGE trademarks

14

and HOF's name under the Collaboration Agreement have generated additional good will for JLM's Designer's' Name related trademarks, as well as the JLM HP Social Media Accounts.

49.     On or about February 2, 2019, Joe Murphy of JLM provided Gutman with the Option Notice required under the Amended Agreement that JLM was exercising its option to renew the term thereof for at least an additional 3 years.  As sales of the HP Brand's goods were so successful, Mr. Murphy offered to negotiate to further amend Gutman's employment agreement to increase the term thereof, and to provide Gutman with additional financial compensation.

50.     In August and September of 2019, after Gutman had requested that JLM hire a social media director to manage and operate the Main IG Account, Gutman continued to utilize a team of JLM employees to assist her in writing content for posts to the account, as well as to post on the Main IG Account.

Gutman's Infringing Acts, Conversion of the Main IG Account and Harm to JLM

51.     Despite the success of the HP Brands, and in stark contrast to the prior cooperation of, and collaboration with, Gutman regarding JLM's ownership and use of the Main IG Account, in November of 2019, Gutman began to take steps to not only assert control over JLM's property, i.e., the Main IG Account, but Gutman took steps that has resulted in damage to JLM's business and intellectual property rights.

52.     Issues with Gutman began on November 2, 2019 when Gutman created a Tik Tok account under the misshayleypaige name (the "TikTok Account"), and subsequently posted videos that did not properly represent the HP Brands.  The misshayleypaige name is one of the Designer's Names and JLM has used it continuously in commerce since at least April of 2012. Consumers who follow the JLM HP Social Media Accounts, which utilizes the HP U.S.

Trademarks, do so because they want to follow JLM's Hayley Paige Brand designer wedding gown collection. As such, they expect to see premier wedding attire and related accessories that are consistent with JLM's image. Consumers who follow the JLM HP Social Media Accounts, expect to see premier bridal attire under the JLM umbrella. When Joe Murphy advised Gutman that she should post JLM approved content on the Tik Tok account, rather than posting personal images, Gutman responded shortly thereafter by changing the password to the Main IG Account so that JLM no longer had access to the account.

53.     Upon information and belief, later in late 2019, or early 2020, Gutman changed the biography section of the Main IG Account to read "Personal & Creative account", and Gutman removed reference to JLM.

54.     Despite Gutman's actions, Gutman continued to work for JLM as a designer and JLM has continued to honor its obligations under Employment Agreement, and the Amended Employment Agreement. Further, although Gutman locked JLM out of the Main IG Account, Gutman continued to post content as requested by JLM.

55.     However, in June of 2020, during discussions between Joe Murphy of JLM and Gutman, Gutman informed JLM that it was her position that the Main IG Account was her personal account. Gutman's position regarding the ownership of the Main IG Account was not only new, but Gutman at all times previously mentioned understood that the Main IG Account was JLM's properly and had acted accordingly.

56.     Upon information and belief, shortly thereafter, in or about July of 2020, Gutman began posting personal images in addition to bridal images, as well as uploading posts promoting the goods of third parties, such as olive oil, beer and nutritional supplements, none of which were approved by JLM, and none of which relate to the bridal industry. Further, these unauthorized

posts by Gutman make it appear that JLM is associated with, or endorses, these goods when JLM does not.  Consumers who followed the Main IG Account do not expect to see salad dressing promotions, fitness videos and scantily clad images, as they are not in line with the image JLM presents—they expect to see premier bridal attire under the JLM umbrella.

57.     By July of 2020, the Main IG Account had approximately1,000,000 followers. By taking possession of the Main IG Account, Gutman now had instant access to at least a 1,000,000, to whom she could promote her relationships with third parties, without authorization or permission, at JLM's expense as JLM had expended substantial time, effort and money to increase the number of followers for the Main IG Account.  Upon information and belief, Gutman has been paid for these endorsements, and therefore has profited off of the substantial investment made by JLM at JLM's expense.

58.     Starting in the summer of 2019, JLM and Gutman engaged in discussions regarding executing a new employment agreement.  Discussions continued until recently.  JLM believed that Gutman's decision to take over the Main IG Account was a negotiation tactic to obtain leverage during negotiations.  Nevertheless, as JLM believed that Gutman would return control over the Main IG Account to JLM as soon as an agreement was reached, and as Gutman restarted posting JLM approved content on the Main IG Account, JLM took no immediate action to regain control over the Main IG Account.

59.     In fact, on October 25, 2020, following a meeting on October 24th at Kleinfeld between Hayley and JLM's CEO, Joseph Murphy, during which Mr. Murphy emphasized to Gutman that it was her duty to the company to include links to JLM's website, Gutman  restored the links on the Main IG Account to JLM's websites and HOF's website.  Unfortunately, on or around November 3, 2020, in a fit of anger after Gutman found out that JLM was not willing to

give her the Main IG Account, Gutman removed these links and many hundreds of bridal related posts in a further act of exercising dominion and control over JLM's property. Gutman's deletion of posts and other changes to the Main IG Account occurred just after Mr. Murphy's telephone call with Gutman her on November 3, 2020 during which Mr. Murphy stated that the Main IG Account belonged to JLM. By doing so, Gutman not only hijacked the Main IG Account, but she took steps to convert it from a JLM company account to a personal account.

60.     Further, on or about November 23, 2020, in response to a JLM's request to add JLM content on the Main IG Account, Gutman refused and again insisted that the Main IG Account is her personal account. Gutman still refuses to return the Main IG Account to JLM, continues to delete JLM related posts on the account, continues to post off-brand content to the Main IG Account and refuses to post the bridal related content as required by JLM. Gutman also refuses to return the Pinterest Account to JLM as well as a TikTok account that belongs to JLM, also with the misshayleypaige handle.

61.     The Main IG Account belongs to JLM, it was never Gutman's personal account. In fact, Gutman has at least two personal accounts with the handles @mrshayleycleven and @allthatglittersonthegram. It is clear that these two accounts are her personal accounts, while Gutman has converted the Main IG Account to be used as her own business platform, as if she were an influencer.

## COUNT I

### FEDERAL TRADEMARK DILUTION 15 U.S.C. § 1125(c)

62.     Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 61 above as though fully set forth herein.

63.     Plaintiff has continuously used its registered the HP U.S. Trademarks, as well as
other of the Designer's Names, such as @misshayleypaige,  in connection with and to identify its
goods and services and to distinguish said goods and services from similar products and service
offered by other companies, by prominently displaying said marks on its goods and services
since at least October 15, 2011.

64.     Based on Plaintiff's extensive sales, marketing and advertising of the HP U.S.
Trademarks, the HP U.S. Trademarks, including @misshayleypaige, have become distinctive
and famous pursuant to 15 U.S.C. § 1125(c).

65.     Based on Plaintiff's continuous use, JLM's unregistered trade names, including
@misshayleypaige, have also become distinctive or have acquired secondary meaning.

66.     Upon information and belief, Defendant's use of the HP U.S. Trademarks,
including but not limited to the @misshayleypaige tradename, in connection with Defendant's
promotion and endorsement of the goods and services of others on the Main IG Account,
constitutes Defendant's commercial use in commerce of the HP U.S. Trademarks and the
@misshayleypaige trade name.

67.     Upon information and belief, Defendant's confusingly similar use of the HP U.S.
Trademarks and the @misshayleypaige trade name, in connection with Defendant's use of the
Main IG Account since at least July of 2020, as well as Defendant's efforts to pass off
Defendant's endorsement of third parties' goods and services, as being part of, marketed,
sponsored, licensed or otherwise authorized or approved by Plaintiff, when they are not, are
eroding the distinctiveness of the HP U.S. Trademarks and the @misshayleypaige trade name.

68.     Upon information and belief, Defendant's confusingly similar use of the HP U.S.
Trademarks and the @misshayleypaige trade name in connection with her unauthorized use of

the Main IG Account as stated above, is likely to harm the reputation associated with the HP U.S. Trademarks and the @misshayleypaige trade name.

69.     Upon information and belief, Defendant's use of the HP U.S. Trademarks and @misshayleypaige trade name began after the HP U.S. Trademark Trademarks and @misshayleypaige trade name became famous.

70.     Upon information and belief, Defendant's use of the @misshaylepaige trade name began after the @misshaylepaige trade name became distinctive or acquired secondary meaning.

71.     Upon information and belief, Defendant's actions have caused a likelihood of dilution with the HP U.S. Trademarks and the @misshayleypaige trade name by lessening the capacity of such mark to identify and distinguish Plaintiff's services from others.

72.     Upon information and belief, Defendant's actions have caused a likelihood of dilution of the HP U.S. Trademarks and the @misshayleypaige tradename by harming or threatening to harm the reputation of the HP U.S. Trademarks.

73.     Plaintiff is threatened with injury through this dilution of its trademark rights, as well as immediate and direct injury to its name, image and business reputation.

74.     Upon information and belief, Defendant has willfully intended to trade on Plaintiff's reputation and/or to cause dilution to the HP U.S. Trademarks and the @misshayleypaige tradename.

75.     Plaintiff has no adequate remedy at law.

76.     Upon information and belief, the conduct of Defendant has caused, and if not enjoined will continue to cause, irreparable harm and damage to Plaintiff's federal and common law trademark rights and Plaintiff's business, reputation, and goodwill.

77.     Upon information and belief, Defendant's infringement of the HP U.S.

Trademarks and the @misshayleypaige trade name was willful, deliberate, fraudulent and

malicious.  Based thereupon and pursuant to 15 U.S.C. § 1117, Plaintiff alleges entitlement to

recovery of attorneys' fees and treble damages.

## COUNT II

## NEW YORK COMMON LAW TRADEMARK DILUTION

78.     Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1

through 77 above as though fully set forth herein.

79.     Plaintiff has continuously used its registered the HP U.S. Trademarks, as well as

other of the Designer's Names, such as @misshayleypaige, throughout the United States,

including New York, in connection with and to identify its goods and services and to distinguish

said goods and services from similar products and service offered by other companies, by

prominently displaying said marks on its goods and services since at least October 15, 2011.

80.     Upon information and belief, Defendant's use of the HP U.S. Trademarks,

including the @misshayleypaigemark.tradename, in connection with Defendant's promotion and

endorsement of the goods and services of others on the Main IG Account, constitutes

Defendant's commercial use in commerce of the HP U.S. Trademarks and the

@misshayleypaige trade name.

81.     Upon information and belief, Defendants' use of the HP U.S. Trademarks and the

@misshayleypaige trade name as aforementioned has occurred within the State of New York,

was intended by Gutman to be seen by individuals within the state of New York and has caused

JLM harm in the State of New York.

82.     Upon information and belief, Defendant's confusingly similar use of the HP U.S. Trademarks and the @misshayleypaige trade name in connection with Defendant's use of the Main IG Account since at least July of 2020, as well as Defendant's efforts to pass off Defendant's endorsement of third parties' goods and services, as being part of, marketed, sponsored, licensed or otherwise authorized or approved by Plaintiff, when they are not, are eroding the distinctiveness of the HP U.S. Trademarks.

83.     Upon information and belief, Defendant's confusingly similar use of the HP U.S. Trademarks and the @misshayleypaige trade name in connection with her unauthorized use of the Main IG Account as stated above, is likely to harm the reputation associated with the HP U.S. Trademarks and the @misshayleypaige trade name.

84.     Upon information and belief, Defendant's actions have caused a likelihood of dilution with the HP U.S. Trademarks and the @misshayleypaige trade name by lessening the capacity of such mark to identify and distinguish Plaintiff's services from others.

85.     Upon information and belief, Defendant's actions have caused a likelihood of dilution of the HP U.S. Trademarks and the @misshayleypaige trade name by harming or threatening to harm the reputation of the HP U.S. Trademarks and the @misshayleypaige trade name.

86.     Plaintiff is threatened with injury through this dilution of its trademark rights, as well as immediate and direct injury to its name, image and business reputation.

87.     Upon information and belief, Defendant has willfully intended to trade on Plaintiff's reputation and/or to cause dilution to the HP U.S. Trademarks and the @misshayleypaige trade name.

88.     Plaintiff has no adequate remedy at law.

89.     Upon information and belief, the conduct of Defendant has caused, and if not enjoined will continue to cause, irreparable harm and damage to Plaintiff's federal and common law trademark rights and Plaintiff's business, reputation, and goodwill.

## COUNT III

### FALSE DESIGNATION OF ORIGIN IN VIOLATION OF 15 U.S.C. §1125(a)

90.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 89 above with the same force and effect as if set forth fully herein.

91.     Through JLM's efforts and use of the Designer's Names, and the registration of the HP U.S. Trademarks, as well as JLM's use of the and the @misshayleypaige trade name on the Main IG Account and on hang tags placed on clothing and apparel, JLM established ownership rights in said trademarks and said trade name, and the exclusive right to use same in interstate commerce in connection with a range of goods and services, including clothing, apparel, jewelry and entertainment services, along with, *inter alia*, the goodwill associated therewith.

92.     Defendant's use of the HP U.S. TRADEMARKS and the @misshayleypaige trade name as stated above, including on the Main IG Account, which is associated with JLM's goods sold under the HP Brands, to promote Gutman's own services separate from those rendered through JLM, constitutes a false designation of origin and/or a false or misleading description and representation of fact which is likely to cause confusion and mistake, and is likely to deceive consumers as to the affiliation, connection and/or association of Defendant with JLM and is likely to mislead consumers to believe that the services and goods of third parties publicized on the Main IG Account are indeed sponsored by, approved by or somehow associated with JLM.

93.     By reason of the foregoing, the trade and public are likely to be and will continue to be confused, misled, or deceived, and JLM has, is now, and will continue to suffer irreparable injury to its goodwill and business reputation for which it has no adequate remedy at law.

94.     Upon information and belief, Defendant has intentionally and knowingly adopted and used the Designer's Names, including but not limited the U.S. HP Trademarks and the @misshayleypaige trade name, that are likely to cause confusion in the marketplace as to the source, origin, or sponsorship of the goods offered for sale and sold by the Defendant.

95.     By virtue of the foregoing, Defendant's acts are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

96.     Defendant's acts are causing and continue to cause JLM irreparable harm in the nature of loss of control over its reputation and loss of substantial consumer goodwill.   The irreparable harm to JLM will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

97.     Upon information and belief, Defendant is using the Designer's Names, including but not limited to misshayleypaige and the U.S. HP Trademarks and the @misshayleypaige trade name, willfully and with knowledge that Defendant does not have the right to use same, and with the intent to unfairly harm JLM's business, and benefit from the goodwill associated with the Designer's Names utilized by JLM, including but not limited to the U.S. HP Trademarks name and the @misshayleypaige trade name.

98.     Defendant's conduct has caused, and is likely to continue causing, substantial injury to the public and to JLM, and JLM is entitled to injunctive relief and to recover Defendant's profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a), 1116 and 1117.

## COUNT IV

## NEW YORK COMMON LAW UNFAIR COMPETITION

99.     Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 98 above as though fully set forth herein.

100.     Defendant's use of the Designer's Names as stated above on the Main IG Account, which is associated with JLM's goods sold under the HP Brands, constitutes a false designation of origin and/or a false or misleading description and representation of fact which is likely to cause confusion and mistake, and is likely to deceive consumers as to the affiliation, connection and/or association of Defendant with JLM  and constitutes trade name and trademark infringement, unfair competition and misappropriation of JLM's goodwill and reputation.

101.     Upon information and belief, Defendant's adopted and used the Designer's Names utilized by JLM, including the HP U.S. Trademarks and the @misshayleypaige trade name, as a trade name and trademark with the intent to trade off of the goodwill and reputation created by JLM.

102.     Upon information and belief, Defendant has infringed JLM's rights in the Designer's Names utilized by JLM, including the HP U.S. Trademarks and the @misshayleypaige trade name, with the intent to deceive the public into believing that services and goods offered, or endorsed, by Defendant are made by, approved by, sponsored by or affiliated with, the owner of the HP Brands, i.e., JLM.

103.     Upon information and belief, Defendant's acts as alleged herein were committed with the intent to pass off and palm off Defendant's services, goods, and the endorsement of the services and goods of others, as the services, goods and endorsement of the services and goods of others of or by JLM, and with the intent to deceive and defraud the public.

104.    Upon information and belief, Defendant adopted and continued to use the Designer's Names utilized by JLM, including the HP U.S. Trademarks and the @misshayleypaige trade name, with knowledge of JLM's ownership of same.  Despite this knowledge and the fact that Defendant could provide goods and services under another name, and under a social media account not owned by JLM, Defendant  decided instead to misappropriate said Designer's Names and use them even though she had assigned same, irrevocably, to JLM.

105.    Upon information and belief, the above-mentioned actions were committed by Defendant in bad faith as Defendant was aware that JLM owned the Main IG Account and that she had assigned all trademark rights in the Designer's Names, including the HP U.S. Trademarks and the @misshayleypaige trade name, to JLM.

106.    Upon information and belief, JLM has been damaged by Defendant's afore-described acts in an amount to be determined at trial, plus interest thereon.

107.    Defendant's acts are causing and continue to cause JLM irreparable harm in the nature of loss of control over its reputation, and loss of substantial consumer goodwill.  This irreparable harm to JLM will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

## COUNT V

## CONVERSION

108.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 107 above as though fully set forth herein.

109.    The Main IG Account has been, the Pinterest Account and the TikTok Account have been JLM's property since the account was created.

110.    Gutman, beginning in November of 2019, has taken a series of steps to assert control over the Main IG Account, as well as other JLM HP Social Media Accounts, which includes changing the account password, and has refused to provide JLM with the access credentials that JLM needs to access the Main IG Account as well other JLM HP Social Media Accounts that Gutman is using and refuses to return.

111.    JLM has expended tens of thousands of dollars to enhance the value of the Main IG Account and JLM's other JLM HP Social Media Accounts and the numbers of people who follow the account.  Said expenditures include but are not limited to advertising campaigns that include that refer to the Main IG Account, give-away promotions on the Main IG Account and the payment of JLM employees who maintained the Main IG Account and/or assisted Gutman to maintain the Main IG Account.

112.    By refusing to provide the access credential to the Main IG Account, as well as other JLM HP Social Media Accounts, to JLM, and in converting said accounts for her own personal use, Plaintiff is entitled to an amount to be determined at trial, plus interest thereon, including the return of control in the Main IG Account, as well as other JLM Social Media Accounts, back to JLM.

## COUNT VI

### UNLAWFUL TRESPASS TO CHATTELS

113.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 112 above as though fully set forth herein.

114.    Defendant's actions, as stated above, has caused harm, and continues to cause harm, to JLM ''s interest in the Main IG Account, as well as other JLM HP Social Media Accounts that Defendant has used for her own personal benefit.

115.    Defendant's actions, as stated above, have adversely affected the condition, quality and value of the Main IG Account, as well as other JLM HP Social Media Accounts that Defendant has used for her own personal benefit.

116.    Defendants' actions, as stated above, have deprived JLM of the use of the Main IG Account, as well as other JLM HP Social Media Accounts, for a prolonged period of time, since at least November of 2019.

117.    By depriving JLM access to, and use of, the Main IG Account, and other JLM HP Social Media Accounts, Plaintiff is entitled to an amount to be determined at trial, plus interest thereon, including the return of control in the Main IG Account, and other JLM HP Social Media Accounts that Gutman is improperly withholding, to JLM.

## COUNT VII

## **BREACH OF FIDELITY**

118.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 117 above as though fully set forth herein.

119.    During Defendant's employment with Plaintiff, Defendant actively and secretly took possession over and used Plaintiff's property while Defendant was an employee of JLM, including but not limited to the Main IG Account.

120.    As a result of Defendant's disloyalty to JLM, JLM has been frozen out of its Main IG Account and has thus been denied the benefit of advertising its goods to the over 1.1 million followers on the account.

121.    While still employed by Plaintiff, Defendant used Plaintiff's time and the Main IG Account to engage in her acts of disloyalty.

28

122.     Defendant's unlawful acts have been willful, deliberate, intended to benefit Defendant at Plaintiff's expense and made in bad faith, and Plaintiff has been damaged thereby.

123.     Plaintiff is entitled to an amount to be determined at trial, plus interest thereon, which includes all compensation paid by JLM to Gutman, beginning from the date the Court determines Gutman's period of disloyalty commenced, plus costs, attorneys' fees and interest.

## COUNT VIII

## **BREACH OF CONTRACT**

124.     Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 123 above as though fully set forth herein.

125.     The Agreement is a valid and enforceable agreement between Plaintiff and Defendant.

126.     Since the Agreement between the parties was entered into, Plaintiff has performed its contractual obligations thereunder.

127.     However, upon information and belief, Defendant breached the Agreement in July of 2020, if not sooner, when she endorsed the goods and services of third parties on the Main IG Account, in violation of the express terms of the Employment Agreement.

128.     Gutman's actions are in clear violation of the Employment Agreement, which expressly provides that:

> [t]he Trademarks shall in perpetuity be the exclusive property of the Company, the Employee having consented to it being filed by the Company and the Employee thereof **shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce during the Term or any time thereafter without the express written consent of the Company**.

*See* Employment Agreement § 10 (b) [Emphasis Added].  Gutman's use of the Main IG

Account, which incorporates one or more of the HP U.S. Trademarks, is a blatant breach of this

provision.

129.    Upon further information and belief, Defendant breached the Agreement in June

of 2020, if not sooner, when Gutman refused to assist JLM in the advertisement and marketing of

the HP Brands, which was required in Section 2 of the Employment Agreement.

130.    Upon further information and belief, Defendant breached the Agreement in

November of 2019, if not sooner, when Gutman failed to devote her full time and attention to

JLM, in violation of Section 3 of the Employment Agreement, as she took possession of the

Main IG Account and subsequently used the Main IG Account which were not for the

company's benefit.

131.    Upon information and belief, Gutman's change of the access credentials for the

Main IG Account, as well as other JLM HP Social Media Accounts, Gutman's failure to provide

Plaintiff with the access credentials of same and use of said social media accounts for her

personal use, and to promote non-JLM authorized goods and services, is a breach of the implied

duty of good faith and fair dealing as.

132.    Defendant's aforementioned breaches has deprived it of access to the Main IG

Account as well as other JLM HP Social Media Accounts, in which JLM has invested

considerable time and money to develop, as well as to JLM's primary marketing tool to advertise

clothing and apparel sold under the HM Brands.

133.    In addition, upon information and belief, Defendant has failed to post photos,

videos and stories about her wearing HOF jewelry as required under the Collaboration

Agreement.

134.    Defendant's breaches of her agreements with JLM have damaged Plaintiff in an amount to be determined at trial, plus interest.

## COUNT IX

## BREACH OF FIDUCIARY DUTY

135.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 134 above as though fully set forth herein.

136.    At all times herein mentioned, Plaintiff relied on Defendant to manage and protect the Main IG Account, as well as other JLM HP Social Media Accounts, for JLM's benefit.

137.    As the Main IG Account was linked to Defendant's email account, she had the ability to change the access credentials to the Main IG Account.  Defendant's access to the Main IG Account, however, did not give her ownership rights in the Main IG Account.  This is particularly true as the Main IG Account was initially created on JLM's behalf, was used to promote and market JLM's brands, namely the HP Brands, and JLM expended significant resources, including money and JLM's employees time, to manage and create content for the Main IG Account and JLM HP Social Media Accounts.

138.    JLM's reliance on Defendant to protect JLM's rights in the Main IG Account, and to project the content thereof, created a relationship of trust and confidence i.e., a fiduciary duty that Defendant owed to JLM.

139.    Defendant breached her fiduciary duty to Plaintiff by changing the access credentials to the Main IG Account, thus preventing JLM from accessing the Main IG Account.

140.    Defendant further breached her fiduciary duty to Plaintiff by refusing to provide JLM with access with the Main IG Account despite JLM's demand that JLM demanded that Defendant provide it with the access credentials for the Main IG Account.

141.    Defendant also breached her fiduciary duty to Plaintiff by posting content on the Main IG Account that has diminished the value of the Main IG Account to JLM.

142.    Defendant has also breached her fiduciary duty to Plaintiff by prohibiting JLM from using its most valuable social media account, with by far the most followers than any other social media account that it owns, to sell its clothing and apparel sold under the HP Brands.

143.    As set forth herein, Defendant's breach has damaged Plaintiff in an amount to be determined at trial, plus costs, attorneys' fees and interest.

## COUNT X

## UNJUST ENRICHMENT

144.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 143 above as though fully set forth herein.

145.    Defendant is using JLM's Main IG Account, and the Designer's Name known as misshayleypaige, the goodwill associated therewith, for her own commercial gain without JLM "s authorization and without making any payments to JLM.

146.    Upon information and belief, Defendant's above-described benefit has been at the expense of JLM and equity and good conscience require restitution.

147.    JLM is entitled to the reasonable value Defendant's use of the Main IG Account, and the goodwill in same, which Defendant benefitted from, in an amount to be determined at trial, plus interest.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a)  Defendant and her  agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, though, or under authority

from Defendant, or in concert or participation with Defendant, and each of them, should be permanently enjoined, from:

    i.    using any of the HP U.S. Trademarks and/or the @misshayleypaige trade name, or any other copy, reproduction, or colorable imitation or simulation of Plaintiff's trademarks on or in connection with advertising, promoting, or rendering services or advertising or selling goods;

    ii.    using any trademark, service mark, name, logo, design or source designation of any kind on or in connection with the rendition, advertisement, promotion or sale of goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to, or in any way similar to the trademarks, service marks, names, or logos of Plaintiff, including the HP U.S. Trademarks and the @misshayleypaige tradename;

    iii.    Using any trademark, service mark, name, logo, design or source designation of any kind on or in connection with Defendant's goods or services, or the endorsement by Defendant of the goods or services of others that, that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Plaintiff, or are sponsored or authorized by or in any way connected or related to Plaintiff;

    iv.    Passing off, palming off, or assisting in passing off or palming off, Defendant's goods or services as those of Plaintiff, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint;

    v.    Engaging in any activity constituting unfair competition with Plaintiff, or constituting an infringement of Plaintiff's HP U.S. Trademarks;

vi.    Registering or applying to register as a trademark, service mark, trade name, internet domain name or any other source identifier or symbol of origin, that is at all similar to any of the HP U.S. Trademarks, or any other mark or name that infringes on or is likely to be confused with Plaintiff's HP U.S. Trademarks or trade name, including but not limited to misshayleypaige;

vii.    Adding posts to, deleting posts from, the HP Social Media Accounts without the express written authorization from JLM or from changing the name of the HP Social Media Accounts;

viii.    Registering, applying to register, owning, possessing, or operating any presence or property in any tangible or intangible format, that incorporate any of the HP U.S. Trademarks or the @misshayleypaige tradename and/or is at all similar to any of the HP U.S. Trademarks or the @misshayleypaige tradename, or any other mark or name that infringes on or is likely to be confused with Plaintiff's HP U.S. Trademarks or trade names;

ix.    Registering, applying to register, owning, possessing, or operating any presence or property in any digital format, including but not limited to social media handles and pages, that incorporate any of the Designer's Names, including the HP U.S. Trademarks or the @misshayleypaige tradename and/or is at all similar to any of the HP U.S. Trademarks or @misshayleypaige tradename, or any other mark or name that infringes on or is likely to be confused with Plaintiff's HP U.S. Trademarks or @misshayleypaige trade name; or

34

b)  Defendant should be ordered to deliver the access credentials to the Main IG Account, the Pinterest Account, the TikTok Account and all HP Social Media Accounts; or, in the alternative,

c)  Defendant should be ordered to maintain JLM HP Social Media Accounts as required by JLM;

d)  That Defendant pay Plaintiff for the damages suffered by Plaintiff, in an amount to be determined at trial, including attorneys' fees, costs and interest, where applicable;

e)  That Defendant account to and pay Plaintiff for all of Defendant's profits, gains and sums arising from the acts of infringement, unfair competition, unjust enrichment as alleged herein, including that Plaintiff should be awarded all damages caused by the acts forming the basis of this Complaint;

f)  Based on Defendant's knowing and intentional use Plaintiff's HP U.S. Trademarks, that Plaintiff be awarded treble damages, the amount of Defendant's profits, costs and Plaintiff's reasonable attorneys' fees;

g)  That Plaintiff be awarded Defendant's profits, actual damages, enhanced profits, punitive damages and Plaintiff's costs, and reasonable attorneys' fees

h)  Based on Defendant's willful and deliberate infringement of the HP U.S. Trademarks and the Main IG Account, and to deter such conduct in the future, Plaintiff should be awarded punitive damages; and

i)  Plaintiff has such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims for relief and issues triable by jury.

Dated: New York, New York
         December 15, 2020

Respectfully submitted,

ADELMAN MATZ P.C.

_____
Sarah M. Matz, Esq.
Gary Adelman, Esq.
*Attorneys for Plaintiff*
1173A Second Ave, Suite 153
New York, New York 10065
Telephone: (646) 650-2207
E-mail: sarah@adelmanmatz.com
E-mail: g@adelmanmatz.com