**20 CV 10575**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE SWAIN**

X------------------------------------------------------------------X

JLM COUTURE, INC,

Case No.: _____

Plaintiff,

v.

HAŸLEY PAIGE GUTMAN,

Defendant.

X------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JLM COUTURE, INC.'S MOTION BY ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

ADELMAN MATZ P.C.
1173A Second Avenue, Suite 153
New York, New York 10065
Phone: (646) 650-2207
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

    A.        JLM's Business ................................................................................ 2

    B.        Gutman's Employment Agreement with JLM ............................... 2

    C.        JLM's Registration of Trademarks ................................................ 4

    D.        JLM's Ownership of the JLM HP Social Media Accounts and Creation of
Goodwill in Said Accounts and its Trademarks ........................................ 5

    E.        Gutman's Improper Conversion, During the Term of the Agreement, of
the Main IG Account for Her Own Use, Over JLM's Objections and at JLM's
Expense ..................................................................................................... 9

STANDARD OF REVIEW ........................................................................................ 12

ARGUMENT .............................................................................................................. 13

    I.        JLM IS LIKELY TO SUCCEED ON THE MERITS ......................... 13

    A.        JLM Established the Likelihood of  Success on Conversion and
Trespass ..................................................................................................... 13

    B.        Plaintiff Will Succeed on its Dilution Claims Under Federal and State Law ....... 14

    C.        Plaintiff Will Likely Establish its Unfair Competition Claims ............................ 17

    D.        JLM Is Also Likely to Succeed on Its Claim for Breach of Contract .................. 19

    E.        JLM Will Likely Succeed on its Breach of Fiduciary Duty Claim ...................... 20

II.       ABSENT AN INJUNCTION JLM WILL SUFFER IRREPARABLE
HARM AND THE BALANCE OF THE EQUITIES ALSO FAVORS JLM........................ 21

III.      THE ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC INTEREST ....... 25

CONCLUSION............................................................................................................................ 25

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*American Broadcasting Companies, Inc. v. Cuomo*,
  570 F.2d 1080 (2d Cir. 1977)............................................................................................ 12

*Ardis Health, LLC v Nankivell*,
  2011 WL 4965172 (S.D.N.Y. Oct. 19, 2011) ................................................................ 13, 22

*Astroworks, Inc. v, Astroexhibit, Inc.*,
  257 F.Supp.2d 609 (S.D.N.Y.2003)................................................................................... 13

*Beach v. Touradji Capital Mgmt., LP*,
  144 A.D.3d 557, 42 N.Y.S.3d 96 (2016) ........................................................................... 20

*Coty Inc. v Excell Brands, LLC*,
  277 F Supp.3d 425 (S.D.N.Y. 2017)..................................................................... 16, 17, 23

*CSI Inv. Partners II, L.P. v Cendant Corp.*,
  507 F Supp 2d 384 (S.D.N.Y. 2007)................................................................................. 19

*Deere & Co. v MTD Products, Inc.*,
  41 F.3d 39 (2d Cir 1994)............................................................................................. 15, 16

*Fed. Exp. Corp. v Fed. Espresso, Inc.*,
  201 F3d 168 (2d Cir 2000)........................................................................................... 14, 15

*Franklin Resources, Inc. v Franklin Credit Mgt. Corp.*,
  988 F Supp 322 (S.D.N.Y. 1997)...................................................................................... 18

*Genesee Brewing Co. v. Stroh Brewing Co.*,
  124 F.3d 137 (2d Cir.1997)......................................................................................... 18, 22

*HarperCollins Publishers L.L.C. v Gawker Media LLC*,
  721 F. Supp. 2d 303 (S.D.N.Y. 2010)........................................................... 12, 13, 21

*Iancu v Brunetti*,
  139 S Ct 2294 (2019).......................................................................................................... 16

*In re Feit & Drexler, Inc.*,
  760 F.2d 406 (2d Cir.1985).............................................................................................. 13

*In re Jetblue Airways Corp. Privacy Litig.*,
  379 F. Supp. 2d 299 (E.D.N.Y. 2005) ................................................................ 13

*Ins. Co. v Cohen*,
  173 F.3d 63 (2d Cir 1999) .................................................................................. 24

*Jordache Enterprises, Inc. v Levi Strauss & Co.*,
  841 F Supp 506 (S.D.N.Y. 1993) ...................................................................... 16

*Manchanda v. Google*,
  No. 16-CV-3350 (JPO)) 2016 WL 6806250 (S.D.N.Y., Nov. 16, 2016) ........................ 13, 14

*Moseley v Secret Catalogue, Inc*.,
  537 US 418, (2003) ............................................................................................ 15

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F.Supp.2d 305 (S.D.N.Y.2010)............................................................... 22, 23

*Natl. El. Cab & Door Corp. v H&B, Inc.*,
  282 Fed Appx 885 (2d Cir. 2008) ...................................................................... 24

*New York Stock Exch., Inc. v New York, New York Hotel LLC*,
  293 F3d 550 (2d Cir 2002) ................................................................................. 16

*Pan American World Airways, Inc. v. Flight 001, Inc.*,
  2007 WL 2040588 (S.D.N.Y. 2007)................................................................... 18

*Polaroid Corp. v Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) ............................................................................... 18

*Register.com v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)............................................................................... 13

*Ritani, LLC v Aghjayan*,
  880 F Supp 2d 425 (S.D.N.Y. 2012).................................................................. 20

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010).................................................................... 12, 21, 22

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009)................................................................................. 18

*The Sports Auth., Inc. v. Prime Hosp. Corp.*,
  89 F.3d 955, 960 (2d Cir. 1996)........................................................... 16, 18, 19

*Thyroff v Nationwide Mut. Ins. Co.,*
    460 F.3d 400 (2d Cir 2006)....................................................................................... 13, 14

*Tiffany (NJ) Inc. v eBay Inc.,*
    600 F3d 93 (2d Cir 2010)............................................................................................... 15

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir.1995)............................................................................................... 22

*Trustees of Columbia Univ. v Columbia/HCA Healthcare Corp.,*
    964 F Supp 733 (S.D.N.Y. 1997)............................................................................. 18, 19

*Veritas Capital Mgt., L.L.C. v. Campbell,*
    82 A.D.3d 529, 918 N.Y.S.2d 448 (1st Dept.2011)...................................................... 21

*Vibrant Sales, Inc. v New Body Boutique, Inc.,*
    652 F.2d 299 (2d Cir. 1981).......................................................................................... 17

*Warner Bros. Inc. v. Dae Rim Trading, Inc.,*
    877 F .2d 1120 (2d. Cir. 1989)...................................................................................... 12

*Yukos Capital S.A.R.L. v Feldman,*
    977 F3d 216 (2d Cir 2020)............................................................................................ 20

**Statutes**

15 U.S.C. §1125(c)(1)....................................................................................................... 15

**Rules**

Fed. R. Civ. P. Rule 65 ..................................................................................................... 12

**Regulations**

16 C.F.R. Part 255............................................................................................................ 24

## **PRELIMINARY STATEMENT**

Plaintiff JLM Couture, Inc. ("JLM" or "Plaintiff") brings the instant motion for a temporary restraining order and preliminary injunction against Defendant Hayley Paige Gutman ("Defendant" or "Gutman") to stop Defendant, a high level, full time employee, from further abusing and misappropriating its intellectual property and the goodwill associated therewith.   In addition, Plaintiff seeks an order requiring Defendant to turnover valuable company property, namely JLM's @misshayleypaige Instagram account that has over 1.1 million followers of JLM's Hayley Paige bridal brand (the "Main IG Account") as well as JLM's Pinterest account under the name misshayleypaige.   Gutman was only entrusted with use of these assets as a result of her position of trust and confidence within JLM and her duties under her employment agreement. Rather than discharge those obligations faithfully, to obtain leverage in a re-negotiation of her employment agreement, Gutman hijacked these accounts.   At least for some time after Gutman had locked JLM out of the accounts she was continuing to use them appropriately to promote the HP Brands that belong to JLM, which she is the face of.   However, more recently, when JLM made it clear it was not simply going to give her valuable company assets she has repudiated her obligations and has simply taken the accounts to use for her other commercial ventures without regard to the damage that it will do to tarnish the JLM brand or the confusion that it will cause among consumers.   Gutman's actions are not only a breach of her employment agreement and fiduciary duties to JLM, they are acts of outright conversion and trademark dilution and infringement. JLM which has spent years and millions of dollars developing the HP Brands and the goodwill associated therewith, brings this motion to prevent the immediate and irreparable harm to its reputation and property that it will suffer if Gutman is allowed to continue her unauthorized commercial use of JLM's Hayley Paige portfolio of trademarks and goodwill associated therewith, including through the use of the social media accounts Gutman has

converted.  Over the past two weeks, Ms. Gutman has made it very clear that she no longer has any intention of acting in the best interest of JLM or complying with her contractual obligations, and unless she is immediately enjoined her actions will irreversibly and irreparably damage the reputation of JLM and its most valuable marketing assets, by *inter alia* tarnishing JLM's brand, and goodwill causing its consumers to think JLM is associated with Gutman's other endorsements when it is not, diluting the association that consumers have with JLM's marks with its bridal goods, and destroying the goodwill JLM has worked so hard to build.

## STATEMENT OF FACTS

### A.  JLM's Business

JLM is a leader in the bridal design and manufacturing industry, owning award-winning brands which include Allison Webb, Ti Adora by Allison Webb, LUCIA by Allison Webb, Lazaro, Tara Keely by Lazaro, Hayley Paige, Blush by Hayley Paige, La Petite Hayley Paige, and Hayley Paige Occasions.  *See* Declaration of Joseph Murphy dated December 14, 2020 ("Murphy Decl.") ¶3.  JLM operates 12 fashion collections, nine of which are bridal collections that cover a broad spectrum of aspirational, or mid-luxury, price points.  *See id.*  JLM's retail sales for 2017 through 2020 are approximately $220,000,000.  *See id*.

### B.  Gutman's Employment Agreement with JLM

Pursuant to a written employment agreement dated July 13, 2011 i.e., the Agreement, as amended and extended,[1] Gutman was hired by JLM on a full time, exclusive basis to design bridal dresses, bridesmaid dresses, evening wear and related apparel to be sold and manufactured by JLM.  *See* Murphy Decl. ¶6; Ex. 2 (the "Employment Agreement"), §§ 1-3. JLM hired Gutman

---

[1] The term of the Agreement was extended, pursuant to a written amendment (*see* Murphy Decl. ¶42, Ex. 62 (the "Amendment") and pursuant to JLM's decision to extend the term for at least an additional three years.  *See* Murphy Decl., ¶58, Ex. 66 (the "Option Notice.").  The Agreement, Amendment and Option Notice are sometimes collectively referred to as the "Agreement."

when she was unknown to build a line of bridal wear around her name, which it exclusively acquired the rights to. *See* Murphy Decl. ¶4-6.   Each of Gutman's designs would be sold by JLM under a brand label of JLM's own choosing.   *See id*.   Gutman is also required to perform "additional duties and services commensurate with her position as a designer for [JLM], as may be assigned to her by an officer of [JLM]…", which included, *inter alia,* traveling to trunk shows and assisting with JLM's "advertising programs…"   *Id*.   Gutman agreed to devote her full time and attention to JLM's business during business hours, and, while she is employed, she would "not, without the prior consent of the President or Board of Directors of [JLM], engage in any other business enterprise which requires the personal time or attention of [Gutman] and which would interfere with the performance of her duties hereunder." *See id.* § 3.[2]

Pursuant to Section 11 of the Agreement, Gutman's Designs, which included any other works conceived of or developed by Gunman in connection with her employment, including those created prior to the execution of the Agreement, would be deemed to be "works for hire" and would be the sole and exclusive property of JLM.  *See id.* §11.  In the event they were not deemed a work for hire, Gutman also irrevocably assigned them to JLM.  *See id.* Gutman also granted JLM

> the exclusive world-wide right and license to use her name "Hayley", "Paige", "Hayley Page Gutman", "Hayley Gutman", "Hayley Page" or any derivative thereof (collectively the "Designer's Name") in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including and all good will associated therewith

for the term of the Agreement, and for a period of two years thereafter, unless JLM exercised its right to file for and obtain a federal trademark registration for any such name, as provided in Section 10(b).  *See id*. § 10(a).  Pursuant to Section 10 (b), Gutman

> irrevocably [sold, assigned, and transferred] all right, title and interest to [JLM] that now exists or may exist during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s)

---

[2] Gutman further agreed not to compete directly or indirectly with JLM as well as various other non-solicitation obligations. *See id.* § 9(a).

thereof as trademarks or service marks (the "Trademark" or "Trademarks") with the USPTO and/or other authorities in the United States or abroad.

See *id*. § 10 (b).  As an additional inducement, once they were registered, Gutman covenanted that

> [t]he Trademarks shall in perpetuity be the exclusive property of [JLM]. . . and [Gutman] shall have no right to use [JLM's trademark, Designer's Names, or any confusingly similar marks or names in trade or commerce during the Term of the [Employment] Agreement or any time thereafter without the express written consent of [JLM]

See *id*. § 10(b).  Obtaining these rights was critical for JLM's plan to create a long-lasting brand under the Hayley Paige name.  *See* Murphy Decl. ¶ 8. Gutman also agreed that in the event she violated any provision of the Agreement, she acknowledged that JLM would "not have an adequate remedy at law and in the event of any breach by [Gutman] . . . [JLM] will suffer irreparable damage and injury" and she "consent[ed] to the granting of a temporary or permanent injunction against her . . .  prohibiting her from violating any provision of this Agreement".  *Id.* § 9(e).

### C.  JLM's Registration of Trademarks

JLM immediately began taking the necessary steps to protect its trademark rights in the Designer's Names that it obtained from Gutman.  *See id.* ¶ 14.   JLM has successfully filed for 10 trademark registrations containing the Designer's Name with the USPTO (collectively "HP U.S. Trademarks").  *See id.* ¶15, Exs. 4-13.[3]  In addition JLM owns approximately 27 foreign trademark registrations and two applications for the Designer's Names.  *See id.* ¶ 16.  "Hayley Paige" (the "Hayley Paige Brand") is the main brand under which JLM sells Gutman's most expensive designs.  *See id.* ¶ 12.  JLM also created sub brands, including "Blush by Hayley Paige", "La Petite

---

[3] These trademarks include, HAYLEY PAIGE (classes 14 and 25), HAYLEY PAIGE AND DESIGN (classes 14 and 25), HAYLEY PAIGE OCCASIONS (class 25), OCCASIONS BY HAYLEY PAIGE (class 14), LE PETITE HAYLEY PAIGE (class 25), LE PETITE HAYLEY PAIGE and Design (class 25), BLUSH BY HAYLEY PAIGE (class 25) and JUST GOT PAIGED (class 41).  *See id.*  ¶15, Exs. 4-13.   Gutman also executed trademark registration acknowledgements, which acknowledged that she had transferred, sold and assigned all trademark rights in the Designer's Names to JLM.  *See id.* Exs. 3, 14-16.

Hayley Paige", and "Hayley Paige Occasions" (collectively referred to with the Hayley Paige Brand as the "HP Brands.").[4]  *See id.* ¶13.  Further, JLM also owns trademark rights in the mark @misshayleypaige as it is one of the Designer's Names and has been used continuously in commerce since April of 2012.  *See id.*; *see also* Exs. 18-42, 54, 56-50, 74.

### D.  JLM's Ownership of the JLM HP Social Media Accounts and Creation of Goodwill in Said Accounts and its Trademarks

Plaintiff has expended significant time and resources to develop, promote and market its clothing and apparel under the HP Brands portfolio of trademarks.  *See id.* ¶17.  Plaintiff's success is attributable largely to its creative advertising and Internet marketing savvy.  *See id.* ¶18.  Internet marketing requires a dynamic advertising model that is targeted over many platforms including social media such as Instagram, Facebook, Pinterest, Twitter and not TikTok.  *See id.* ¶19.

As part of JLM's overall marketing strategy, JLM had a series of social media accounts created, on multiple platforms, related to each of the HP Brands (the "JLM HP Social Media Accounts"), which includes the Main IG Account and the Pinterest account.  *See id.* ¶20, Ex. 17; Declaration of Sarah Matz, dated December 15, 2020 ("Matz Decl."). Ex. 83.  On or about April 6, 2012, pursuant to the Agreement and within the scope of her employment, Gutman created the Main IG Account for the specific purpose of assisting with JLM's advertising programs and promoting the HP Brand.  *See id.* ¶21[5].  The Main IG Account is business account, not a personal account.  *See* Declaration of Svetlana Gryazeva, dated December 13, 2020, ("Gryazeva Decl.") ¶6.  JLM has always owned the account.  *See* Murphy Decl., ¶21.  Until late April/early May of

---

[4] Blush by Hayley Paige is a more moderately priced collection of wedding dresses, relative to the Hayley Paige Brand, but shares the same styling signatures of the Hayley Paige look.  La Petite Hayley Paige sells non-formal clothing and apparel, such as flower girl dresses.  Hayley Paige Occasions sells bridesmaid dresses and apparel.  *See* Murphy Decl., ¶13, n.1.

[5] When the Main IG Account was created, Instagram was relatively new and had only about 50 million users.  *See id.* ¶33, Ex. 43.  JLM and Gutman agreed that the JLM brands should take advantage of this new and evolving platform.  *See id.* ¶33.  Instagram's growth has been astronomical, and now has more than a billion users.  *See id.* Ex. 44.

2020, JLM's Facebook account was linked to the Main IG Account. *See* Declaration of Brittany Noe, dated December 11, 2020 ("Noe Decl.") Ex. ¶12. Most, if not all of the first posts on the Main IG Account, and all posts until recently, related to JLM's HP Branded designs, the bridal industry and trunk shows and bridal markets.[6] *See id.* ¶¶9-10; Murphy Decl., ¶21. JLM also owns social media accounts for its other designers and the brands that they design. *See* Murphy Decl. ¶22. JLM also owns several domains used to host websites for the HP Brands (the "JLM HP Website"), including www.hayleypaige.com and www.misshayleypaige.com (the "JLM HP Domain Names."). *See id.* ¶ 23.

For years, JLM's use of social media has been an integral part of its marketing strategy and creation of name recognition for each of its brands, including the HP Brands. *See id.* ¶24. JLM embeds links on the JLM HP Website to its JLM HP Social Media Accounts. *See id.* ¶24, Ex. 18 at pp 3, 14. JLM also embeds links on each of its JLM HP Social Media Accounts to JLM's other JLM HP Social Media Accounts and JLM HP Website. *See id.* ¶24, Exs. 19, 56-59 (displaying links to JLM's www.hayleypaige.com website). JLM also employs budgeted social media advertising campaigns, primarily using the Main IG Account, to create interest in and boost sales of its HP Brands. *See* Gryazeva Decl. ¶¶ 5-10. The Main IG Account has also been used to make posts endorsing JLM's other JLM HP Social Media Accounts, including on YouTube and Facebook. *See e.g.*, Murphy Decl. ¶¶ 26-28, Ex. 33.

JLM advertised and promoted the HP Brands and its HP Social Media Accounts in print mediums as well. By way of example business cards[7] and flyers containing the Main IG Account

---

[6] A trunk show is an event in which JLM ships specific gowns to retailers so that brides can view and purchase gowns that are not in stores. Bridal markets are events worldwide where JLM showcases new collections to retailers so that they can purchase stock inventory. *See* Murphy Decl., ¶21

[7] In addition to the creation of business cards with the @misshayleypaige mark, further acknowledging the importance of the Main IG Account to JLM and JLM's ownership of same,

and the JLM HP Website were created and distributed to thousands of retailers and prospective brides at showrooms and trunk shows. *See id*. ¶¶29-30, Exs. 37-39.  Since at least 2015, JLM has also included the Main IG Account as a source indicator on its hang tags[8] for each piece of apparel sold under the HP Brands. *See id.* ¶32, Ex. 42.  JLM also advertises its HP Social Media Accounts, in magazine advertisements for the HP Brands. *See id.* ¶25, Exs. 20-32.

For many years, JLM has expended its own funds to maintain and updated the Main IG Account, including paying its on-staff PR department and Gutman to assist in maintaining and updating the Main IG Account. *See id*. ¶¶39, 42 Exs. 45-51; Noe Decl., ¶¶4-9.  Gutman was aware of this and even asked that JLM hire a social media director to run the JLM HP Social Media Accounts, including the Main IG Account. *See* Murphy Decl. ¶41, Ex. 53.

JLM's advertising strategy, and its marketing expenditures to promote the Hayley Paige Brand, has significantly increased the number of followers on the Main IG Account. *See id*. ¶44. From 2012 through 2020, JLM has spent in excess of $4,068,000 to advertise and market just the Hayley Paige Brand, not including the other HP Brands. *See id.* ¶44, Ex. 55.  As a direct result, the number of followers of the Main IG Account grew to over 1.1 million followers. *See id.* ¶45, Exs. 19, 56-60.   JLM's marketing efforts using the Main IG Account were extremely successful as combined sales for the HP Brands have exceeded $220,000,000 in world-wide retail sales. *See id.* ¶51, Exs. 57, 60.

Given that they are a direct line to millions of consumers, JLM Social media Accounts, in particular the Main IG Account, are essential to JLM's business. *See id*. Ex. 75.  As such, JLM

---

Gutman continues to use the @misshayleypaige Instagram handle in her email signature when she is communicating in her capacity as a JLM's Head Designer. *See id.* ¶46, Exs. 38, 45-53.

[8] Hang tags are used as source identifies for the garments themselves, including being the best evidence of such source identifiers when applying for trademark rights with the USPTO. *See id*. In fact, hang tags were used as specimens for three of the HP U.S. Trademarks to show that the marks were being used in commerce by JLM, two of which contained the Main IG Account name, i.e., @misshayleypaige, prominently displayed. *See id*. Exs. 40-41.

undertook significant effort and expense to protect and ensure its continued maintenance and the control over the creative content of the JLM HP Social Media Accounts. *See id*. ¶35. JLM has made sure that the content its HP Social Media Accounts, contain specific types of imagery, namely beautifully curated images of bridal related content that will be appealing to its consumers, who are mainly young women in the bridal market. *See id.* ¶38. JLM's Social Media Accounts, in particular the Main IG Account, are also important to JLM's ability to quickly adapt new marketing campaigns and respond to the quickly changing demands of customers, new fashions and events. *See id*. ¶34. In the current climate, the ability to quickly and seamlessly modify advertising content can mean the difference between success and failure of its HP Brands. *See id*.

As part of JLM's strategy to market the HP Brands and to build name recognition, JLM also worked to create additional exposure in other mediums, including on television. *See id*. ¶50. Through the efforts of JLM, Gutman became a featured designer on TLC's television program, *Say Yes to the Dress,* from November 17, 2015 to the present as well as a featured designer on a spin-off called "Say Yes to America." *See id.* ¶¶50-51, Ex. 63. The HP Brands' additional exposure in JLM's marketing campaigns that featured the Main IG Account, and on television, generated more followers for the Main IG Account, which also increased the value of the HP Brands and sales. *See id*. ¶51. The HP Brands' success has also resulted in collaboration with other companies, such as Hearts of Fire, a jewelry company that licensed the right to use the Designer's Names from JLM in connection with its jewelry. *See id*. ¶53 Ex. 64.[9] In connection therewith, Gutman executed a letter of inducement acknowledging her obligation to promote the jewelry line under the Designer's Name. *See id.* ¶54. In furtherance thereof, the Main IG Account, for at least a while, contained a link to the jewelry company's website. *See id.* ¶55, Exs. 59, 65.

---

[9] JLM has also filed for trademark protection for HAYLEY PAIGE and HAYLEY PAIGE and Design in Class 14 for jewelry. *See id*. ¶54 Exs 6-7.

From at least the date the Main IG Account was created until recently, Gutman actively worked and cooperated with JLM's other employees to improve and add posts to, the Main IG Account to further JLM's advertising and marketing strategies or as she put it "stimulate sales" of JLM HP Brand goods, within the scope of her duties. *See id*. ¶36; Ex. 54; Ex. 2 § 2. Also, until recently Gutman was aligned with JLM with respect to the appropriate use of the JLM HP Social Media Accounts. *See id*. ¶¶59, 64. In accordance with her responsibilities, Gutman posted content on said accounts related to her designs, bridal content, bridal markets and trunk shows and responded to direct messages from followers on the Main IG Account, to create buzz and brand loyalty for the HP Brands. *See id*. ¶37. Gutman was not permitted to post content related to a competitor's products or non-bridal related matters unless the posts were approved by JLM. *See id*. ¶38. Gutman was also aware that that any marketing decision that would affect JLM's image, such as giveaways, required the authorization of JLM. *See id*. ¶40 Ex. 51 at p 1, Ex. 52.

**E. Gutman's Improper Conversion, During the Term of the Agreement, of the Main IG Account for Her Own Use, Over JLM's Objections and at JLM's Expense**

Through most of 2019, Gutman continued to comply with her obligations as an employee and help with JLM's marketing strategy, by assisting JLM in the advertisement and marketing of HP Brands on the HP Social Media Accounts, including the Main IG Account. *See id*. ¶54. Exs. 38, 45-53. In June of 2019, Gutman even requested that JLM ramp up its control over the Main IG Account by hiring a social media director to handle the account. *See id*. Ex. 53. In November of 2019, however, Gutman began to take steps to assert control over some of JLM's HP Social Media Accounts namely the Main IG Account and the Pinterest Account. *See id*. ¶¶60-61.

Issues with Gutman began on November 2, 2019, when Gutman created a TikTok account under the JLM owned name "misshayleypaige" name and posted videos that did not represent the HP Brands. *See id*. ¶61. In response to JLM's objections over the use of the TikTok account, in mid to late November of 2019, Gutman changed the password on the Main IG Account, locking

9

JLM out of the account.  *See id*. ¶¶61-62.  Until recently however, Gutman continued to use the Main IG Account to, for the most part, promote the HP Brands as she was required to do and as JLM directed.  *See id*. ¶ 64; Exs. 52, 59; Gryazeva Decl. ¶1 4; Exs. 66-67; Noe Decl. ¶12.

In late 2019, Gutman began sprinkling in personal photographs in posts on the Main IG Account.  *See* Noe Decl. ¶10.  Gutman also later removed the links to JLM's HP Brand websites in the bio section and later changed the account so it said it was the 'Personal & Creative account' of Gutman, which is untrue and misleading.  *See* Murphy Decl.  ¶62; Noe Decl. ¶12.  Sometime between April 29, 2020 and May 4, 2020, Gutman also detached the Main IG Account from JLM's Hayley Page Brand Facebook account, at www.facebook.com/HayleyPaigeBridal/misshayleypaige, without JLM's permission or authorization.  *See id.*  At that time Gutman and JLM were in the process of negotiating some revisions to the Agreement, and Gutman also began taking the position as part of those negotiations that she should own the Main IG Account.  *See* Murphy Decl. ¶65, Ex. 67.

By July of 2020, Gutman had also made posts on the Main IG Account that contained personal images that were not appropriate for HP Brands, as well as posts promoting the goods of third parties, such as olive oil products, beer, nutritional supplements.  *See id*., ¶65, Exs 68-71; Noe Decl. ¶ 12.  However, as Gutman was still mostly posting JLM content, and the parties were negotiating, JLM was hopeful that these issues could be resolved.  *See* Murphy Decl. ¶¶68-69.

JLM was further hopeful because after voicing its objection to this behavior, for a short time around October 25, 2020, at JLM's request Gutman restored the links to JLM's website and the jewelry company JLM is collaborating with on the Main IG Account.  *See id.* ¶ 69; Ex. 60.

Unfortunately, that did not last long.  On November 3, 2020, after a conversation with Gutman, where Mr. Murphy made clear that JLM would not assign ownership of the Main IG Account to her, Ms. Gutman became extremely upset, and that night, removed the links to the JLM

website and took down hundreds of posts of JLM bridal content from the Main IG Account.  *See id.* ¶69.  Gutman has since deleted hundreds of JLM's posts from the Main IG Account.  *See id.* ¶70, Ex. 74.  Then, on November 25, 2020, in response to JLM's request to post JLM content on the Main IG Account, Gutman refused and insisted that the account belongs to her.  *See id.* ¶71.

Since that time Ms. Gutman has hijacked the Main IG Account and is now almost exclusively using it to post off brand personal content and content promoting goods and services of third parties.  *See id.* ¶¶62, 65, Exs. 68-72, 78-80.  Previously, the focus of the Main IG Account had always been on the HP Brands and related bridal content.  *See e.g., id.* Exs 59, 74.  Now, Gutman is openly abusing JLM's property including the Main IG Account, its trademarks, and the goodwill associated therewith, including over 1.1 million followers of JLM's Hayley Paige Brand, to promote her off-brand relationships for her own personal gain.  *See* Murphy Decl. ¶¶65-66; Matz Decl., Ex. 84, 85, 87. The difference between the historical content of the Main IG Account, which was almost exclusively bridal, to November 17, 2020, which had some bridal related posts, to December 10, 2020, which has almost no new bridal related posts is clear.  *Compare* Murphy Decl. Ex. 60 with Ex. 72.  Gutman's most recent posts on December 13, 2020, show that she is no longer interested in assisting JLM in advertising the HP Brands as she is contractually obligated to do, and is instead using the Main IG Account to promote her paid endorsements, as well as the endorsements of her fiancé, Conrad Cleven.  *See id.* ¶ 65, Exs. 68-73, 78-80

Gutman's actions are causing, and unless immediately enjoined, will continue to cause immediate and irreparable damage to JLM by (a) depriving JLM key marketing tools that it has used for years to advertise its HP Brands, which JLM spent considerable time and money to create and which JLM needs to be able to market quickly and effectively; (b) negatively affecting how Instagram's algorithm will see the Main IG Account, namely that if Instagram ceases viewing the Main IG Account as being related to bridal it will stop feeding it to users who are interested in that

content; (c) tarnishing JLM's trademarks, including the HP U.S. Trademarks and JLM's trademark rights in @misshayleypage; and (d) creating confusion amongst consumers of the HP Brands, including amongst the followers of the Main IG Account, who either believe that Gutman is the source of the HP Brand goods not JLM, or that JLM is endorsing or associated with the goods and services being endorsed on the Main IG Account.  *See* Murphy Decl. ¶¶ 65-81, Exs 67-74, 78-80; Gryazeva Decl. ¶¶ 11-13; Matz Decl., Exs. 84, 85, 87.

## STANDARD OF REVIEW

In the Second Circuit, a court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) if the plaintiff demonstrates: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs favor"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "the balance of hardships tips in the plaintiffs favor;" and (4) the "public interest would not be disserved" by the issuance of a preliminary injunction.  *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citation and quotations omitted).   A temporary restraining order is a short-term protective device authorized under Fed. R. Civ. P. Rule 65.  Its purpose is to protect a party from irreparable harm until more lasting relief, such as a preliminary injunction, can be sought. *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (*citing e.g. American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)); *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F .2d 1120, 1125 (2d. Cir. 1989) ("[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.") (internal citation omitted). "Plaintiffs seeking a temporary restraining order [should] show (1) either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation, with

a balance of hardships tipping decidedly in the [applicant's] favor;' and (2) the likelihood of irreparable harm in the absence of such an order." *HarperCollins Publishers L.L.C.*, 721 F Supp 2d at 305 (*quoting* I*n re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir.1985)).

## ARGUMENT

## I.    JLM IS LIKELY TO SUCCEED ON THE MERITS

### A.    JLM Established the Likelihood of Success on Conversion and Trespass

It is well settled that "'[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Thyroff v Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir 2006), *certified question accepted*, 7 N.Y.3d 837 (2006), and *certified question answered,* 8 N.Y.3d 283 (2007) (citation omitted).  In addition to tangible property, intangible property, including intellectual property, social media accounts, their contents, and other business information, are forms of property that can be converted.  *See Ardis Health, LLC v Nankivell*, 2011 WL 4965172, at *3 (S.D.N.Y. Oct. 19, 2011) (holding, inter alia, that plaintiff satisfied the likelihood of success on its conversion claim where defendant retained over control over plaintiff's social media and ordering defendant to provide plaintiff with the access information for the account);  *Astroworks, Inc. v, Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y.2003) (holding that ideas set forth on website constitute "tangible expression or implementation of an idea," which can be converted as a matter of law).

"Under New York law, 'trespass to a chattel may be committed by intentionally ... using or intermeddling with a chattel in the possession of another, where the chattel is impaired as to its condition, quality, or value.'" *See Manchanda v. Google*, No. 16-CV-3350 (JPO)) 2016 WL 6806250, at *5 (S.D.N.Y., Nov. 16, 2016) (plaintiff did not establish his claim as he did not allege that defendant had possession of plaintiff's property or that defendant had impaired any property belonging to plaintiff) (*citing In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327

(E.D.N.Y. 2005); *Register.com v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)).

There can be no dispute that the JLM HP Social Media Accounts are the property of JLM, i.e., the first required element of both claims. *See Thyroff*, 460 F3.d at 403-04; *Manchanda,* 2016 WL 6806250, at *5. Defendant cannot escape the enforceability of the Agreement, which *inter alia* (i) assigned to JLM the exclusive right to use the Designer's Names, which includes @misshayleypaige, to sell, market and distribute goods sold under the HP Brands, and to acquire trademarks therein, which JLM did; (ii) made works conceived or developed by Gutman were works for hire and/or property that was assigned to JLM; (iii) required Gutman to assist JLM in the advertising and marketing of said goods; and (iv) prohibited Gutman from any commercial use of the Designer's Names. *See* SOF §§ B-C. The Main IG Account was created in April of 2012 as a business account, and the Pinterest account was created in 2014, both as a part of Gutman's work to promote and advertise the HP Brands, which until recently as is they were used. *See* SOF §§ D-F. As such, there is no question that the HP Social Media Accounts are JLM's property.

JLM has also established that Gutman has exercised control over JLM's Main IG Account and Pinterest at the exclusion JLM's rights, which satisfies the remaining elements of JLM's conversion claim. *See Thyroff*, 460 F3.d at 403-04. Additionally, JLM has sought the return of hits property from Gutman, but Gutman has refused. *See* SOF § E. JLM has also established the remaining elements to its trespass to chattels claim as Gutman has been "intentionally ... using or intermeddling with a chattel in the possession of another, where the chattel is impaired as to its condition, quality, or value.'" *See Manchanda*, 2016 WL 6806250, at *5. Gutman's new non-brand posts, and the deletion of JLM's older bridal related posts, on the Main IG Account have changed the appearance of the account, which has harmed JLM's business, and is damaging the goodwill that JLM created in the account. *See* SOF § E; *see also* Murphy Decl. ¶¶ 65-67, 72.

**B.      Plaintiff Will Succeed on its Dilution Claims Under Federal and State Law**

Both federal and state laws protect against "dilution". *See Fed. Exp. Corp. v Fed. Espresso, Inc.*, 201 F3d 168, 175 (2d Cir 2000). The Federal Trademark Action provides in relevant part that "[t]he owner of a famous mark shall be entitled …to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. §1125(c)(1). Dilution is the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." *Moseley v Secret Catalogue, Inc*., 537 US 418, 433, (2003). Dilution under state law is similar, except that it does not require a mark to be famous for dilution to apply. *See Tiffany (NJ) Inc. v eBay Inc*., 600 F.3d 93, 111 (2d Cir 2010); *see also* Gen. Bus. Law § 360-l. To prevail on a New York State dilution claim, a plaintiff must prove that its trademark is distinctive or has acquired secondary meaning and that there is a likelihood of dilution.[10] *See Deere & Co*., 41 F.3d at 42 (defendant's commercial mocking plaintiff's symbol of a deer was likely to result in dilution of the mark). However, a plaintiff need not prove likelihood of confusion. *See Fed. Exp. Corp*., 201 F.3d at 175.

Dilution by "[t]arnishment[11] generally arises when the plaintiff's trademark is linked to products of shoddy quality or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *See Deere & Co.,* 41 F.3d at 43. (Citations omitted). "In such situations, the trademark's reputation and commercial value might be diminished because the public will associate the lack of quality or lack of prestige in the

---

[10] Although predatory intent is a factor used by courts it is not a necessary element of the claim. *See Deere & Co. v MTD Products, Inc.,* 41 F.3d 39, 42 (2d Cir 1994).

[11] JLM will also likely succeed on the claim of dilution by blurring claim. ""[B]lurring" may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co.*, 41 F.3d at 43 (citations omitted).

defendant's goods with the plaintiff's unrelated goods, or because the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services." *See id.* However, tarnishment "is not limited to seamy conduct." *New York Stock Exch., Inc. v New York, New York Hotel LLC*, 293 F3d 550, 558 (2d Cir 2002). "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Coty Inc. v Excell Brands, LLC*, 277 F Supp.3d 425, 460-61 (S.D.N.Y. 2017) (finding tarnishment of marks for high end fragrances where defendant's goods were inferior oils with cheap packaging).

Plaintiff is indisputably the owner of at least ten registrations for the name Hayley Paige, or derivatives thereof,[12] as well as rights in and to the name "@misshayleypaige" which it has used in commerce since the foundation of the Main IG Account as well as in connection with the sale of its goods. *See* SOF §§ C-D. The marks are distinctive as they are arbitrary and fanciful, as they do not describe any particular quality or characteristic of JLM's goods. *See Jordache Enterprises, Inc. v Levi Strauss & Co.*, 841 F Supp 506, 522 (S.D.N.Y. 1993). Additionally, the marks have acquired secondary meaning based on the sales of JLM's goods.[13] *See id.* Plaintiff has continuously used these trademarks to market its goods sold under HP Brands since at least October 15, 2011. *See* Murphy Decl. Ex 4; *See* also SOF §§ C-D. Through JLM's extensive and exclusive use of the HP U.S. Trademarks, including its @misshayleypaige mark, these trademarks have become distinctively connected with JLM's Hayley Paige branded goods. *See* SOF §§ C-D.

---

[12] JLM's trademark registrations constitute "prima facie evidence" of the validity of the trademarks. *See Iancu v Brunetti*, 139 S Ct 2294, 2297-98 (2019).

[13] Since 2017, JLM's retail sales of the Hayley Paige Brand alone is approximately $220,000,000. See Murphy Decl. ¶ 52. These goods are sold with hang tags that include @misshayleypaige. *See id.,* ¶ 32, Ex. 42. Further, secondary meaning, even of a descriptive mark, is deemed acquired if the mark is incontestable by registration for more than five years). *The Sports Auth., Inc.,* 89 F3d at 961. JLM's HAYLEY PAIGE (Reg. No. 4,161,091), was registered on June 19, 2012, more than five years ago. *See id.,* Ex. 4.

JLM has also established a likelihood of dilution by tarnishment based on Gutman's association of @misshayleypaige with unrelated goods such as oils, salad dressings and supplements is diminishing the value of the mark by associating the high-end wedding dresses sold under the Hayley Paige Brand with inferior and/or off brand products and services. *See id.;* Murphy Decl. ¶65, Exs. 68-71; *Coty Inc.,* 277 F.Supp 3d at 460-61. These products are not in line with the high-end line of goods, including Hayley Paige Brand collection of Gutman's most expensive designs, that are sold by JLM. *See* Murphy Decl. ¶¶12-13; *Compare* JLM's goods at Ex. 74, *with* the goods endorsed by Defendant at Exs. 68-73; 78-80. Now, JLM's customers who follow the Main IG Account expecting to see bridal related content are instead seeing the promotion of non-bridal food products and supplements, all of which are also non-luxury goods. *See id.* ¶72; Matz Decl., Exs. 84, 85, 87. Gutman's changes to the Main IG Account has made the account off-brand, making it less likely that Instagram's algorithm will see it as bridal related and feed it to followers as such. *See* Murphy Decl. ¶77. This content does not drive sales of JLM's goods and is actually turning off consumers who would otherwise purchase JLM's goods. *See id.* ¶72. JLM's tarnishment is real and imminent as Gutman is making drastic changes to the Main IG Account every day. Unless she is immediately enjoined, the harm Gutman is causing to JLM's marks and associated goodwill and property, including the Main IG Account, will be irreversible. *See id.* ¶¶ 67,77-81, 83.

### C.   Plaintiff Will Likely Establish its Unfair Competition Claims

Gutman is also using JLM's federally registered trademarks, and its trade name @misshayleypaige, in a manner that is creating confusion amongst consumers of JLM products who believe that either JLM is the source of or endorses the third-parties' goods now being peddled on the Main IG Account, or that the source of the HP Brands is now Gutman.

Section 43(a) of the Lanham Act creates a federal cause of action for the infringement of

registered and unregistered trademarks.  *See, e.g.*, *Vibrant Sales, Inc. v New Body Boutique, Inc.*, 652 F.2d 299, 303 (2d Cir. 1981), *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997).  To prevail on a Section 43(a) claim of trademark infringement under the Lanham Act, "the plaintiff must show, first, that its mark merits protection, and second, that the defendant's use of a similar mark is likely to cause consumer confusion as to the origin, sponsorship, or affiliation of the defendant's goods."  *Pan American World Airways, Inc. v. Flight 001, Inc*. 2007 WL 2040588, 7 (S.D.N.Y. 2007); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009).  To prevail, "a plaintiff does not have to show necessarily that consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996).  Courts in this Circuit utilize the Polaroid balancing test to determine likelihood of confusion, namely:

> 1) the strength of the plaintiff's mark, 2) the degree of similarity between the plaintiff's and the defendant's marks, 3) the proximity of the products, 4) the likelihood that the plaintiff will "bridge the gap" between the two products, 5) actual confusion between the two marks, 6) the defendant's good faith in adopting its mark, 7) the quality of the defendant's product(s), and 8) the sophistication of buyers of the plaintiff's and defendant's goods or services.

*See id*. (*quoting Polaroid Corp. v Polarad Elecs. Corp*., 287 F.2d 492, 495 (2d Cir. 1961)).  However, the focus is "whether, looking at the products in their totality, consumers are likely to be confused." *See Starbucks Corp.*, 588 F.3d at 115.  To prevail on a New York State unfair competition claim, a plaintiff must also show bad faith by the defendant.  *See Franklin Resources, Inc. v Franklin Credit Mgt. Corp.*, 988 F Supp 322, 338 (S.D.N.Y. 1997). "Bad faith is shown by demonstrating that the mark was adopted "with the intention of capitalizing on [the] plaintiff's reputation and goodwill. . . " *Trustees of Columbia Univ. v Columbia/HCA Healthcare Corp.*, 964 F Supp 733, 747-48 (S.D.N.Y. 1997) (citation omitted).

   As shown in Section 1(B), *supra*, JLM owns valid trademark rights in the HP U.S. Trademarks and the @misshayleypaige trade names.  Further, each of the Polaroid factors, except

for potentially factors 3 and 4 where the off-brand food products are concerned, clearly weigh in JLM's favor.  JLM's marks are strong (*see* Section I (B), *supra*) and JLM's marks, and Defendant's use of @misshayleypaige is identical to JLM's @misshayleypaige trade name, and is nearly identical to JLM's HP U.S. Trademarks, namely the HAYLEY PAIGE marks.  *See* SOF § C. Plaintiff has shown that there is actual confusion in the marketplace as the Main IG Account bearing the @misshayleypaige trade name has been used by Plaintiff to market and sell Hayley Paige Brand goods since 2012 and consumers follow the Main IG Account expecting to see the HP Goods.  *See* Murphy Decl. ¶¶67, 72, 77. Gutman's use of the Main IG Account to endorse the goods of others "is creating confusion amongst consumers of JLM products who believe that either JLM is the source of or endorses the third-parties' goods now being peddled on the Main IG Account (Matz Decl., Exs. 84, 85, 87), or that the source of the HP Brands is now Gutman."  *See* Murphy Decl., ¶67.  Gutman cannot show good faith in using the @misshayleypaige mark (*see* SOF §§ D-E) and, as, discussed in Section 1 (B), *supra,* her endorsed goods are of inferior quality. Finally, the sophistication of consumers factor weighs in JLM's favor as "general impression of the ordinary purchaser", which includes the follower of the Main IG Account, is that Gutman, the HP Brands' designer, is the identical source as JLM's HP Branded goods also marketed on the Main IG Account.  *See The Sports Auth., Inc*., 89 F3d at 965. Finally, JLM establishes its New York State claim as Gutman's use of JLM's trademarks was in bad faith as she assigned the rights therein to JLM, agreed not to use them, and Gutman is aware that JLM has utilized those rights in commerce.  *See* SOF §§B-E.  *See Trustees of Columbia Univ*, 964 F Supp at 747-48.

### D.     JLM Is Also Likely to Succeed on Its Claim for Breach of Contract

JLM has submitted evidence to establish each element of its contract claim, namely (1) the existence of a contract; (2) defendant's failure to perform thereunder; (3) plaintiff's performance and (4) damages.  *See CSI Inv. Partners II, L.P. v Cendant Corp.*, 507 F Supp 2d 384, 429

(S.D.N.Y. 2007), *subsequently affd,* 328 Fed Appx 56 (2d Cir. 2009).

There is no dispute that there is a valid Agreement and that JLM has performed.  *See* SOF § B; Murphy Decl. ¶11. There also can be no dispute that Gutman has breached the Agreement by taking control of the Main IG Account and the Pinterest account which are JLM property under the Agreement, refusing to post JLM content and using the Main IG Account to promote Gutman's other commercial purposes, in violation of the provisions of the Agreement that (i) obligate Gutman to assist with JLM's advertising campaigns (*see* Murphy Decl. Ex 2 § 2); (ii) devote her full time and attention to the business of JLM (*see id.* § 3); (iii) provided JLM with ownership of Gutman's work as work made for hire and/or by virtue of assignment (*see id.* § 11); (iv) require Gutman to take further action necessary to effectuate JLM's ownership in the property assigned to it including the work for hire, assignment and trademarks (*see id.* §§ 10(b), 11); and (v) prohibit Gutman from any commercial use of the Designer's Names, which includes "misshayleypaige". *See* Agreement § 10(b); SOF §§ C-D. JLM has also established damage.  *See* SOF § E.

### E.       JLM Will Likely Succeed on its Breach of Fiduciary Duty Claim

"'To state a cause of action … for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'"  *Yukos Capital S.A.R.L. v Feldman*, 977 F3d 216, 241 (2d Cir 2020) (citations omitted).  Gutman, a high-level employee who is the face of the HP Brands, owes JLM a broad fiduciary duty to act in JLM's best interest.  *See Ritani, LLC v Aghjayan*, 880 F Supp 2d 425, 454 (S.D.N.Y. 2012) (New York law prohibits an employee "from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.")(citation omitted); *Beach v. Touradji Capital Mgmt., LP*, 144 A.D.3d 557, 562, 42 N.Y.S.3d 96, 101 (2016) (although plaintiffs were at-will employees, they could be found to have breached a fiduciary duty to their employer if they "acted

directly against the employer's interests" (*citing Veritas Capital Mgt., L.L.C. v. Campbell,* 82 A.D.3d 529, 530, 918 N.Y.S.2d 448 (1st Dept.2011), *lv. dismissed* 17 N.Y.3d 778, 929 N.Y.S.2d 80, 952 N.E.2d 1074 (2011)).

JLM relied upon Gutman to ensure that the Main IG Account was used for JLM's business, including after Gutman locked JLM out of the Main IG Account and JLM was no longer able to have its other employees maintain the account. *See* SOF §§ C-D. JLM placed trust and confidence in Defendant and gave her considerable discretion in connection with advertising and marketing, as until recently, Gutman was aligned with JLM's strategies. *See* Murphy Decl. ¶¶ 5, 23, 37, 38,51. These facts establish Gutman's fiduciary duty. JLM has also provided sufficient evidence to establish that it has been and is being JLM damaged as a direct result of Gutman's breaches of her duties to JLM. Specifically, that rather than assist JLM in advertising the HP Brands that JLM spent millions of dollars to build, Gutman is using these assets, including the Main IG Account to promote herself and financially benefit from the endorsement of off-brand products. *See* SOF §§ D-E; Gryazeva Decl. ¶¶ 12-13. As such, JLM will succeed on this claim.

## II. ABSENT AN INJUNCTION JLM WILL SUFFER IRREPARABLE HARM AND THE BALANCE OF THE EQUITIES ALSO FAVORS JLM

As noted by the Second Circuit, these "two items, both of which consider the harm to the parties, are related." *Salinger,* 607 F.3d at 81. On the issue of irreparable harm, Courts must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *HarperCollins Publishers L.L.C.,* 721 F.Supp 2d at 305 (*quoting Salinger*, 607 F3d at 80). The Second Circuit has further noted that "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger*, 607 F.3d at 81. Where the damage is difficult to quantify, such as

damage to the value of a social media account, which the plaintiff relies upon to advertise its business and needs to continuously update, and trademarks and the associated goodwill, constitutes irreparable harm.  *See Ardis Health, LLC,* 2011 WL 4965172, at *2 (order defendant to provide plaintiff on a motion for a temporary restraining order and injunctive relief to deliver to the plaintiff the login credentials to the social media account at issue) (*citing Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 38 (2d Cir.1995) (discussing the principle that irreparable harm lies "where there is a threatened imminent loss that will be very difficult to quantify at trial")).  *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 343 (S.D.N.Y.2010) (finding "[p]rospective loss of ... goodwill alone" to be "sufficient to support a finding of irreparable harm" and noting plaintiff's loss of "the ability to control its reputation").  *Genesee Brewing Co., Inc.,* 124 F.3d at 142 (a showing of likelihood of confusion (a requirement of both trademark infringement and unfair competition claims) establishes irreparable harm).  Irreparable harm will be presumed from a finding of likely dilution.  *See New York City Triathlon*, 704 F Supp 2d at 326 (citations omitted).

JLM has provided evidence establishing that it relies heavily on the HP Social Media Accounts, including the Main IG Account and Pinterest to advertise and sell JLM's clothing and apparel under the HP Brands, that it needs to keep the contents on those accounts current and on brand to be effective, and that its failure to be able to do so is and will continue to significantly harm JLM's ability to market and sell its goods.  *See* SOF § E.  By seizing control over the Main IG Account and Pinterest account, Defendant has significantly impaired JLM's compete in the marketplace by impairing JLM's ability to use those assets to market its goods to its over 1.1 million followers.  *See* Murphy Decl. ¶¶75-78; Gryazeva Decl. ¶¶.11-13.  Further, Defendant's continued off-brand use of the Main IG Account to promote lifestyle images and commercially endorse third party products and services is affecting JLM's ability to market and sell its goods

and is further diminishing the value of the HP Brand and JLM HP Social Media Accounts.  *See id.*
¶¶65-67, Exs. 67-73, 78-80; Gryazeva Decl. ¶¶11-13.  If this use is allowed to continue, the Main
IG Account will become less effective as a marketing tool as it will becomes less associated with
bridal related goods.  *See* Murphy Decl. ¶67; Gryazeva Decl. ¶13.  Additionally, the reputation of
the HP Brands will be tarnished if consumers begin to believe that instead of selling high end
luxury bridal goods, JLM is in the business of endorsing cooking oil and protein supplements.  *See*
*Coty Inc.,* 277 F Supp.3d at 460-61.  Such use will tarnish HP U.S. Trademarks, and the
@misshayleypaige mark, and create confusion as to whether JLM is associated with or endorsing
the non-bridal goods that are being marketed on the Main IG Account.  *See* Section I (C); Murphy
Decl. ¶¶65-67, Exs. 67-73, 78-80; Matz Decl., Exs. 84, 85, 87.

A TRO and preliminary injunction are necessary here where Gutman has ramped up her
personal and non-JLM commercial use of the Main IG Account, which is causing and will continue
to cause irreparable damage.  *See* Murphy Decl. ¶¶65-67, 75, 81.  JLM needs to regain control
over its Main IG Account and Pinterest account immediately as JLM relies on heightened interest
in wedding dresses during the holiday season, the top time for engagements, to market and selling
the HP Brands' goods.  *See id*. ¶¶76, 81.  Gutman's actions are creating confusion in the
marketplace and are eroding the goodwill that JLM created in both the HP Social Media Accounts
and in its trademarks and is destroying the brand association between @misshayleypaige and the
HP Brands.  *See* Murphy Decl. ¶¶65-67.  Each off-brand post by Gutman makes the algorithm
used by Instagram less likely that the Main IG Account will appear on the Instagram feed of a
prospective bride interested in buying a wedding dress.  *See id.* ¶77; Gryazeva Decl. ¶13.

Harm is imminent, as Gutman continues to use JLM's trademarks in commerce for their
own personal commercial gain.  *See* SOF § E.  The difference between the content of the Main IG
Account between just the end of November and today is *striking*.  *See* SOF § E.  JLM did not file

this motion sooner as it believed that it could resolve its issues with Gutman during negotiations over an amended employment agreement and it was not until recently that she completely stopped complying with JLM's directions to post JLM content.  *See* Murphy Decl. ¶¶ 71, 85, Ex. 75. Further, Gutman is about to appear in upcoming episodes of *Say Yes to the Dress* with her fiancé, Conrad Cleven, and based on Cleven's and Gutman's recent use of JLM's trademarks and the Main IG Account to endorse the goods of others, JLM reasonably believes that Gutman will allow Cleven endorse the goods of others and/or act inappropriately, further harming the HP Brands' reputation and associated goodwill.  *See* Murphy Decl. ¶81.  If Gutman is allowed to retain control over the Main IG Account, Pinterest account and use the HP Brands commercially without JLM's authorization, until a preliminary injunction hearing or trial, the brand association that JLM has spent years and considerable amounts of resources building could be significantly damaged or even worthless, leaving Plaintiff without any adequate remedy at law.[14]

Where, as here, the Agreement itself contains (i) a covenant not to use any of the Designer Names or Trademarks which necessarily includes @misshayleypaige, in commerce for any reason; (ii) an acknowledgement that any breach by Gutman could cause irreparable harm; and (iii) a consent by Gutman to the granting of a temporary or permanent injunction prohibiting her from violating any provision of the Agreement, this prong has been satisfied. *See* Murphy Decl. Ex.2 § 9(e), 10(b); s*ee Ticor Tit. Ins. Co. v Cohen*, 173 F.3d 63, 69 (2d Cir 1999) (contract's provision entitling plaintiff to injunctive relief was an admission of irreparable harm by defendant); *see also Natl. El. Cab & Door Corp. v H&B, Inc.,* 282 Fed Appx 885, 887 (2d Cir. 2008).

As JLM is merely seeking to prohibit Gutman from engaging in the foregoing actions that

---

[14] Gutman's recent' promotions also appear to violate FTC advertising regulations i.e. 16 C.F.R. Part 255 for deceptive advertising as she does not indicate in her social media posts that she is being paid for her endorsements.  *See e.g.,* Murph Decl. Exs. 67-71, 78.  Gutman's actions are opening JLM up to allegations and issues in connection therewith, including Instagram striking the Main IG Account.

she has no right to engage in either by law or under the Agreement, the balance of the equities clearly tips in JLM's favor.  On the other hand, Gutman does not need the Main IG Account as she has two personal accounts from which she can post.  *See* Murphy Decl. ¶72   Furthermore, as Gutman is employed by JLM and has agreed to refrain from engaging in other commercial use of the Trademarks, Designers' Name or any confusingly similar marks, including @misshayleypaige, she cannot suffer any hardship by not being allowed to continue to misuse JLM's property.

### III.      THE ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC INTEREST

The public's interest is also served by (i) preventing Defendant from creating confusion in the marketplace regarding the source of JLM's goods and services, or causing consumers to believe that JLM endorses the non-bridal goods being endorsed on the Main IG Account; (ii) preventing Gutman from asserting trademark rights in the HP U.S. Trademarks, and the @misshayleypaige trade name, that Gutman does not own; (iii) preventing Gutman from breaching her Agreement with JLM; and (iv) preventing further misappropriation and conversation of its assets, in particular the Main IG Account and the Pinterest account.

Moreover, given the strong showing of likelihood of success on the merits, as set forth above, the public's interest is served by stopping Defendant and giving Plaintiff access to its Main IG Account and Pinterest Account while the Court makes a decision on the merits of this action. If Plaintiff ultimately prevails, which as set forth above it is likely that it will, then it would not serve the public to allow Defendant to retain access and control over these assets in the meantime, nor would it serve the public to allow Gutman to utilize the HP Trademarks, in commerce, without authorization or permission from JLM.

### **<u>CONCLUSION</u>**

As set forth herein, Plaintiff respectfully requests that the Court grant Plaintiff's motion for a temporary restraining order and preliminary injunction, as requested herein.

Dated: New York, New York               Respectfully submitted,
   December 15, 2020               ADELMAN MATZ P.C.

               By:_____
                 Sarah M. Matz, Esq.
                Gary Adelman, Esq.
               1173A Second Avenue, Suite 153
               New York, New York 10065
               Tel: (646) 650-2207
               Email: sarah@adelmanmatz.com
               Email: g@adelmanmatz.com
               *Attorneys for Plaintiff*