UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JLM COUTURE, INC.,<br><br>                    Plaintiffs,<br>vs.<br><br>HAYLEY PAIGE GUTMAN,<br><br>                    Defendant. | Case No. 20-CV-20575 (LTS) (SLC) |

# DEFENDANT HAYLEY PAIGE GUTMAN'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

HAYNES AND BOONE, LLP
*Attorneys for Defendant Hayley Paige Gutman*

Richard D. Rochford
Joseph Lawlor
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Tel: (212) 659-7300
Fax: (212) 918-8989
richard.rochford@haynesboone.com
joseph.lawlor@haynesboone.com

Tiffany Cooke (*pro hac vice* admission pending*)*
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Tel:  (214) 651-5000
Fax: (214) 651-5940
tiffany.cooke@haynesboone.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

    I.     HAYLEY'S PROFESSIONAL BACKGROUND ................................................. 2

    II.    HAYLEY'S SOCIAL MEDIA ACCOUNTS ....................................................... 3

    III.   HAYLEY'S EMPLOYMENT WITH JLM ............................................................ 7

    IV.   JLM'S 2019 PROPOSED AGREEMENT ......................................................... 7

    V.    JLM'S CLAIMS IN THIS ACTION ................................................................. 8

        A.    The Facts Belie JLM's Ownership Claims ................................................. 8

        B.    Public Perception of Hayley's Accounts ................................................. 11

        C.    JLM's Control Is Damaging Hayley's Accounts Significantly ............... 12

ARGUMENT ...................................................................................................... 12

    I.     JLM IS NOT ENTITLED TO EXTRAORDINARY RELIEF............................ 12

    II.    JLM CAN NOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE
        MERITS. ........................................................................................... 13

        A.    JLM's Contract Claims Fail ................................................................. 13

            1.    The 2011 Agreement and 2014 Amendment Do Not Even
                Mention Social Media or Hayley's Accounts. ............................ 13

            2.    JLM's Breach of Contract Theories Are Meritless and Do Not
                Support the Requested Relief in Any Event. ............................. 14

        B.    JLM's Trademark Claims Are Without Merit .......................................... 18

            1.    Trademark Infringement ............................................................. 18

            2.    Trademark Dilution.................................................................... 20

        C.    JLM's Common Law Tort Claims Are Without Merit............................ 21

    III.   JLM HAS NOT SHOWN ANY IRREPARABLE INJURY BUT HAYLEY
        HAS................................................................................................... 21

IV.     THE BALANCE OF HARDSHIPS ACTUALLY TIPS DECIDEDLY IN
        HAYLEY'S FAVOR .......................................................................................... 22

V.      A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST ........ 23

VI.     JLM SEEKS IMPROPER INJUNCTIVE RELIEF UNRELATED TO ITS
        UNDERLYING CLAIMS ................................................................................... 24

CONCLUSION ............................................................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aceto Agric. Chems. Corp. v. Bayer Aktiengesellschaft*,
   531 F. App'x 103 (2d Cir. 2013) ..........................................................................18

*Ardis Health, LLC v. Nankivell*,
   11-CV-5013, 2011 U.S. Dist. LEXIS 120738 (S.D.N.Y. Oct. 19, 2011) ...............................21

*BBC Grp. NV Ltd. Liab. Co. v. Island Life Rest. Grp. Ltd. Liab. Co.*,
   18-1011, 2020 U.S. Dist. LEXIS 136591 (W.D. Wash. July 31, 2020) .................................20

*Carco Grp., Inc. v. Maconachy*,
   644 F. Supp. 2d 218 (E.D.N.Y. 2009) ..................................................................21

*Cedar Swamp Holdings, Inc. v. Zaman*,
   472 F. Supp. 2d 591 (S.D.N.Y. 2007)....................................................................25

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985).............................................................................18

*Convergen Energy WI, LLC*,
   20-CV-5240, 2020 U.S. Dist. LEXIS 184252 (S.D.N.Y. Oct. 5, 2020) ...................................12

*Deep Foods Inc. v. Deep Foods Inc.*,
   419 F. Supp. 3d 569 (W.D.N.Y. 2019) ..................................................................20

*Diastar, Inc. v. Hallmark Indus., Inc.*,
   89-CV-6587, 1989 U.S. Dist. LEXIS 14441 (S.D.N.Y. Dec. 4, 1989) ...................................23

*E.A. Sween Co. v. A & M Deli Express Inc.*,
   787 F. App'x 780 (2d Cir. 2019) ........................................................................19

*Eagle v. Morgan*,
   11-4303, 2013 U.S. Dist. LEXIS 34220 (E.D. Pa. Mar. 12, 2013) .......................................14

*Easter Unlimited, Inc. v. Rubie's Costume Co., Inc.*,
   00-CV-6241, 2000 U.S. Dist. LEXIS 13337 (S.D.N.Y. Sep. 15, 2000)...................................22

*Eventide Inc. v. Dod Elecs. Corp.*,
   93-CV-2713, 1995 U.S. Dist. LEXIS 5404 (S.D.N.Y. Apr. 18, 1995) ...................................19

*Fonar Corp. v. Deccaid Servs., Inc.*,
   983 F.2d 427 (2d Cir. 1993)............................................................................25

*Fung-Schwartz*,
   804 F. App'x 85, 87 (2d Cir. 2020) ....................................................................25

*George Nelson Found. v. Modernica, Inc.*,
  12 F. Supp. 3d 635 (S.D.N.Y. 2014) ...................................................................................18

*Glob. Brand Holdings, LLC v. Church & Dwight Co.*,
  17-CV-6571, 2017 U.S. Dist. LEXIS 208759 (S.D.N.Y. Dec. 19, 2017) ............................20

*Hancock v. Essential Res., Inc.*,
  792 F. Supp. 924 (S.D.N.Y. 1992) .....................................................................................12

*Hooks v. Howard*,
  07-CV-0724, 2008 U.S. Dist. LEXIS 51568 (N.D.N.Y. July 3, 2008) .................................25

*Int'l Home Care Servs. of N.Y., LLC v. People's United Bank, Nat'l Ass'n*,
  20-CV-3358, 2020 U.S. Dist. LEXIS 176084 (E.D.N.Y. Sept. 24, 2020) ...........................12

*Joshi v. Trs. of Columbia Univ.*,
  17-CV-4112, 2020 U.S. Dist. LEXIS 158635 (S.D.N.Y. Aug. 31, 2020)..............................22

*Latino Officers Ass'n v. City of N.Y.*,
  97-CV-1384, 1997 U.S. Dist. LEXIS 12353 (S.D.N.Y. Aug. 15, 1997)................................24

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  454 F.3d 108 (2d Cir. 2006)................................................................................................20

*Magnet Commc'ns LLC v. Magnet Commc'ns, Inc.*,
  00-CV-5746, 2001 U.S. Dist. LEXIS 14460 (S.D.N.Y. Sept. 19, 2001)..............................18

*Maremont v. Susan Fredman Design Grp., Ltd.*,
  10-CV-7811, 2014 U.S. Dist. LEXIS 26557, at *3 (N.D. Ill. Mar. 3, 2014)..........................14

*Peregrine Myanmar v. Segal*,
  89 F.3d 41 (2d Cir. 1996)....................................................................................................25

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*,
  LLC, 587 F. Supp. 2d 548 (S.D.N.Y. 2008) ........................................................................23

*Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*,
  937 F. Supp. 204 (S.D.N.Y. 1996) ......................................................................................20

*Rosenfeld v. Saunders*,
  728 F. Supp. 236 (S.D.N.Y. 1990) ......................................................................................14

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)..................................................................................................24

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*,
  103 F. Supp. 2d 711 (S.D.N.Y. 2000)..................................................................................17

iv

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995)..................................................................................13

*Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*,
    03-CV-2420, 2006 U.S. Dist. LEXIS 25291 (S.D.N.Y. May 1, 2006) ..................................19

*U.S. Polo Ass'n v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011)..................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................12

## Rules and Statutes

15 U.S.C. § 1116........................................................................................19

18 U.S.C. § 2701........................................................................................23

Fed. R. Civ. P. Rule 65(c)..............................................................................24

Fed. R. Civ. P. Rule 65(d)..............................................................................25

Defendant Hayley Paige Gutman ("Hayley") respectfully submits this memorandum of law and accompanying papers in opposition to the request by plaintiff JLM Couture, Inc. ("JLM") for a preliminary injunction (the "Motion").

## PRELIMINARY STATEMENT

JLM asks this Court for truly extraordinary relief: the transfer of ownership of Hayley's highly valuable personal Instagram, TikTok, and Pinterest accounts (collectively "Hayley's Accounts"). Hayley began using misshaleypaige on social media in 2004, and she created her Instagram Account in 2012. Over the last eight years, Hayley has built a community of over a million followers by sharing her love, her loss, her personality, and her life with her followers. Everyone, including JLM's employees, understands that Hayley's Accounts and the community she built belongs to Hayley. Until it was temporarily transferred by Court Order, the @misshayleypaige Instagram account was "100% Hayley." (Flax Decl. ¶ 6)

No documentary evidence supports JLM's request. Indeed, the employment agreement between JLM and Hayley does not even mention social media, let alone grant JLM ownership of Hayley's Accounts. JLM's claim relies on little more than the bald and conclusory assertion that "[i]t was agreed and understood that the [Instagram] Account was not her personal account." (Murphy Decl. ¶ 38) In fact, the opposite is true: JLM knows full well that Hayley owns Hayley's Accounts. JLM tells customers that Hayley's Instagram is "her own personal account," and that JLM does not "have any control over what gets posted." (Hayley Decl. ¶ 65; Ex. 19 at 1) JLM has exhorted the public to follow Hayley on "her" account, telling them that "[h]er Instagram will also brighten up your Monday morning." (Deane Decl. ¶ 8, Ex. 2 at 10)

In 2019, JLM made a new employment contract proposal that sought to include social media responsibilities and to make Hayley responsible for "Instagram" promotions for the first

time. (Hayley Decl. ¶¶ 48-50; Ex. 14) Hayley rejected this contract proposal as it sought to impose duties that were beyond those required of a wedding dress designer. After Hayley's rejection and the unproductive contract negotiations that followed, JLM began to claim that it owned Hayley's Accounts in a transparent effort to gain and exert leverage over its star designer.

Since the entry of the TRO, Hayley's devoted, and long-term followers have engaged in open revolt: they know that Hayley has always personally owned, controlled, and posted to her Accounts; Hayley's authenticity is a calling card. In response, JLM has only posted a handful of times on Hayley's Instagram (and made no posts on Hayley's TikTok), and completely disabled all public commenting on Hayley's Instagram. JLM's control has caused engagement with Hayley's Accounts to plummet and enter a "digital death spiral," losing followers and impressions and crushing the substantial value Hayley had created over eight years.

The fundamental question posed to the Court is whether JLM has established by clear evidence that JLM owns Hayley's Accounts. JLM failed to meet its burden. The record demonstrates in no uncertain terms that the Accounts are Hayley's—the product of her personal devotion and engagement with her fans and followers over the course of almost a decade. Accordingly, JLM's Motion should be denied in its entirety.

## FACTUAL BACKGROUND

### I.   Hayley's Professional Background

After graduating from Cornell University in 2007, Hayley began working as an apparel designer for Priscilla of Boston—eventually taking over as a lead designer in 2011. From 2007 through 2011, Hayley also worked as a freelance styling assistant, where she worked with high-profile individuals including celebrities like Pharrell Williams, Ke$ha, and Teyana Taylor. Hayley also co-founded a revolutionary bridal gown rental company and started a fashion blog. (Hayley Decl. ¶¶ 2-7)

## II.    Hayley's Social Media Accounts

Hayley was an early adopter of social media. In 2004, Hayley opened a personal Facebook account under "Hayley Paige" using the URL "misshayleypaige"—a term of endearment bestowed by her mother. (Hayley's Decl. ¶ 8) Over the years, Hayley opened other social media accounts using "Hayley Paige" or "misshayleypaige," including Twitter, LinkedIn, Pinterest, Instagram, SnapChat, Spotify, and TikTok. (*Id*., ¶ 9) Like millions of others, Hayley opened the Accounts for her own personal reasons. (*Id*., ¶ 10)

In April 2012, on the recommendation of a friend, Hayley opened her Instagram with the handle @misshayleypaige as a "personal" account. (*Id*., ¶ 11) Hayley's first posts to her Instagram were highly personal and included inspirational quotes, a photo of Hayley's apartment, and a picture of her best friend. (*Id*., ¶¶ 12-13) Hayley's Instagram has maintained this personal character and authentically reflected her life, family, adventures, and work. Hayley used her Instagram to share some of her most personal life experiences, including posts about her childhood and family. (*Id*., 14; Ex. 2 at 22-23) (a tribute to her mother (left) and father (right)):



Hayley's dog Winnie is also regularly featured on Hayley's Instagram, along with videos of her and her fiancé cooking, and vacation photos. (*Id*., ¶ 15-17; Ex. 2 at 10, 15, 26; Ex. 3):



Hayley's Instagram content comes directly from her heart. (*Id.*, ¶ 18) She regularly shares

emotional thoughts and feelings.  For example, around Thanksgiving 2019, she wrote:

> I know there are inevitable times where that comparison fatigue creeps in for any
> of us, but more often that not, this platform feels like a community for warm
> engagement and inspiration. I try to focus on hearing the heartbeats behind the
> comments and direct messages, and I just want to express my
> acknowledgment/purpose in being as authentic as possible on the other end.
>
> Gratitude allows you to continually fall in the love with the life you have and the
> people in it. Cheers to the people in my life and the ones I don't even know
> personally but still feel connected to 🙏 I hope however you spend your
> Thanksgiving, you feel a little extra love and joy 🦃🍴🤍❄️ #attitudeofgratitude
> #happythanksgiving #instagram. (*Id.*)

Because Hayley's posts are so personal, she also receives highly personal DMs. (*Id.*, ¶ 20; Ex. 2)

An exemplary message that Hayley received on her Instagram is shown below:



In January 2017, Instagram verified Hayley's Instagram as a "Public Figure" account.

(*Id.*, ¶ 24) Having a verified Instagram account is a recognition of authenticity and is something

4

that Instagram awards to certain accounts of public figures, celebrities, and brands. (*Id.*, ¶ 24) "Public Figure" verification is reserved for individuals, is relatively rare, and entails a rigorous process. (Declaration of Dr. Karen Freberg ("Freberg Decl.") ¶¶ 17-18) Hayley personally undertook the process of getting her Instagram verified. (Hayley Decl. ¶ 24; Ex. 4)



Hayley's Instagram is instantly recognizable as a personal account. Hayley collected a sampling of approximately 300 posts that show that she has not only posted to her Instagram since 2012, but she did so in a very personal way. (*Id.*, ¶ 21; Exs. 1, 2, 8) Hayley personally created nearly all of the content on her Instagram (both feed posts and story contents), which includes drafting unique captions for nearly all of her 5,859 posts. (*Id.*, ¶ 25)

Hayley has made a deep commitment to her Accounts. (*Id.*, ¶ 26) She answers anywhere from 150-200 direct messages (DMs) per day—approximately 170,000 over the eight years since starting her Instagram. (*Id.*) Hayley's most common DMs relate to how she became a designer, styling tips, recovering from her divorce, finding love again, and her workout routines. (*Id.*, ¶ 28)

Hayley's Instagram has grown organically into a wildly successful account based on the personal moments that she shares. (*Id.*, ¶ 30) Hayley's Instagram's largest growth came after publicly sharing her wedding in July 2015. (*Id.*) And her most "liked" posts are personal—the highest "likes" going to her 2019 engagement posts with 65,000 and 162,000 "likes." (*Id.*)

Hayley's personal posts often receive upwards of four or five times more likes than any bridal-related photos. (*Id.*)

Hayley's Instagram also grew substantially from cross-promotion and tagging from celebrities and influential people she knows, including Kaitlyn Bristowe, Lauren Luyendyk, Chris Pratt, Sabrina Bryan, and Jay Glazer. (*Id.*, ¶ 32) In early 2017, Hayley's Instagram reached over one million followers. (*Id.*) Shortly thereafter, a video of her and her fiancé became her most-viewed video with over 400,000 views. (*Id.*) Because Hayley shares very personal aspects of her life on her Instagram, there are also some painful moments that Hayley has shared but ultimately deleted and/or archived, including over 100 photos of her first wedding. (*Id.*, ¶ 33)

Hayley started her Pinterest Account (misshayleypaige) on November 3, 2011, and her TikTok Account (@misshayleypaige) in November 2019. (*Id.*, ¶¶ 34-35) Like her Instagram, Hayley started her TikTok and Pinterest accounts for her own personal reasons—as with her Instagram, no one from JLM asked or otherwise instructed her to open them. (*Id.*) On her Pinterest, Hayley regularly "pinned" images that inspired all aspects of her life, including travel, architecture, color, design, food, and, of course, bridal design. (*Id.*; Ex. 9) On her TikTok, Hayley posted lots of fun content, including videos of her dog, fiancé, snowboarding, exercise, dancing, and redecorating her apartment. (*Id.*, ¶ 36; Ex. 10) Examples of both are below:

 

### III.    Hayley's Employment with JLM

On July 13, 2011, at twenty-five years old, Hayley signed an employment agreement with JLM ("2011 Agreement"). (*Id.*, ¶ 37; Ex. 11) JLM employed Hayley as "a designer of a line of brides and bridesmaids dresses." (*Id.*; Ex. 11, § 2.) On August 1, 2011, Hayley began working at JLM as a head designer for the Blush by Jim Hjelm collection. (*Id.*, ¶ 41) The 2011 Agreement allowed JLM to use Hayley's name in connection with bridal dresses and accessories that she created, and the first Hayley Paige collection launched in October 2011. (*Id.*, ¶ 41; Ex. 11, § 7) On August 1, 2014, Hayley signed an amendment to the 2011 Agreement ("2014 Amendment"), which provided additional compensation for her substantial increase in sales.  (*Id.*, ¶ 44; Ex. 12)

During her employment with JLM, Hayley served as the head designer for more than ten bridal collections. (*Id.*, ¶ 42) Hayley regularly assisted with advertising activities typical of a wedding dress designer, including designing the Lookbook and ad campaign images for her collections; directing bi-annual runway shows for her collections; and attending between ten to twenty trunk shows each year in person. (*Id.*, ¶ 45)

### IV.    JLM's 2019 Proposed Agreement

Around February 12, 2019, JLM extended Hayley's current agreement for three years to August 1, 2022 ("2019 Extension"). (*Id.*, ¶ 47; Ex. 13) In July 2019, Mr. Murphy sent Hayley a proposed agreement ("2019 Proposal"). (*Id.*, ¶ 48; Ex. 14) The 2019 Proposal sought to impose even more duties and responsibilities on Hayley and expand JLM's rights even further.

The 2019 Proposal also included a list of promotional and marketing responsibilities beyond the scope of the 2011 Agreement and 2014 Amendment: "Additional Duties include, but are not limited to, appearances as a personality on television, radio, as a speaker, ***social media monetized opportunities*** such as YouTube advertising, ***Instagram*** and any and promotional opportunities not currently known. . . ." (*Id.*, ¶ 50; Ex.14, § 3(d) (emphasis added)) The 2019

Proposal would also require Hayley to "participat[e] in, creating and/or promoting marketing content for the Products." (*Id*.; Ex. 14, § 2)

It quickly became clear that JLM wished to impose new responsibilities on Hayley relating to Instagram and social media that were well beyond the scope of her responsibilities as a wedding dress designer and her employment with JLM. (*Id*., ¶ 51) Hayley responded that the 2019 Proposal was unacceptable, and she also sought clarity on the parties' positions with respect to the "Hayley Paige" name. (*Id*., ¶ 53) On September 15, 2019, Mr. Murphy responded that "As far as [your] personal investment (regarding JLM) it really is only related to Hayley Paige wedding gowns and related categories. . . . But rest assured, I do not claim access to your persona beyond what I describe above." (*Id*., ¶ 54; Ex. 16 at 1-2)

In May 2020, JLM escalated their demands—claiming and seeking ownership over Hayley's persona and Hayley's Instagram. (*Id*., ¶ 56) This was the first time that anyone at JLM ever expressed a claim of ownership over Hayley's persona or any of Hayley's Accounts. (*Id*.) Hayley responded firmly, stating: "I cannot accept you or JLM making a claim to my personal Instagram account and general persona." (*Id*.; Ex. 17)

Due to the hostile nature of Hayley's working environment at JLM, the constant threats and legal harassment, and JLM's various baseless legal claims against her, it became impossible to continue working at JLM, and Hayley resigned on December 17, 2020. (*Id*., ¶ 63)

## V.   JLM's Claims in this Action

### A.   The Facts Belie JLM's Ownership Claims

Prior to the entry of the TRO, Hayley had amassed over 1.1 million followers on her Instagram because of her dedication, care, and cultivation of relationships. (*Id*. ¶ 63) Hayley chose, at times, to use her Instagram to promote the dresses she designed because she had a vested interest in authentically and ethically sharing the work she was so passionate about. (*Id*.)

8

Prior to entry of the TRO, however, JLM has never had access or the ability to post to Hayley's Accounts without her approval, and JLM never had any control over what content was posted or the frequency of posting. (*Id.*, ¶ 64)

JLM has also consistently referred to Hayley's Accounts as ***Hayley's personal accounts***. (*Id.*, ¶ 65) This is confirmed by several former JLM employees who have provided declarations in connection with this action (excerpted below):

> "It was, and always has been, my understanding that the @misshayleypaige Instagram account was Hayley's personal Instagram account. At no point during my employment managing JLM's public relations activities was I ever instructed that Hayley's @misshayleypaige Instagram account was owned or otherwise controlled by JLM. During my extensive communications with all other JLM employees involved in PR and marketing during my time working for JLM, no JLM employee ever expressed the belief to me that the @misshayleypaige Instagram account was a JLM-owned account. I often discussed PR/marketing with Mr. Murphy, including our use of social media, and Mr. Murphy never expressed to me that Hayley's @misshayleypaige Instagram account was owned or controlled by JLM." (Declaration of Melissa Deane ("Deane Decl.") ¶ 6)

> "Hayley Gutman had her own personal Instagram account with the handle @misshayleypaige. Hayley's @misshayleypaige Instagram account was not JLM's main Instagram account. From what I can recall, it was understood amongst JLM employees that Hayley's @misshayleypaige Instagram account was her personal account . . . . Hayley made all of the decisions about what to post on the @misshayleypaige Instagram account. I recall occasions where JLM employees would discuss Hayley's @misshayleypaige Instagram account as being "too sparkly" and "over the top." But, because the account belonged to Hayley, JLM had no control over the type of content that Hayley posted, like it did for JLM's social media accounts." (Declaration of Sarah Flax ("Flax Decl.") ¶¶ 5, 7)

Contemporaneous correspondence also confirms Hayley's ownership. In a May 2019 email, a JLM employee told a customer that "***Hayley's Instagram is also her own personal account***, I don't really have any control over what gets posted." (Hayley Decl. ¶ 65; Ex. 19 (emphasis added)) Similarly, when Brittany Noe was asked whether a bride could be featured on Hayley's Instagram, Ms. Noe responded, "***Hayley is super picky about featuring brides on her page***" and suggested that the bride be directed to JLM's website instead. (*Id.*, ¶ 66; Ex. 19

9

(emphasis added)) In September 2016, JLM's PR representative referred to the account as "Hayley's Instagram." (*Id.*, ¶ 67; Ex. 20 at 3)

The foundational claims to ownership in the three declarations submitted by JLM are demonstrably false. Contrary to Ms. Gryazeva's statement, there has never been a period that Hayley posted only "wedding gowns all the time." (Gryazeva Decl. ¶ 13) This is demonstrated by the hundreds of posts submitted with Hayley's declaration. Similarly, Ms. Noe's statement that "[w]hen I started working at JLM, there were no personal photos of Hayley on the @misshayleypaige Instagram Account that I recall," is again demonstrably false. (Noe Decl. ¶ 10) Countless examples of these posts are in Hayley's Declaration.

JLM's conclusory claims (particularly in Mr. Murphy's declaration) that Hayley's Accounts were created for JLM's benefit and JLM controlled the content on the accounts are not supported by a single document and are directly contradicted by Hayley, the content of the accounts, and JLM's own employees.

Despite JLM's fixation on Hayley's Accounts, JLM has a number of corporate brand social media accounts of its own, including its primary @jlm_couture Instagram account. (Hayley Decl. ¶ 87) These "JLM Brand Instagram Accounts" include:

- @lapetitehaypleypaige Instagram Account (11,700 followers)
- @blushbyhayleypaige Instagram Account (204,000 followers)
- @hayleypaigeoccasions Instagram Account (108,000 followers)
- @holymatrimoji Instagram Account (4,499 followers)
- @jim_hjelm (Jim Hjelm by Hayley Paige) (48,500 followers)

The JLM Brand Instagram Accounts are traditional brand Instagram accounts that are dedicated exclusively to bridal-related content. (*Id.*, ¶ 91) None of the JLM Brand Instagram Accounts have been verified by Instagram, and the content is starkly different from Hayley's Instagram. (*Id.*) The JLM Brand Instagram Accounts comprise mostly formal JLM-created content:



(*Id.*, ¶¶ 91-101; Ex. 35-39) Similarly, each JLM Brand Instagram Account has brand profile

photos, while Hayley has always used a profile picture of herself. (Hayley Decl. ¶ 102; Ex. 40):



### B.   Public Perception of Hayley's Accounts

Shortly after the TRO was entered, JLM took control of Hayley's Instagram and began

making typical, corporate-style posts. Hayley's followers started flooding Hayley's Instagram

Account (now in JLM's control) with thousands of comments expressing their shock and disgust.

A small sample is shown below[1] (*Id.*, ¶ 86; Ex. 33):



---

[1]   JLM has not produced these comments in response to Hayley's expedited discovery request, so these samples are
representative of what was captured before JLM disabled public comments.

The public knew that JLM was misleading them, and it did not go over well. (*Id*., ¶ 86) Upon review and analysis of Hayley's Accounts, Dr. Karen Freberg determined that the Instagram "account was Hayley's personal account for over eight years, was verified by Instagram as her personal account, and was clearly associated with Hayley (and not JLM) by her one million followers." (Freberg Decl. ¶ 27)

### C. JLM's Control Is Damaging Hayley's Accounts Significantly

Hayley is a "Mega Influencer" and her Instagram is highly valuable. (Freberg Decl. ¶ 15) Industry standard tools value Hayley's Instagram Account at $28,500 per post, with a true reach of 108,500 followers per post, even after drastically reduced engagement with the account since JLM took it over. (*Id*., ¶¶ 15, 22) In just a few weeks since entry of the TRO, Hayley's Instagram has lost almost 20,000 followers and its value is dropping precipitously. (Hayley Decl. ¶ 109; Ex. 41) JLM has disabled commenting, which is critical to engagement with followers and, thus, to value. (Freberg Decl. ¶ 25) JLM's control is putting Hayley's Instagram into a "digital death spiral." (*Id*.) Under JLM's control, the value of Hayley's Instagram account may well drop to the level of JLM's other corporate accounts: approximately $4,600 per post. (*Id*., ¶ 24)

### **ARGUMENT**

### I. JLM Is Not Entitled To Extraordinary Relief

"A preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). "Conclusory allegations lacking supporting evidence will not support a preliminary injunction." *Convergen Energy WI, LLC*, 20-CV-5240, 2020 U.S. Dist. LEXIS 184252, at *12-13 (S.D.N.Y. Oct. 5, 2020); *see Hancock v. Essential Res., Inc*., 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("hypotheticals" insufficient); *Int'l Home Care Servs. of N.Y., LLC v. People's United Bank, Nat'l Ass'n*, 2020 U.S. Dist. LEXIS 176084 (E.D.N.Y. Sept. 24, 2020) ("Other than the conclusory assertions that its business may

close, [p]laintiff has not proffered evidence showing that its business could not be returned to the status quo ante with money damages at the conclusion of this case.").

Hayley has used her name and the URL "misshayleypaige" on social media continuously since 2004. She has had full control and autonomy over her Instagram account since she created it in 2012, her Pinterest account since 2011, and her TikTok account since 2019. JLM has *never* had control of any of Hayley's Accounts. JLM's attempt to acquire control over Hayley's Accounts now, "will alter, rather than maintain, the status quo." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc*., 60 F.3d 27, 33-34 (2d Cir. 1995). In such circumstances amounting to a mandatory injunction, "the Second Circuit requires the movant to meet a higher standard." *Id*. JLM utterly fails to make the "clear showing" required. *Id.*

## II.   JLM Can Not Establish a Likelihood of Success on the Merits.

### A.   JLM's Contract Claims Fail

#### 1.   The 2011 Agreement and 2014 Amendment Do Not Even Mention Social Media or Hayley's Accounts.

There is not a single word about social media or Hayley's Accounts in either of her employment agreements with JLM. Yet, JLM asserts that it is somehow entitled to ownership of those accounts. Indeed, JLM has not presented any documentary proof of its ownership rights.

JLM attempts to cobble together ownership claims from selective and misleading parsing of general provisions in the agreements (debunked below), but its course of conduct over the past eight years demonstrates that JLM fully accepted and understood that Hayley owned Hayley's Accounts. JLM's belated, and rejected, attempts to impose social media duties on Hayley during contract negotiations in 2019 (*see* Hayley Decl. ¶ 48; Ex. 14 (2019 Proposal)) further confirms JLM's awareness that it does not own Hayley's Accounts.

13

Absent a clear assignment of ownership to JLM, Hayley retains ownership of her Accounts. In *Eagle v. Morgan*, plaintiff Eagle, an employee of defendant Edcomm, created a LinkedIn account in 2009 at her employer's urging, gave her LinkedIn account password to certain Edcomm employees to help maintain the account, and was well-known in her field (like Hayley). 11-4303, 2013 U.S. Dist. LEXIS 34220, at *3-4, 6 (E.D. Pa. Mar. 12, 2013). Because, among other things, "no policy had been adopted to inform the employees that their LinkedIn accounts were the property of the employer," the Court rejected Edcomm's claims "that Eagle misappropriated the LinkedIn account as her own." *Id.* at *6, 44.

Similarly, in *Maremont v. Susan Fredman Design Grp., Ltd.*, plaintiff Maremont, who was "well known in the Chicago design community," and responsible for "developing and conducting social media campaigns" for her employer SFDG, created a Facebook and Twitter account for "her personal use as well as to promote SFDG." 10-CV-7811, 2014 U.S. Dist. LEXIS 26557, at *3 (N.D. Ill. Mar. 3, 2014). Despite SFDG's assertion that it "directed Maremont to open the Twitter account for SFDG" and SFDG's access to the accounts, the Court found that Maremont stated a cognizable ownership claim, because, "she could promote another employer to her Twitter and Facebook followers [and t]his following has, in the internet age, become a marketable commercial interest." *Id.* at *13.

### 2.     JLM's Breach of Contract Theories Are Meritless and Do Not Support the Requested Relief in Any Event.

JLM alleges that the parties' 2011 Agreement establishes its entitlement to an injunction. JLM's position is entirely without merit on the substance, and also fails because injunctive relief is rarely available for a breach of contract, since the remedy for breach is monetary damages. *See Rosenfeld v. Saunders*, 728 F. Supp. 236, 244 (S.D.N.Y. 1990).

14

*a.   There Is No Breach of Section 2*

JLM argues that Hayley is in breach of the obligation that she "assist with JLM's advertising campaigns," and that the 2011 Agreement broadly "required Gutman to assist JLM in the advertising and marketing of said good." (JLM Mem., p. 14) JLM, critically, ignores the plain meaning of the provision, which actually reads: "In addition to designing the Products, the Employee shall perform such other duties and services commensurate with her position as a designer for the Company, as may be assigned to her by an officer of the Company, including, but not limited to, . . . assisting with advertising programs . . . ." (Hayley Decl. ¶ 43, Ex.11, § 2)

Thus, such duties only fall within the scope of Hayley's employment if they are (i) "commensurate with her position as a designer"; (ii) "assigned to her by an officer of the Company"; and (iii) are "assisting with advertising programs." Hayley's creation, and control of a one-million-follower personal Instagram account where she shares her life and personality is certainly not commensurate with her position as a designer. (*Id*., ¶ 64) No officer of JLM ever assigned any duties to Hayley regarding Hayley's Accounts. (Hayley Decl. ¶¶ 63-64) And Hayley's Accounts have never been JLM's "advertising programs"—they were not operated or controlled by JLM and they focused on Hayley the person, not advertisements of JLM's "goods."

*b.   There Is No Breach of Section 3*

JLM next argues that Hayley breached her obligation to "devote her full time and attention to the business of JLM." (JLM Mem., p. 20). This claim is facially absurd, given that Hayley's almost nine years of hard work designing dresses sold exclusively by JLM across multiple product lines has driven millions of dollars of revenue for JLM. (Hayley Decl. ¶ 45)

Beyond that, JLM has, once again, misstated the terms of the Agreement. The provision actually states that Hayley should "devote her full time and attention during business hours on the Company's premises to the business affairs of the Company" and that she may not "without

the prior consent of the President or Board of Directors of the Company, engage in any other business enterprise which requires the personal time or attention of the Employee *and which would interfere with the performance of her duties hereunder*." (Hayley Decl., Ex. 11 § 3)

Hayley never breached any of these duties. Not only has JLM failed to produce any evidence of any breach, it was fully aware of Hayley's efforts on, and commitment to, her Accounts for over eight years. JLM never objected or claimed that those efforts violated any contractual duties to JLM; indeed, the good will, notoriety and following Hayley generated through those efforts was also good for JLM. In any event, even if JLM could somehow establish a breach of Section 3, it could never establish that such a breach somehow entitles JLM to ownership of Hayley's Accounts.

### c. There Is No Breach of Sections 10(b) and 11

JLM's claim that Hayley's Accounts are "works for hire" under the 2011 Agreement fails, because Hayley's Accounts do not fall within the plain language of this section. The works for hire provision explicitly identifies dress designs and materials directly related to the designs as the subject of the clause.[2] Hayley's Accounts are not dress designs. And like the rest of the 2011 Agreement, these provisions make no mention of social media accounts. They cannot be read to cover the personal social media accounts that Hayley created, and JLM never claimed during the past eight years that it owned Hayley's Accounts under these provisions.

---

[2]   "The parties expressly agree that all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Employee in connection with her employment with the Company involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by the Company through the Term of the Employment Agreement and any extensions thereof (collectively, the 'Designs'), are works for hire, and ownership of any intellectual property arising from or related to the Designs shall be the sole and exclusive property of the Company." (Hayley Decl., Ex. 11, § 11).

### d.  There Is No Breach of Section 10(b) ("Designer's Names")

JLM also cites Section 10(b), which it claims "prohibit Gutman from any commercial use of the Designer's Names, which includes 'misshayleypaige.'" (JLM Mem., p. 14). But, JLM again fails to address the entire section, which makes clear that no breach has occurred. Section 10(a) contains a listing of names that are defined as: "her name 'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Paige', or any derivative thereof." Section 10(a) states further that Hayley assigned use of those Designer's Names to JLM *only* "in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items … provided Employee has substantially participated in the design or creation of such clothing or related items."

Therefore, the provision covers only (i) Hayley's name and (ii) the use of her name on bridal apparel designed by Hayley. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 723 (S.D.N.Y. 2000) (Court should undertake a "literal reading of the plain language of the contract[]"). JLM's attempt to contort this provision to apply to Hayley's Accounts, which are not bridal apparel that Hayley has "substantially participated in the design or creation of," is precluded by the literal plain language of the agreement. *Id*. Indeed, JLM's CEO has already conceded the limitations of JLM's claims to Hayley's name and persona: "I do not claim access to your persona beyond" "Hayley Paige wedding gowns and related categories." (Hayley Decl. ¶ 54, Ex. 16)

Finally, even if Hayley were in breach of this provision—which she is not—JLM's willing acquiescence over eight years while Hayley built these valuable assets and a community connected directly to her, precludes any remedy, let alone extraordinary injunctive relief.

17

### B.  JLM's Trademark Claims Are Without Merit

#### 1.  Trademark Infringement

JLM's claim for trademark infringement necessarily concedes that Hayley owns Hayley's Accounts, because it is nonsensical for a party to bring an infringement claim against itself. JLM really contends that Hayley is infringing its trademark rights by using @misshayleypaige and Miss Hayley Paige as her handles on the social media accounts that *she* owns. Yet, JLM acquiesced to Hayley's use of those handles for over eight years, during which JLM also benefitted from Hayley's personal efforts to build her brand and reputation through the accounts that she created, owned, and operated. JLM's attempt to now seek preliminary injunctive relief is foreclosed by its eight years of acquiescence. *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (10-week delay precludes preliminary injunction); *Magnet Commc'ns LLC v. Magnet Commc'ns, Inc.*, 00-CV-5746, 2001 U.S. Dist. LEXIS 14460, at *1 (S.D.N.Y. Sept. 19, 2001) (12-week delay precludes preliminary injunction).

Beyond that, JLM fails to establish a likelihood of success on the merits of its trademark infringement claim. First, Hayley's priority of use extinguishes JLM's claim: she coined and has used misshayleypaige continuously on her social media accounts since 2004. *See George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 645 (S.D.N.Y. 2014) (first user has priority).

Second, Hayley's use of her handles and JLM's use of the marks licensed to it have coexisted without any consumer confusion for over eight years. Consumers fully recognize that, until last month, Hayley, and not JLM, was the source of Hayley's Accounts. (Hayley Dec. ¶¶ 84-86, 112) The absence of any evidence of confusion over eight years of coexistence compels rejection of JLM's infringement claims, especially its claim for preliminary injunctive relief. *See, e.g., Aceto Agric. Chems. Corp. v. Bayer Aktiengesellschaft*, 531 F. App'x 103, 104 (2d Cir. 2013) (no likelihood of confusion where marks co-existed for 38 months without any evidence of

actual confusion); *Eventide Inc. v. Dod Elecs. Corp*., 93-CV-2713, 1995 U.S. Dist. LEXIS 5404, at *35 (S.D.N.Y. Apr. 18, 1995) (likelihood of confusion is limited given successful coexistence of marks).

While these defects are dispositive, JLM fares no better on the other elements of its infringement claim. Hayley's Accounts are not commercial accounts for the sale of bridal garments; they focus on Hayley's life and her personal connection with followers. Confusion is unlikely with such dissimilar uses. *See E.A. Sween Co. v. A & M Deli Express Inc*., 787 F. App'x 780, 785-86 (2d Cir. 2019). Hayley's use of the personal pronoun "miss" in the handles for her personal accounts (as designated and even "Verified" on Instagram), emphasizes the personal nature of the use and distinguishes the handles from the brand marks used by JLM.[3] *See Grout*, 824 F. Supp. 2d at 413 (the Court must "analyze the mark[s'] overall impression on a consumer, considering *the context in which the marks are displayed* and the totality of factors that could cause confusion among prospective purchasers.") (emphasis added).

Hayley's followers fully appreciate that Hayley's Accounts are Hayley's personal accounts and not JLM's.  (Hayley Dec. ¶¶ 84-86, 112) And the buyers of JLM's luxury goods are likely to exhibit a high level of care when purchasing and are unlikely to be confused. *See Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc*., 03-CV-2420, 2006 U.S. Dist. LEXIS 25291, at *36 (S.D.N.Y. May 1, 2006).

Finally, the remedy sought by JLM is not one available to a trademark holder. The Lanham Act makes plain that an injunction may only issue to the extent necessary to "to prevent the violation of any right of the registrant." 15 U.S.C. § 1116. If Hayley is ultimately determined

---

[3]   JLM's brief disingenuously states that JLM also owns a mark for "@misshayleypaige," which "has been used by Plaintiff to market and sell Hayley Paige Brand goods since 2012." (JLM Mem., p. 18-19) This assertion is untrue and not supported by the record cites included in JLM's brief.  (JLM Mem., p. 18-19 (citing Murphy Decl. ¶¶ 67, 72, 77).

to be violating JLM's trademark rights, and equitable relief is available, such relief might include an order to not use certain marks. ***However, the assignment of specific personal property, such as social media accounts, is not an available remedy in a trademark dispute.*** *See BBC Grp. NV Ltd. Liab. Co. v. Island Life Rest. Grp. Ltd. Liab. Co*., 18-1011, 2020 U.S. Dist. LEXIS 136591, at \*12 (W.D. Wash. July 31, 2020) (ordering party to "revise its social media handles to remedy the trademark infringement").

## 2.      Trademark Dilution

Even if JLM had demonstrated it has rights to "famous" marks, and overcome other proof defects, its dilution claim fails. *See Glob. Brand Holdings, LLC v. Church & Dwight Co*., 17-cv-6571, 2017 U.S. Dist. LEXIS 208759, at \*7 (S.D.N.Y. Dec. 19, 2017) ("Dilution causes of action are restricted to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like."). Hayley coined and began using misshayleypaige in 2004. JLM therefore cannot meet an essential element of its claim: that "defendant's use began after the mark became famous."[4]  JLM's state law dilution by tarnishment claim fails for the additional reason that JLM has not shown that Hayley used a Registered Mark, and that such use associated the mark with "obscenity, sexual activity[,] illegal activity" or products of inferior quality. *See Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F. Supp. 204, 209 (S.D.N.Y. 1996); *Deep Foods Inc. v. Deep Foods Inc*., 419 F. Supp. 3d 569, 585 (W.D.N.Y. 2019).

---

[4]   JLM must establish that: "(i) its mark is famous; (ii) the defendant is making commercial use of the mark in commerce; (iii) **the defendant's use began after the mark became famous;** and (iv) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services."  *Louis Vuitton Malletier v. Dooney & Bourke, Inc*., 454 F.3d 108, 118 (2d Cir. 2006).

### C.     JLM's Common Law Tort Claims Are Without Merit

JLM also fails to establish a likelihood of success on its conversion and trespass to chattel claims, each of which requires JLM to establish ownership over property. For the reasons discussed above, JLM has not established ownership over Hayley's Accounts under either its contract or trademark theories.[5]

JLM's breach of fiduciary duty claims fails for several reasons, including because it "is merely duplicative of a breach of contract claim and cannot stand." *Carco Grp., Inc. v. Maconachy*, 644 F. Supp. 2d 218, 242 (E.D.N.Y. 2009). Moreover, even if JLM could establish a likelihood of success on this claim, the remedy would be money damages—if any—not a requirement that Hayley relinquish control of her Accounts.

### III.     JLM Has Not Shown Any Irreparable Injury But Hayley Has

JLM's claims of irreparable harm rely entirely on its disproven assertions that it owns Hayley's Accounts. Hayley's Instagram Account has never been JLM's "Main IG Account" (JLM Mem. p. 23), as JLM disingenuously told the Court. Moreover, JLM's eight years of acquiescence to Hayley's ownership and control of Hayley's Accounts preclude JLM's claims of irreparable harm in any event. But, even if JLM had brought a legitimate claim, and had been entitled to equitable relief, it only speculates about what might happen in the future, not the specific evidence of irreparable harm required. *Id.*; *see U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 n.18 (S.D.N.Y. 2011) ("plaintiffs mush show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm" (internal quotation marks omitted)).

---

[5]   JLM's citation, JLM Mem., p. 13, of *Ardis Health, LLC v. Nankivell*, 11-CV-5013, 2011 U.S. Dist. LEXIS 120738, at *4 (S.D.N.Y. Oct. 19, 2011) in support of its conversion claim is inapposite, because in Ardis the plaintiff owned the property at issue: "It is uncontested that plaintiffs own the rights to the Access Information [user name and password]."

Hayley is the one suffering irreparable harm. Prior to JLM taking control, Hayley's Accounts were flourishing assets with a growing following and high engagement, driven by Hayley's personality and connection. (Haley Decl. ¶¶ 26; 30-33; Freberg Decl. ¶¶ 15, 19) In just a few weeks under JLM's control, Hayley's Accounts are losing value and followers. (Freberg Decl. ¶¶ 23-28) Hayley's Instagram followers have revolted ("We want Hayley back") and the hashtag #givehayleypaigehernameback began to trend. (*See* Hayley Decl. ¶ 88; Ex. 33) The backlash was so swift that JLM has taken the unprecedented step of shutting down the comments feature on Hayley's Instagram Account. This action destroys engagement, and thus value of the account, and threatens to put that account into a "digital death spiral." (Freberg Decl. ¶ 25)

A social media account is only as valuable as the connection with its followers.  The reaction to JLM taking control of the account has been swift and universally derided as shown in the samples captured in Exhibit 33 to Hayley's Declaration.[6] JLM has not even posted on the TikTok and Pinterest accounts—thus driving down engagement, and value, on those accounts as well. (Freberg Decl. ¶ 28)

## IV. The Balance of Hardships Actually Tips Decidedly in Hayley's Favor

"To establish that the balance of hardships tips in [his] favor, the [plaintiff] must demonstrate that the harm [he] would suffer absent the relief sought is substantially greater than the harm the defendants would suffer if the injunction were granted." *Joshi v. Trs. of Columbia Univ.*, 17-cv-4112 (JGK), 2020 U.S. Dist. LEXIS 158635, at *23 (S.D.N.Y. Aug. 31, 2020); *Easter Unlimited, Inc. v. Rubie's Costume Co., Inc.*, 00-CV-6241, 2000 U.S. Dist. LEXIS 13337, at *25 (S.D.N.Y. Sep. 15, 2000).

---

[6]   Because JLM disabled public comments, we have not been able to secure a full catalogue of the public reaction to JLM's control over Hayley's Instagram account.  In fact, we sought discovery of this information from JLM, but they have refused to provide it. (Doc. No. 28).

JLM's interests are met through its numerous corporate social media accounts. These accounts—many of which are dedicated to brands previously designed by Hayley—have significant follower counts and have already been established as the primary vehicles for commercialization of JLM's products on social media. Hayley, on the other hand, has been deprived of the primary forum she created and built, and has used to communicate with her followers for many years. Further, as discussed above, the value of Hayley's Accounts is declining every day that JLM controls them.

The relief that JLM seeks also violates the Stored Communications Act, 18 U.S.C. § 2701, *et seq*. ("SCA"). SCA makes it a criminal offense (with civil right of action), for an employer to access its employee's electronically-stored communications. In particular, the DMs on Hayley's Accounts (i.e., private electronic communications akin to email) are accessible to JLM by virtue of the TRO. The preliminary injunction requested would permit JLM to continue to read Hayley's private conversations, in violation of the SCA. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, LLC, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008).

The balance of the hardships should also consider the parties' respective resources. *See Diastar, Inc. v. Hallmark Indus., Inc*., 89-CV-6587, 1989 U.S. Dist. LEXIS 14441, at *3 (S.D.N.Y. Dec. 4, 1989) ("plaintiff's financial resources were greatly exceeded by those of the corporate defendants, such that the balance of hardships tipped decidedly in plaintiff's favor"). Hayley is an individual, where JLM is a publicly-traded bridal design house with substantial assets and ongoing revenue streams.

## V.    A Preliminary Injunction Is Not in the Public Interest

The relief sought by JLM is not in the public interest for several reasons. First, it is inconsistent with the public belief as to ownership and speech from Hayley's Accounts for the past 8 years. Over 1 million members of the public have cultivated and continued a personal

relationship with Hayley through her Instagram account alone. Eliminating the method and forum for Hayley's communication with her followers is deeply inconsistent with the public interest. *See Latino Officers Ass'n v. City of N.Y.*, 97-CV-1384, 1997 U.S. Dist. LEXIS 12353, at *10 (S.D.N.Y. Aug. 15, 1997) (Court must weigh "the potential audience for the expressed speech").

Second, it is critical that the Court consider the public's speech rights and not just the rights of the parties. *See Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) ("The public's interest in free expression, however, is significant and is distinct from the parties' speech interests."). While Hayley had always allowed free and open public comment on her Instagram posts, within days after entry of the TRO, JLM removed all public comments and disabled commenting for all public users. JLM is eliminating a developed arena of free speech and also eliminating prior speech from the public sphere. The public interest is in "protecting those who wish to enter the marketplace of ideas from government attack," not eliminating the free flow of speech. *Id*. ("the First Amendment protects the public's interest in receiving information").

## VI.    JLM Seeks Improper Injunctive Relief Unrelated to Its Underlying Claims

While JLM's briefing is devoted nearly entirely to the issue of control over Hayley's Accounts, JLM's preliminary injunction request seeks several categories of relief completely unrelated to Hayley's Accounts and the underlying claims in this action. (*See* Doc. No. 8 at A.(iii)-(v)) Subsection (iii) of JLM's OTSC broadly and vaguely seeks to prohibit Hayley from "taking any action that breaches JLM's Employment Agreement . . . including but not limited to . . . without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy." Subsection (iv) seeks to prohibit Hayley from "using any of the Designer's Names, Trademarks or any confusingly similar term to endorse, advertise or promote the products and/or services of herself or others directly or indirectly … without the express written permission of

24

Plaintiff's chief executive officer, Joseph L. Murphy." Subsection (v) is so broad as to simply swallow subsection (iv), and seeks to prohibit Hayley from "using, or authorizing third parties to use, the Designer's Names, Trademarks or any confusingly similar term, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy."

Each of these requests is patently improper. They have no basis in any legal claim brought by JLM and seek absurd relief: Hayley would have to seek written permission from Mr. Murphy to *use her own name*. These requests are not seeking to prevent any imminent or definable harm, they are purely punitive.[7] These requests also fail procedurally. Rule 65(d) requires that "[e]very order granting an injunction . . . be specific in terms" and that it "describe in reasonable detail . . . the act or acts sought to be restrained." *Cedar Swamp Holdings, Inc. v. Zaman*, 472 F. Supp. 2d 591, 596 (S.D.N.Y. 2007). A broad prohibition against breaching the employment agreement is improper. *See Peregrine Myanmar v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("an injunction must be more specific than a simple command that the defendant obey the law"). The reference to "confusingly similar term[s]" is impermissibly vague. *See Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993) (vacating injunction that is "too indefinite and ambiguous to permit of enforcement"). The request also violates Rule 65(d)(1)(C), which specifically sets forth that an injunction request cannot "refer[] to the complaint or other document" by incorporating defined terms and concepts in the 2011 Agreement.

---

[7]   JLM has not offered evidence of any harm that is "not remote or speculative" and for which the injury "cannot be fully remedied by monetary damages" in connection with these requests. *Hooks v. Howard*, 07-CV-0724, 2008 U.S. Dist. LEXIS 51568, at *4 (N.D.N.Y. July 3, 2008); *Fung-Schwartz*, 804 F. App'x 85, 87 (2d Cir. 2020) (District Courts properly "deny requested preliminary injunctions" where "the evidence supporting a claim of imminent irreparable harm consists only of the plaintiffs' conjecture that the defendant might take a harmful step at some point in the future.").

## <u>CONCLUSION</u>

Based on the foregoing, JLM cannot establish a likelihood of success on the merits of its claims and cannot show irreparable harm. The public interest weighs decidedly against a preliminary injunction, and Hayley will suffer substantial harm if the Court were to grant the preliminary injunction. Accordingly, JLM's Motion for a preliminary injunction should be denied.

DATED: January 12, 2020

HAYNES AND BOONE, LLP
*Attorneys for Defendant*
*Hayley Paige Gutman*

By:   *s/ Richard D. Rochford*
Richard D. Rochford
Joseph Lawlor
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Tel: (212) 659- 7300
Fax: (212) 918-8989
richard.rochford@haynesboone.com
joseph.lawlor@haynesboone.com

Tiffany Cooke*
2323 Victory Ave., Suite 700
Dallas, TX 75219
Tel: (214) 651-5849
Fax: (214) 200-0847
tiffany.cooke@haynesboone.com
*Pro hac vice* admission pending