UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X------------------------------------------------------------------X
JLM COUTURE, INC,

                             Plaintiff,

                v.

HAYLEY PAIGE GUTMAN,

                            Defendant.
X------------------------------------------------------------------X

Case No: 20-CV-10575-LTS-SLC

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF JLM COUTURE, INC.'S MOTION BY ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**ADELMAN MATZ P.C.**
**1173A Second Avenue, Suite 153**
**New York, New York 10065**
**Phone: (646) 650-2207**
*Attorneys for Plaintiff*

...

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

I.   The Relief Sought by JLM is not a Mandatory Injunction ....................................................... 2

II.  JLM Has Established Likelihood of Success on the Merits ..................................................... 2

    A.   JLM Has Established Ownership of the HP Social Media Accounts Sufficient for Its Claims of Conversion and Trespass ............................................................. 2

    B.   Gutman Has, and Unless Further Enjoined, Will Continue to Breach the Agreement ........................................................................................................................ 8

    C.   JLM is also Likely to Prevail on its Trademark Claims ....................................... 11

    D.   JLM Has Also Established Likelihood of Success on its Other Claims ............... 13

III. JLM Is Entitled to THE injunctive relief IT SEEKS ................................................................ 13

IV. THE ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC INTEREST ......................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ardis Health, LLC v Nankivell*, 11 CIV. 5013 NRB,
2011 WL 4965172 (SDNY Oct. 19, 2011) .................................................................................. 15

*Deere & Co. v MTD Products, Inc.*,
41 F3d 39 (2d Cir 1994) ............................................................................................................ 13

*Eagle v. Morgan*,
2013 WL 943350 (E.D. Pa. Mar. 12, 2013) ................................................................................ 6

*Genesee Brewing Co., Inc. v Stroh Brewing Co.*,
124 F3d 137 (2d Cir 1997) ........................................................................................................ 14

*Huber Baking Co. v. Stroehmann Bros. Co.*,
252 F.2d 945 (2d Cir. 1958) ...................................................................................................... 12

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ......................................................................................... 5

*In re Alert Holdings, Inc.*,
148 B.R. 194 (Bankr. S.D.N.Y. 1992) ........................................................................................ 8

*In re Borders Grp., Inc.*,
2011 WL 5520261 (Bankr. S.D.N.Y. Sept. 27, 2011) ................................................................ 7

*In re CTLI, LLC*,
528 B.R. 359 (Bankr. S.D. Tex. 2015) ........................................................................................ 8

*Ins. Co. v Cohen*,
173 F.3d 63 (2d Cir 1999) .................................................................................................... 14, 8

*Maremont v. Susan Fredman Design Grp., Ltd.*,
2014 WL 812401 (N.D. Ill. Mar. 3, 2014) .................................................................................. 6

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
704 F.Supp.2d 305 (S.D.N.Y.2010) .......................................................................................... 14

*Pan American World Airways, Inc. v. Flight 001, Inc.*,
2007 WL 2040588 (S.D.N.Y. 2007) ......................................................................................... 12

*Radiology Assocs. of Poughkeepsie, PLLC v. Drocea*,
  87 A.D.3d 1121, 930 N.Y.S.2d 594 (2011) .................................................................... 10

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ..................................................................................... 14, 15

*Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*,
  363 F.3d 177 (2d Cir. 2004) ......................................................................................... 6, 7

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009) ............................................................................................ 12

*Tiffany (NJ) Inc. v eBay Inc.*,
  600 F.3d 93 (2d Cir 2010) ............................................................................................. 13

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*,
  294 F.3d 383 (2d Cir. 2002) .......................................................................................... 13

**Statutes**

17 U.S.C. § 101 ........................................................................................................................ 6

Gen. Bus. Law § 360-l ........................................................................................................... 13

**Rules**

FRE 602 .................................................................................................................................... 4

FRE 701 .................................................................................................................................... 4

JLM[1] respectfully submits this memorandum of law in further support of its motion for a preliminary injunction. Gutman has failed to make any showing that JLM is not entitled to an injunction, and indeed has conceded much of JLM's claims. Gutman's opposition focuses almost entirely on her position that the HP Social Media accounts were a 'personal' accounts that she used to share memories and feelings. But that is not true and despite her extensive efforts to spin the facts, a simple review of the accounts shows that Gutman's characterizations of the content and the nature of her activity on the accounts are demonstratively false. The HP Social Media Accounts were, are and always have been business accounts that are the property of JLM. Gutman's locking JLM out of, using JLM's trademarks to promote third party goods and then refusing to post Hayley Paige branded content also constitutes breaches of her Employment Agreement, trespass, conversion, as well as trademark infringement, dilution and unfair competition.

Although that is clearly sufficient, since the entry of TRO on December 16, 2020, Gutman has gone further by publicly repudiating her agreement in an online video that was part of a pre-meditated online bullying campaign designed to inflict maximum damage on JLM and the Hayley Paige brand, in the hopes that would leverage JLM to simply give up. Gutman has continued this campaign and is actively interfering with JLM's advertising programs, relationships with customers and stores. Gutman is also continuing to use the Hayley Paige name in commerce, to identify herself as a designer, promote the goods of others and even in association with sales of competitive goods, all in further violation of her Employment Agreement. There could not be a clearer need for a preliminary injunction to stop the damage to the reputation of JLM, the Hayley

---

[1] Unless separately defined herein, the capitalized terms herein shall have the same meaning as set forth in JLM's moving papers. The "Reply Murphy Decl." shall refer to the Declaration of Joe Murphy in Reply, dated January 22, 2021), "Reply Matz Decl." shall refer to the Reply Declaration of Sarah Matz, dated January 22, 2021, the "Ladell Decl.," shall refer to Declaration of Dean Ladell, dated January 22, 2021, the "Priestley Decl.," shall refer to the Declaration of Jess Priestley dated January 22, 2021, and the "Thomson Decl.," shall refer to the Declaration of Jessalyn Thomson dated January 22, 2021.

Paige brand and the goodwill associated therewith, which is being further damaged every day that Gutman is allowed to persist in these actions.

## I. THE RELIEF SOUGHT BY JLM IS NOT A MANDATORY INJUNCTION

The relief sought is not a change to the status quo. Until recently, JLM had access and control to the HP Social Media Accounts through Gutman and other employees. *See* Murphy Decl. ¶¶21, 36, 39, 41, 61; Noe Decl. ¶¶4-9, 11; Gryazeva Decl. ¶¶9-11, 14. Gutman's decision to change the password and deny use of the accounts, does not make her conversion of them the status quo. Even if a higher standard applied, JLM has satisfied it.

## II. JLM HAS ESTABLISHED LIKELIHOOD OF SUCCESS ON THE MERITS

### A. JLM Has Established Ownership of the HP Social Media Accounts Sufficient for Its Claims of Conversion and Trespass

Although the Court need not breach a determination of the issue of ownership in order to issue the preliminary injunction, JLM is likely to succeed on this issue. There is no basis for Gutman's assertion that the Main IG Account was her 'personal Instagram account' or that it is owned by her, and her repeating that statement over and over, does not make it true.

Gutman's opposition rests on nothing but inadmissible opinions and a distorted presentation of posts that are used to make grossly exaggerated assertions. Unfortunately for Gutman however, the content does not lie. A simple review of the HP Social Media Accounts, including the Main IG Account, (Ladell Decl., ¶14, Ex. 1, Ex. T; Murphy Decl., Exs. 56-61, 74), shows that Gutman's assertions that a high percentage of the content was "personal" or non-bridal is demonstratively false. There were over 5,879 posts on the Main IG Account. *See* Ladell Decl., ¶14, Ex. 1, T, U. Even assuming *arguendo* that the 300 photos cherry picked by Gutman were all personal, that still means that at least 95% of the content on the Main IG Account related to the Hayley Paige Brand. *Id.* Taking into account content that was taken down or deleted, the percentage is likely much higher. *Id.* Even the examples that Gutman has given as "personal posts",

however, are not. A review of those posts with their captions and other information that Gutman omitted, shows that the vast majority of these examples are related to JLM and the promotion of the Hayley Paige bridal brand. *See* Ladell Decl., ⁋15-16, Ex. 1. This type of engagement strategy i.e.to mix in a small glimpse of 'personality' in social media content, with memes and viral videos is very common amongst lifestyle and personally named brands like Hayley Paige. *See* Ladell Decl., ⁋15-16, Ex. 1, p. 9, Ex. P, Q, R and T.

Equally as specious is Gutman's contention JLM had no influence or control over her posts. JLM paid for and was involved in the creation of the vast majority of the content on the Main IG Account, including much of the personality glimpse content Hayley Paige brand content that she now claims is 'personal'. Gryazeva Decl. Ex. 76; Reply Murphy Decl., Ex. 123. For example, JLM specifically commissioned and paid for the videos of Gutman's engagement and the bake-off content she has harped on as being prime examples of personal content. *See* Reply Murphy Decl., Ex. Exs. 90-92. While Gutman was given a discretion commensurate with her position as lead designer (see Murphy Decl. ¶37), JLM was also involved with and did exercise control over the content when needed. For example, when Gutman failed to properly tag certain posts, she was asked to and corrected those issues. *See* Reply Murphy Decl.. Ex. 93. In connection with the post about her divorce, which Gutman has repeatedly cited as a prime example of her use of the Main IG Account as a tool to share details of her personal life (12/16/20 Tr. 33:23-25), Gutman sought approval to post that to the Main IG Account, worked out the language with Mr. Murphy and even used the JLM trademarked logo design mark in the post. *See* Reply Murphy Decl. Exs. 94-95, 134. Gutman's citation to loose, and sparce references in correspondence to the Main IG Account as 'her' or 'Hayley's' account are similarly unavailing. Given Gutman's status as head designer of the Hayley Paige brands, employees regularly referred to various Hayley Paige branded assets in that manner, despite the fact that those assets were clearly owned by JLM. *See* Reply Murphy

3

Decl. Ex. 96; Priestley Decl. ¶5.[2]

Gutman's reliance on the inadmissible opinion of former JLM employees also does not establish her point. Neither Deane nor Flax are competent under FRE 602 or 701. Neither were in positions where they were privy to the details regarding JLM's contractual arrangements with, assignment of duties to or acquisition of rights from Gutman. *See* Reply Murphy Decl. ¶¶3-5. Nor would they need to be explicitly instructed that JLM owned its brand's social media accounts. *Id.* Their unsupported opinion that the @misshayleypaige Instagram account was Hayley's personal Instagram account is nothing more than rank speculation, which is not admissible.[3] Similarly, Deane has no personal knowledge about Hayley's obligations or terms of employment or what type of discretion Gutman did or did not have. *See* Deane Decl., ¶9; Reply Murphy Decl ¶¶4-5. Deane's speculation about what other employees knew is also inadmissible. *See* Deane Decl., ¶5 (claiming that to her knowledge no one at JLM, including Lana had access).[4]

The manufactured 'opinions' of Gutman's internet followers are equally as inadmissible. The vast majority of these posts are only making vague references to 'giving Hayley her name back', when JLM indisputably owns the trademark rights, a contention that Gutman does not even contest. Furthermore, none of these comments were posted until after Gutman told her followers what to think i.e. that the Main IG Account was hers. *See* Reply Matz Decl. Exs. 127, 129, 130.[5]

---

[2] Even Gutman in her declaration submitted to this Court erroneously refers to JLM owned assets as hers. *See e.g.* Gutman Decl., ¶69 "I was personally and financially invested in the success of **my brands**." (emphasis added"). The Hayley Paige brands are not Gutman's –they belong to JLM and Gutman referring to the brand as hers does not make it true, just as passing references by Gutman or employees without authority to the Main IG Account as hers or Hayley's does not make that a fact. *See* Reply Murphy Decl. ¶¶3-5; Priestley Decl. ¶5.

[3] Deane's testimony is also contradicted by documents, showing that she regularly included the @misshayleypaige Instagram account and its statistics in JLM Press Kits for the Hayley Paige brand, and that she was on emails where Mr. Murphy discussed the Main IG Account as a means of crediting the Hayley Paige brand. See Reply Murphy Decl. Exs. 97-98, 121.

[4] That is especially true when those other employees who are competent to testify about matters of their own personal knowledge have already contradicted those assertions. *See* Gryazeva Decl. ¶6 (testifying that she accessed the Main IG Account using the password).

[5] Gutman also misled her followers about many other facts including telling them that she did not have an attorney when she negotiated her employment agreement, which is also not true. *See* Reply Murphy Decl. Ex. 120. Gutman

4

Just as a Court would not accept survey responses where the questions were leading and suggestive, this Court should not accept responses from consumers agreeing with Ms. Gutman after she told them what to think about the ownership of the account and asked them to take action. *See Id.; Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007) (factor in accepting responses is whether the questions were leading or suggestive).

Gutman's purported expert should be similarly disregarded. Ms. Freberg has failed to disclose her methodology in connection with her opinions, how it was applied, or any other information that would support a finding that she employed a reliable methodology reliably. *See* Ladell Decl., ¶23, Ex. 1, pp. 12, 15-16. Indeed, it appears that Ms. Freberg omitted and did not consider material information and factors about the nature of business verses personal accounts and used data algorithms without disclosing the information that was provided to them or how the analysis works. *Id.,* ¶7, 23-24, Ex. 1, pp. 6-8, 15-16. Even if the Court considers her testimony, it is clearly wrong. *See id.* A simple review of the history of the content posted on the Main IG Account makes clear it was *never* a personal account and has always been for the promotion of the Hayley Paige brands. *See* Murphy Decl. Ex. 74; Reply Murphy Decl. 117, 133; Ladell Decl., Ex. T, U; Thompson Decl., ¶¶10-11 (stores regarded it as such and utilized it to look at and show the Hayley Paige collections).

Gutman's assertion that this is predominately where she shares her life and personality is a blatant falsehood. Since its inception the Main IG Account was and always the property of JLM. Ladell Decl., ¶13, Ex. 1, pp. 8-9, A-4, Gutman began the account while employed by JLM, and as such it was JLM property by virtue of the work for hire and assignment provisions in the

---

told her followers that JLM was demanding the right to permanently use her name in the promotion of their products even after they are no longer working together- a right Gutman knows JLM has. *See* Matz Reply Decl. Ex. 127. Gutman told her followers that JLM and Mr. Murphy were "controlling, manipulative and bullying" and implied they were unethical and treated their employees badly, and that they stomped on her "sandcastle". *See id*. Gutman told them that JLM was attempting to take "my authentic relationships" and turn them into a "business opportunity or a product driven page". Then she tasked them to take action. *Id.*

5

Employment Agreement.[6]  Murphy Decl., Ex. 2, §11.  The argument that the accounts are not encompassed in the definition of "Designs" is incorrect, as the definition of includes any other works conceived of or developed by Gunman in connection with her employment, and the accounts clearly predominately feature JLM's content.[7]  Equally as incorrect is Gutman's argument that absent a clear assignment, Gutman retains ownership.[8]  Even without an agreement, the Main IG Account is owned by JLM because it was a "work prepared by an employee within the scope of" her employment. 17 U.S.C. § 101. Under this "work-for-hire" exception, "[t]he employer...is considered the author...and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights…". *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185-86 (2d Cir. 2004) (test for determining if an employee's conduct is within the scope of his employment: (1) It is of the kind of work he is employed to perform; (2) It occurs substantially within authorized work hours; (3) It is actuated, at least in part, by a purpose to serve the employer)(internal citations omitted).

All of those factors are squarely met here.  Assisting with advertising programs is one of Gutman's contractual obligations.  *See* Murphy Decl. Ex. 2 §2. Based on the documentary evidence, it is clear that Gutman worked on the Main IG Account as part of her duties (*see* Reply Murphy Exs. 99-106), and Gutman herself viewed and utilized the social media accounts,

---

[6] The same is true for all of the Hayley Paige branded social media accounts that Gutman started within the scope of her employment that were used for the promotion of the Hayley Paige brand, that are and will be a part of this action, even if they were not specifically a part of JLM's preliminary injunction motion.

[7] JLM's employee handbooks contained a similar work for hire and assignment provision that also included databases. *See* Murphy Reply Decl. Exs. 109, 111, 113, each at § 1.11, Exs. 110, 112.

[8] The cases cited by Gutman do not support these conclusions.  In *Eagle v. Morgan,* the court relied heavily on the fact that the company had not had any control over the accounts, and did not pay for the accounts, and that the contact list was not developed and built through the investment of the company's time and money.  *See Eagle v. Morgan*, 2013 WL 943350, at *16 (E.D. Pa. Mar. 12, 2013).  JLM was responsible and when needed controlled the content, did pay for content on the accounts, and the follower list was developed and built through the company's time and money.  The holding in *Maremont v. Susan Fredman Design Grp., Ltd.*, No. 10 C 7811, 2014 WL 812401, at *4 (N.D. Ill. Mar. 3, 2014), has also been entirely misrepresented.  The Court in *Maremont*, did not find that she had stated a cognizable ownership claim because "she could promote another employer to her" followers.  Ownership was not even an issue in the case, and that she could promote another employer was a contention of hers in connection with a standing argument for her Lanham Act claim that was dismissed by the Court. *Id.*

including the Main IG Account as a marketing platform for the Hayley Paige brand that she worked on as part of her job.  *See id.* Exs. 99-107; Murphy Decl., Ex. 53.  There is also clear evidence that much of Gutman's work occurred substantially within authorized work hours.[9]  *See* Reply Murphy Reply Decl. *e.g.,* Exs. 99, 102, 103.  There can also be no question that the use of these the Main IG Account was motivated, predominately, by a purpose to fulfill her duties to JLM, assistance with advertising programs and the promotion of JLM's Hayley Paige brand, which Gutman benefitted from.  *See* Murphy Decl., Ex. 53; Reply Murphy Decl. Exs. 88, 89, 107.  The vast majority of content featured on the Main IG Account depicts JLM content, promotes the Hayley Paige brands or was created with the use of JLM resources as part of its marketing program.  *See e.g.* Murphy Reply Decl. Exs. 106-108, 114,117, 123; Murphy Decl. Exs. 21, 24-32, 39-41, 74.

There is simply no question that, JLM owns the Main IG Account and all of its parts, including the trademark rights in and to the @misshayleypaige handle (Point II.C, *infra*), the designs and clothing that are featured in those posts and videos, the followers which are a form of customer list, and the goodwill associated therewith.  *In re Borders Grp., Inc.*, 2011 WL 5520261, at *13 (Bankr. S.D.N.Y. Sept. 27, 2011) (social media accounts, related Internet pages, content and contact/subscriber lists are property); *In re Alert Holdings, Inc.*, 148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992) (intangibles such as customer lists and goodwill are property); *In re CTLI, LLC*, 528 B.R. 359, 367-73 (Bankr. S.D. Tex. 2015) (business social media accounts provide valuable access to customers and potential customers, and "is in a sense a manifestation of the business's accrued goodwill").  Facing similar questions Courts have rejected arguments like the ones made by Gutman.  In the case *In re CTLI, LLC*, the Court rejected a business owner's claims that

---

[9] To this end JLM's employee handbooks repeatedly prohibited the use of time during the workday and use of the internet for personal matters unrelated to the business of the Company.  *See* 2011 Handbook §4.9, 2016 and 2018 Handbooks §4.11.  Gutman's claims that she answers 150-200 direct messages per day and comments on nearly 150 images per day (Gutman Decl., ¶26-27) would take up a significant portion of time, much of which was during business hours.   See Reply Murphy Decl. Exs. 99, 102, 103.

7

Facebook and Twitter pages started by him were personal accounts, and held that they were property of the Company.  528 B.R. 359, 367 (Bankr. S.D. Tex. 2015).  This holding was based on, *inter alia,* the fact that the pages were started using the company name, linked to the company website, its posts were business related, and advertised and promoted the store.  *Id.*  In addition, the owner had granted access to an employee to post status updates, and even at times associates for promotion.  *Id.*  The Court held that evidence that the owner had started the page for 'personal reasons, used it to publish personal posts, personal status updates and accessed it through his personal profile was insufficient to overcome the presumption that they were business pages.  Additionally, the fact that he may have posted personal status updates and content to the page referencing himself as an individual does not establish that the majority of posts are personal or transform the page into his personal property.  *In re CTLI, LLC*, 528 B.R. 359, 371 ( "nature of social media dictates that its best use for business is somewhat more subtle than other forms of marketing… advertising the fact that the owner of a gun store is at a gun show, far from being especially "personal" in nature, is a perfect example of this kind of subtle marketing.").

Gutman's claims should fare no different.  The Main IG Account was from its start a business account.  It was started using the JLM's trademarked name, it linked to JLM's website, and it was primarily used for the marketing and promotion of the business.  *See* Reply Murphy Decl. Ex. 122, 133; Ladell Decl., ₱13, Ex. 1, pp. 8-9, A-4, T, U.  Claims that the account was started for 'personal' reasons and occasional personal posts that are consistent with subtle marketing or a personal glimpse strategy do not transform the account to a personal one.  The HP Social Media Accounts are a manifestation of JLM's goodwill, and as such cannot be anything but assets of the business.

B. **Gutman Has, and Unless Further Enjoined, Will Continue to Breach the Agreement**

JLM will also prevail on its breach of contract claims.  The Employment Agreement clearly

8

requires that Gutman assist with JLM's "advertising programs…" *See* Murphy Decl. Ex. A §2. Gutman's argument that she has not breached these provisions because social media is not specifically identified, is utterly baseless. The Court already found that the provision "does not specifically talk about any particular advertising platform, whether, print, electronic or anything else" is not "something that would support an exclusionary inference". 12/16/20 Tr. 92:20-93:04.[10]

Furthermore, the evidence shows that the Main IG Account has been used to promote the Hayley Paige brand, under marks owned by JLM, and that JLM has invested significantly in this. As such JLM has a reasonable expectation that Gutman will continue to assist with its marketing programs, as she is contractually required to do. As set forth in JLM's moving papers the Employment Agreement also contains other restrictive covenants, including a non-compete (§9(a)), non-solicitation (§9(b)), and confidentiality (§9(c)), no use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce for any purpose (§10(b), 12) and a prohibition that for five years following the termination of her employment "she shall not be identified to the trade or consuming public as the designer, and her role as designer shall not be used to promote the sale, of any goods" competitive with JLM (§10(e)). All of these provisions are enforceable during the period Gutman agreed to be employed i.e. until August 21, 2022 (*see* Murphy Decl. Ex. 66) and then for the periods identified thereafter. *Radiology Assocs. of Poughkeepsie, PLLC v. Drocea*, 87 A.D.3d 1121, 1124, 930 N.Y.S.2d 594 (2011) (unilateral termination of the agreement during the term was ineffective because it was not an authorized method of termination and resignation was not effective until the end of the term).

In addition to Gutman's breaches of the agreement by the promotion of third-party goods

---

[10] Gutman's reliance on an unsigned draft agreement from when the parties were discussing amending the Employment Agreement, in which Gutman's duties were further explained, which was never agreed upon, also is not evidence that those duties were not included in the original Employment Agreement's broader provisions. That is especially true where Gutman repeatedly acknowledged these duties and discussed her performance of them with JLM's CEO and other employees. See Murphy Decl. Exs. 94-95, 99-106, 107-108; Murphy Decl, Ex. 45-53.

9

(*see* Murphy Decl. 69-73, 78-79; Matz Decl., Ex. 84-85, 87), and her repudiation of her obligations to assist with marketing in November 23, 2020 (Murphy Decl., Ex. 75), Gutman recently repudiated all of her obligations. *See* Reply Matz Decl. Exs. 127.  In light of the fact that the Employment Agreement is for a specified period of time, which had been properly renewed through August 1, 2022, Gutman's refusal to provide services to JLM in accordance therewith is in and of itself a breach.  Furthermore, since the issuance of the TRO, Gutman has further breached the agreement by actively interfering with JLM's marketing programs in executing her social bullying campaign which is hindering JLM's ability to use the Main IG Account *See* Reply Matz Decl. Exs. 127, 129, 130; Reply Murphy Decl., ¶6-13; Ladell Decl., ¶27-36, Ex. 1, pp. 18-21.  Gutman has also violated the non-solicitation clause in 9(b) by "directly or indirectly induc[ing] []person[s] associated with . . . the Company, to . . . terminate his association with the Company". Reply Murphy Decl., Ex. 118.  Gutman is also still using the Designer Name and Trademark in commerce, without JLM's permission, identifying herself as a designer, and is engaging in and is being associated with organizations engaging in the sale of bridal apparel, in violation of Paragraphs 9(a), 10(b), 10(e) and 12. *See* Reply Matz Decl., Ex. 125; Thomson Decl., Ex. 2.

Gutman's argument that because the Hayley Paige product lines have been successful, she did not breach her obligations in Section 3 of the Agreement, is completely without merit. Gutman's other 'enterprises', including her recent use of JLM's trademarks in commerce to endorse third party products without permission from JLM, for her own personal benefit and/or that of her fiancée, interfere with the performance of Gutman's duties, and breach 10(b) and 12.

Gutman's argument that the prohibition in §10(b) is only in connection with bridal categories is also incorrect.  The categories of the license in §10(a) does not limit the prohibition in §10(b) to bridal categories, nor is that limitation part of the definition of the Designer Names or Trademarks or referenced in 10(b).  For that matter, such limitation is also not in §12, which clearly

10

prohibits those uses "for any purpose whatsoever". This prohibition was an important part of JLM's control over the Trademarks. Reply Murphy Decl., ¶10. Had the parties intended to limit the prohibition in §10(b) to bridal categories, that language would have been incorporated, but it was not. Gutman's statement that the Court should interpret the plain meaning of the contract is correct, but the Court cannot as Gutman suggests re-write the provision to include limitations that do not exist because Gutman would like them to. Gutman's suggestion that these provisions were modified when the parties were negotiating an amendment that was never consummated in 2019 is also completely without merit. The emails Gutman points to do not modify these provisions or even discuss them. Those emails and draft agreements where the parties were discussing amending their agreement, which both sides acknowledge did not happen, are wholly irrelevant. JLM has clearly shown that Gutman has and is continuing to breach her obligations under the Employment Agreement §§ 2, 3, 9(a), 10(b), 10(e) and 12.[11]

### C. JLM is also Likely to Prevail on its Trademark Claims

Gutman has not disputed, and thus conceded that JLM is the exclusive owner of the HP U.S. Trademarks, and as such there is no dispute as to the first element of JLM's claims for trademark dilution, infringement and unfair competition. There is also no rational dispute that JLM owns a trademark in and to @misshayleypaige.[12] Gutman's argument in a footnote that JLM has not supported its claim of ownership in the @misshayleypaige mark intentionally ignores the

---

[11] Gutman's actions claiming that JLM is wrongly claiming rights in the Hayley Paige name and failure to cooperate with JLM to effectuate the ownership of the Designs and Trademarks, is also likely a separate breach of §10(b), 11 and 12. *See* Reply Matz Decl. Exs. 127.

[12] Gutman's contention that JLM is either suing itself for infringement or that the mere bringing of this claim somehow concedes that Gutman owns the Main IG Account, is absurd. The only required elements for this claim are that the Plaintiff show "that its mark merits protection, and second, that the defendant's use of a similar mark is likely to cause consumer confusion as to the origin, sponsorship, or affiliation of the defendant's goods." *Pan American World Airways, Inc. v. Flight 001, Inc*. 2007 WL 2040588, 7 (S.D.N.Y. 2007); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). A defendant's use of a similar mark does not have to be in a medium owned by the defendant to constitute infringement. If Ms. Gutman used the name in a full page ad in the New York Times, her use could (and indeed would) be infringing without conferring ownership of the newspaper upon her. That Gutman essentially hijacked the Main IG Account and used it in a manner not authorized by JLM is the crux of its claims, but that does not concede ownership to her.

11

both black letter law and the extensive factual record before this Court. It is well settled that "[t]rademark rights are acquired by use, or appropriation." *Huber Baking Co. v. Stroehmann Bros. Co.*, 252 F.2d 945, 955 (2d Cir. 1958). JLM has set forth extensive evidence of the @misshayleypaige mark on its goods and advertising for same, including on the actual hangtags of the Hayley Paige branded goods, as well as in print advertising, on its website, business cards and other examples. Murphy Decl., ¶32, Exs. 20-23, 25-32, 33, 40, 42; Reply Murphy Decl., Ex. 107, 108. JLM also owns the URL. *Id.* Ex. 116.

Gutman's assertion she has prior rights in @misshayleypaige which "extinguishes JLM's claims" must also be rejected out of hand. Even if @misshayleypaige had been used in commerce in a manner sufficient for Gutman to acquire trademark rights by Gutman prior to her employment with JLM, JLM would still own the mark. Any rights Gutman alleges to have had in the Trademarks, which included the Designer's Name "or any derivatives(s) thereof", which necessarily includes @misshayleypaige, were irrevocably transferred to JLM. Furthermore, Gutman agreed not to use them. *See* Murphy Decl., Ex. 2, ¶10(b). Based on this the argument that JLM's marks were not famous before Gutman's recent acts of infringement, also fails.[13]

Equally as disingenuous, is Gutman's argument that confusion is 'unlikely' with dissimilar uses or that there has been co-existence of the marks. Both of these arguments are premised the highly disingenuous denial of Gutman that *for years* the social media accounts were used to promote JLM's Hayley Paige branded goods, and holds goodwill associated therewith. Use of the accounts now to promote third party goods and services is likely to cause confusion in that it could lead consumers to believe that there is an association between the Hayley Paige brand and those third parties that Gutman has promoted, when there is none. *See* JLM Br. pp. 14-17.

---

[13] Although Gutman does not contest, and therefore concedes that JLM's marks are famous, dilution under New York Law, does not require a mark to be famous for dilution to apply. *See Tiffany (NJ) Inc. v eBay Inc.*, 600 F.3d 93, 111 (2d Cir 2010); *see also* Gen. Bus. Law § 360-l.

Gutman has also failed to make out an acquiescence defense. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (three elements of acquiescence. There is no evidence that JLM actively consented to Gutman's current unauthorized use and represented it would not make a claim nor is there evidence of delay. To the contrary, JLM warned Gutman that if she did not cease and desist it would pursue legal action. For a short time Gutman began complying, and when she stopped and repudiated her obligations, JLM commenced legal action. Murphy Decl., ¶68, Ex. 75; Gutman Decl., Ex. 18.

JLM has shown that Gutman has associated its Trademark with different goods of inferior quality (*compare* Murphy Decl., Ex. 20, high end bridal gowns, *with* Matz Ex. 87 protein supplements and salad dressing), which is also sufficient to constitute both dilution by tarnishment and dilution by blurring. *See e.g. Deere & Co. v MTD Products, Inc.*, 41 F3d 39, 43 (2d Cir 1994).

### D. JLM Has Also Established Likelihood of Success on its Other Claims

JLM's claims for breach of fiduciary duty are not duplicative of its breach of contract claims, that is especially true where Gutman is actively disputing the scope of the contract. Gutman does not dispute that she owed JLM a fiduciary duty, and to the extent that she engaged in acts of self-dealing to the detriment of JLM, that also constitutes a breach of her fiduciary duty.

### III. JLM IS ENTITLED TO THE INJUNCTIVE RELIEF IT SEEKS

JLM has absolutely established irreparable harm on its trademark claims. *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 343 (S.D.N.Y.2010) (finding "[p]rospective loss of ... goodwill alone" to be "sufficient to support a finding of irreparable harm"). *Genesee Brewing Co., Inc. v Stroh Brewing Co.*, 124 F3d 137, 142 (2d Cir 1997) (a showing of likelihood of confusion establishes irreparable harm). Irreparable harm will be presumed from a finding of likely dilution. *See New York City Triathlon*, 704 F Supp 2d at 326.

Injunctive relief is available on JLM's other claims as well including its breach of contract

claim.[14] "[I]rreparable harm may be found where damages are difficult to establish and measure. *See e.g. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (*citing Ticor Title Ins. Co.*, 173 F3d at 69 ("injunctive relief is appropriate where it would be "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."). JLM is facing immediate and irreparable damage to it's ability to market its goods, if it cannot utilize and control the account and its brand name. Murphy Decl., ₱75-78. If Gutman were allowed to utilize the accounts to promote non-JLM goods, it would irreparably damage the value of the HP Social Media Accounts, and dilute and tarnish the brand. Gutman's recent false and misleading smear campaign against JLM, that was designed to damage JLM, the Hayley Paige brand and the goodwill associated therewith, is also causing immediate and irreparable harm, and only makes the need for injunctive relief more urgent and necessary. Reply Murphy Decl., ₱6-13. In addition to the reputation damage, JLM has already lost some stores. *Id.,* ₱7, 12. If Gutman is not enjoined from violating §§2, 3, 9(a), 10(b), 12 and 10(e), JLM will suffer immediate and irreparable harm. Those provisions were specifically negotiated as was securing a period of Gutman's employment to protect the brand and to ensure JLM had adequate notice to plan a transition at the end of Gutman's employment contract. Without enforcement of those terms for the full time period that Gutman was to be employed, and afterwards where applicable, JLM will suffer damage to its reputation as well as customer and relationship loss. Gutman cannot be allowed to simply quit and start competing with company with over a year left on her contract, wherein she was bound to a non-compete. Furthermore they are not impermissibly vague. They are specific acts that Gutman agreed to, and are enforceable, as the terms are clearly defined. Reply Murphy Decl., ₱9.

---

[14] Gutman also consented to injunctive relief. *See* Murphy Decl. Ex.2 § 9(e), 10(b); s*ee Ticor Tit. Ins. Co. v Cohen*, 173 F.3d 63, 69 (2d Cir 1999) (contract's provision entitling plaintiff to injunctive relief was an admission of irreparable harm by defendant).

Additionally, the relief sought here is in an appropriate form. *See Ardis Health, LLC v Nankivell*, 11 CIV. 5013 NRB, 2011 WL 4965172, at *2 (SDNY Oct. 19, 2011). JLM's continued access to and control over these accounts that represent goodwill in its business and which it relies heavily on is absolutely imperative. That is especially true where Gutman has demonstrated a complete disregard for and intention to harm the Hayley Paige brands.

Gutman on the other hand, who is causing the damage is not suffering harm. As an initial matter, the opinion as to the value of the account and the damage it has sustained are wholly unreliable and inadmissible. Ladell Decl., ¶23-26. However, even if the value of the account is being damaged, Gutman alone caused it. *Id.* As JLM is merely seeking to prohibit Gutman from engaging in the foregoing actions that she has no right to engage in, the balance of the equities clearly tips in JLM's favor. Reply Murphy Decl., ¶9-13. On the other hand, Gutman does not need the Main IG Account as she has two personal accounts from which she can post, and is posting. *See* Murphy Decl. ¶72  Gutman also does not have a legitimate interest in being allowed to breach her contract with impunity.

## IV. THE ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC INTEREST

The public's interest is also served by protecting JLM's trademark rights and preventing consumer confusion, and enforcing the terms of the Employment Agreement that Gutman willfully violated, including those that were specifically negotiated to protect the brand and JLM's ability to successfully transition after the period of Gutman's employment. *Id.* ¶8-13. The public interest is also served by enjoining Gutman from continuing her online smear campaign that is actively interfering with and causing further breach of her obligation to assist with marketing programs. The public interest is not served by allowing Gutman to destroy the Hayley Paige brand and all of the goodwill associated therewith because she now does not like the agreement she voluntarily signed and profited tremendously from.

Dated: New York, New York  
      December 15, 2020

Respectfully submitted,  
ADELMAN MATZ P.C.

By: <u>  /s/Sarah M. Matz                  </u>  
    Sarah M. Matz, Esq.  
    Gary Adelman, Esq.  
1173A Second Avenue, Suite 153  
New York, New York 10065  
Tel: (646) 650-2207  
Email: sarah@adelmanmatz.com  
Email: g@adelmanmatz.com  
*Attorneys for Plaintiff*