UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JLM COUTURE, INC.,

           Plaintiff,

  -v-                                        No.  20 CV 10575-LTS-SLC

HAYLEY PAIGE GUTMAN,

           Defendant.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

        The issues in this case include a novel dispute, over the control and use of social

media accounts, between a leading bridal wear designer and the manufacturer from whose

employ she recently resigned.  Plaintiff JLM Couture, Inc. ("Plaintiff" or "JLM") brings this

action against Defendant Hayley Paige Gutman ("Defendant" or "Ms. Gutman"), the lead

designer of certain of JLM's prominent lines of bridalwear and related merchandise, asserting

federal and state law claims of trademark infringement and dilution, false designation of origin,

unfair competition, conversion, trespass to chattel, breach of fidelity, breach of contract, breach

of fiduciary duty, and unjust enrichment arising principally from Defendant's activities in

connection with social media accounts.  (Complaint, Docket No. 1.)  Before the Court is

Plaintiff's application pursuant to Federal Rule of Civil Procedure 65 for preliminary injunctive

relief barring Defendant from, among other things, altering the attributes and content of certain

social media accounts without Plaintiff's permission and from engaging in activities that

Plaintiff maintains constitute breaches of provisions of the 2011 employment contract between

the parties.  (Docket Entry No. 12.)  The Court entered an order to show cause and temporary

restraining order on December 16, 2020 (Docket Entry No. 8), and, after discovery and an

adjournment at the parties' request, held an evidentiary hearing on the preliminary injunction

motion on February 4, 2020.  The Court has jurisdiction of this matter pursuant to 15 U.S.C.

section 1121, and 28 U.S.C. sections 1138(a) and 1331, and 1367(a)

In accordance with Federal Rule of Civil Procedure 52(a), this Memorandum

Opinion and Order constitutes the Court's findings of fact and conclusions of law.  To the extent

any finding of fact includes a conclusion of law it is deemed a conclusion of law, and vice

versa.

The Court has reviewed carefully all of the parties' submissions and evidence

and has had the opportunity to observe the demeanor and assess the credibility of the witnesses.

For the following reasons, the Court grants in part and denies in part Plaintiff's motion for a

preliminary injunction.

## FINDINGS OF FACT

The Court finds as follows.

By written contract dated July 13, 2011, as amended and extended (the

"Contract", Docket Entry No. 14, Exh. 2), Hayley Paige Gutman agreed to work for Plaintiff,

JLM Couture, a company in the luxury bridal design and manufacturing industry, as a designer

of brides', bridesmaids', and evening wear and related apparel.  (Docket Entry No. 14, at ¶¶ 3,

6; Docket Entry No. 106, Preliminary Injunction Hearing Transcript ("P.I. Tr."), 129:19-24.)[1]

---

[1]     The "Contract," as the term is used herein, comprises the 2011 employment agreement
(Docket Entry No. 14, Exh. 2), as amended by the 2014 amendment extending that
agreement through August 1, 2019, (Docket Entry No. 14, Exh. 62), and the February
12, 2019, notice letter exercising Plaintiff's option to further extend Defendant's
employment term by three years through August 1, 2022.  (Id., Exh. 66.)  While
Defendant argues that she rejected additional duties proposed after the 2019 extension,

The original 2011 Contract provided that its term would run from the date of execution through August 1, 2016, unless it was further extended by Plaintiff JLM (Contract, § 1); as noted above (see note 1), it has been extended through August 1, 2022.  The Contract provides for termination by the Plaintiff for or without cause, and in the event of Defendant's death or disability (Contract, §§ 7, 8).  It includes no provision permitting Defendant to terminate it unilaterally.

In the Contract, Ms. Gutman agreed, inter alia, to perform certain duties and granted Plaintiff certain exclusive rights to use and trademark the name "Hayley Paige" and variations thereof.  (See generally Contract.)  Ms. Gutman also granted Plaintiff "the exclusive world-wide right and license to use her name 'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Paige' or any derivative thereof ([defined] collectively [as] the 'Designer's Name')" for certain purposes during the stated term of the Contract and for two years thereafter.  (Contract, § 10(a).)  Explicitly in exchange "for the assignment to the Company of the Designer's Name and the Trademarks," JLM agreed to pay Ms. Gutman as consideration, in addition to her base pay and additional sales volume-related compensation, and for ten years following the termination of her employment with the company, a further percentage of "net revenues derived from the sale of goods under the Designer's Name and Trademarks based on the Designer's [N]ame."  (Contract, § 10(c)(i); P.I. Tr. 183:18-23.)  The parties engaged in "rounds of negotiations" over the terms of the Contract, during which Ms. Gutman referenced a "Kenneth Pool example" and asked to "add perpetuity language."  (Docket Entry No. 60, at ¶ 6.)  Ms. Gutman represented to Plaintiff during the negotiations that she had

---

she does not dispute that Plaintiff validly extended the Contract.  (Docket Entry No. 39, at 7.)

an attorney review the Contract during the negotiations, a statement she now claims was untrue. (P.I. Tr. 182:3-8.)

On September 12, 2011, Ms. Gutman signed a trademark registration acknowledgment, confirming that she had transferred all trademark rights in the name "Hayley Paige" and any derivatives thereof to JLM and that she consented to the registration of the trademark "Hayley Paige." (Docket Entry No. 14, Exh. 3.)  On July 19, 2021, JLM exercised its rights under the Contract by registering the trademark "Hayley Paige." (Docket Entry No. 14, Exh. 4.)[2]

The Contract provisions that are material to this preliminary injunction motion practice read in pertinent part as follows:

> Section 2.  Duties.  . . . the Employee shall be employed as a designer of a line of brides and bridesmaids dresses . . . [and] the Employee shall perform such other duties and services commensurate with her position as a designer for the Company, as may be assigned to her by an officer of the Company, including, but not limited to . . . assisting with advertising programs . . . .
>
> Section 9(a).  Covenant not to Compete.  Employee covenants and agrees that during the period of her employment with the Company, Employee shall not compete with the Company, directly or indirectly. For purposes of this Agreement, Employee shall be deemed to compete with the Company if she engages in, or is associated with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids, mother of the bride and flower girls and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by the Company.
>
> Section 9(e).  [Damage in case of Breach.]  In the event that the Employee shall violate any provision of this Agreement (including but not limited to the provisions of this Paragraph 9), the Employee hereby consents to the granting of a temporary or permanent injunction against her by any court of competent jurisdiction prohibiting her from violating any provision of this Agreement. In any proceeding

---

[2]     Plaintiff has registered the trademarks listed in Addendum 2 to this Memorandum Opinion and Order.  (See Docket Entry No. 14, at ¶¶ 15, 32.)

for an injunction, the Employee agrees that her ability to answer in damages shall not be a bar or interposed as a defense to the granting of such temporary or permanent injunction against the Employee. The Employee further agrees that the Company will not have an adequate remedy at law in the event of any breach by the Employee hereunder and that the Company will suffer irreparable damage and injury if the Employee breaches any of the provisions of this Agreement.

Section 10(a).  <u>Exclusive Right to the Designer Name</u>.  The Employee hereby grants to the Company the exclusive world-wide right and license to use her name 'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Paige' or any derivative thereof (collectively the 'Designer's Name') in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including any and all good will associated therewith, throughout the Term (including any extension of the Term), plus a two (2) year period following the Term or any extension thereof, provided Employee has substantially participated in the design or creation of such clothing or related items during her employment by the Company.

Section 10(b).   [<u>Trademark Rights</u>.]   The Employee hereby irrevocably sells, assigns, and transfers all right, title and interest to the Company that now exists or may exist during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s) thereof as trademarks or service marks (the 'Trademark' or 'Trademarks') . . . The Trademarks shall in perpetuity be the exclusive property of the Company, the Employee having consented to it being filed by the Company and the Employee thereof shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce during the Term or any time thereafter without the express written consent of the Company. The Company shall be solely permitted to license the Trademarks to a third party.

Section 11.  <u>Designs and Intellectual Property</u>.  The parties expressly agree that all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Employee in connection with her employment with the Company involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by the Company through the Term of the Employment Agreement and any extensions thereof (collectively, the 'Designs'), are works for hire, and ownership of any intellectual property arising from or related to the Designs shall be the sole and exclusive property of the Company . . .  If, for any reason, the Designs, or any portion thereof, are deemed not to be a work made for hire, then the Employee irrevocably, absolutely and unconditionally assigns to the Company (a) all of right, title and interest in and to the Designs and/or any portion thereof (whether arising under copyright law, trademark law, or otherwise), including to the extent applicable, but not limited to, the exclusive rights enumerated in 1 U.S.C. Section 106, and all extensions and renewals thereof, and (b) all moral rights with respect to the Designs, including but not limited to, any and all rights of identification of authorship and any and all rights

of approval, restriction or limitation on use or subsequent modifications relating to the Designs.

Section 12.  <u>Use of Designs</u>.  Employee agrees and acknowledges that after such time as she is no longer employed by the Company, she shall have no right to use the Designs or any Trademarks owned by the Company, or any variations, versions, representations or confusingly similar facsimiles thereof, in trade or commerce for any purpose whatsoever.

Section 15.  <u>No Waiver</u>.  The failure of any of the parties hereto to enforce any provision hereof on any occasion shall not be deemed to be a waiver of any preceding or succeeding breach of such provision or of any other provision.

In 2004, prior to contracting with Plaintiff, Defendant opened a Facebook account under the name Hayley Paige, using the URL www.facebook.com/misshayleypaige, as well as Twitter and LinkedIn accounts using the same or similar terms.  (Docket Entry No. 44, at ¶¶ 8-9.)  "Miss Hayley Paige" is a term of endearment for Defendant used by her mother.  (<u>Id.</u>, at ¶ 8.)  On April 6, 2012, while employed by Plaintiff, Defendant also opened an Instagram account (the "Account").  (<u>Id.</u>, at ¶ 11.)  Defendant proffers that, when she created the Account, her given name was already "taken by another person, so [she] went with MISS-my name," creating the Instagram handle @misshayleypaige.  (Docket Entry No. 75, Exh. 45.)  Defendant also opened Pinterest and TikTok accounts under the name Miss Hayley Paige after becoming Plaintiff's employee.  (Docket Entry No. 44, at ¶ 9.)[3]

Ms. Gutman used the Account to display aspects of her life and her personality, posting images, text, and videos that focused on her parents, her travels, and her hobbies.  (<u>See, e.g.</u>, Docket Entry No. 44, ¶¶ 12-21; <u>id.</u>, Exh. 1.)  She also regularly used the Account in conjunction with Plaintiff's advertising programs to display Plaintiff's gowns and apparel.  (<u>See, e.g.</u>, Docket Entry No. 14, Exh. 74; Docket Entry No. 60, Exh. 133.)  For at least some

---

[3]      The JLM HP Social Media Accounts at issue in this case are listed in Addendum 1 to this Memorandum Opinion and Order.

periods prior to late 2019, the Account's biographical section identified Defendant as a public figure[4] in addition to displaying links to Plaintiff's PR department email address and the website www.hayleypaige.com, which is owned by Plaintiff (Docket Entry No. 14, at ¶ 23). (See Docket Entry No. 14, ¶ 62, Exhs. 19, 58, 59; Docket Entry No. 60, Exh. 117.)   Plaintiff funded giveaways of its goods to followers of the Account, including "wedding dresses, athleisurewear, and accessories."  (Docket Entry No. 14, at ¶ 47.)

Ms. Gutman discussed a marketing strategy for the Hayley Paige brand of bridalwear with JLM's President and CEO Joe Murphy ("Mr. Murphy"), whereby they would "combine the personality with the brand."  (P.I. Tr. 41:10-11; see also Docket Entry No. 14, Exhs. 45-51.)  Mr. Murphy testified credibly that this was the Hayley Paige brand's marketing strategy "from day one."  (P.I. Tr. 41:4.)  He explained further that "smart phones had just started to become ubiquitous," so the "personalized touch . . . [of] somebody who was close to the same age as [the] brides in th[e] millennial demographic" was "blended with the rest of [Plaintiff's] advertising marketing program".  (Id., 41:13-25.)  JLM also marketed Hayley Paige-branded products using television and print media (Docket Entry No. 14, at ¶ 10), but the Account's unique blend of product and personality was "a big part of [Plaintiff's] strategy because then brides feel closer to the brand," Svetlana Gryazeva, a social media coordinator for Plaintiff, testified credibly.  (P.I. Tr. 61:23-24; see also id., 41:4-5, 10-11, 64:22-65:2.)  The Account displayed pictures of "behind-the-scenes" activity at Plaintiff's photo shoots and events.  (P.I. Tr. 17:10; id., 62:20-21; Docket Entry No. 15, at ¶ 9.)  Defendant attended these

---

[4]     A verified "public figure" designation requires an individual to affirm that they run the account and provide a government-issued ID.  (Docket Entry No. 41, at ¶ 17.)  Plaintiff's expert opined that Instagram's designation of "public figure" can be used by a "brand, entity, or individual," and that verification affirms authenticity but not an individual's ownership of the account.  (Docket Entry No. 61, at ¶ 22; Exh. 1, at 13-14.)

photo shoots and events in her capacity as the lead designer for the Hayley Paige brand.  (P.I. Tr. 157:4-9.)  The Account also displayed pictures of vendors selling or brides wearing Plaintiff's gowns.  (Docket Entry No. 15, at ¶ 9.)

   Plaintiff provided Defendant with photos from its fashion shoots and shows and draft captions for photographs related to the Hayley Paige-branded goods to be posted on the Account.  (See, e.g., Docket Entry No. 15, at ¶ 5.)  Ms. Gutman composed all or substantially all of the captions displayed with images on the Account, as well as other narrative content.  (Docket Entry No. 47, at ¶ 25.)  Plaintiff believed that the success of its brand depended on its ability to "immediately and seamlessly modify the content" of the Account.  (Docket Entry No. 14, at ¶ 34.)  Ms. Gutman, who was Plaintiff's employee and was the lead designer of the goods, had discretion to post to the Account to maintain engagement and respond to direct messages from followers.  (Docket Entry No. 14, at ¶¶ 37, 38; P.I. Tr. 153:3-5.)  Defendant responded to direct messages about her personal life and answered questions about Plaintiff's products.  (Docket Entry No. 14, at ¶ 37; Docket Entry No. 44, at ¶ 20.)  In 2019, Defendant asked Plaintiff to hire a "Social Media Director/Strategist" to "manage the digital media marketing efforts and day-to[-]day activities/posts on all platforms."  (Docket Entry No. 14, Exh. 53.)  Ms. Gutman specified in her email proposing the Social Media Director/Strategist position that this proposed director would oversee the @misshayleypaige Instagram, and that the director would help "maintain the balance specifically on the @misshayleypaige account . . . [because] I think it's important that we do not dilute this Instagram with too much promotion/advertisement so that we can maintain the aesthetic and personality of the brand."  (Id.; see P.I. Tr. 174:1-12.)  Defendant noted in her email that Plaintiff's employee Brittany Noe helped to respond to comments and direct messages on the Account, but that Defendant's

efforts were getting distracted.  (Docket Entry No. 14, Exh. 53.)  Ms. Noe's declaration confirms that she and Defendant shared the responsibility of managing the Account, and that she responded to comments and direct messages sent to the Account and fixed errors in Defendant's posts.  (Docket Entry No. 15, at ¶ 6.)

Ms. Gutman also requested that Plaintiff's employees write content for the Account.  For instance, in the aftermath of a terror attack in England, Mr. Murphy suggested that Defendant "say something about the Manchester event," to which Ms. Gutman responded, "could someone write it for me or think of a proper caption?"  (Docket Entry No. 98, Exh. P-192.)  Mr. Murphy provided a draft caption and told Defendant to "wait on IG to do anymore posts till England wakes up."  (Id.)  This was not the only explicit direction Mr. Murphy provided Defendant as to the Account's content and the timing of posts.  In another exchange, Defendant asked Mr. Murphy whether it was "Ok to post some blush images?"[5]  (Docket Entry No. 98, Exh. P-193.)  In another, she asked him "Ok to post on Insta? Or wait?"  (Docket Entry No. 98, Exh. P-194.)  In an email exchange, Defendant apologized for forgetting to tag a boutique selling Plaintiff's goods, stating that her failure to tag the boutique in the Account's photo was "a neglectful oversight on my part."  (Docket Entry No. 60, Exh. 93.)   Defendant corrected that oversight at Plaintiff's request.  (Id.)

Plaintiff made social media, including the Account itself, a part of its efforts to market the Hayley Paige brand.  Plaintiff identified its goods with reference to the Account by putting "@misshayleypaige" on hang tags of the physical garments and including the Account handle and other social media reference information in print advertisements.  (Docket Entry No.

---

[5]       Blush by Hayley Paige is a fashion label within the grouping of labels based on Defendant's name that Plaintiff refers to as "the HP brands."  (Docket Entry No. 14, at ¶ 13.)

14, Exhs. 20-32, 42; id. at ¶ 10.)  Plaintiff's Public Relations representative, Ms. Noe, responded to email inquiries, which consisted mainly of industry-related appearance requests for Defendant, sent to the PR department address listed in the Account's biographical section. (Docket Entry No. 15, at ¶ 7.)  Brides who asked questions directly of the Account were mostly asking, in Defendant's own assessment, "about where to find the gowns."  (Docket Entry No. 60, Exh. 102.)

In July of 2020, Ms. Gutman entered into an "influencer" deal with Chosen Foods, a salad dressing company.  (Docket Entry No. 14, Exh. 68; P.I. Tr. 192:9.)  The evidence showed that the term "influencer" refers to the holder of a social media account that is viewed by a large enough number of other social media accounts that the account holder can feature the goods or services of another person or entity in the account's content in exchange for payment.[6]  (See Docket Entry No. 41, at ¶ 22 (describing influencer monitoring tools and metrics); Docket Entry No. 61, at ¶ 18 (Mega Influencers "operate their account in a business manner").)  Under her contract with Chosen Foods, Ms. Gutman received compensation in exchange for promoting Chosen Foods' products in posts to the Account.  (P.I. Tr. 192:7-9; P-178.)  Ms. Gutman did in fact post photos promoting Chosen Foods to the Account.  (Docket Entry No. 14, Exh. 68.) She also provided Chosen Foods with analytics for the Account.  (Id., 192:10-13.)  Analytic information, which displays information such as the number of other accounts reached in a given time period and the level of engagement with those accounts, is a "backend" tool

---

[6]     The parties dispute whether the Account warrants designation as a "Mega Influencer." Defendant's expert opines that an individual with an account that has over 1 million followers is a Mega Influencer.  (Docket Entry No. 41, at ¶ 15.)  Plaintiff's expert opines that Mega Influencers are more often celebrities whose accounts are followed by tens of millions of accounts and whose posts are valued at over $1,000,000 each.  (Docket Entry No. 61, at ¶ 18.)  The Court need not resolve this semantic dispute, and simply notes that "influencer" status is related to the monetization of a social media account.

available only to those with the Account's access credentials.  (Docket Entry No. 61, at ¶ 25:
Exh. M.)

Ms. Gutman also used the Account to promote a nutritional supplement product
of another third party, Optimum Whey.  (Docket Entry No. 14, at ¶ 65; id., Exh. 78.)  Defendant
is also shown on the Optimum Whey website in an "influencer" capacity (P.I. Tr. 188:17-25),
identified by name as a member of "TEAM ON," and described as a "wedding dress designer,
diamond ambassador . . . [who has had] her gowns worn by celebrities, influencers and TV
personalities."  (Docket Entry No. 58, Exh. 125.)  The page on the Optimum Whey website also
describes her work in developing a wedding-focused emoji app for Plaintiff.  (Docket Entry No.
58, Exh. 125; see also Docket Entry 14, Exhs. 36, 37, 42.)  Defendant testified at the hearing
that she did not have a "formal or informal agreement with Optimum" (P.I. Tr. 188:4), and that
she did not give Optimum Whey permission to use her name on its website.  (Id., 188:7.)  Ms.
Gutman admitted, however, that she had entered into an "informal agreement" (id., 191:12-13)
with her fiancé, who had a contract with Optimum Whey, under which the fiancé gave
Optimum Whey permission to use Ms. Gutman's name on her behalf.  (Id., 189:14-17.)
Defendant wrote in an email to Optimum Whey that she was "happy to have all payments go
through [my fiancé's] contract. I can easily share/post content to my stories at least one or two
times a month for now until the terms of my existing contract with my company are
negotiated."  (P.I. Tr. 189:24-190:3.)  Ms. Gutman was referring to the Account and asking for
payment in exchange for her involvement with Optimum Whey.  (Id., 190:8-18; P-182.)  As a
part of Defendant's "informal agreement" with her fiancé, he used the Hayley Paige name to
promote Optimum products.  (Id., 191:20-24.)  Defendant did not have JLM's permission to use
the Designer's Name or the Account to promote the products of Chosen Foods or Optimum

Whey.  (Docket Entry No. 14, at ¶ 65.)  Followers of the Account responded to these promotional posts by asking where they could buy the Chosen Foods and Optimum Whey products.  (See, e.g., Docket Entry No. 17, Exhs. 84-87.)

        In the summer of 2019, after JLM extended Defendant's Contract, the parties engaged in unsuccessful negotiations to amend the terms of the Contract.  (Docket Entry No. 14, at ¶¶ 58, 68; Docket Entry No. 44, at ¶ 47.)  JLM's proposed terms specified that Defendant's duties included "social media monetized opportunities such as . . . Instagram." (Docket Entry No. 44, at ¶ 50.)  Defendant did not accept Plaintiff's proposed terms.  (Id. at ¶¶ 52, 53.)   In November 2019, Defendant changed the access credentials for the Account and did not share them with Plaintiff.  (Docket Entry No. 14, at ¶¶ 42, 64.)  Mr. Murphy believed Defendant's actions were a negotiating tactic and JLM took no action to regain access to the Account.  (Docket Entry No. 14, at ¶ 68.)

        As of November 17, 2020, the Account had over 1.1 million followers.  (Docket Entry No. 14, at ¶ 45.)  On November 23, 2020, Defendant informed Plaintiff that she would "not be posting any JLM related business" to the Account.  (Docket Entry No. 14, Exh. 75.) JLM commenced this lawsuit on December 15, 2020.  (Docket Entry No. 1.)

        Subsequent to this Court's issuance of a Temporary Restraining Order (the "TRO," Docket Entry No. 8) (directing Defendant to turn over control of the Account and certain other social media accounts to Plaintiff and prohibiting Plaintiff from altering or posting to the accounts without Plaintiff's permission, breaching the Contract by using the Designer's Name or Trademarks to advertise products or services of herself or others), Defendant disseminated a series of public video statements through a separate Instagram account.  On December 17, 2020, Defendant posted a video to that account, announcing that she had decided

to resign from Plaintiff's employ, accusing Plaintiff of deceiving the followers of the Account by not revealing the resignation and the fact that Defendant was no longer authoring copy or direct message ("DM") responses for the Account, and relating her opinions of Plaintiff and its conduct in connection with her Contract.  (Docket Entry No. 58, Exh. 127.)  Defendant also published at least two additional videos discussing the merits of this litigation, Defendant's opinions about her experience working for Plaintiff, and Defendant's account of the impact this litigation has had on her life.  (See Docket Entry No. 58, Exhs. 129, 130; Docket Entry No. 75, Exh. 45.)

Since the TRO was issued, Plaintiff has changed the biographical section of the Account by replacing the "Public Figure" designation with "clothing brand," (Docket Entry No. 75, Exh. 47), deleted Defendant's self-description and reinstated Plaintiff's website and PR email address links (compare Docket Entry No. 74, Exh. 54 with Docket Entry No. 44, Exh. 5), posted images of JLM HP-labeled products (Docket Entry No. 80, at ¶ 8), and assigned its employees to respond to messages to the account.

Citing the Contract, its registered trademarks, and Plaintiff's conduct before and after the issuance of the TRO, Plaintiff now seeks preliminary injunctive relief as follows:

A.    During the pendency of this action, Defendant, along with her officers, agents, servants, employees, and attorneys and all other persons who are in active concert or participation with her and them, are enjoined from taking any of the following actions:

(i)     making any changes to any of the social media accounts listed in [**Addendum 1**] (the 'JLM HP Social Media Accounts'), including but not limited to changing the name of the handles on the accounts, posting any new content

thereto and/or deleting or altering any content located therein, from tagging any other posts, users or accounts, transferring any such accounts or the right to use any such account from Defendant to any other person except to JLM, or communicating with third parties through same for commercial purposes, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

(ii)      utilizing, or taking any action to gain exclusive control over, any of the JLM HP Social Media Accounts, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

(iii)     Breaching JLM's Employment Agreement with Defendant, dated July 13, 2011, together with the amendments and extensions thereto, by:

(a)      using, or authorizing others to use, 'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Pa[i]ge' or any derivative thereof, including misshayleypaige (collectively the 'Designer's Name'), trademarks in the Designer's Name, including but not limited to the trademarks identified [at **Addendum 2]** (collectively, the 'Trademarks'), or any confusingly similar marks or names in trade or commerce, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

(b)      until August 1, 2022, directly or indirectly interfering with JLM's advertising programs, including but not limited by (i) interfering with JLM's use of the Designer's Name, Trademarks, or JLM HP Social Media Accounts; (ii) publicly disparaging JLM; or (iii) continuing Defendant's social media bullying campaign;

(c)      until August 1, 2022, directly or indirectly, engaging in, or being associated with (whether as an officer, director, shareholder, partner, employee, independent

contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids, mother of the bride and flower girls apparel and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by JLM;

(d)      until August 1, 2024, directly or indirectly inducing any person associated with or employed by JLM or any subsidiary of JLM, to leave the employ of or terminate their association with JLM, or any subsidiary of JLM, and soliciting the employment of any such person on Defendant's own behalf or on behalf of any other business enterprise;

(e)      using or authorizing others to use any Designs,[7] or any of the Trademarks or any variations, versions, representations or confusingly similar facsimiles thereof, in trade or commerce for any purpose whatsoever;

(f)      directly or indirectly, disclosing to any person, not authorized by JLM to receive or use such information, any of JLM's financial information, marketing plans, strategies, trade secrets, data, know-how, process, techniques, designs, styles, customer lists or other proprietary information of JLM or its affiliates (the 'Confidential Information'), or give any Confidential Information to any person not authorized by JLM to receive it;

---

[7]      "Designs," as used in Plaintiff's proposed order (Docket Entry No. 86), refers to "all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Gutman in connection with her employment with JLM involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, created from the commencement of her employment by JLM through August 1, 2022."

(g)      until August 1, 2027, (i) being identified, or authorizing or allowing others to identify, her to the trade or consuming public as a designer; or (ii) using, or authorizing others to use, her role as designer, to promote the sale, of any goods in competition with goods manufactured and sold by JLM or its licensees;

(iv)      using or authorizing others to use any of the Designer's Names, Trademarks or any confusingly similar term, name, symbol or device, or any combination thereof, in commerce in connection with any goods or services, including to endorse, advertise or promote the products and/or services of herself or others directly or indirectly, including but not limited to on social media or in television or media appearances, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy; or

(v)      from using, or authorizing others to use, the Designer's Names, Trademarks or any confusingly similar term, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy; and

. . . that during the pendency of this action, to the extent not previously delivered, within twenty four (24) hours of this Order Defendant shall deliver to JLM's attorneys the current login credentials, including the current username and password for the Main IG Account, the Pinterest account and the TikTok account with the handle @misshayleypaige, and take any action necessary to enable JLM to regain access and control to any of the JLM HP Social Media Accounts including linking the accounts to one of JLM's email addresses and/or phone numbers and/or other social media accounts as requested.

(Proposed Preliminary Injunction Order, Docket Entry No. 86.)

<u>CONCLUSIONS OF LAW</u>

A party seeking a preliminary injunction must demonstrate: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "the balance of hardships tips in the plaintiff's favor;" and that (4) the "public interest would not be disserved" by the issuance of a preliminary injunction. <u>Salinger v. Colting</u>, 607 F.3d 68, 79-80 (2d Cir. 2010).  A different, more demanding standard applies where a proposed preliminary injunction would impose affirmative obligations upon a defendant.  Such a mandatory injunction is warranted only upon a "clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  <u>Tom Doherty Assocs, Inc. v. Saban Entertainment, Inc.</u>, 60 F.3d 27, 34 (2d Cir. 1995).

<u>Likelihood of Success on the Merits of the Breach of Contract Claims</u>

The parties dispute the meaning of the provisions of the Contract describing Defendant's duties and the scope of its provisions transferring the right to use Ms. Gutman's name.  "[W]hether the language of a contract is unambiguous, and, if so, what construction is proper, are legal questions." <u>Seiden Associates, Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 429 (2d Cir. 1992); <u>see also</u> <u>JA Apparel v. Abboud</u>, 568 F.3d 390, 396-97 (2d Cir. 2009). Ambiguity is determined by looking within the four corners of the Contract, not to outside sources.  <u>Kass v. Kass</u>, 91 N.Y.2d 554, 566 (1998).  Only if a contract is ambiguous may a court look to extrinsic evidence to determine the parties' rights.  <u>Metropolitan Life Insurance Co. v.</u>

RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990).  Accordingly, the Court must first examine the Contract to determine whether the provisions at issue are ambiguous.

Contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (citation omitted).  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."  Id.  Instead, "[a]mbiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) (internal quotation marks omitted).

As an initial matter, the parties dispute whether Ms. Gutman remains bound by the provisions of the Contract that apply during its Term in light of Defendant's December 17, 2020, publicly-announced resignation (Docket Entry No. 58, Exh. 127).  (Compare Docket Entry No. 59, at 9, with Docket Entry No. 39, at 8.)  The Contract defines its "Term" as commencing on the date of full execution and extending until August 1, 2016, and further provides that the Term could be extended unilaterally by JLM for up to a total of six years. Plaintiff has invoked the extension provisions; the Term currently runs through August 1, 2022.[8]  (See Docket Entry No. 14, Exh. 66.)  According to Section 13 of the Contract, the

---

[8]     Defendant does not dispute that Plaintiff validly extended the Contract.  (Docket Entry No. 39, at 7.)

authorized methods of terminating the Contract are termination by JLM for cause or termination

by JLM without cause.[9]  The Contract is thus for a definite term and it includes no provision

empowering Ms. Gutman to terminate it unilaterally.  See Rooney v. Tyson, 697 N.E.2d 571

(1998) (applying New York law, and holding the at-will doctrine inapplicable to employment

agreements for a definite duration).  Because the Contract does not provide for unilateral

termination by Defendant, her announced resignation was ineffective to extinguish her duties as

an employee thereunder, see, e.g., Radiology Assocs. of Poughkeepsie, PLLC v. Drocea, 930

N.Y.S.2d 594 (N.Y. App. Div. 2011) (unilateral termination was not an authorized method and

resignation therefore was not effective until the term ended), and did not alter the Contract

Term.[10]  While a preliminary injunction cannot enforce the Contract to the extent it requires

Defendant to perform personal services through the Term of the Contract, see In re CTLI, LLC,

528 B.R. 359, 367 (Bankr. S.D. Tex. 2015) (citing the Thirteenth Amendment), a preliminary

injunction can prohibit Ms. Gutman from engaging in conduct that would breach Contract

provisions that apply during her Term of employment.  Here, the relief sought by Plaintiff

---

[9]    Separate provisions govern termination in the event of Defendant's death or disability. (Contract, §§ 7, 8.)

[10]   Because the Court finds that the Contract Term extends to August 1, 2022, Plaintiff's request for injunctive relief is not ripe to the extent it would specifically prohibit Defendant from identifying herself in commerce as the designer of goods in competition with JLM until Aug. 1, 2027.  (Docket Entry No. 86, at ¶ A(iii)(g).)  Plaintiff argues this request is supported by Defendant's alleged breach of Section 10(e) of the Contract. However, that provision imposes restrictions "for a period of five years following termination of [Defendant's] employment."  (Contract, § 10(e)) (emphasis added.) Similarly unripe is Plaintiff's request, based on Section 9(b) of the Contract, for injunctive relief prohibiting Defendant from "directly or indirectly inducing any person associated with or employed by JLM . . . to leave the employ of or terminate their association with JLM," because that provision of the contract only applies for the two years following the Term of the Contract.  (Contract, § 9(b).)  As discussed below, however, other Contract provisions restrict Defendant's activities in commerce during the Term of the Contract.

includes prohibitions on actions involving the commercial use of Ms. Gutman's name, which

has been trademarked pursuant to the Contract, and variations thereof.

The Court's analysis of the Contract in relation to the use of Defendant's name

begins with Section 10(a), which grants Plaintiff

> the exclusive world-wide right and license to use her name
> "Hayley", Paige", "Hayley Paige Gutman", "Hayley Gutman",
> "Hayley Paige" or any derivative thereof (collectively the
> "Designer's Name") in connection with the design, manufacture,
> marketing and/or sale of bridal clothing, accessories and related
> bridal and wedding items, including any and all good will
> associated therewith, throughout the Term (including any
> extension of the Term), plus a two (2) year period following the
> Term or any extension thereof, provided Employee has
> substantially participated in the design or creation of such clothing
> or related items during her employment by the Company.

(Contract, §10(a)).  This provision unambiguously transfers to Plaintiff the exclusive right to

use the name Hayley Paige and any derivatives in connection with bridal goods that Defendant

substantially participated in designing or creating during her employment until August 1, 2022,

and for two years thereafter.  The term Designer's Name also unambiguously encompasses

"misshayleypaige" and "@misshayleypaige," which are derivatives of "Hayley Paige."

Defendant's conclusory argument to the contrary – that the Designer's Name only includes the

versions of her name listed in Section 10(a) (see Docket Entry No. 39, at 17)  – reads the term

"any derivative" out of the contract provision (Contract, § 10(a)), and thereby violates the well-

settled principle that courts must give every term of a contract independent meaning.  See Kelly

v. Honeywell International, Inc., 933 F.3d 173, 183 (2d Cir. 2019) (courts "must avoid an

interpretation of an agreement that renders one of its provisions superfluous") (citation omitted).

A "derivative" is "[s]omething that is based on another source."[11]  Though the scope of the phrase "any derivative" is certainly broad, it is not indefinite or imprecise, particularly as applied to uses that incorporate terms specifically listed in the Contract.  That there is no reasonable basis for a difference of opinion as to its meaning is, perhaps, evidenced best by Defendant's failure to offer any alternative definition of "any derivative."  Because the core of the term "misshayleypaige" is the name Hayley Paige (Docket Entry No. 75, Exh. 2) (Ms. Gutman explained in her post-TRO video that, when she established the Account during her employment with Plaintiff, "my name was taken by another person, so I went with MISS-my name"), the Account handle is a name to which Defendant has granted Plaintiff exclusive commercial rights under Section 10(a) of the Contract for the purposes set forth in that provision.

Defendant's contractual transfer to Plaintiff of the right to use and control the use of the variation of the Designer's Name that is embodied in the Account handle is made still clearer by Section 10(b) of the Contract, which grants Plaintiff the exclusive right to register and use trade and service marks in the Designer's Name and derivatives thereof and unambiguously provides that Plaintiff cannot make commercial use of marks that JLM has registered, the Designer's Name, or any confusingly similar marks or names, without JLM's express written consent.  Section 10(b) provides in pertinent part that Defendant

> irrevocably sells, assigns, and transfers all right, title and interest to the Company that now exists or may exist during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s) thereof as trademarks or service marks (the 'Trademark' or 'Trademarks') with the USPTO and/or other authorities in the United States or

---

[11]     Derivative, oxforddictionaries.com.
https://premium.oxforddictionaries.com/us/definition/american_english/derivative (last visited March 3, 2021.)

abroad.  Except as otherwise provided herein, the permission of the Employee to the Company to so register the Trademarks shall be exclusive and perpetual and is hereby granted in exchange for good and valid consideration . . .  The Trademarks shall in perpetuity be the exclusive property of the Company, the Employee having consented to it being filed by the Company and the Employee thereof shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce during the Term or any time thereafter without the express written consent of the Company.

(Contract, § 10(b).)

Plaintiff argues that Ms. Gutman breached this provision by using the Account, whose handle is itself a Designer's Name, commercially to endorse third-party products for compensation and without Plaintiff's permission.  (Docket Entry No. 59, at 10.)  Ms. Gutman's argument that her use of "misshayleypaige" to promote third-party goods without JLM's permission does not violate the Contract because the definition of "Designer's Name" extends only to uses of those terms that are related to bridal goods designed or created by Defendant is unavailing, for three reasons.  (Docket Entry No. 39, at 17.)  First, the term "Designer's Name" is defined before the references to bridal and related goods are introduced and thus, grammatically, the limiting references are not part of the defined term.  Nothing in the configuration of Section 10(a)'s text suggests that the scope of the defined term is limited by terms following the definition.  Second, the presence of a temporal provision (referring to the Term as extended, and the two years following the end of the Term) between two of the bridal and design-related terms that Defendant seeks to use to limit the scope of the definition of "Designer's Name" further undermines any inference that the term "Designer's Name" encompasses uses for bridal goods only; Defendant's reading conveniently (but illogically) ignores the temporal provision.  Finally, reading the definition of Designer's Name to limit JLM's rights in it to uses within commerce related only to bridal goods designed or created by

Defendant is inconsistent with the plain language of Section 10(b), which grants JLM exclusive, perpetual rights in the trademarks it registers in a timely fashion, and deprives Ms. Gutman of any right to use those marks, the Designer's Name, or "any confusingly similar marks or name in trade or commerce during the Term, or any time thereafter," without JLM's express written consent.

Under the unambiguous terms of Section 10(b), Ms. Gutman has "no right to the use of . . . [@misshayleypaige] in trade or commerce during the Term or any time thereafter" without JLM's consent.  The credible evidence tendered at the Preliminary Injunction Hearing established that Ms. Gutman used the Designer's Name in the form of the Account handle and otherwise in commerce for her own benefit during her employment, without the knowledge or permission of the Plaintiff.  She entered into a compensated arrangement with Chosen Foods and promoted its products using the Account.  (Docket Entry No. 14, Exh. 68; P.I. Tr. 192:7-9; P-178.)  She agreed to be an influencer promoting Chosen Foods.  (P.I. Tr. 192:9.)  She also used the Account to promote the goods of Optimum Whey.  (Docket Entry No. 14, Exh. 78.)  Defendant also authorized Optimum Whey to use her name on its own website as an endorsing influencer and agreed to promote Optimum products on the Account.  (P.I. Tr. 189:17; 191:24.)  Ms. Gutman did not have JLM's express written permission to promote those third-party products using the Designer's Name.  (P.I. Tr. 169:13; Docket Entry No. 14, at ¶ 65.)[12]

---

[12]     Ms. Gutman's argument that Plaintiff acquiesced in her use of the Designer's Name by not objecting until the instant lawsuit and thereby waived any ability to enforce its rights in the Designer's Name for commercial use of the Account (Docket Entry No. 39, at 17) is unavailing in light of the Contract's condition that she receive written permission to use the Designer's Name in commerce (Contract, § 10(b)), and the Contract's provision stating that any failure to enforce a provision shall not be deemed a waiver.  (Contract, § 15.)

Accordingly, Plaintiff has demonstrated a likelihood of success on its claim that Defendant

breached Section 10(b) of the Contract by using the Account handle and the Designer's Name to

promote third-party goods in commerce for her own benefit during the Term of the Contract

without Plaintiff's permission.  The restrictions on Ms. Gutman's ability to use the Designer's

Name, including derivatives, continue to apply notwithstanding her resignation, and Plaintiff

has thus demonstrated a strong likelihood of success on its claim that any unauthorized use or

control of the Account or similarly-named social media accounts going forward to promote

Defendant as a celebrity influencer and/or endorse third-party products and services for

commercial purposes would constitute a breach of the Contract, as Ms. Gutman has contracted

away any right to monetize the trademarks and Designer's Name without JLM's permission.

Plaintiff further claims that Ms. Gutman has breached her duties under the

Contract to assist with advertising, by refusing to post Plaintiff's marketing content on the

Account and instead using the Account to promote goods that are unrelated to Plaintiff's

business.  (Docket Entry No. 13, at 20.)  Ms. Gutman asserts that the establishment,

maintenance and content of the Account were always unconnected with any duties she had

undertaken under the Contract, such that refusal to post Plaintiff's content does not constitute a

breach of the Contract.  The express provisions of the Contract render Ms. Gutman's position

untenable.  Section 2 of the Contract sets forth Defendant's duties thereunder, which include

performing "such other duties and services commensurate with her position as a designer for the

Company, as may be assigned to her by an officer of the Company, including, but not limited to

. . . assisting with advertising programs . . . ."  (Contract, at § 2.)  The "advertising" reference in

the Contract is not specific to any particular type of advertising platform, and the evidence

shows clearly that JLM's advertising programs include social media.  JLM used social media to

exhibit and promote its products (Docket Entry No 14, at ¶¶ 10, 22, 24), and bridal store owners that carried JLM goods testified credibly that the Account motivated brides to buy JLM's gowns.  (P.I. Tr. 130:4-6; Docket Entry No. 78, at ¶¶ 7, 8; Docket Entry No. 79, at ¶ 5; Docket Entry No. 80, at ¶ 6.)  Social media advertising and communications are ubiquitous in modern American society.  Indeed, as the Court found in connection with its issuance of the TRO, social media existed as an advertising medium when the parties entered into the Contract in 2011. (Docket Entry No. 26, at 92:21-24.) [13]  No reasonable, objective reading of the provision could logically exclude social media from the scope of Defendant's advertising assistance duties, particularly where JLM specifically asked Ms. Gutman to make social media posts of content on an account whose handle is the exclusive property of the company.  Cf. Revson, 221 F.3d at 66 (contract language is unambiguous if it is susceptible of only one objective reading by a reasonably intelligent person familiar with the entire contract and the practices of the industry).

Plaintiff produced credible testimony and evidence that social media was one of many advertising platforms it used to market the HP brands.  (P.I. Tr. 41:19-25; Docket Entry No. 14, at ¶ 10.)  Plaintiff also presented credible evidence that Defendant was not only expected to assist with social media promotional efforts as a lead designer, but that the display of her personality in such promotions was "a big part of [Plaintiff's] strategy because then brides feel closer to the brand."  (P.I. Tr. 61:23-24.)  Defendant posted pictures from "behind

---

[13]       Defendant proffers communications related to contract amendment negotiations between the parties from 2019, after the Contract had been extended – in which the parties discussed, and Defendant rejected, duties specific to social media – as evidence of the parties' intent vis à vis Section 2.  (Docket Entry No. 39, at 7-8.)  Because the Court finds that the existing Contract provision is not ambiguous, resort to later negotiations as an interpretive device is unnecessary and inappropriate.  See Metropolitan Life Insurance Co., 906 F.2d at 889 (the court cannot consider extrinsic evidence of the parties' intentions).

the scenes" at Plaintiff's photoshoots, which she attended in her capacity as lead designer. (Docket Entry No. 15, at ¶ 9; P.I. Tr. 17:10-12, 157:4-9.)  Defendant and Mr. Murphy discussed personalizing the HP brand by showcasing Defendant's personality alongside the products.  (P.I. Tr. 41:4-25, 61:23-24, 64:22-65:1.)  Ms. Gutman received draft captions and other content for the Account from Plaintiff's employees (see, e.g., Docket Entry No. 15, ¶ 5; Docket Entry No. 98, Exh. P-192), and occasionally received specific directions from Mr. Murphy about whether and when to post to the Account.  (Docket Entry No. 60, Exh. 93; Docket Entry No. 98, Exhs. P-193, P-194).  Plaintiff also produced credible evidence that Defendant, in her capacity as JLM's employee and a lead designer, was given discretion to post to the Account and respond to direct messages in real time to maintain customer engagement.  (Docket Entry No. 14, at ¶¶ 37, 38; P.I. Tr. 153:3-5.)  When Defendant did not exercise that discretion to Plaintiff's satisfaction, for instance when she failed to tag a boutique affiliated with Plaintiff in one of her posts to the Account, Defendant changed the content at Plaintiff's direction.  (Docket Entry No. 60, Exh. 93.)  Plaintiff also produced evidence that Defendant asked for help in performing social media-related aspects of her work by requesting that Plaintiff hire a social media manager to help with the Account.  (P.I. Tr. 174:1-12; Docket Entry No. 14, Exh. 53.)

Accordingly, there is substantial credible evidence, and the Court finds for purposes of this preliminary injunction motion practice, that promoting the HP brands on the Account was commensurate with Ms. Gutman's position as lead designer and was a duty assigned to her by Plaintiff's authorized personnel.  Plaintiff has demonstrated a clear and substantial likelihood of success in establishing that Defendant breached her duty to assist with advertising programs by repudiating her obligation to post Plaintiff's content on the Account

(see, e.g., Docket Entry No. 14, Exh. 75), and by using the Account to promote third party

goods and build a commercial platform that she intended to use for herself as an influencer.[14]

Plaintiff has also carried its burden of proving its clear likelihood of success in

establishing that, under Section 11 of the Contract, Defendant conveyed to Plaintiff any rights

that she had in the bridal business-related material she created for the Account.  Section 11

provides that

> all designs, drawings, notes, patterns, sketches, prototypes, samples,
> improvements to existing works, and any other works conceived of
> or developed by Employee in connection with her employment with
> the Company involving bridal clothing, bridal accessories and
> related bridal or wedding items, either alone or with others, from the
> commencement of her employment by the Company through the
> Term of the Employment Agreement and any extensions thereof
> (collectively, the 'Designs'), are works for hire, and ownership of
> any intellectual property arising from or related to the Designs shall
> be the sole and exclusive property of the Company.

(Contract, § 11.)  Section 11 further provides that

> [i]f, for any reason the Designs, or any portion thereof, are deemed
> not to be a work made for hire, then the Employee irrevocably,
> absolutely and unconditionally assigns to the Company (a) all of
> right, title and interest in and to the Designs and/or any portion
> thereof (whether arising under copyright law, trademark law, or
> otherwise), including to the extent applicable, but not limited to, the
> exclusive rights enumerated in 1 U.S.C. Section 106, and all
> extensions and renewals thereof, and (b) all moral rights with respect
> to the Designs, including but not limited to, any and all rights of
> identification of authorship and any and all rights of approval,

---

[14]     Plaintiff also alleges that Defendant has breached her duty to assist with advertising by
implementing an "online bullying campaign . . . [that is] interfering with JLM's
advertising programs" (Docket Entry No. 59, at 1) by posting videos on social media
expressing her views of her employment and this litigation.  (Id. at 10.)  Plaintiff further
argues that the "bullying campaign" breaches Defendant's duty to devote her full time
an attention to Plaintiff's business, as set forth in Section 3 of the Contract.  (P.I. Tr.
270:23, 271:22-24.)  Even if Plaintiff might succeed on the merits of these breach of
contract claims, injunctive relief restraining her in advance from speaking would violate
the free speech guarantees of the First Amendment.  See discussion infra.

> restriction or limitation on use or subsequent modifications relating
> to the Designs.

(Id.)  Ms. Gutman argues that Section 11 cannot be read to cover the Account because it is not a dress design and social media accounts are not listed in the definition of "Design."  (Docket Entry No. 39, at 16.)  However, Section 11 provides a non-exhaustive list of types of works, and an exclusionary inference as to social media accounts is not warranted on the basis of that list alone. Hunt Ltd., 889 F.2d at 1277 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.")  The credible evidence of record, including Ms. Gutman's participation in creating and posting bridal-related content and her own testimony that she posted "personal" material to provide actual and potential bridalwear customers with a feeling of a personal connection to the bridalwear designer, clearly places at least a very high proportion of the Account content in the realm of "works conceived of or developed by [Defendant] in connection with her employment with the Company involving bridal clothing, bridal accessories and related bridal or wedding items."  (Contract, § 11.)

The Account was developed by Ms. Gutman in connection with her employment involving bridal goods.  Although Ms. Gutman used the Account to introduce herself to the public, it is undisputed that she also used it to attract the public to the gowns and apparel she created under her Contract with Plaintiff.  (See, e.g., Docket Entry No. 14, Exh. 74.)  Indeed, Plaintiff presented credible testimony that its marketing strategy relied on this combination of Ms. Gutman's personality and Plaintiff's bridal goods.  (See, e.g., P.I. Tr. 41:4-5, 10-11, 61:23-24, 64:22-65:1.)  The Account regularly featured bridal clothing designed by Defendant.  (See, e.g., Docket Entry No. 60, Exhs. 117, 133.)  The target audience of the Account was Plaintiff's customer base – brides – and the parties regularly discussed using the Account to market

Plaintiff's goods to brides.  (See, e.g., Docket Entry No. 14, Exhs. 45-51.)  Plaintiff

incorporated the Account into its marketing campaigns and marked the hangtags of its goods

with the Account handle and other social media account references.  (Docket Entry No. 14, at ¶

10, Exhs 20-32.)  The Account was linked to Plaintiff's website www.hayleypaige.com as early

as 2015.  (Docket Entry No. 14, at ¶ 23, Exh. 19.)  The Account also featured contact

information for Plaintiff's Public Relations department (Docket Entry No. 60, Exh. 117), and

was managed in part by Plaintiff's employees (see, e.g., Docket Entry No. 14, Exh. 45), further

demonstrating that the narrative and visual work displayed on the Account was a part of and

promoted Plaintiff's bridal and related product business.  Also relevant to the Court's

conclusion that the Account content is a work for hire is the fact that Ms. Gutman developed the

Account under a handle that incorporated the name to which she had already granted Plaintiff

the exclusive right and license to use in commerce related to its bridal goods that she designed

under her Contract.  See discussion supra.  Accordingly, Plaintiff has made a clear showing that

it is likely to succeed in establishing that the Account content created by Ms. Gutman

constitutes a work for hire or similar work of intellectual property as to which her rights have

been transferred to JLM pursuant to Section 11 of the Contract, and that Ms. Gutman's denial to

JLM of access to the content and her effort to exploit it unilaterally for her own benefit violate

JLM's rights under the Contract.

In addition to demonstrating a clear and substantial likelihood that the Account

content is a work for hire pursuant to Section 11 of the Contract, Plaintiff has also shown a clear

and substantial likelihood that it owns copyrights in key components of the Account.

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium

of expression from which they can be perceived, reproduced, or otherwise communicated, either

directly or with the aid of a machine or device."  17 U.S.C.A. § 102(a) (Westlaw Pub. L. 116-259).  Copyright ownership ordinarily vests in the author of the work and gives the owner "the right to exclude others from using his property."  eBay Inc. v. Merc Exchange, LLC, 547 U.S. 388, 293 (2006) (citation omitted).  The author is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection."  Community for Creative Non-violence v. Reid, 490 U.S. 730, 737 (1989).  However, under the "work made for hire" exception an employer is considered the author if the work was "prepared by the employee within the scope of his or her employment" and there is no express agreement otherwise as to ownership.  17 U.S.C.A. §§ 101, 201(b) (Westlaw Pub. L. 116-259).  Courts determine whether a work is prepared within the scope of employment by reference to the common law of agency.  Reid, 490 U.S. at 751.  Accordingly, a work is prepared within the scope of employment where (1) it is the kind of work the author is employed to perform, (2) done substantially within authorized work hours, and (3) actuated at least in part by purpose to benefit the employer.  See Shaul v. Cherry Valley-Springfield Cent. School Dist., 363 F.3d 177, 186 (2d Cir. 2004) (citing the Restatement (Second) of Agency § 228 (1958)) (holding that lesson plans created by a teacher were owned by his employer under the work for hire exception).

         As discussed above, Ms. Gutman developed the Account within the scope of her employment with Plaintiff.  Using the Account to promote JLM's goods was the kind of work she was employed to perform, as it was commensurate with her position as a lead designer.  She was given wide discretion to post and respond to messages as necessary to engage the Account's followers.  And Plaintiff presented evidence that Defendant's use of Account was actuated by a desire to market a combination of Plaintiff's products and Defendant's personality.  Accordingly, the contents of the Account are a work for hire, and Plaintiff has

made a clear showing that it owns the Account's contents as work for hire or pursuant to the assignment provision of Section 11 of the Contract.  Based on the nature of the Account content and Plaintiff's ownership of trademark rights to the handle and its exclusive right to use and prohibit Defendant from using that trademark in commerce without its written consent, see also trademark law discussion infra, Plaintiff has made a clear showing of likely success on its claim that Ms. Gutman's commercial and confusing use of the Account breached the Contract and that ongoing unauthorized "influencer" use of the Account would also breach the Contract.

Plaintiff also seeks injunctive relief prohibiting Ms. Gutman from using or authorizing others to use the Designer's Name, derivatives or confusingly similar names in commerce in connection with goods or services, including endorsements, to promote products and or services of herself or others, including on social media or appearances on television or other media.  Plaintiff cites Ms. Gutman's announced February 2021 appearance, in her capacity as a wedding gown designer, at a virtual bridal expo. [15]  (See Docket Entry No. 59, at 10; Docket Entry No. 58, Exh. 126.)  Section 9 of the Contract provides that Defendant shall not compete with the company directly or indirectly during the Term of the Contract, and that Defendant is deemed to "compete" if she

> engages in, or is associated with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids, mother of the bride and flower girls and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by the Company.

---

[15]   The expo was scheduled to occur February 28, 2021.  (Docket Entry No. 58, Exh. 126.)  Accordingly, Plaintiff's request for a preliminary injunction to prevent Ms. Gutman from breaching the non-competition provision of the Contract is moot to the extent it is based on the need to prevent her participation in the February 28, 2021, expo.

(Contract, § 9(a).)  Plaintiff proffered evidence that Defendant advertised that she would appear, identified as a wedding gown designer, at a multi-vendor bridal expo.  (Docket Entry No. 56, at ¶ 4; Docket Entry No. 58, Exh. 126.)  Plaintiff is likely to succeed on its claim that such commercial activity would breach this non-competition provision of the Contract.

Plaintiff has demonstrated a clear likelihood of success on the merits of its breach of contract claims relating to Plaintiff's use and intended use of the Account.  Plaintiff has established that, during the Term of her employment, Ms. Gutman promoted third-party goods using the Account, refused to utilize the Account to assist with Plaintiff's marketing campaigns, used and plans to use the Designer's Name in commerce without Plaintiff's permission.  These acts are prohibited by the unambiguous provisions of the Contract.  (See Contract §§ 2, 9(a), 10(a), 10(b), and 11.)   Ms. Gutman's conduct in connection with the Account and her influencer ambitions also provide sufficient evidence to support the Court's conclusion that breaches of the provisions of the Contract relating to use of the Designer's Name and derivatives, assistance in advertising, and the use of trademarks and Designs, will likely arise if she is given unfettered access to the JLM HP Social Media Accounts, whose handles are Trademarks, derivatives thereof, or source designations closely identified with Trademarks and JLM's goods.  The Court further concludes that Plaintiff has demonstrated that it is likely to succeed on its claims that social and other media appearances by Ms. Gutman in connection with commercial ventures marketing competing bridal-related goods breach the Contract.

Likelihood of Success on the Merits of the Trademark and Unfair Competition Claims

Plaintiff claims that Ms. Gutman's use of the Account as her personal influencer platform to the exclusion of JLM's advertising and control constitutes trademark infringement,

false designation of origin, trademark dilution under federal and New York law, and unfair

competition under New York law.  To succeed on claims of trademark infringement and false

designation of origin under 15 U.S.C. §§ 1114(1) and 1125(a), Plaintiff must show that it has a

valid mark that is entitled to protection under the Lanham Act and that Defendant's use of a

similar mark is likely to cause consumer confusion as to "source, sponsorship, affiliation,

connection, or identification" of the goods at issue.  Star Industries, Inc. v. Bacardi & Co., Ltd,

412 F.3d 373, 383 (2d Cir. 2005) (citation omitted); Starbucks Corp. v. Wolfe's Borough

Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009); Genesee Brewing Company, Inc. v. Stroh

Brewing Company, Inc., 124 F.3d 137, 142 (2d Cir. 1997).  Section 1114(1) only protects

registered trademarks, see Berni v. International Gourmet Restaurants of American, Inc., 838

F.2d 642, 645-46 (2d Cir. 1988) (section 1114(1) "grants standing . . . solely to the registrant")

(internal quotations omitted), while section 1125(a) "may protect unregistered trademarks."

Genesee Brewing Company, Inc., 124 F.3d at 142.

          "To be valid and protectible, a mark must be capable of distinguishing the

products it marks from those of others."  Lane Capital Mgmt., Inc. v. Lane Capital Mgmt, Inc.,

192 F.3d 337, 344 (2d Cir. 1999).  There are five categories of terms used to classify a mark's

ability to distinguish products: generic, descriptive, suggestive, arbitrary, and fanciful.  Id.  A

mark is "entitled to protection when it is inherently distinctive," Time, Inc. v. Petersen Pub. Co.

L.L.C., 173 F.3d 113, 117 (2d Cir. 1999), and marks that are "suggestive, arbitrary, [or]

fanciful" are inherently distinctive.  Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192

F.3d 337, 344 (2d Cir. 1999); Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 391 (2d

Cir. 1995) (holding that such marks can be protected without the need to demonstrate that "the

name and the business have become synonymous in the mind of the public") (citation omitted).

Registration is prima facie evidence of the registrant's exclusive right to use that mark, see Gucci America, Inc. v. Tyrrell-Miller, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008), and "creates the presumption that the mark . . . is inherently distinctive." Lane Capital Mgmt., Inc., 192 F.3d at 345. Here, Plaintiff has a registered trademark in the name "Hayley Paige" (Docket Entry No. 14, Exh. 4) and has established its likelihood of success in proving that Ms. Gutman granted Plaintiff, in Section 10(b) of the Contract, the right to register that mark and use it exclusively in commerce, notwithstanding that it is her birth name. See discussion supra. Plaintiff's registered mark in the name Hayley Paige is uncontested, and therefore "satisfies the first prong of the test" for a claim under section 1114(1). Gucci America, Inc., 678 F. Supp. 2d at 119; see Lane Capital Mgmt., Inc., 192 F.3d at 345 (holding that a defendant bears the burden of rebutting the presumption of protectability by a preponderance of the evidence.) [16]

  Both trademark infringement and unfair competition claims under the Lanham Act require a showing that Defendant's use of a similar mark is likely to cause consumer confusion as to "source, sponsorship, affiliation, connection, or identification." Star Indus. Inc., 412 F.3d at 383; see also Genesee Brewing Company, Inc., 124 F.3d at 149 (recognizing that unfair competition under New York common law closely resembles a Lanham Act claim, with

---

[16] Defendant argues that she held a trademark right to the term "misshayleypaige" at the time the Contract was formed because she had used the term on her social media accounts since 2004. (Docket Entry No. 39, at 18.) However, because common law trademark rights cannot accrue without continuous commercial use such that the mark is affixed to the product whose origin it identifies, see Cullman Ventures, 717 F. Supp. at 113, and Defendant has not proffered that she affixed the term "misshayleypaige" to goods that were distinct from Plaintiff's, or that she used the term commercially, she has not proffered a viable basis for a prior use defense under the Lanham Act. Furthermore, Defendant transferred any prior right she may have had to the use of "misshayleypaige" in commerce through Section 10(b) of the Contract, which prohibits Defendant from using the Designer's Name in commerce without Plaintiff's permission, and Section 10(a), which transferred to Plaintiff all right to use the term in connection with the sale of bridal goods substantially designed or created by Defendant.

the additional element of bad faith).  "The public's belief that the mark's owner sponsored or

otherwise approved the use of the trademark satisfies the confusion requirement."  Star Indus.

Inc., 412 F.3d at 384 (quotation omitted).  Plaintiff must demonstrate "a probability of

confusion, not a mere possibility, affecting numerous ordinary prudent purchasers" to establish

a likelihood of confusion.  Starbucks Corp., 588 F.3d at 115 (citation omitted).

        To determine whether there is a likelihood of confusion, Courts apply the eight-

factor balancing test introduced in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir.

1961).  "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3)

proximity of the products and their competitiveness with one another; (4) evidence that the

senior user may "bridge the gap" by developing a product for sale in the market of the alleged

infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative

mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of

consumers in the relevant market."  Starbucks Corp., 588 F.3d at 115.  As explained below, the

Polaroid factors here weigh in favor of a finding that Ms. Gutman's use of the Hayley Paige and

misshayleypaige marks, and other Trademarks and terms associated with JLM's product lines,

as an endorser of third-party products is likely to cause consumer confusion as to a relationship

between JLM, which owns the marks, and Ms. Gutman's unauthorized activities.

        First, the strength of a trademark is "determined by its tendency to uniquely

identify the source of the product," measured by whether the mark is distinctive "either

inherently or by virtue of having acquired secondary meaning."  Star Indus., Inc., 412 F.3d at

384.  As stated above, registration "creates the presumption that the mark . . . is inherently

distinctive."  Lane Capital Mgmt., Inc., 192 F.3d at 345.  Here, Defendant does not dispute the

distinctive character of the marks.

Second, similarity is assessed with regard to the "overall impression created by the logos and the context in which they are found." Star Indus., Inc., 412 F.3d at 386. The term "misshayleypaige", for example, incorporates Plaintiff's trademark "Hayley Paige" in its entirety, and Ms. Gutman seeks to use it in the context of information about her own personal and professional activities and endorsements of goods and services from third-party providers. Despite the inclusion of the honorific, which may marginally lessen similarity, see Starbucks Corp., 588 F.3d at 107 (holding no clear error in district court's finding that the addition of "mister" to "Charbucks" lessened similarity of that satirical alteration to "Starbucks"), Plaintiff's trademark is the dominant, distinctive aspect of the Account handle. The addition of "miss" does not suggest to consumers that the handle refers to any name other than Plaintiff's trademarked name, particularly since Plaintiff's trademark appears whole and unaltered in the Account handle. Cf. Starbucks Corp., 588 F.3d at 106-107 (holding that the obvious similarity between "Charbucks" and "Starbucks" was not substantial because of the overall impression created by the context in which consumers encountered the allegedly infringing mark). Indeed, JLM used the @misshayleypaige handle on garment hangtags and in other printed advertising. Accordingly, the similarity of the marks weighs in favor of a likelihood of confusion as to whether JLM has approved or is otherwise connected to the content of the social media postings.

The third Polaroid factor – proximity of the products and their competitiveness with one another – looks to the nature of the products themselves and the structure of the relevant market. Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996). Plaintiff concedes that Plaintiff's bridalwear and the third-party products Defendant endorsed on the Account are dissimilar. (Docket Entry No. 13, at 18-19.) Thus, the degree of proximity

relevant here is the likelihood that consumers may be confused as to Plaintiff's affiliation with the products.  See McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1134 (2d Cir. 1979).  The structure of the relevant consumer market informs whether the two products have an "overlapping client base that creates a potential for confusion" by considering both the geographic proximity and the market proximity of the two products.  Brennan's Inc. v. Brennan's Restaurant, LLC, 360 F.3d 125, 134 (2d Cir. 2004).  The market proximity takes into account "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold."  Cadbury Beverages, Inc., 73 F.3d at 480.  The parties have not produced evidence addressed to these factors, but the Court notes that Ms. Gutman used, and proposes to continue to use, the same Instagram Account and handle used to promote Plaintiff's goods.  For this reason, there is necessary overlap of the class of consumers to whom the goods are sold and an identity of advertising method.  Plaintiff has demonstrated that the marketing proximity creates an overlap in consumers that weighs in favor of a likelihood of confusion as to whether Plaintiff is affiliated with the third-party products.

The fourth Polaroid factor – whether the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product or consumers perceive Plaintiff as likely to do so – weighs against confusion.  See The Sports Authority, Inc. v. Prime Hospitality Corp, 89 F.3d 955, 963 (2d Cir. 1996).  As Plaintiff concedes, (Docket Entry No. 13, at 18-19), it does not intend to offer products to compete with the third-party food and nutrient products promoted by Ms. Gutman on the Account.  Neither has Plaintiff advanced argument that consumers are likely to think it will do so.

With respect to the fifth <u>Polaroid</u> factor, actual consumer confusion, Plaintiff proffered evidence that consumers believe the Account is associated with its bridal goods. Plaintiff submitted the declaration of a bridal store owner who would "quite often use [the Account] as a reference tool to see and show gowns."  (Docket Entry No. 56, at ¶ 10.) Defendant herself, in describing the duties of JLM's social media representative, noted that any representative would need to "[r]un through tagged photos and designer posts to answer questions from brides (most ask about where to find the gowns . . . )."  (Docket Entry No. 60, Exh. 102.)  Plaintiff also proffered screen captures of Account followers commenting on Defendant's third-party food product posts, asking where they could buy the food product. (Docket Entry No. 17, Exhs. 84, 85, 87.)  This constitutes evidence that consumers believe that the Account and the "misshayleypaige" mark the Account operates under are affiliated with both sets of products.  Plaintiff does not need to demonstrate that consumers believe JLM to be the producer of the third-party goods, merely that it is affiliated with or endorses those goods. <u>Star Indus., Inc.</u>, 412 F.3d at 383-84 ("a consumer need not believe that the owner of the mark actually produced the item and placed it on the market") (citation omitted).  Here, Plaintiff has demonstrated that consumers view the Account as affiliated with both its goods and the third-party goods, which establishes actual confusion.

<u>Polaroid</u> factor six, Defendant's bad faith in adopting the mark, is established where Defendant adopted the mark "with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between" the two parties' products.  <u>See</u> <u>Arrow Fastener</u>, 59 F.3d at 397 (citation omitted).  Defendant testified that she had used the term "misshayleypaige" before working for Plaintiff, and that she selected it for sentimental reasons.  (Docket Entry No. 44, at ¶ 8; Docket Entry No. 75, Exh. 45.)  However, the Contract unambiguously transferred

Ms. Gutman's right to use that term in connection with bridal goods that she substantially designed and for the purpose of the registration of trademarks in which Plaintiff would have rights in perpetuity.  (Contract, §§ 10(a), 10(b).)  Ms. Gutman was aware that JLM was exercising those rights.  Ms. Gutman further agreed in the Contract, which has been in effect since 2011, not to use derivatives of the Designer's Name, which logically included "misshayleypaige," or any confusingly similar marks in trade or commerce without Plaintiff's written permission, and also agreed that creative work related to her bridal designer employment belonged to JLM.  (Contract, §§ 10(b), 11.)  Goodwill had accrued to the Account as a result of the use of Plaintiff's resources and contributions and Ms. Gutman's active management of the Account and creative contributions to it in the course of her employment for JLM.  Ms. Gutman's attempts, beginning in November 2019, to exclude JLM and its products from the Account, and her claim of the following and goodwill of the Account and other JLM HP Social Media Accounts under tags that are Trademarks, derivatives of Trademarks or the Designer's Name, or JLM product names, as her personal assets, are indicative of a bad faith attempt to use the Account and other JLM HP Social Media Accounts, and therefore Plaintiff's trademarks, in commerce for her own personal benefit.  Ms. Gutman's authorization of use of her name to promote the Optimum Whey products is also indicative of bad faith use of the marks that she had transferred to Plaintiff under the Contract.  Ms. Gutman, using her fiancé as an intermediary, gave Optimum Whey permission to list her as an "influencer" under her trademarked name to promote Optimum Whey nutritional supplement products.  (P.I. Tr. 189:14-17.)  She also negotiated an "informal agreement" through her fiancé to receive payments through his contract with Optimum Whey in exchange for sharing and posting content on the Account "until the terms of my existing contract with my company are negotiated."  (P.I.

Tr. 189:14-190:19, 191:20-24.)  Ms. Gutman's "TEAM ON Member" biography on the

Optimum Whey website identified her principally as a wedding dress designer and described the

work she did under her Contract with Plaintiff.  (Docket Entry No. 58, Exh. 125.)  Ms. Gutman

knew that her Contract prohibited her from using JLM's trademarks in commerce (Contract, §

10(b)), and gave Plaintiff exclusive promotional rights in connection to her work as a designer

for Plaintiff (Contract, § 10(a)).  Ms. Gutman's "informal agreement" with her fiancé to use her

trademarked name in a way that apparently sought to avoid explicitly contracting with a third

party to use that name in commerce evidences an intent to trade on Plaintiff's goodwill.

Similarly, Ms. Gutman's decision to direct the followers of the Account toward commercial

interests that did not benefit Plaintiff evidences an intent to trade on Plaintiff's reputation and

goodwill and profit from any resulting confusion as to affiliation and endorsement.

   As to the seventh <u>Polaroid</u> factor, the respective quality of the parties' products,

Plaintiff has presented evidence that the Hayley Paige-branded products displayed on the

Account are high-priced luxury bridal apparel.  (P.I. Tr. 129:19-24.)  Plaintiff has not produced

evidence of the comparative quality of the third-party goods, merely their different nature and

comparative inexpensiveness.  <u>Compare</u> Docket Entry No. 14, Exh. 74 <u>with</u> Exhs. 68-73, 78-80;

P.I. Tr. 130:19-24; <u>see</u> <u>Star Indus., Inc.</u>, 412 F.3d at 389 (holding that <u>Polaroid</u> factor seven was

"evenly balanced" where the record was insufficient to find "either product is markedly superior

in quality" even though "Georgi's vodka was much cheaper than Bacardi's rum"); <u>Trustees of

Columbia University v. Columbia/HCA Healthcare Corp.</u>, 964 F. Supp. 733, 748 (S.D.N.Y.

1997) (holding that the seventh factor was neutral where no evidence of Defendant's product's

quality was presented).  Plaintiff has produced evidence that the inclusion of third-party

products on the Account "did not represent the level of luxury associated with" the Account or

Plaintiff's goods.  (Docket Entry No. 56, at ¶ 11.)  While Plaintiff argues that the third-party products are "off brand" in terms of inconsistency with JLM's image and product lines and therefore harmful to its reputation (id.; Docket Entry No. 13, at 17), the seventh Polaroid factor is in the main concerned with harm arising from confusion with a product of inferior quality, not differing products or price-points.  See Arrow Fastener, 59 F.3d at 398 (seventh factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.")

Finally, in considering the sophistication of the consumers under the eighth Polaroid factor, the Court "must evaluate the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods . . ."  Trustees of Columbia University, 964 F. Supp. at 748 (quoting McGregor-Doniger, Inc., 599 F.2d at 1137).  No evidence was presented to demonstrate the sophistication of wedding gown consumers, and, given the difference thus far between JLM's goods and the type of third-party products that Ms. Gutman has sought to promote, this factor does not militate for or against a likelihood of confusion between JLM's goods and the third party goods.

Balancing the factors is not a mechanical process.  Star Indus., Inc., 412 F.3d at 384.  To summarize, factors one, two, three, five, and six weigh in favor of consumer confusion, factor four weighs against, and factors seven and eight are neutral.  Ms. Gutman's bad faith in using her trademarked name in commerce separate from her work for Plaintiff weighs particularly heavily in the Court's balancing, given the evidence that she sought to exploit her work for Plaintiff while avoiding a direct contractual relationship with the Optimum Whey enterprise until after she had renegotiated the Contract.  In assessing the totality of the likely

impression on a consumer, the Court also notes that the "misshayleypaige" term has been used to identify the Account in connection with both Plaintiff's goods and the third-party goods.  The use of an identical mark on an Account where consumers had previously seen Plaintiff's goods and also began to see promotion of third-party goods, increases the likelihood of confusion as to affiliation should Ms. Gutman be able to continue to use the handle and Designer's Name in commercial activities on social media.  Accordingly, the Court finds that consumer confusion is likely to result from Ms. Gutman's use of the Designer's Name, its registered trademarks, or similar variations in commerce to promote other products or to promote Ms. Gutman herself as an influencer able to promote other vendors' products.[17]

        Ms. Gutman argues that Plaintiff's trademark infringement claims are not ripe, relying on JA Apparel Corp. v. Abboud, 682 F. Supp. 2d 294 (S.D.N.Y. 2010) for the proposition that courts cannot restrict the use of a person's name "in a vacuum."  (P.I. Tr. 260:18.)  In that case, Mr. Abboud, a well-known clothing designer, had contractually assigned the right to use his name to his former employer, and the Court, after Mr. Abboud had at first been imprecise as to the manner in which he proposed to use his name in connection with a new clothing line, ultimately analyzed the infringement and fair use issues presented by reference to particular mockups of advertisements.  See JA Apparel Corp., 682 F. Supp. 2d at 311.  Here, Ms. Gutman has used, and asserted the right to use, @misshayleypaige as the handle of the Account to pursue Instagram influencer commercial ventures of her own, including the promotion of third party products, and has lent her name and references to work performed for Plaintiff in connection with the trademarks to the promotion of third-party enterprises from

---

[17]     The Court's finding in this regard encompasses the JLM HP Social Media Accounts listed in Addendum 1 to this Memorandum Opinion and Order that incorporate the Designer's Name.

which she solicited compensation.  Ms. Gutman has exhibited an intent, unless enjoined, to generate profits from the use of a term incorporating her name as an identifier of a business venture, which violates the terms of her Contract with Plaintiff.  Id. at 312 ("If an individual has previously sold 'use of his name and its goodwill, to the plaintiff, . . . courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it.'")  Plaintiff's claim for injunctive relief with respect to the JLM HP Social Media Accounts is, accordingly, ripe for adjudication.

Plaintiff also asserts claims for trademark dilution.  However, the Court need not address those claims, as it finds that Plaintiff is likely to succeed on the merits of its trademark infringement, unfair competition, and Contract breach claims and Plaintiff does not seek different or additional relief based on its dilution claims.  See JA Apparel Corp., 682 F. Supp. 2d at 317; Morningside Group, Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 143 (2d Cir. 1999) ("We need not address the [dilution claim] because Morningside Group – having already succeeded on its infringement claim – has neither requested, nor could it receive, any further relief based on dilution.")  The Court also declines to address Plaintiff's conversion, trespass to chattel, and breach of fiduciary duty claims in the context of this motion practice. The ultimate viability of the conversion and trespass claims turns on resolution of the parties' vigorous dispute, which the Court does not need to reach to resolve this motion, regarding the somewhat more nuanced issue of "ownership" of the Account itself.

Speech Restrictions

Plaintiff also seeks injunctive relief prohibiting Defendant from (i) "interfering with" Plaintiff's use of the Designer's Name, Trademarks, or the Accounts; (ii) publicly

disparaging Plaintiff; or (iii) continuing what Plaintiff characterizes as Defendant's social media

bullying campaign.  (Docket Entry No. 86, § A(iii)(b).)  Because this aspect of Plaintiff's

motion amounts to a request that this Court use its governmental authority to restrict Ms.

Gutman's future speech, the Court must analyze that request within the framework of the First

Amendment.  See Shelley v. Kraemer, 334 U.S. 1 (1948) (holding that enforcing by injunction a

private racially restrictive covenant was state action subject to the Fourteenth Amendment).

   In the First Amendment context, a preliminary injunction is a prior restraint and,

as such, "bear[s] a heavy presumption against its constitutional validity."  Bantam Books, Inc. v.

Sullivan, 372 U.S. 58, 70 (1963); Pittsburgh Press Co. v. Pittsburgh Comm'n on Human

Relations, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication

will be suppressed . . . before an adequate determination that it is unprotected by the First

Amendment");  Latino Officers Ass'n, New York, Inc. v. City of New York, 196 F.3d 458, 465

(2d Cir. 1999) ("The danger of a prior restraint, as opposed to ex post disciplinary action, is

precisely that making predictions ex ante as to what restrictions on speech will ultimately be

found permissible is hazardous and may chill protected speech.").  The presumption against

prior restraints has been upheld even where the speech at issue was intended to have a coercive

impact on the subject.  See Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971)

("The claim that the expressions were intended to exercise a coercive impact on respondent

does not remove them from the reach of the First Amendment . . . so long as the means are

peaceful, the communication need not meet standards of acceptability.")  In the labor dispute

context, the Second Circuit has held that an employee's efforts to exert social pressure by

conduct that is harassing, upsetting, or coercive are nonetheless entitled to First Amendment

protection.  See Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Intern. Union, 239 F.3d 172, 178 (2d Cir. 2001).

However, "constitutional rights . . . may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." Erie Telecomm., Inc. v. City of Erie, Pa., 853 F.2d 1084, 1096 (3d Cir. 1988).  "The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law," Brookhart v. Janis, 384 U.S. 1, 4 (1966), and courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (internal quotation omitted); Legal Aid Society v. City of New York, 114 F. Supp. 2d 204, 227 (S.D.N.Y. 2000).

A party may be found to have waived constitutional rights if there is "clear" and "compelling" evidence of waiver and that waiver is voluntary, knowing, and intelligent. Curtis Publ'g Co. v. Butts, 388 U.S. 130, 145 (1967).  Determining whether a waiver was voluntary, knowing, and intelligent rests "upon the particular facts and circumstances surrounding that case, including the background, experience and conduct" of the waiving party. Zerbst, 304 U.S. at 464.

Although there is clear and compelling evidence, in the form of relevant provisions of the negotiated Contract, that Ms. Gutman voluntarily, knowingly, and intelligently, in exchange for consideration, waived her right to use the Designer's Name for commercial purposes without JLM's permission, Plaintiff has not presented clear and compelling evidence that any provision of the Contract explicitly prohibits Ms. Gutman from speaking on the topic of this litigation or speaking of her experience with the company in ways

that Plaintiff believes are harmful to its business interests.  Plaintiff cites Ms. Gutman's

contractual duties to assist with advertising programs and devote her full time and attention to

JLM's business (Docket Entry No. 59, at 10; P.I. Tr. 270:19-271:24), but those positive duties

are insufficient to support implication of the necessary explicit waiver of a right to make

negative statements relating to her dispute with JLM.  The waiver of a fundamental right "can

neither be presumed nor may it be lightly inferred."  Legal Aid Society, 114 F. Supp. 2d at 227

(citation omitted).  Plaintiff has not produced such "clear and compelling" evidence that Ms.

Gutman has waived her right to speak publicly in ways that may harm Plaintiff's advertising

programs that the Court could enjoin such speech in advance without running afoul of the First

Amendment.  See Curtis Publ'g Co., 388 U.S. at 145.  Accordingly, Plaintiff's preliminary

injunction motion is denied insofar as it seeks an order prohibiting "publicly disparaging JLM . .

. [and] continuing Defendant's social media bullying campaign."  (Docket Entry No 86, §

A(iii)(b).)[18]

---

[18]     Section A(iii)(b) of JLM's proposed preliminary injunction order also asks the Court to
prohibit Defendant from "interfering with JLM's use of the Designer Name,
Trademarks, or JLM Social Media Accounts" as violative of the duty to assist in
advertising.  (Docket Entry No. 86, § A(iii)(b).)  That element of the proposed order is
duplicative of relief sought on contract and trademark grounds and is therefore denied
without prejudice to consideration of the other requests insofar as they seek exclusion of
Ms. Gutman from commercial use of the Designer's Name and variations in connection
with the Account and otherwise.  Insofar as it seeks an advance restriction on speech,
Plaintiff's request is denied without prejudice to claims and requests for remedial relief
regarding the nature, legality and effect of any activity in which Ms. Gutman has
engaged or that she undertakes in the future.

Irreparable harm absent injunctive relief

In addition to demonstrating a likelihood of success on the merits, Plaintiff must show that it is likely to suffer irreparable injury in the absence of an injunction.  See Salinger, 607 F.3d at 79-80.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted).  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Grand River Enterprise Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

"Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" New York City Triathlon v. NYC Triathlon Club, 704 F. Supp. 2d 305, 342 (S.D.N.Y. 2010); see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) ("the presumption of irreparable injury in trademark cases is no longer appropriate") (citing Salinger, 607 F.3d at 77-78).

Here, Ms. Gutman has demonstrated and stated her intention to continue undermining JLM's goodwill and marketing efforts by using Plaintiff's trademark in the Account handle for her own commercial and reputational benefit.  (Docket Entry No. 14, Exhs. 68, 75 ("I am not posting any JLM related business"); P.I. Tr. 190:12-15.)  If Ms. Gutman were allowed to resume exclusive control of the Account, for the "personal" use to which she claims,

but has not shown, that she has a right, Plaintiff's access to 1.1 million customers and potential customers of its products will be severed, along with the utility of the Account as a powerful marketing platform to which JLM has contributed both financial resources and the time and efforts of its employees (including Ms. Gutman, prior to her resignation).  Plaintiff would be deprived of the trademark rights it bought from Ms. Gutman, which are "the linchpin in JLM's marketing of its HP brands" (Docket Entry No. 14, at ¶ 75), and the goodwill associated with the Account.  Given the likelihood of confusion between Plaintiff's trademark and Ms. Gutman's use of the @misshayleypaige Account handle, the impression given to actual and potential JLM customers when encountering endorsements of third-party products on the Account rather than attractive presentations of its JLM products and the activities of the person working for JLM as lead designer of those products will not be under Plaintiff's control and will harm the reputation and goodwill Plaintiff has cultivated in connection with its trademark.  Ms. Gutman's claims and activities with respect to the Account also present sufficient evidence of prospects of confusion and irreparable harm to goodwill should she have unilateral control of the other JLM HP Social Media Accounts.  Plaintiff's loss of control of its reputation and goodwill is not precisely calculable, and therefore Plaintiff will suffer irreparable harm absent injunctive relief.

The Court "has the discretion to permit injunctive relief for breach of contract," even though "the classic remedy for breach of contract is an action at law for damages." Rosenfeld v.  W.B. Saunders, 728 F. Supp. 236, 244 (S.D.N.Y. 1990) (citation omitted). Injunctive relief is appropriate for breach of contract where damages are an inadequate remedy, such as where damages are difficult to assess and measure.  Id. (quoting Danielson v. Local 275, Laborers International Union of North America, 479 F.2d 1033, 1037 (2d Cir. 1973)).  A court

may consider in this connection an employment contract provision stating that a breach constitutes irreparable harm for which there is not an adequate remedy at law as an admission by the breaching party.  See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999); Singas Famous Pizza Brands Corp. v. New York Advertising LLC, 468 Fed. App'x 43, 46 (2d Cir. 2012).  The Contract here contains just such a provision (Contract, § 9(e)), and the contract rights sought to be protected by the injunction go to value associated with JLM's goodwill, which is inherently difficult to quantify, much less to restore.  See U.S. Polo Ass'n, Inc., 800 F. Supp. 2d at 541 ("losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable").  Plaintiff has provided persuasive evidence of Ms. Gutman's willingness to violate Plaintiff's trademark rights and material provisions of the Contract that protect Plaintiff's goodwill and investment in the Designer's Name by using the account to deliver posts promoting third-party products for direct and indirect compensation (see, e.g., Docket Entry No. 14, Exh. 68), refusing to provide advertising assistance by excluding JLM and its products from the Account (Docket Entry No. 14, Exh. 75), associating herself with a third-party's bridal expo enterprise that markets products competitive with those of JLM (Docket Entry No. 56, at ¶ 4; Docket Entry No. 58, Exh. 126), and surreptitiously approving Optimum Whey's use of her name and image as a designer and developer of JLM products in an endorsing influence post on Optimum Whey's website (P.I. Tr. 189:24-190:7).

   The balance of equities also tips in Plaintiff's favor.  Plaintiff has shown that the Account, whose very handle is derived from a trademark to which Plaintiff has permanent exclusive contractual rights, is a work or compilation of works created by Plaintiff's employee during the course of her employment, developed and maintained through the use of its resources and employees' efforts, substantially featuring JLM's products for JLM's commercial benefit,

which Ms. Gutman used and wishes to continue to exploit for her exclusive economic benefit.

Particularly in light of the fact that Ms. Gutman has declared that she is no longer Plaintiff's

employee, she has no right to continue to use the Account and the other JLM HP Social Media

Accounts, or the trademarks under which their followings developed, without Plaintiff's

permission.  Nor has she the right to make commercial use of the Designer's Name and

goodwill associated with the work that she has performed for JLM by associating herself with

competitive enterprises during the remainder of the Term and other periods as provided in the

Contract.[19]

   Finally, enjoining Ms. Gutman's control of the JLM HP Social Media Accounts

and her use of them without JLM's permission, and her use of the Designer's Name in

commerce during the pendency of this litigation serves the public interest.  The injunction will

protect Plaintiff's trademark rights, prevent consumer confusion, and enforce the Contract

against Ms. Gutman's ongoing and imminent willful violations.[20]

   Accordingly, Plaintiff has demonstrated a likelihood of success on the merits,

irreparable injury, a favorable balance of hardships, and that the public interest would not be

disserved by the issuance of preliminary injunctive relief prohibiting Ms. Gutman from making

---

[19] Because the Court is only addressing preliminary injunctive relief pending further litigation, the Court need not determine at this point the merits of the parties' positions as to post-employment restrictive covenants and other restrictions that may continue or purport to become effective after the Term.

[20] The injunctive relief granted herein obviates the need for prospective relief prohibiting Ms. Gutman from using any of the Account information that may come within the contractual definition of confidential.  (See Contract, § 9(c).)  Accordingly, to the extent Plaintiff requests that the Court enjoin Ms. Gutman's dissemination of the Account's analytics, that request is denied.  To the extent Plaintiff argued summarily at the evidentiary hearing that Ms. Gutman is publicly sharing "things that happened at JLM [and] the marketing strategy" (P.I. Tr. 268:22-23) in violation of Section 9(c) of the Contract, Plaintiff's argument is conclusory and insufficient to demonstrate a likelihood of success on the merits of such a claim.

any changes to the JLM HP Social Media Accounts (including the Account) listed in Addendum 1 hereto; transferring any such JLM HP Social Media Account or the right to use it to any person other than JLM and communicating with third parties through any JLM HP Social Media Account for commercial purposes without the express permission of JLM's CEO; utilizing or taking any action to gain exclusive control over any JLM HP Social Media Account; using the Designer's Name, Trademarks and any derivatives or anything confusingly similar in trade or commerce; engaging in or associating with any person or entity engaged in design, manufacture marketing or sale of goods in categories competing with JLM; and using Designs, including content created for JLM HP Social Media Accounts, without JLM's permission.  Plaintiff has demonstrated a clear showing of its likely success on the merits of the contract and trademark claims and associated harms, equities, and public interests that underly the mandatory aspects of this relief, specifically those that require Ms. Gutman to cede control of the Account.  On the record before the Court, Plaintiff has not, however, demonstrated that an injunction is warranted or necessary at this juncture to prevent irreparable harm from Ms. Gutman's disclosure or dissemination of JLM's confidential information; or to prevent solicitation of company affiliates or employees to break those ties; or to prevent breaches of various restrictions on Ms. Gutman's activity that, under the terms of the Contract, come into effect after the employment Term ends.

C<small>ONCLUSION</small>

For the forgoing reasons, Plaintiff's motion for preliminary injunction is granted to the following extent:

During the pendency of this action, Ms. Gutman, along with her officers, agents, servants, employees, and attorneys and all other persons who are in active concert or participation with her and them, are enjoined from taking any of the following actions:

1. Making any changes to any of the social media accounts listed in **Addendum 1 hereto** (the "JLM HP Social Media Accounts"), including but not limited to changing the name of the handles on the accounts, posting any new content thereto and/or deleting or altering any content located therein, tagging any other posts, users or accounts, transferring any such accounts or the right to use any such account from Defendant to any other person except to JLM, or communicating with third parties through same for commercial purposes, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

2. Utilizing, or taking any action to gain exclusive control over, any of the JLM HP Social Media Accounts, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

3. Breaching the employment Contract, dated July 13, 2011, together with the amendments and extensions thereto, by:

    a. using, or authorizing others to use, "Hayley", "Paige", "Hayley Paige Gutman", "Hayley Gutman", "Hayley Paige" or any derivative thereof, including misshayleypaige (collectively the "Designer's

Name"), trademarks in the Designer's Name, including but not limited to the trademarks identified at **Addendum 2  hereto** (collectively, the "Trademarks"), or any confusingly similar marks or names in trade or commerce, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

b.   Directly or indirectly, engaging in, or being associated with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids', mother of the bride and flower girls' apparel and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by JLM;

c.   using or authorizing others to use any Designs,[21] or any of the Trademarks or any variations, versions, representations or confusingly similar facsimiles thereof, in trade or commerce for any purpose whatsoever; and

---

[21]   "Designs", as used here, means designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Employee in connection with her employment with Plaintiff involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by Plaintiff through the Term of the Contract.  The term includes content created or compiled for the JLM HP Social Media Accounts.

4. Using, or authorizing others to use, any of the Designer's Names,

Trademarks or any confusingly similar term, name, symbol or device, or any

combination thereof, in commerce in connection with any goods or services,

including to endorse, advertise or promote the products and/or services of

herself or others directly or indirectly, including but not limited to on social

media or in television or media appearances, without the express written

permission of Plaintiff's chief executive officer, Joseph L. Murphy.

To the extent not previously delivered, within 24 hours of the entry of this

Memorandum Opinion and Order Defendant shall deliver to Plaintiff's attorneys the

current login credentials, including the current username and password for the Account

(as defined above), the Pinterest and the TikTok accounts with the handle

"misshayleypaige," and take any action necessary to enable JLM to regain access and

control of the JLM HP Social Media Accounts, including linking the accounts to one of

JLM's email addresses and/or phone numbers and/or other social media accounts as

requested.

This preliminary injunction is conditioned upon maintenance of the previously

posted undertaking of $200,000, which was posted by JLM on December 18, 2020, to secure

payment of costs and damages as may be suffered or sustained by any party who is wrongfully

restrained hereby.  No additional bond or undertaking shall be required.

This preliminary injunction shall remain in full force and effect until the final

judgment in this action is entered, unless otherwise ordered by the Court.

Plaintiff's preliminary injunction motion is denied in all other respects.

This Memorandum Opinion and Order resolves Docket Entry Number 12 and

supersedes the TRO (Docket Entry No. 8).  This case remains referred to Magistrate Judge Cave

for general pretrial management.

      SO ORDERED.

Dated: New York, New York
      March 4, 2021
      Issued at: 2:43pm

                    /s/ Laura Taylor Swain
                    LAURA TAYLOR SWAIN
                    United States District Judge

## Addendum 1

| Brand | Platform | Handle | Account Link |
|---|---|---|---|
| Hayley Paige | Instagram | misshayleypaige | https://www.instagram.com/misshayleypaige/ |
| Hayley Paige | Facebook | Hayley Paige / HayleyPaigeBridal | https://www.facebook.com/HayleyPaigeBridal |
| Hayley Paige | Pinterest | Hayley Paige / hayleypaigejlm | https://www.pinterest.com/hayleypaigejlm/_saved/ |
| Hayley Paige | Pinterest | misshayleypaige | https://www.pinterest.com/misshayleypaige/_saved/ |
| Hayley Paige | Youtube | Miss Hayley Paige | https://www.youtube.com/channel/UCJR_76xqVd6ihrlUm3AL-qg?view_as=subscriber |
| Hayley Paige | Twitter | hayleypaige_jlm | https://twitter.com/HayleyPaige_JLM |
| Blush by Hayley | Instagram | blushbyhayleypaige | https://www.instagram.com/blushbyhayleypaige/ |
| Blush by Hayley | Facebook | BlushbyHayleyPaige | https://www.facebook.com/BlushbyHayleyPaige |
| Blush by Hayley | Pinterest | blushbyHP | https://www.pinterest.com/blushbyHP/_created/ |
| Blush by Hayley | Twitter | BlushbyHP | https://twitter.com/BlushbyHP |
| Hayley Paige Occasions | Instagram | hayleypaigeoccasions | https://www.instagram.com/hayleypaigeoccasions/ |
| Hayley Paige Occasions | Facebook | hpoccasions | https://www.facebook.com/hpoccasions/ |
| Hayley Paige Occasions | Twitter | Jim_H_Occasions | https://twitter.com/Jim_H_Occasions |
| La Petite Hayley Paige | Instagram | lapetitehayleypaige | https://www.instagram.com/lapetitehayleypaige/ |
| La Petite Hayley Paige | Facebook | lapetitehayleypaige | https://www.facebook.com/lapetitehayleypaige |
| Holy Matrimoji App | Instagram | holymatrimoji | https://www.instagram.com/holymatrimoji/ |
| Holy Matrimoji App | Facebook | HolyMatrimoji | https://www.facebook.com/HolyMatrimoji |
| All Brands | TikTok | misshayleypaige | https://vm.tiktok.com/ZMJqYv9S6/ |

**Addendum 2**

| Trademark | Country | Registration No. | Registration Date | Classes |
|---|---|---|---|---|
| BLUSH BY HAYLEY PAIGE | USA | 6141381 | 09/01/2020 | 25 Int. |
| HAYLEY PAIGE | USA | 5858534 | 09/10/2019 | 14 Int. |
| HAYLEY PAIGE | USA | 4161091 | 06/19/2012 | 25 Int. |
| HAYLEY PAIGE + DESIGN | USA | 5368112 | 01/02/2018 | 25 Int. |
| HAYLEY PAIGE + DESIGN | USA | 5858703 | 09/10/2019 | 14 Int. |
| HAYLEY PAIGE OCCASIONS | USA | 5276982 | 08/29/2017 | 25 Int. |
| JUST GOT PAIGED | USA | 5728141 | 04/16/2019 | 41 Int. |
| LA PETITE HAYLEY PAIGE | USA | 5698436 | 03/19/2019 | 25 Int. |
| LA PETITE HAYLEY PAIGE + DESIGN | USA | 5698444 | 03/12/2019 | 25 Int. |
| OCCASSIONS BY HAYLEY PAIGE | USA | 4914471 | 03/08/2016 | 25 Int. |