UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JLM COUTURE, INC.,<br><br>                              Plaintiff,<br>vs.<br><br>HAYLEY PAIGE GUTMAN,<br><br>                              Defendant. | Case No. 1:20-CV-10575 (LTS) (SLC) |
| HAYLEY PAIGE GUTMAN,<br><br><br>                              Counterclaim-<br>                              Plaintiff,<br><br>vs.<br><br>JLM COUTURE, INC. and<br>JOSEPH L. MURPHY<br><br><br>                              Counterclaim-<br>                              Defendants. | |

**DEFENDANT COUNTERCLAIM-PLAINTIFF HAYLEY PAIGE GUTMAN'S
ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant/Counterclaim-Plaintiff Hayley Paige Gutman  ("Hayley"), by and through her

attorneys, Haynes and Boone, LLP and Menken Simpson & Rozger LLP for her Answer,

Affirmative Defenses, and Counterclaims to the Complaint filed by Plaintiff/Counterclaim-

Defendant JLM Couture, Inc. ("JLM") in this action, denies any and all substantive allegations

except where expressly admitted and states on knowledge as to her own acts and on information

and belief as to all other matters except as indicated otherwise as follows:

## ANSWER

1.      As Paragraph 1 of the Complaint attempts to characterize the nature of the action and the claims set forth in the Complaint, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 1 of the Complaint.

### JURISDICTION AND VENUE[1]

2.      As Paragraph 2 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley admits that this Court has subject matter jurisdiction to adjudicate this action, but otherwise denies each and every allegation set forth in Paragraph 2 of the Complaint.

3.      As Paragraph 3 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley admits that venue is appropriate, but otherwise denies each and every allegation set forth in Paragraph 3 of the Complaint.

4.      As Paragraph 4 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley admits that venue is appropriate, but otherwise denies each and every allegation set forth in Paragraph 4 of the Complaint.

5.      As Paragraph 5 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 5 of the Complaint.

### NATURE OF THE PARTIES

6.      Hayley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Complaint.

---

[1]    Hayley includes headings consistent with those contained in the Complaint for the ease of reference, but no response is necessary to headings because they are not included in separately-numbered paragraphs.  To the extent a response to any heading is required, Hayley denies each and every allegation in the headings.

7.      Hayley denies each and every allegation set forth in Paragraph 7 of the Complaint except admits that she is a natural person.

## FACTUAL BACKGROUND

8.      Hayley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 8 of the Complaint.

9.      Hayley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 9 of the Complaint.

10.      Hayley denies each and every allegations set forth in Paragraph 10 of the Complaint except that she admits that she graduated from Cornell University.

11.      Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 11 of the Complaint.

12.      Hayley denies each and every allegation set forth in Paragraph 12 of the Complaint except admits that she was only 25 years old at the time of the "Employment Agreement."

13.      Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 13 of the Complaint.

14.      Hayley denies each and every allegation set forth in Paragraph 14 of the Complaint.

15.      Hayley denies each and every allegation set forth in Paragraph 15 of the Complaint.

16.      Hayley denies each and every allegation set forth in Paragraph 16 of the Complaint.

17.    Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 17 of the Complaint.

18.    Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 18 of the Complaint.

19.    Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 19 of the Complaint.

20.    Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 20 of the Complaint.

21.    Hayley refers to the referenced "Employment Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 21 of the Complaint.

22.    Hayley denies each and every allegation set forth in Paragraph 22 of the Complaint, except admits that for a period of time JLM did sell bridal products designed by Hayley under various brands.

23.    Hayley denies each and every allegation set forth in Paragraph 23 of the Complaint, except admits that for a period of time JLM did sell bridal products designed by Hayley under various brands.

24.    Hayley refers to the referenced documents for their contents, and otherwise denies each and every allegation set forth in Paragraph 24 of the Complaint.

25.    Hayley refers to documents held by the U.S. Patent and Trademark Office for their contents, and otherwise denies each and every allegation set forth in Paragraph 25 of the Complaint.

26.    Hayley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26 of the Complaint.

27.     Hayley denies each and every allegation set forth in Paragraph 27 of the Complaint.

28.     Hayley refers to the referenced website for its contents, and otherwise denies each and every allegation set forth in Paragraph 28 of the Complaint.

29.     Hayley denies each and every allegation set forth in Paragraph 29 of the Complaint.

30.     Hayley denies each and every allegation set forth in Paragraph 30 of the Complaint.

31.     Hayley denies each and every allegation set forth in Paragraph 31 of the Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegation that "JLM has expended approximately $4,068,000 on advertising since 2012."

32.     Hayley denies each and every allegation set forth in Paragraph 32 of the Complaint.

33.     Hayley denies each and every allegation set forth in Paragraph 33 of the Complaint.

34.     Hayley denies each and every allegation set forth in Paragraph 34 of the Complaint, except admits that JLM employs multiple designers, and denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of Paragraph 34 of the Complaint.

35.     Hayley denies each and every allegation set forth in Paragraph 35 of the Complaint, except admits that she fully performed all contractual obligaitons and admits that the @misshayleypaige Instagram account was created on or about April 6, 2012.

36.     Hayley denies each and every allegation set forth in Paragraph 36 of the Complaint.

37.     Hayley denies each and every allegation set forth in Paragraph 37 of the Complaint.

38.     Hayley denies each and every allegation set forth in Paragraph 38 of the Complaint.

39.     Hayley denies each and every allegation set forth in Paragraph 39 of the Complaint.

40.     Hayley denies each and every allegation set forth in Paragraph 40 of the Complaint.

41.     Hayley denies each and every allegation set forth in Paragraph 41 of the Complaint, except denies knowledge or information sufficient to form a belief as to the undefined "JLM Account."

42.     Hayley denies each and every allegation set forth in Paragraph 42 of the Complaint, except admits that sales of products she designed increased year over year due to Hayley's designs and Hayley's efforts.

43.     Hayley refers to the referenced "Amended Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 43 of the Complaint.

44.     The allegations in Paragraph 44 of the Complaint are vague and ambiguous, and Hayley denies each and every allegation set forth in Paragraph 44 of the Complaint.

45.     Hayley refers to her media appearances for the content therein, and otherwise denies each and every allegation set forth in Paragraph 45 of the Complaint.

46.     Hayley refers to the referenced "Collaboration Agreement" for its contents, and otherwise denies each and every allegation set forth in Paragraph 46 of the Complaint.

47.     Hayley refers to the referenced letter for its contents, and otherwise denies each and every allegation set forth in Paragraph 47 of the Complaint.

48.     Hayley denies each and every allegation set forth in Paragraph 48 of the Complaint, except denies knowledge or information to form a belief as payments received by JLM.

49.     Hayley denies each and every allegation set forth in Paragraph 49 of the Complaint.

50.     Hayley denies each and every allegation set forth in Paragraph 50 of the Complaint.

51.     Hayley denies each and every allegation set forth in Paragraph 51 of the Complaint.

52.     Hayley denies each and every allegation set forth in Paragraph 52 of the Complaint.

53.     Hayley denies each and every allegation set forth in Paragraph 53 of the Complaint.

54.     Hayley denies each and every allegation set forth in Paragraph 54 of the Complaint, except Hayley admits that she met all of her contractual obligations.

55.     Hayley denies each and every allegation set forth in Paragraph 55 of the Complaint.

56.     The allegations in Paragraph 56 of the Complaint are vague and ambiguous, and Hayley denies each and every allegation set forth in Paragraph 56 of the Complaint.

57.     Hayley denies each and every allegation set forth in Paragraph 57 of the Complaint.

58.     Hayley denies each and every allegation set forth in Paragraph 58 of the Complaint, except admits that JLM offered a new proposed agreement in 2019.

59.     Hayley denies each and every allegation set forth in Paragraph 59 of the Complaint, except admits that Murphy did threaten Hayley during an October 2020 meeting.

60.     Hayley denies each and every allegation set forth in Paragraph 60 of the Complaint.

61.     Hayley denies each and every allegation set forth in Paragraph 61 of the Complaint

## **Count 1 – Federal Trademark Dilution**

62.     As Paragraph 62 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

63.     Hayley denies each and every allegation set forth in Paragraph 63 of the Complaint.

64.     As Paragraph 64 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 64 of the Complaint.

65.     As Paragraph 65 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 65 of the Complaint.

66.     As Paragraph 66 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 66 of the Complaint.

67.     As Paragraph 67 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 67 of the Complaint.

68.     As Paragraph 68 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 68 of the Complaint.

69.     As Paragraph 69 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 69 of the Complaint.

70.     As Paragraph 70 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 70 of the Complaint.

71.     As Paragraph 71 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 71 of the Complaint.

72.     As Paragraph 72 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 72 of the Complaint.

73.     As Paragraph 73 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 73 of the Complaint.

74.     Hayley denies each and every allegation set forth in Paragraph 74 of the Complaint.

75.     As Paragraph 75 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 75 of the Complaint.

76.     Hayley denies each and every allegation set forth in Paragraph 76 of the Complaint.

77.     Hayley denies each and every allegation set forth in Paragraph 77 of the Complaint.

## Count 2 – State Trademark Dilution

78.     As Paragraph 78 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

79.     Hayley denies each and every allegation set forth in Paragraph 79 of the Complaint.

80.     As Paragraph 80 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 80 of the Complaint.

81.     Hayley denies each and every allegation set forth in Paragraph 81 of the Complaint.

82.     As Paragraph 82 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 82 of the Complaint.

83.     Hayley denies each and every allegation set forth in Paragraph 83 of the Complaint.

84.     Hayley denies each and every allegation set forth in Paragraph 84 of the Complaint.

85.     Hayley denies each and every allegation set forth in Paragraph 85 of the Complaint

86.     Hayley denies each and every allegation set forth in Paragraph 86 of the Complaint.

87.     Hayley denies each and every allegation set forth in Paragraph 87 of the Complaint.

88.     As Paragraph 88 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 88 of the Complaint.

89.     Hayley denies each and every allegation set forth in Paragraph 89 of the Complaint.

<u>**Count 3 – Federal Trademark Infringment**</u>

90.     As Paragraph 90 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

91.     Hayley denies each and every allegation set forth in Paragraph 91 of the Complaint.

92.     Hayley denies each and every allegation set forth in Paragraph 92 of the Complaint.

93.     Hayley denies each and every allegation set forth in Paragraph 93 of the Complaint.

94.     Hayley denies each and every allegation set forth in Paragraph 94 of the Complaint.

95.     As Paragraph 95 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 95 of the Complaint.

96.     Hayley denies each and every allegation set forth in Paragraph 96 of the Complaint.

97.     Hayley denies each and every allegation set forth in Paragraph 97 of the Complaint.

98.     Hayley denies each and every allegation set forth in Paragraph 98 of the Complaint.

### Count 4 – State Trademark Infringment

99.     As Paragraph 99 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

100.     Hayley denies each and every allegation set forth in Paragraph 100 of the Complaint.

101.     Hayley denies each and every allegation set forth in Paragraph 101 of the Complaint.

102.     Hayley denies each and every allegation set forth in Paragraph 102 of the Complaint.

103.     Hayley denies each and every allegation set forth in Paragraph 103 of the Complaint.

104.     Hayley denies each and every allegation set forth in Paragraph 104 of the Complaint.

105.     Hayley denies each and every allegation set forth in Paragraph 105 of the Complaint.

106.     Hayley denies each and every allegation set forth in Paragraph 106 of the Complaint.

107.     Hayley denies each and every allegation set forth in Paragraph 107 of the Complaint.

## Count 5 – Conversion

108.     As Paragraph 108 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

109.     Hayley denies each and every allegation set forth in Paragraph 109 of the Complaint.

110.     Hayley denies each and every allegation set forth in Paragraph 110 of the Complaint.

111.     Hayley denies each and every allegation set forth in Paragraph 111 of the Complaint.

112.     Hayley denies each and every allegation set forth in Paragraph 112 of the Complaint.

## Count 6 – Unlawful Trespass to Chattels

113.     As Paragraph 113 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

114.     Hayley denies each and every allegation set forth in Paragraph 114 of the Complaint.

115.     Hayley denies each and every allegation set forth in Paragraph 115 of the Complaint.

116.     Hayley denies each and every allegation set forth in Paragraph 116 of the Complaint.

117.     Hayley denies each and every allegation set forth in Paragraph 117 of the Complaint.

## Count 7 – Breach of Fidelity

118.     As Paragraph 118 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

119.     Hayley denies each and every allegation set forth in Paragraph 119 of the Complaint.

120.   Hayley denies each and every allegation set forth in Paragraph 120 of the Complaint.

121.   Hayley denies each and every allegation set forth in Paragraph 121 of the Complaint.

122.   Hayley denies each and every allegation set forth in Paragraph 122 of the Complaint.

123.   Hayley denies each and every allegation set forth in Paragraph 123 of the Complaint.

**Count 8 – Breach of Contract**

124.   As Paragraph 124 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

125.   As Paragraph 125 of the Complaint asserts conclusions of law, no response is required.  To the extent a response is required, Hayley denies each and every allegation set forth in Paragraph 125 of the Complaint.

126.   Hayley denies each and every allegation set forth in Paragraph 126 of the Complaint.

127.   Hayley denies each and every allegation set forth in Paragraph 127 of the Complaint.

128.   Hayley denies each and every allegation set forth in Paragraph 128 of the Complaint.

129.   Hayley denies each and every allegation set forth in Paragraph 129 of the Complaint.

130.    Hayley denies each and every allegation set forth in Paragraph 130 of the Complaint.

131.    Hayley denies each and every allegation set forth in Paragraph 131 of the Complaint.

132.    Hayley denies each and every allegation set forth in Paragraph 132 of the Complaint.

133.    Hayley denies each and every allegation set forth in Paragraph 133 of the Complaint.

134.    Hayley denies each and every allegation set forth in Paragraph 134 of the Complaint.

## **Count 9 – Breach of Fiduciary Duty**

135.    As Paragraph 135 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

136.    Hayley denies each and every allegation set forth in Paragraph 136 of the Complaint.

137.    Hayley denies each and every allegation set forth in Paragraph 137 of the Complaint.

138.    Hayley denies each and every allegation set forth in Paragraph 138 of the Complaint.

139.    Hayley denies each and every allegation set forth in Paragraph 139 of the Complaint.

140.    Hayley denies each and every allegation set forth in Paragraph 140 of the Complaint.

141.    Hayley denies each and every allegation set forth in Paragraph 141 of the Complaint.

142.    Hayley denies each and every allegation set forth in Paragraph 142 of the Complaint.

143.    Hayley denies each and every allegation set forth in Paragraph 143 of the Complaint.

**Count 10 – Unjust Enrichment**

144.    As Paragraph 144 of the Complaint is merely an incorporation of the prior allegations, no response is required.  To the extent a response is required, Hayley incorporates by reference her responses above as if set forth fully herein.

145.    Hayley denies each and every allegation set forth in Paragraph 145 of the Complaint.

146.    Hayley denies each and every allegation set forth in Paragraph 146 of the Complaint.

147.    Hayley denies each and every allegation set forth in Paragraph 147 of the Complaint.

**Prayer For Relief**

To the extent the Complaint's "WHEREFORE" provisions request relief to which JLM asserts it is entitled, no response is required.  To the extent a response to the Complaint's "WHEREFORE" provisions is required, Hayley denies that JLM is entitled to any relief sought

in the Complaint including, without limitation, the relief requested in the "WHEREFORE" provisions.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

JLM's claims for relief are barred, in whole or in part, for failure to state a claim upon which relief can be granted.

### Second Affirmative Defense

JLM's claims for relief are barred, in whole or in part, by the terms of the 2011 Agreement and the terms of the 2014 Amendment.

### Third Affirmative Defense

In the alternative, the Agreement is ambiguous. Because multiple interpretations are reasonable under the Agreement, the Agreement is ambiguous and should be construed strictly against its drafter, JLM.

### Fourth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, by its own prior material breach of the 2011 Agreement, 2014 Amendment, and all supplements thereto, and its failure to satisfy or perform all its obligations under the 2011 Agreement, 2014 Amendment, and all supplements thereto.  By way of example, JLM failed to comply with Sections 4 and 5 of the 2011 Agreement, Section 3 of the 2014 Amendment, and JLM's July 24, 2019 letter supplementing the 2014 Amendment.

### Fifth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, because the 2011 Agreement and 2014 Amendment are terminated and/or voided, including but not limited to, because JLM failed

to satisfy or perform all its obligations under the 2011 Agreement, 2014 Amendment, and all supplements thereto.

### Sixth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, by the doctrine of trademark acquiescence.

### Seventh Affirmative Defense

JLM's claims for relief are barred, in whole or in part, by the equitable doctrines of laches, estoppel, and/or unclean hands, including by virtue of JLM's conduct described in the Counterclaims below.

### Eighth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, by the doctrine of waiver.

### Ninth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, because it has failed to act in good faith.

### Tenth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, because it has not suffered any damages as a result of any actions taken by Hayley, and JLM is thus barred from asserting any cause of action against Hayley.

### Eleventh Affirmative Defense

JLM's claims for relief are barred, in whole or in part, because it has failed and neglected to mitigate damages, if there were any, and to the extent of such failure to mitigate, any damages awarded under the Complaint should be reduced accordingly.

## Twelfth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, by principles of offset and/or setoff for amounts due to Hayley by JLM in connection with the claims asserted in the Counterclaims below.

## Thirteenth Affirmative Defense

JLM's claims for relief are barred, in whole or in part, because JLM has been unjustly enriched at Hayley's expense and it would be against equity and good conscience to allow JLM to retain the benefits of Hayley's work and investment delivered to it without payment of a fair price for the benefit retained by JLM.

## Additional Affirmative Defenses

Any relief sought by JLM against Hayley may be barred, in whole or in part, by additional defenses that cannot now be articulated because of the generality of JLM's pleading, the fact that discovery has not yet been taken, and other presently undeveloped information. Accordingly, Hayley reserves the right to supplement the foregoing defenses and to raise additional defenses as may appear as the case progresses to the full extent allowed by law.  Thus, the omission of any such additional defenses at this time is not intended to be a waiver of any such additional defenses.

[*continued on next page*]

## COUNTERCLAIMS

Hayley, by and through her attorneys, Haynes and Boone, LLP and Menken Simpson & Rozger LLP, for her counterclaims against Counterclaim-Defendants JLM and Joseph L. Murphy ("Murphy"), states as follows:

## NATURE OF THE COUNTERCLAIMS

1.      JLM forced Hayley to endure a workplace of fear, harassment, and inappropriate behavior.  JLM has fostered and acquiesced to an environment where its CEO, Murphy, has had multiple sexual and inappropriate relationships with subordinates, made scores of sexually inappropriate comments, and engaged in sexual harassment of other(s).

2.      Murphy's history of unwanted behavior and treatment of women who did not yield to his advances is not a secret at JLM and Hayley was aware of it.  At JLM, employees who engaged in extremely personal or sexual relationships with Murphy were treated more favorably and given special treatment, such as not having to come into the office during work hours, than those employees who did not.  Hayley was no exception.  Murphy ogled at her private parts, said lewd things to her and otherwise engaged in numerous inappropriate conversations with and inappropriate behavior toward Hayley.

3.      As one example, with full knowledge of the implicit threat of this behavior, Murphy would often summon Hayley to a crammed secluded back office, use his physically imposing nature to block the door, and engage in inappropriate and invasive personal conversations into Hayley's romantic relationships, sex life and family life.  The threat and the toll on Hayley's mental well-being was so severe, that she began carrying a sharp object (i.e., a seam ripper or exacto knife) whenever summoned to these meetings in case she needed to defend herself.  The result of this environment has taken a toll on Hayley mentally and physically—she

has experienced hair loss, circulation issues, trouble sleeping, and sought therapy as a direct result of the work environment at JLM.

4.      The frequency and tenor of Defendants' harassing actions only increased over the past year as it became clear that Hayley would not agree to social media responsibilities in connection with a new employment agreement.  Then, after filing this lawsuit and seeking a temporary restraining order against Hayley while she was still employed by JLM, JLM embarked on a campaign to defame Hayley by spreading malicious lies in the press.  This was designed to create negotiating leverage over Hayley and to dissuade other bridal studios, such as Mon Cherie, from hiring her.

5.      In addition to subjecting Hayley to a sexually hostile workplace, JLM failed to pay Hayley the compensation that she was owed under her Employment Agreement and the Collaboration Agreement with Hearts On Fire Company, LLC.  JLM also failed to provide Hayley with the necessary financial accounting information, as required by her Employment Agreement, which would have allowed her to confirm whether the payments that JLM did pay her were proper.  Upon information and belief, Hayley is owed substantial unpaid wages (characterized as "Additional Compensation") under her Employment Agreement.

## PARTIES

6.      Hayley is an individual who resides in California.

7.      Upon information and belief, JLM Couture, Inc., is a corporation duly formed and existing under the laws of the State of Delaware, with its principal offices located at 225 West 37th Street, 5th Floor, New York 10018.

8.      Upon information and belief, Murphy is a natural person residing in New York City and Florida.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C.

§ 1332(a)(1) because the parties are of diverse citizenship and the amount in controversy exceeds

$75,000, exclusive of interests and costs.  The Court also has subject matter jurisdiction pursuant

to 28 U.S.C. §§ 1331 and 1367.

10.     This Court has personal jurisdiction over JLM, and this Court is the proper venue

under 28 U.S.C. § 1391(b), because JLM is a resident of this District, because Hayley's claims

arise out of JLM's acts in this District, and due to the choice of forum clause in the parties' 2011

Agreement.

11.     This Court has personal jurisdiction over Murphy, and this Court is the proper

venue under 28 U.S.C. § 1391(b), because Murphy is a resident of this District, because Hayley's

claims arise out of Murphy's acts in this District, and Murphy is subject to personal jurisdiction

in this District.

12.     Contemporaneous with the filing of this action, Hayley will effectuate service of

this pleading on the New York City Commission on Human Rights and the Office of the New

York City Corporation Counsel as required under state law.

## RELEVANT FACTS FOR COUNTERCLAIMS

A.      **Hayley's Background**

13.     After graduating from Cornell University in 2007 with a degree in fiber science

and apparel design, Hayley began working as an apparel designer for Priscilla of Boston—

eventually taking over as a lead designer in 2011.  From 2007 through 2011, Hayley also worked

as a freelance styling assistant, where she worked with high-profile individuals including

celebrities like Pharrell Williams, Ke$ha, and Teyana Taylor.  Hayley also co-founded a

revolutionary bridal gown rental company and started a fashion blog.  Since graduating from

Cornell, every job that Hayley held has been in the wedding or fashion industry.

**B.      Hayley's Social Media Accounts**

14.      Hayley was an early adopter of social media.  In 2004, Hayley opened a personal

Facebook account under "Hayley Paige," which uses the URL "misshayleypaige"—a term of

endearment bestowed by her mother.  Over the years, Hayley opened other social media accounts

using "Hayley Paige" or "misshayleypaige," including Twitter, LinkedIn, Pinterest, Instagram,

SnapChat, Spotify, and TikTok.  Like millions of others, Hayley opened the Accounts for her

own personal reasons.

15.      In April 2012, on the recommendation of a friend, Hayley opened her Instagram

with the handle @misshayleypaige as a "personal" account.  Hayley's first posts to her Instagram

were highly personal and included inspirational quotes, a photo of Hayley's apartment, and a

picture of her best friend.  Hayley's Instagram has maintained this personal character and

authentically reflected her life, family, adventures, and work.  Hayley used her Instagram to

share some of her most personal life experiences, including posts about her childhood and family

(a tribute to her mother (left) and father (right)):

 

16.     In January 2017, Instagram verified Hayley's Instagram and Hayley categorized her account as "Public Figure" – not business or brand.  Having a verified Instagram account is a recognition of authenticity and is something that Instagram awards to certain accounts of public figures, celebrities, and brands.  Public Figure verification is reserved for individuals, is relatively rare, and entails a rigorous process.  Hayley personally undertook the process of getting her Instagram verified.

17.     Hayley started her Pinterest Account (misshayleypaige) on November 3, 2011, and her TikTok Account (@misshayleypaige) in November 2019.  Like her Instagram, Hayley started her TikTok and Pinterest accounts for her own personal reasons (collectively, "Hayley's Accounts").  Hayley was not instructed by an officer of JLM nor did she contractually agree to open and run these social media accounts on behalf of or for the benefit of JLM.

**C.     Hayley's Employment Agreement**

18.     On July 13, 2011, at twenty-five years old, Hayley signed an employment agreement with JLM ("2011 Agreement").  JLM employed Hayley as "a designer of a line of brides and bridesmaids dresses."  On August 1, 2014, Hayley signed an amendment to the 2011 Agreement ("2014 Amendment," together with the 2011 Agreement, the "Employment Agreement").  The 2011 Agreement and 2014 Amendment were both drafted by JLM.

19.     The 2011 Agreement provided that Hayley:

> grants to the Company the exclusive world-wide right and license to use her name "Hayley", "Paige", "Hayley Paige Gutman", "Hayley Gutman", "Hayley Paige" or any derivative thereof (collectively the "Designer's Name") ***in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including any and all good will associated therewith***, throughout the Term (including any extension of the Term), plus a two (2) year period following the Term or any extension thereof, provided Employee has substantially participated in the design or creation of such clothing or related items during her employment by the Company.

(2011 Agreement, § 10(a) (emphasis added).)

20.     The 2011 Agreement also provided that Hayley assigned her interest to JLM "during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s) thereof as trademarks or service marks. . . ."  (2011 Agreement, § 10(a).)

21.     Thus, the Employment Agreement clearly sets forth that, to the extent JLM has any rights in Hayley's name, such rights are limited in scope and time.  Namely, those rights apply only to "the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items" that Hayley "has substantially participated in the design or creation of such clothing or related items during her employment by" JLM.  In addition, those rights only last during the Term of the Employment Agreement plus two years.

22.     On August 9, 2018, JLM sent Hayley a letter purporting to extend the 2014 Amendment for a period of three years to August 1, 2022.

23.     On February 2, 2019, JLM sent Hayley another letter purporting to extend the 2014 Amendment for a period of three years to August 1, 2022.

24.     On July 24, 2019, JLM sent Hayley a letter increasing Hayley's Base Compensation effective August 1, 2019 and increasing the percentage of net sales generated by HP bridal gowns and related gown products to ███████████████ and retroactive to November 1, 2018.

**D.    Hayley's Employment with JLM**

  *1.    Hayley Meets All of Her Obligations Under the Employment Agreement*

25.     On August 1, 2011, Hayley began working at JLM as a head designer for the Blush by Jim Hjelm collection.  The first Hayley Paige collection launched in October 2011.

26.     During her employment with JLM, Hayley served as the head designer for the following collections and products (collectively, the "Products"):

–   Hayley Paige (bridal collection)

–   Blush by Hayley Paige (bridal collection)

–   Hayley Paige Occasions (bridesmaids collection)

–   La Petite Hayley Paige (flower girl collection)

–   Hayley Paige Plus Size initiative (a style and size extension to both the Hayley Paige and Blush by Hayley Paige bridal collections)

–   Hayley Paige x BHLDN (capsule bridal and cocktail collection)

–   Kleinfeld Exclusive Collection (micro collection of high end gowns)

–   Hayley Paige veils

–   Hayley Paige Red Carpet

–   Jim Hjelm by Hayley Paige

–   PopUpPaige.com (website site that sells Hayley's hand signed sketches and other products)

–   Hayley Paige Athleisure Collection

–   Hayley Paige for Hearts On Fire

–   Holy Matrimoji

27.     During Hayley's employment as a designer with JLM, she regularly participated in assisting with the advertising activities typical of a wedding dress designer.  For example, she designed and directed the execution of Lookbook and ad campaign images for each of her collections; creatively directed bi-annual runway shows for her collections; consistently attended between ten to twenty trunk shows each year in person; and participated in countless interviews.

In general, including at JLM, social media direction and content creation is a separate job title and is not an industry requirement for designers. JLM has two other lead designers, Lazaro Perez and Allison Webb, neither of which have the responsibility or requirement of social media direction or content creation as part of their role as a designer at JLM.

28.     While Hayley began working out of JLM's New York office, she began working from California in June 2020.

29.     Hayley has never been in breach of any of her obligations under the Employment Agreement.

### 2.     *JLM Fails to Properly Pay Base Compensation Due to Hayley*

30.     The Employment Agreement required JLM to regularly pay Hayley increases to her base compensation. JLM failed to pay these base compensation increases.

31.     The 2011 Agreement provides:

> Commencing on August 1, 2011, as Base Compensation, Employee shall be paid at the rate of ▮▮▮▮▮▮, which Base Compensation shall be increased at the rate of ▮▮▮▮▮▮▮ per year.

(2011 Agreement, §4(a).)

32.     The 2014 Amendment provides:

> Commencing on August 1, 2014, as Base Compensation, in consideration for her duties hereunder and in the Agreement, Employee shall be paid at the annual rate of ▮▮▮▮▮, which Base Compensation shall be increased at the rate of ▮▮▮▮▮▮▮ per year.

(2011 Agreement, §3(a).)

33.     JLM repeatedly failed to pay Hayley the ▮▮▮▮▮▮ annual increase in Base Compensation for multiple years including at least for the periods of August 2015 to August 2016, August 2017 to August 2018, and August 2019 to August 2020.

34.     JLM also repeatedly failed to pay Hayley the proper amount of Base

Compensation.  As only one example, the paystub generated and provided by JLM to Hayley on

or about February 28, 2020, identified her annual Base Compensation as ▮▮▮▮, despite

JLM's written agreement to pay Hayley ▮▮▮▮ per year in Base Compensation, effective

August 1, 2019.

35.     The Employment Agreement required JLM to regularly pay Hayley increases to

her Base Compensation.  JLM failed to pay these Base Compensation increases.

36.     JLM has also ceased paying Hayley the Base Compensation she is owed under the

Employment Agreement.  The last Base Compensation check Hayley received from JLM was on

December 24, 2020.

### 3.     *JLM Willfully Fails to Properly Pay Additional Compensation Due to Hayley*

37.     JLM has also failed to pay and/or unlawfully deducted the Additional

Compensation Hayley that is owed under the Employment Agreement.

38.     The 2011 Agreement defines "Products" as "all apparel designed by" Hayley.

(2011 Agreement, § 2.)

39.     The 2011 Agreement then defines "Additional Compensation" due to Hayley

(above her base compensation) as follows:

> [Hayley] shall be paid ▮▮▮▮▮▮▮ of annual net sales of the Products in excess
> of ▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ of annual
> net of the Products sales in excess of ▮▮▮▮▮▮▮▮▮▮ per year
> during each fiscal year of the Term and any extension thereof.

(2011 Agreement, § 4(b).)

40.     The 2011 Agreement describes that the Additional Compensation must be paid to

Hayley no later than 120 days after the end of each fiscal year:

> The Additional Compensation to be paid pursuant to Paragraph 4(b) shall be
> payable not later than 120 days after the end of each fiscal year of the Company.

(2011 Agreement, § 4(f).)

41.     The 2011 Agreement by its plain terms requires JLM to pay Hayley ▮
Additional Compensation for the sale of all Products in excess of ▮▮▮▮ in annual revenue
and ▮▮ for Product sales in excess of ▮▮▮▮.

42.     Notably, this provision explicitly provides that it shall continue for "each fiscal
year of the Term and any extension thereof."

43.     In 2014, the parties executed the 2014 Amendment.  The 2014 Amendment states
that "[t]he parties acknowledge and agree that all other terms and conditions, not specifically
addressed herein, which are conditioned in the Employment Agreement dated July 13, 2011,
shall remain in full force and effect."  (2014 Amendment, § 4.)

44.     The 2014 Amendment provides that Hayley is to receive "additional"
compensation on four specific lines commencing on August 1, 2014:

- ▮ on annual sales of the Hayley Paige collection in excess of ▮▮▮▮ in sales
  per year;

- ▮ on annual sales of the Hayley Paige Blush collection in excess of ▮▮▮▮ in
  sales per year;

- ▮ on annual sales of the Occasions Bridesmaids Products sales in excess of
  ▮▮▮▮ in sales per year; and

- ▮ on annual sales of the Jim Hjelm Bridal Products sales in excess of ▮▮▮▮ in
  sales per year.

(2014 Amendment, § 3(b)-(c).)

45.     The 2014 Amendment does not repeal or void Section 4(b) of the 2011
Agreement with respect to Additional Compensation owed on Products.  Instead, the 2014
Amendment modifies Section 4 to provide "additional compensation" for sales exceeding
benchmarks on particular lines.

46.     The 2014 Amendment also states that "[t]he Additional Compensation to be paid pursuant to Paragraph 3(b) and (c) shall be payable not later than 120 days after the end of each fiscal year of the Company.  (2014 Amendment, § 3(f.).)

47.     On August 9, 2018, JLM sent Hayley a letter purporting to extend her Agreement for three years, until August 1, 2022.  As part of this purported extension, JLM agreed to increase Hayley's Base Compensation by ████.

48.     On July 24, 2019, JLM sent Hayley a letter increasing Hayley's Base Compensation to ████, effective August 1, 2019, and increasing Hayley's Additional Compensation to "███ of net sales (after credits, returns, discounts, etc.) generated by HP bridal gowns and related gown products."  JLM agreed to pay Hayley "████████" and agreed to make the revised "███ commission terms retroactive to the beginning of the current fiscal year, that is from November 1st [2018] through October 31st of this year."

49.     For at least the past six years, JLM has willfully failed to pay and/or unlawfully deducted the Additional Compensation due to Hayley under the Employment Agreement and amendments thereto (including the July 24, 2019 letter).  For the Additional Compensation that JLM did pay to Hayley, JLM regularly failed to meet the 120-day deadline.  JLM has not paid and/or unlawfully deducted the Additional Compensation due Hayley for the period of November 1, 2019 through October 31, 2020.  The deadline for JLM to do so was March 1, 2021.

50.     The total Additional Compensation owed to Hayley is not known due to JLM's willful failure to properly provide accounting statements as outlined below.  However, based on the limited information provided by JLM, and the growing popularity of the Products, upon information and belief, sales of the Products have exceeded ████████ in each of the past six

years.  Thus, upon information and belief, the unpaid Additional Compensation exceeds

$2 million, which remains due and owing to Hayley.

51.     In addition to the unpaid Additional Compensation, upon information and belief,

JLM has willfully refused and failed to provide the accounting information due to Hayley under

the Employment Agreement, because JLM has underpaid the Additional Compensation

thereunder.

### 4.     *JLM Fails to Properly Account for the Compensation Due to Hayley*

52.     Pursuant to the Employment Agreement, Hayley was entitled to "Additional

Compensation" based on the sales of products she designed.

53.     The Employment Agreement provides two separate provisions pursuant to which

Hayley is entitled to receive financial information supporting JLM's Additional Compensation

payments (the "Financial Information"):

> "The Employee shall have the right, on an annual basis, to receive a schedule
> detailing the sales information that the Company relies upon in making payments
> of Additional Compensation to the Employee."

(2011 Agreement § 5.)

> "Unaudited summaries and sales estimates will periodically be made available, as
> may be reasonably requested by the Designer, as to orders for the collections that
> Designer is responsible for. Designer shall be entitled to meet with the company's
> financial officer at the end of the fiscal year for a comprehensive breakdown of net
> sales."

(2014 Amendment § 3(g).)

54.     The Employment Agreement further imposes an obligation on JLM to compute

the Net Sales of the Products for each fiscal year of the Company within 90 days as follows:

> Net Sales of the Products for the purposes of Paragraph 4(b) shall be computed
> separately for each fiscal year of the Company . . . Such computation shall be made
> as soon as practicable after the end of each such period, but not later than ninety
> (90) days after the end of each fiscal year of the Company on October 31.

(2011 Agreement § 4(b); *see also* 2014 Amendment § 4(d).)

55.     JLM has repeatedly failed to compute the net sales of Products for the purpose of complying with Paragraph 4(b) of the 2011 Agreement and 4(d) of the 2014 Amendment.

56.     Hayley has repeatedly made requests to JLM for JLM to provide the Financial Information to which she is entitled under the Employment Agreement.

57.     JLM has repeatedly failed to provide the Financial Information to Hayley that she is entitled to receive under the Employment Agreement.

58.     In fact, the sales director for several product lines designed by Hayley was instructed by JLM management to conceal financial information and sales figures from Hayley in a concerted effort to prevent Hayley from understanding the sales figures underlying her payments.

59.     Upon information and belief, JLM was using the sales of products designed by Hayley to prop up its other underperforming divisions.  However, this was not proper under the accounting principles set forth in the Employment Agreement.

> **5.     *JLM Fails to Properly Pay Commission and Ambassador Fee Due to Hayley Under Hearts On Fire Collaboration Agreement***

60.     JLM has failed to pay Hayley the commission and Brand Ambassador Fee that she is owed under the Collaboration Agreement with Hearts On Fire Company, LLC ("Hearts On Fire").

61.     On August 1, 2018, JLM and Hearts On Fire entered into a Collaboration Agreement under which JLM granted Hearts On Fire a license to the Hayley Paige trademarks in connection with a line of jewelry to be called "Hearts On Fire by Hayley Paige" and "Hayley Paige for Hearts On Fire."

62.    The Collaboration Agreement, entered into between Hearts On Fire and JLM was made, at least partially, for the benefit of Hayley, whose introduction, relationship, reputation, and name were the basis for the Agreement and monies paid by Hearts On Fire to JLM were payable to Hayley as the beneficiary of the Agreement.

63.    Hayley was solely responsible for bringing in this Collaboration Agreement with Hearts On Fire.  One of Hayley's contacts from her prior employment at Priscilla of Boston was working at Hearts On Fire and reached out to Hayley about the potential collaboration with Hayley and JLM.  Hayley was invaluable in securing the deal.

64.    Under the terms of the Collaboration Agreement, Hearts On Fire agreed to pay "Minimum Royalties" in the amount of ███████ commencing in Contract Year 2 (August 1, 2019 – July 31, 2020) and ███████ in Contract Year 3 (August 1, 2020 – July 31, 2021). (Collaboration Agreement, § 6.1.)

65.    Under the Collaboration Agreement, Hearts On Fire also agreed to pay "Earned Royalties" "based on the sales of Licensed Products in an amount equal to █████████████ of the Wholesale Net Sales . . . plus █████████████ of Retail Net Sales of all Licensed Product sold under this Agreement."  Additionally, for Licensed Products that Hearts On Fire sells or distributes to Nordstrom or Kleinfeld Bridal, Hearts On Fire agreed to pay ███████ ███████ of the Wholesale Net Sales of Licensed Products.  (Collaboration Agreement, § 6.2.)

66.    Under the Collaboration Agreement, Hayley was designated the "Brand Ambassador," which Murphy confirmed to Hayley.  As the Brand Ambassador, Hayley was obligated to, and did, carry out "Brand Ambassador Services," which included a trip to Taiwan and China for Hayley to promote Hearts On Fire, among other things.  In exchange for performing the "Brand Ambassador Services," Hearts On Fire agreed to pay Hayley a ███████

per contract year "Brand Ambassador Fee."  Hayley was a beneficiary of the Collaboration

Agreement and the sole intended recipient for the ████ per year Brand Ambassador Fee.

67.     Hayley met with Murphy during and after the execution of the Collaboration

Agreement.  During these conversations, Murphy told Hayley repeatedly that she was the Brand

Ambassador and that she would be paid the entirety of the Brand Ambassador Fee.  With respect

to the Hearts On Fire royalties, Murphy told Hayley that she would receive 30-40% of the

royalties.  Murphy also told Hayley that "we will make this fair" and "you deserve to be

rewarded."  Murphy never discussed with Hayley that any royalties would be paid out under the

terms of her Employment Agreement.  Hayley would have never agreed to receive only ███ of

the royalties on an agreement she was responsible for securing and that was completely outside

the terms of her Employment Agreement.

68.     Upon information and belief, JLM has received three payments of ████

(totaling ████) from Hearts On Fire for Hayley's Brand Ambassador Services for Contract

Year One, Contract Year Two, and Contract Year 3.  However, JLM breached the Collaboration

Agreement and its agreement with Hayley and unilaterally decided to keep, upon information

and belief, at least ██ of the Brand Ambassador Fee.  JLM failed to pay Hayley the Brand

Ambassador Fee and/or only paid Hayley a percentage of the Brand Ambassador Fee that she

was entitled to for performing the Brand Ambassador Services under the Collaboration

Agreement.  JLM owes Hayley all unpaid Brand Ambassador Fees.

69.     JLM also failed to pay Hayley the "Minimum Royalties" and/or "Earned

Royalties" owed to her under the Collaboration Agreement.

70.     Even though Hayley was solely responsible for securing the Collaboration

Agreement with Hearts On Fire and Murphy had repeatedly told Hayley that she would get 30-

40% of the royalties under the Collaboration Agreement, JLM only paid Hayley ████ of the

"Minimum Royalties" and/or "Earned Royalties" earned under the Collaboration Agreement,

while JLM kept ████ of the royalties for itself.

71.     JLM has also failed to pay Hayley all royalties in connection with the Hearts On

Fire "Minimum Royalties" and/or "Earned Royalties" owed to her for the fourth quarter of 2020.

**E.      JLM Creates a Hostile and Intolerable Work Atmosphere for Hayley**

*1.      JLM Fosters a Culture of Sexual Favoritism and Threatening Behavior*

72.     JLM's CEO, Joe Murphy, created a culture where work was secondary to his own

personal, prurient, and financial interests.  Murphy sought to control subordinate female

employees and often engaged in inappropriate sexual and personal relationships with them.

These women, always much younger than Murphy and usually blonde, who capitulated to

Murphy's advances obtained preferential treatment at JLM.

73.     Although did Hayley did receive some perquisites (because she did generate so

much revenue for JLM), Hayley did not receive the same preferential treatment because she did

not engage in a sexual relationship with Murphy who instead threatened, harassed, and

intimidated her.

74.     Upon information and belief, over the past several years, Murphy has engaged in

inappropriate workplace relationships with at least three women who were his subordinates.

Upon information and belief, in one such instance, Murphy fathered a child with the employee

while he was married to another woman.

75.     Most recently Murphy was engaged in a sexual relationship with a JLM

employee, Svetlana Gryazeva, who Murphy referred to as the "World's Greatest Girlfriend."

From: Joseph Murphy ████████████ >
Subject: **Re: Copyright**
Date: September 12, 2014 at 12:59:05 PM EDT
To: ████████████████████
Cc: Svetlana World's Greatest Girlfriend < ████████████ >

76.     Murphy's relationship with Ms. Gryazeva was well-known amongst JLM employees and bridal store owners, among others.  Ms. Gryazeva accompanied Murphy to industry events, including Hayley's 2015 wedding where they shared a hotel room.  Ms. Gryazeva's work-role was never clearly defined to JLM employees, but because of her sexual relationship with Murphy, she received special treatment.  Ms. Gryazeva was permitted to come into the office when she pleased, would not be criticized for poor performance, and other employees would walk on eggshells around Ms. Gryazeva due to her relationship with Murphy.  For example, she regularly passed off work to others or completed tasks incorrectly, but no other employees could complain to her directly or to Murphy, because of their relationship.

77.     Murphy would often compliment Ms. Gryazeva in front of others – including Hayley – even though whatever work Ms. Gryazeva did was sub-par.  This sent a clear message to Hayley and her colleagues that a sexual relationship with Murphy would result in praise and protection in the workplace.  To underscore this message, Murphy kept a prominent photograph of Ms. Gryazeva in his 5th floor secluded back office, which Hayley and others would see when talking to Murphy.

78.     Like Ms. Gryazeva, it is known that other employees who engaged in sexual or other extremely personal relationships with Murphy have been given extremely preferential treatment by JLM and Murphy.  Some of these employees were permitted to work whatever hours they saw fit and were immune to criticism by others.  Murphy created a toxic work culture

where it became clear that employees who engaged in sexual or extremely personal relationships with Murphy were openly treated differently than those who did not.

79.     Upon information and belief, Murphy also made direct inappropriate and unwanted sexual advances to another female JLM employee.  This employee resisted Murphy's advances, and then required therapy to process the incident.  After this incident, Murphy often spoke negatively of the employee's boyfriend to Hayley.  Upon information and belief, Murphy intended to demean and insert himself between his female employees and their partners when Murphy desired a sexual relationship with the employee.

80.     After the particular employee rejected Murphy's unwanted sexual advance, Murphy also began commenting negatively on her performance.  For example, in a text message to Hayley, Murphy stated that she "is put together differently psychologically and needs to be micromanaged."  And that she "can't delegate . . . has no aptitude, cannot keep track of time nor multitask."  This sent a clear message that employees who reject Murphy's advance will be subjected to ridicule on their job performance as well as psychological makeup.

81.     Murphy frequently harassed and disrespected his female employees (on both work and personal issues) to the point that they openly cried in the workplace.  He often discussed his female employees' personal lives and character in ways that were completely unrelated to work.  However, Murphy did not engage in such conduct with respect to the women with whom he was sexually involved with.

### 2.     *Murphy's Repeated Inappropriate Comments and Behavior*

82.     Throughout the last 5-7 years and at least going back to 2014, Murphy repeatedly made sexually provocative comments to Hayley.  Some examples are: (a) On October 12, 2014 at bridal market at JLM Murphy lewdly told Hayley, who was wearing red pants, that she had

"camel toe," meaning that he was able to see the contours of her genitals; (b) On April 15, 2016, Murphy told Hayley she "looked pregnant"; (c) On October 21, 2016, Murphy said she "looked real cute at a JLM store in Los Angeles; (d) In January/February 2018, Murphy told Hayley, who was wearing a pink shirt, "you look washed out, wide, and down market"; (e) On January 3, 2018 in Nashville, Murphy told Hayley, who was wearing a black lace outfit, that she "looked sexy"; (f) In October 2019 in Beijing, Murphy looked Hayley up and down as if she were a piece of meat and said, "you look spectacular and really slimmed down"; and (g) Upon seeing Hayley on the The Knot magazine cover, told her she looked "sexy, fun, and fresh."

83.     When making these comments, Murphy would often ogle and stare at Hayley's breasts and legs (which he often commented to Hayley were "strong gymnastics legs") while looking up and down her body.  He even took Hayley shopping for clothes at BCBG and J. Crew and insisted that she try the clothes on for him while he looked on.  This made Hayley deeply uncomfortable, though she complied with his demands out of fear of upsetting Murphy.

84.     Murphy also made sexually inappropriate comments to or about other female employees.  As only one example, Murphy commented on an intern's blouse and said, "I didn't know it was a wet T-shirt day" in front of other JLM employees.

85.     Murphy frequently got inappropriately close to Hayley at work and at various events and would often put his arm around her, most memorably on April 10, 2019 when she was wearing a backless romper.

86.     Before Hayley was married, Murphy would frequently invite Hayley to his Florida home for the weekend and implied this would be a getaway for pleasure, as opposed to business.  She laughed off or expressly rejected these inappropriate invitations.

87.     Because she did not relent to Murphy's pressure, Murphy would put Hayley down, condemn her, and compare her to Ms. Gryazeva.  He repeatedly told her that her design work had gotten worse, that she hit her peak in 2018, and that like Muhammad Ali, she "got caught admiring her own work" and was going to get knocked down.  He suggested that Hayley should be more like Ms. Gryazeva, saying: "Lana has that Russian charm that most women don't have.  You should really hang out with her more often, she has a lot to offer."  Murphy also commented to Hayley that Ms. Gryazeva's physical attractiveness made her intimidating to other women.  Hayley felt uncomfortable listening to Murphy comment on the attractiveness of another JLM employee.

88.     Despite being a publicly-traded company, during Hayley's employment, JLM did not have a qualified Human Resources officer or department.  As the largest shareholder, JLM is essentially Murphy's company and all personnel decisions were driven by Murphy, even though he was the biggest offender, leaving Hayley and her colleagues no one to complain to.

89.     Murphy's "mancave," where he had a special provocative photograph of his pet employee, Ms. Gryazeva, was secluded and only accessible by going through several offices.  The space was little larger than a closet and it was there where he would meet with Hayley alone or with other female employees and question them about their personal lives and romantic relationships.  Murphy would keep the air conditioning blasting cold in the small space and Murphy always sat closest to the door.  Hayley would be forced to sit on a folding chair directly next to Murphy, who controlled entrance and exit to the room as the only person to open and close the door.  The effect was that Murphy – who is physically imposing compared to Hayley – made Hayley feel trapped.  This, combined with Hayley's awareness of Murphy's repeated sexual relationships with other employees and unwanted harassing behavior toward her, lead

Hayley to hide a sharp object in her pants or dress to use to defend herself in case Murphy tried to physically touch her.

90.     During these meetings, Murphy often steered the conversation to inappropriate personal topics.  Hayley was fearful not to engage on a personal level with Murphy, but he groomed her to divulge deeply personal information in fear of what may happen if she refused to do so.  During one such meeting, after Hayley told Murphy her (then) husband had health issues, Murphy told Hayley that he would never be able to "satisfy [her] in a marriage."

91.     In other "mancave" meetings, Murphy pushed Hayley to talk about her romantic life and, upon getting her to talk, repeatedly told her that she was "losing focus" and distracted by her fiancée, Conrad Louis Clevlen.  Murphy told Hayley that her relationship with her fiancée is "really not good for you" because it was a distraction from her work.  Murphy made it clear he did not approve of Mr. Clevlen, making Hayley feel that she had to agree with Murphy and comply with his wishes to stay in his good graces and keep her job.

92.     Furthering what amounted to a hostile work environment where young, sexy women were hired, groomed, and solicited by him, Murphy, in these private meetings, repeatedly told Hayley not to have a family and children, often spoke negatively about employees with children, and suggested that they were performing poorly because of their familial status.  For example, during one meeting with Hayley, Murphy stated that: "[female employee A] is constantly distracted by her kids. She can't possibly be getting her job done working as a mom from home."  Murphy also said that kids are "a distraction, look at [female employee B], she's too busy having babies to be invested in advancing."  Murphy stated that work was the only thing that could fulfill Hayley's life and that she "won't get that from family or a marriage."  As a result, Hayley knew that if she married or had children, she would be subject to the same

41

ridicule as these other employees or worse.  Hayley also felt obligated to not discuss her desire to have children because that would harm her growth at JLM.

93.     Including but not limited to the reasons set forth above, JLM and Murphy created and fostered a sexually hostile work environment.

### 3. *The Effects of the JLM Hostile Work Environment*

94.     Hayley loved designing dresses and often justified the hostile environment as the price to pay for doing a job she wanted.  She would also often appear agreeable or overly positive in interactions with Murphy even when she disagreed with him wholeheartedly simply because it was easier to be compliant than to subject herself to his harassment.  However, as a result of working under Murphy for years, Hayley has seen adverse effects on her mental and physical health, as well as her personal relationships.

95.     Hayley has experienced hair loss, circulation issues, trouble sleeping, and sought therapy as a direct result of the work environment at JLM and interactions with Murphy.  In recent years when called to a meeting with Murphy in the small room, Hayley would often physically begin shaking.  Hayley became terrified of these meetings, and often counteracted that fear with agreeability with the belief that any resistance would just prolong the uncomfortable experience.

96.     As discussed below, the JLM work environment and Murphy's behavior – and the toll it took on Hayley's mental and physical well-being – ultimately became too much to bear and so intolerable that Hayley was forced to resign from JLM.

**F.      JLM's 2019 New Contract Proposal and Aftermath**

97.      In July 2019, Murphy sent Hayley a proposed new employment agreement ("2019 Proposal"). The 2019 Proposal sought to impose even more duties and responsibilities on Hayley and expand JLM's rights even further.

98.      The 2019 Proposal included a list of promotional and marketing responsibilities beyond the scope of the Employment Agreement: "Additional Duties include, but are not limited to, appearances as a personality on television, radio, as a speaker, social media monetized opportunities such as YouTube advertising, Instagram and any and promotional opportunities not currently known. . . ." The 2019 Proposal would also require Hayley to "participat[e] in, creating and/or promoting marketing content for the Products."

99.      It quickly became clear that JLM and Murphy wished to impose new responsibilities on Hayley relating to Instagram and social media that were well beyond the scope of her responsibilities as a wedding dress designer and her employment with JLM. Hayley responded that the 2019 Proposal was unacceptable, and she also sought clarity on the parties' positions with respect to the "Hayley Paige" name.

100.     On September 15, 2019, Murphy responded that "As far as [your] personal investment (regarding JLM) it really is only related to Hayley Paige wedding gowns and related categories. . . . But rest assured, I do not claim access to your persona beyond what I describe above."

101.     Murphy's statement confirmed Hayley's understanding of the Employment Agreement that neither Murphy nor JLM intended to claim rights to Hayley's name outside of the bridal gowns and other JLM bridal-related product lines created by Hayley during her employment.

43

102.    On or around May 2020, Murphy began to escalate his demands and, despite his prior statements and representations, started claiming expanded ownership over Hayley's persona and personal Instagram account @misshayleypaige, beyond what was set forth in the Employment Agreement.  This was the first time in the nine years that Hayley worked for JLM that anyone expressed a claim of ownership over her persona or any of her personal social media accounts.

103.    Hayley viewed this assertion as going well beyond the rights set forth in the Employment Agreement. Accordingly, on June 3, 2020, Hayley responded to Murphy and made it clear that "I cannot accept you or JLM making a claim to my personal Instagram account and general persona."

104.    Despite Murphy's assertion, in October, JLM increased its pressure on Hayley to enter into the 2019 Proposal and relinquish additional rights.  Specifically, JLM had its lawyers send a threatening letter to (its employee) Hayley.  JLM threatened that "Ms. Gutman has failed to agree to reasonable terms and may not recognize the importance of concluding this matter."

105.    JLM's attacks increased during a confrontation instituted by Murphy at an in-person event in October 2020.  On October 24-25, 2020, Hayley attended a bridal trunk show at Kleinfeld Bridal in New York.  Hayley was so nervous to meet with Murphy that she had to take anti-anxiety medication to calm down before she was able to meet with him.  During the trunk show, Murphy was condescending, stating that Hayley needed him to be successful.  Murphy also suggested that he had "a lot of money" to fight Hayley.

106.    On December 15, 2020, while Hayley was still employed by JLM, JLM filed the Complaint against Hayley and sought a TRO (which was granted) that among other things prohibited Hayley from: "using, or authorizing third parties to use, the Designer's Names,

Trademarks or any confusingly similar term, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy."  Given that the name "Hayley Paige" is defined as a "Designer's Name," the TRO prevents Hayley from "using" her name without Murphy's express written permission.

107.    Thus, the TRO sought by JLM was one further piece in Murphy's deliberate effort to impose himself on Hayley's life – both business and personal – in an attempt to exert control over Hayley.  By the TRO, Murphy gained control over Hayley's ability to simply speak her own name.

108.    Upon information and belief, JLM acted deliberately and intended that the escalation of their baseless legal threats and demands, Murphy's threatening and improper personal comments, and the filing of a baseless lawsuit would create a work atmosphere that was so intolerable Hayley would be forced to resign.  Through this forced resignation, JLM sought to gain through the legal system that which it could not gain through negotiation – the rights to Hayley's social media accounts, name, and ability to earn a living.

109.    Under the enormous weight of JLM's demands, threats, and discomfort that Murphy caused, Hayley had nowhere at JLM to turn.  Murphy was the CEO of JLM and asserted total control – he inappropriately injected himself into his employee's personal lives, engaged in sexual relationships with other subordinates, and attempted to dictate the workings of Hayley's relationship with her fiancée, among other things.

110.    Due to the intolerable nature of Hayley's working environment, the constant threats and legal harassment, Murphy's inappropriate exercise of control over Hayley (including the use of her name), and JLM's various baseless legal claims against her, it became impossible to continue working at JLM.  Therefore, Hayley resigned from JLM on December 17, 2020.

**G.     JLM Improperly Uses Hayley's Image to Sell its Products**

111.    On December 21, 2020, Hayley's counsel wrote to JLM's counsel and stated: "Ms. Gutman does not consent to JLM Couture, Inc.'s use of her photograph, portrait, image, voice, or likeness."

112.    Despite this explicit demand that JLM not use Hayley's "photograph, portrait, image, voice, or likeness," JLM proceeded to repeatedly do just that.

113.    In particular, using the Instagram account with handle "@misshayleypaige" JLM has made commercial feed posts and posted Instagram Stories using a photograph of Hayley.  An illustrative example is shown below:



114.    Until recently, each of JLM's feed posts and Stories has been accompanied by the unauthorized image of Hayley shown below:



115.    When JLM began posting its own content selling its bridalwear on Hayley's Instagram, JLM did not make any mention or announcement that it was no longer Hayley using the account or that Hayley had resigned from JLM.  To date, JLM has made more than 65 feed posts advertising its products and many additional Stories posts without any mention that Hayley is no longer in control of the account and is no longer associated with JLM.

116.    JLM has also failed to take down the thousands of personal posts and photographs of Hayley and her fiancé, family, and friends.  Thousands of the photographs and posts on the @misshayleypaige Instagram Account to do not belong to JLM and the individuals in those photographs and posts have not given JLM permission to use their likeness and images in public.

117.    JLM's deception, aimed at Hayley's Instagram followers, is intended to deceive those followers into believing that Hayley is still in control of the account to influence those followers to purchase JLM's goods.

118.    Hayley is an influencer and her Instagram is highly valuable.  Prior to entry of the TRO, industry standard tools valued Hayley's Instagram Account at $28,500 per post, with a true reach of 108,500 followers per post, even after drastically reduced engagement with the account since JLM took it over.  In just a few weeks after entry of the TRO, Hayley's Instagram lost

thousands of followers and its value dropped, and continues to drop, precipitously.  JLM has disabled commenting, which is critical to engagement with followers and, thus, to value.  Upon information and belief, under JLM's control, the value of Hayley's Instagram account will drop to the level of JLM's other corporate accounts: approximately $4,600 per post or less.

## H.  JLM Defames Hayley

119.    After Hayley was constructively discharged from JLM, JLM began mounting a public and private campaign to damage Hayley's future business prospects.   JLM has knowingly made a false statement to the media with the intent to disparage Hayley.

120.    On December 24, 2020, JLM notified Hayley's counsel, because JLM asserted that it was locked out of the @misshayleypaige Instagram account.  JLM's counsel, Sarah Matz, stated: "late last night, someone, we presume Ms. Gutman changed the associated email and phone number" for the account.

121.    Within 2 hours of receiving this message, Hayley's counsel responded that "Hayley has not changed anything with respect to the @misshayleypaige account, including the associated email, phone number, password, or otherwise since entry of the TRO."

122.    Ms. Matz stated that "JLM is currently locked out of the @misshayleypaige Instagram account and does not have access."   Hayley's counsel reiterated that "Hayley did not change anything to the account," but offered to help JLM unlock the account if JLM had locked itself out.  JLM did manage to unlock the account with the help of Hayley's counsel on Christmas Eve.

123.     Despite this background, JLM claimed in an email to Insider that Hayley locked JLM out of @misshayleypaige accounts by changing the login and password.  Specifically, Insider reported that[2]:

> A JLM spokesperson told Insider that Gutman changed the login information on the @misshayleypaige Instagram account after the court order which required her to hand over the account to the company.
>
> Hayley again hijacked the account by changing once again the login and password and refused to share those with JLM, an apparent violation of the court order," the spokesperson told Insider at the time.

124.     In addition to being knowingly false, this statement carries the accusation that Hayley has knowingly violated a Court order.  In fact, the JLM spokesperson explicitly stated that Hayley's conduct was "an apparent violation of the court order."

125.     JLM has made no attempt to correct its knowingly false statement.

## I.     The Employment Agreement Is Terminated

126.     On March 18, 2021, Hayley, through her counsel, sent a letter to JLM terminating the Employment Agreement.  As set forth above, JLM repeatedly and materially breached the Employment Agreement, including but not limited to, by ceasing all Base Compensation Payments and failing to pay Additional Compensation owed to Hayley.

127.     Hayley also notified JLM that it no longer retained any benefits of the Employment Agreement and that JLM is no longer authorized to manufacture, cause to be manufactured, sell, market, or otherwise distribute or promote any products bearing the Trademarks or the Designer's Name, Hayley's photograph, signature, image, or likeness, or to otherwise associate JLM or JLM's products with Hayley.  JLM's continued use of the Trademarks or the Designer's Name, Hayley's photograph, signature, image, or likeness, or

---

[2] Available at https://www.insider.com/hayley-paige-gutman-jlm-couture-controversy-timeline-2021-1 (last accessed January 18, 2021).

ongoing association of JLM or JLM's products with Hayley is a violation of Section 43 of the

Lanham Act, 15 U.S.C. § 125(a) and N.Y. Civ. R. Law §§ 50, 51.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against JLM – Failure to Properly Pay Wages)

128.    Hayley repeats and realleges the allegations above as if fully set forth herein.

129.    As described above, the Employment Agreement constitutes a valid and legally

binding contract between Hayley and JLM.

130.    Hayley fully performed her obligations under the Employment Agreement.

131.    JLM materially breached its obligations under the Employment Agreement by,

among other things, failing to properly and timely pay wages (including Base Compensation,

Additional Compensation, and the Hearts On Fire Brand royalties), as described above.

132.    The effect of JLM's breaches was material.

133.    Accordingly, JLM failed to substantially perform its obligations under the

Employment Agreement.

134.    As a result of JLM's various material breaches of the Employment Agreement

and failure to substantially perform its obligations under the Employment Agreement, Hayley

has been damaged in an amount to be determined at trial, plus interest from the date of breach.

## SECOND CAUSE OF ACTION
### (Violation of N.Y. Labor Law Against JLM – Failure to Pay Wages and Timely Pay Wages)

135.    Hayley repeats and realleges the allegations above as if fully set forth herein.

136.    As described above, JLM, as Hayley's employer under the NYLL, failed to pay

and timely pay Hayley wages that she was owed.

137.    JLM's refusal to pay Hayley all of the wages that she is owed constitutes an

unlawful deduction in violation of NYLL § 193.

138.    The foregoing conduct of JLM constitutes willful violations of the NYLL.

139.    JLM's conduct violates N.Y. Labor Law §§ 190 et seq., which entitles Hayley to full payment of wages to which she is owed, along with prejudgment interest, attorney's fees, and liquidated damages equal to one hundred percent of the total amount of the wages found to be due.

### THIRD CAUSE OF ACTION
**(Breach of Contract Against JLM – Failure to Comply with Audit Obligation)**

140.    Hayley repeats and realleges the allegations above as if fully set forth herein.

141.    As described above, the Employment Agreement constitutes a valid and legally binding contract between Hayley and JLM.

142.    Hayley fully performed her obligations under the Employment Agreement.

143.    JLM materially breached its obligations under the Employment Agreement by, among other things, failing to provide the Financial Information and a meeting with JLM's CFO to Hayley.

144.    The effect of JLM's breaches was material.

145.    Accordingly, JLM failed to substantially perform its obligations under the Employment Agreement

146.    As a result of JLM's various material breaches of the Employment Agreement and failure to substantially perform its obligations under the Employment Agreement, Hayley has been damaged in an amount to be determined at trial, plus interest from the date of breach.

### FOURTH CAUSE OF ACTION
**(Accounting Against JLM)**

147.    Hayley repeats and realleges the allegations above as if fully set forth herein.

148.    By virtue of the Employment Agreement and JLM's obligation to pay Additional Compensation to Hayley, JLM and Hayley were parties to a confidential and fiduciary relationship.

149.    Hayley has an interest in the amount and value of proper Additional Compensation generated by sale of the Products under the Employment Agreement.

150.    Hayley has repeatedly requested more detailed financial information from JLM, to which she is entitled, but JLM has failed to provide Hayley with a proper accounting of detailed financial information sufficient to determine the proper Additional Compensation to which she is owed.

151.    Hayley is without an adequate remedy at law to determine the full extent of JLM's failure to properly account for the Additional Compensation to which Hayley is due absent a full accounting.

## FIFTH CAUSE OF ACTION
### (Breach of Contract Against JLM – Constructive Discharge)

152.    Hayley repeats and realleges the allegations above as if fully set forth herein.

153.    As described above, the Employment Agreement constitutes a valid and legally binding contract between Hayley and JLM.

154.    Hayley fully performed her obligations under the Employment Agreement.

155.    As discussed above, by its actions, JLM created an intolerable working environment for Hayley.

156.    JLM materially breached its obligations under the Employment Agreement by creating an intolerable working environment, and as a result of this intolerable working environment, Hayley was compelled to resign from JLM.

157.    As a result of this constructive discharged, Hayley has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
**(Breach of Contract Against JLM – Failure to Properly Pay Wages Under Collaboration Agreement)**

158.    Hayley repeats and realleges the allegations above as if fully set forth herein.

159.    As described above, JLM and Hayley entered into an agreement regarding the Hearts On Fire Collaboration Agreement, which is a valid and legally binding contract between Hayley and JLM.  Alternatively, Hayley was a third-party beneficiary to the Hearts On Fire Collaboration Agreement.

160.    Hayley performed the Brand Ambassador Services set forth in the Collaboration Agreement.

161.    JLM materially breached the agreement by, among other things, failing to properly and timely pay Hayley the Brand Ambassador Fee, as described above.

162.    The effect of JLM's breaches was material.

163.    Accordingly, JLM failed to substantially perform its obligations under the agreement with Hayley.

164.    As a result of JLM's material breaches of the agreement and failure to substantially perform its obligations under the agreement, Hayley has been damaged in an amount to be determined at trial, plus interest from the date of breach.

## SEVENTH CAUSE OF ACTION
**(Unjust Enrichment Against JLM – In the Alternative)**

165.    Hayley repeats and realleges the allegations above as if fully set forth herein.

166.    As discussed above, Hayley and JLM had a contractual relationship.

167.     JLM has been enriched by Hayley's performance of the Brand Ambassador Services in connection with the Hearts On Fire Collaboration Agreement.

168.     Hayley has expended significant time and effort performing the Brand Ambassador Services.

169.     JLM has unjustly retained the benefits of Hayley's performance of the Brand Ambassador Services without providing just compensation to Hayley for her work.

### EIGHTH CAUSE OF ACTION
**(Conversion Against JLM)**

170.     Hayley repeats and realleges the allegations above as if fully set forth herein.

171.     As set forth above, Hayley owns Hayley's Accounts.

172.     JLM has improperly exercised dominion and control over Hayley's Accounts to the exclusion of Hayley on the basis of its various misrepresentations to the Court.

173.     By reason of the foregoing, Hayley has suffered substantial damages and JLM has enriched itself.

### NINTH CAUSE OF ACTION
**(Violation of Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq*. Against JLM)**

174.     Hayley repeats and realleges the allegations above as if fully set forth herein.

175.     As set forth above, Hayley owns Hayley's Accounts.

176.     The data, including private messages, connected to Hayley's Accounts are in electronic storage.

177.     Hayley has not authorized JLM to access the electronic messages (including DMs) associated with Hayley's Accounts.

178.     Upon information and belief, JLM has accessed electronic communications on Hayley's Accounts.

179.    JLM's unlawful access to Hayley's electronic communications has harmed

Hayley.

## TENTH CAUSE OF ACTION
### (Violation of N.Y. Civil Rights Law §§ 50, 51 Against JLM)

180.    Hayley repeats and realleges the allegations above as if fully set forth herein.

181.    By publishing feed posts and Stories on Hayley's Instagram Account, JLM has

used Hayley's name, portrait, and picture for advertising purposes and for purposes of trade

without Hayley's consent.  JLM's posts unlawfully and falsely convey an affiliation between

those posts and Hayley and unlawfully suggest Hayley's approval of those posts.

182.    By manufacturing, causing to be manufactured, selling, marketing, distributing,

and promoting products bearing the Trademarks, Designer's Name (including Hayley's name),

Hayley's photograph, signature, image, or likeness after termination of the Employment

Agreement, JLM has used Hayley's name, portrait, and picture for purposes of advertising

purposes and for the purposes of trade without Hayley's consent.

183.    JLM's conduct violated Hayley's rights under Sections 50 and 51 of the Civil

Rights Law of the State of New York.

184.    By reason of the foregoing, Hayley has suffered, and will continue to suffer,

substantial damages.

## ELEVENTH CAUSE OF ACTION
### (False Advertising Against JLM – Lanham Act)

185.    Hayley repeats and realleges the allegations above as if fully set forth herein.

186.    As detailed above, JLM's actions are likely to cause confusion, mistake, or to

deceive as to the affiliation, connection, or association of JLM posts with Hayley, and as to the

origin, sponsorship, or approval of JLM's goods, services, or commercial activities by Hayley.

Further, JLM's promotions misrepresent the nature, characteristics, and qualities of JLM commercial activities – i.e., that its commercial posts on Hayley's Instagram Account are actually those of Hayley.

187.     By reason of the foregoing, Hayley has suffered, and will continue to suffer, substantial damages, and JLM have reaped substantial profits.

## TWELFTH CAUSE OF ACTION
### (Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) Against JLM)

188.     Hayley repeats and realleges the allegations above as if fully set forth herein.

189.     As detailed herein, the Employment Agreement is terminated, void, and/or unenforceable and Hayley does not consent to JLM's use of the Trademarks, Designer's Name, or variations thereof.  Thus, JLM's actions are likely to cause confusion, mistake, or to deceive as to the affiliation, connection, or association of JLM with Hayley, and as to the origin, sponsorship, or approval of JLM's products, services, and commercial activities.

190.     JLM's actions in commercial advertising and promotion of products using or in connection with the Trademarks, Designer's Name, or variations thereof, misrepresents the nature, characteristics, and qualities of JLM's goods, services, or commercial activities.

191.     JLM has misappropriated the Trademarks, Designer's Name, variations thereof, and the associated goodwill, which were created through Hayley's skill and labor.

192.     By reason of the foregoing, Hayley has suffered, and will continue to suffer, substantial damages, and JLM has reaped substantial profits.

## THIRTEENTH CAUSE OF ACTION
### (Violation of N.Y. G.B.L. §§ 349(h), 350 Against JLM)

193.     Hayley repeats and realleges the allegations above as if fully set forth herein.

194.     As described above, JLM's posts on Hayley's Instagram account amount to consumer-oriented conduct for the purpose of promoting JLM's products.

195.     JLM's posts are materially misleading in that they communicate to consumers that Hayley is posting messages from her account, when in fact those posts are made by JLM.

196.     By reason of the foregoing, Hayley has suffered substantial damages and JLM has enriched itself.

## FOURTEENTH CAUSE OF ACTION
### (Unjust Enrichment Against JLM – In the Alternative)

197.     Hayley repeats and realleges the allegations above as if fully set forth herein.

198.     As discussed above, Hayley and JLM had a legal relationship.

199.     JLM has been enriched by use of Hayley's Accounts, which were created, conceived, and developed by Hayley.

200.     Hayley has expended significant time, effort, and money to create and develop Hayley's Accounts, including the content therein.

201.     JLM has unjustly retained the benefits of the use of Hayley's Accounts without providing just compensation to Hayley for their use.

## FIFTEENTH CAUSE OF ACTION
### (Defamation Against JLM)

202.     Hayley repeats and realleges the allegations above as if fully set forth herein.

203.     As described above, JLM intentionally and maliciously caused writings to be delivered to the press and bridal industry insiders, accusing Hayley of, *inter alia*, wrongful business practices and violating a Court Order.

204.     JLM made these statements with full knowledge that these statements and accusations are false, and with malicious intent to cause Hayley harm.

205.    Certain of these statements are defamation per se.

206.    JLM published these false statements maliciously and oppressively, with actual malice, ill will, and intent to defame and injure Hayley.  These defamatory statements were aimed at inflicting injury on Hayley and forcing Hayley to acquiesce to JLM's baseless litigation demands.

207.    These statements constitute unconscionable and unjustifiable conduct.

208.    As a direct and proximate cause of JLM's defamation, Hayley has incurred damages, including per se injury to reputation, pecuniary loss, and loss of business and business opportunities.

### SIXTEENTH CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL Against All Defendants)**

209.    Hayley repeats and realleges the allegations above as if fully set forth herein.

210.    Defendants, acting together and in concert, and under Murphy's direction and pursuant to his actions, discriminated against Hayley on the basis of her gender and sex in violation of the NYSHRL by, *inter alia*, denying Hayley equal terms and conditions of employment available to similarly-situated male employees, including, but not limited to, subjecting Hayley to disparate treatment, including disparate criticism, sexism, personal comments and touching based on her gender and sex.

211.    Defendants discriminated against Hayley on the basis of her gender and sex in violation of NYSHRL by fostering, condoning, accepting, ratifying and failing to prevent and remedy a discriminatory environment that has included continuous and pervasive discrimination against Hayley, and by subjecting Hayley to a hostile work environment and acquiescing to a hostile work environment and failing to address Defendants' environment of discrimination.

212.     As discussed above, by their actions, Defendants created an intolerable working environment for Hayley.  As a result of this intolerable working environment, Hayley was compelled to resign from JLM which amounts to a constructive discharge.

213.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Hayley has suffered, and continues to suffer, monetary and economic harm for which she is entitled to an award of damages.

214.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Hayley has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

## SEVENTEENTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL Against All Defendants)

215.     Hayley repeats and realleges the allegations above as if fully set forth herein.

216.     Defendants, acting together and in concert, and under Murphy's direction and pursuant to his actions, discriminated against Hayley on the basis of her gender and sex in violation of the NYCHRL by, *inter alia*, denying Hayley equal terms and conditions of employment available to similarly-situated male employees, including, but not limited to, subjecting Hayley to disparate treatment, including disparate criticism, sexism, personal comments and touching based on her gender and sex.

217.     Defendants discriminated against Hayley on the basis of her gender and sex in violation of NYCHRL by fostering, condoning, accepting, ratifying, and failing to prevent and remedy a discriminatory environment that has included continuous and pervasive discrimination against Hayley, and by subjecting Hayley to a hostile work environment and acquiescing to a hostile work environment and failing to address Defendants' environment of discrimination.

218.     As discussed above, by its actions, Defendants created an intolerable working environment for Hayley where no objectively reasonable employee would continue to work.  As a result of this intolerable working environment, Hayley was compelled to resign from JLM which amounts to a constructive discharge.

219.     As a direct and proximate result of JLM's unlawful discriminatory conduct in violation of the NYCHRL, Hayley has suffered, and continues to suffer, monetary and economic harm for which she is entitled to an award of damages.

220.     As a direct and proximate result of Defendants unlawful discriminatory conduct in violation of the NYCHRL, Hayley has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

## EIGHTEENTH CAUSE OF ACTION
**(Declaratory Judgement Against JLM – Rights and Obligations Under the Employment Agreement)**

221.     Hayley repeats and realleges the allegations above as if fully set forth herein.

222.     An actual controversy exists as to whether Hayley remains bound by the terms of the Employment Agreement despite JLM's constructive discharge and other material breaches of the Employment Agreement.

223.     A declaration is necessary and appropriate at this time to affirm that Hayley does not remain bound by the obligations of the Employment Agreement and the provisions thereof, including relating to assignment and non-competition, are void.

224.     Accordingly, Hayley seeks a declaration from this Court that she is no longer bound by the Employment Agreement, any assignments under the Employment Agreement are void, any non-competition provisions under the Employment Agreement are void, and JLM may no longer reap any benefits of the Employment Agreement.

## NINETEENTH CAUSE OF ACTION
### (Declaratory Judgement Against JLM –Use of Designer's Names)

225.     Hayley repeats and realleges the allegations above as if fully set forth herein.

226.     An actual controversy exists as to whether JLM may continue to use the Designer's Names and whether Hayley may use the Designer's Names in connection with her future businesses and sale of goods and services.

227.     To the extent the Court determines that Hayley is still bound by the Employment Agreement, a declaration is necessary and appropriate at this time to affirm that as a result of JLM's constructive discharge and breach of the Employment Agreement, Hayley is not restricted in her use of the Designer's Names and JLM may no longer use the Designer's Names in connection with the manufacturing, marketing, or sale of its goods or services.

228.     Accordingly, Hayley seeks a declaration from this Court that Hayley is not restricted in her use of the Designer's Names and that JLM may no longer use the Designer's Names in connection with the manufacturing, marketing, or sale of its goods or services.

229.     In the alternative, Hayley seeks a declaration from this Court that JLM may only use the Designer's Names (i) in connection with bridal clothing and accessories that Hayley has substantially participated in the design or creation of during her employment by the JLM; and (ii) such use may only extending until no later than December 16, 2022; and Hayley may use the Designer's Names in a descriptive manner to describe products or services that she designs or sells.

## TWENTIETH CAUSE OF ACTION
### (Declaratory Judgement in the Alternative Against JLM – Unenforceable Non-Compete)

230.     Hayley repeats and realleges the allegations above as if fully set forth herein.

231.    An actual controversy exists as to whether JLM may restrict Hayley's ability to offer her services as a bridal designer pursuant to the Employment Agreement.

232.    To the extent the Court determines that Hayley is still bound by the Employment Agreement, a declaration is necessary and appropriate at this time to affirm that the provision that "Employee covenants and agrees that during the period of her employment with the Company, Employee shall not compete with the Company, directly or indirectly" does not operate as a non-compete provision that inhibits Hayley's ability to work, offer services, run a business, or compete with JLM.

233.    Accordingly, Hayley seeks a declaration from this Court that Hayley is not restricted in ability to work, offer services, run a business, or compete with JLM.

### TWENTY-FIRST CAUSE OF ACTION
**(Declaratory Judgement Against JLM – JLM's Trademark Claims)**

234.    Hayley repeats and realleges the allegations above as if fully set forth herein.

235.    An actual controversy exists as to whether JLM owns rights in any trademarks that it registered pursuant to Hayley's limited grant of rights in the Designer's Names pursuant to the 2011 Agreement.

236.    Any trademark rights, grant of rights, and registrations under the Employment Agreement (the "Hayley Paige-Formative Marks") should revert back to Hayley due to JLM's material breach of the Employment Agreement and constructive discharge.

237.    Moreover, JLM has not registered or otherwise established any enforceable rights in "@misshayleypaige" for use as a social media handle.  And Hayley has established a priority of use dating to 2004.

238.     Accordingly, Hayley seeks a declaration from this Court that JLM: (i) does not own any rights in "@misshayleypaige" for use as a social media handle; and (ii) JLM does not retain any rights in the Hayley Paige-Formative Marks, which are rightfully owned by Hayley.

## PRAYER FOR RELIEF

**WHEREFORE**, Hayley demands that judgment be entered in her favor against JLM as follows:

(i)     Entering a Declaratory Judgment that:

  a.  Hayley is no longer bound by the Employment Agreement, any assignments under the Employment Agreement are void, and JLM may no longer reap any benefits of the Employment Agreement;

  b.  Hayley is not restricted in her use of the Designer's Names and JLM may no longer use the Designer's Names in connection with the manufacturing, marketing, or sale of its goods or services, or, in the alternative, JLM's may only use the Designer's Names (i) in connection with bridal clothing and accessories that Hayley has substantially participated in the design or creation of during her employment by the JLM and (ii) such use may only extend until no later than December 16, 2022, and Hayley may use the Designer's Names in a descriptive manner to describe products or services that she designs or sells;

  c.  Hayley is not restricted in her ability to work, offer services, run a business, or compete with JLM;

  d.  JLM does not own any rights in "@misshayleypaige" for use as a social media handle, and JLM does not retain any rights in the Hayley Paige-Formative Marks, which are rightfully owned by Hayley; and

     e.   Hayley is the sole and exclusive owner of Hayley's Accounts.

(ii)    Enjoining JLM and its officers, directors, agents, employees, successors, assigns and attorneys, and all other persons or entities in active concert or participation with JLM who receive notice of the injunction by personal service or otherwise, from doing, aiding, causing or abetting the following:

     a.   engaging in any further use of marks or brands that are identical or confusingly similar to Hayley, Hayley Paige, or misshayleypaige;

     b.   directly or indirectly using in commerce an identical or confusingly similar imitation of the Hayley, Hayley Paige, or misshayleypaige names in connection with the sale, offering for sale, distribution, promotion, or advertisement of any goods and/or services without authorization from Hayley; and

     c.   using a mark that is identical or confusingly similar to the Hayley, Hayley Paige, or misshayleypaige names in commercial advertising or promotion, and thus misrepresenting the nature, characteristics, and/or qualities of JLM's products and services.

(iii)   directing JLM to destroy any goods or marketing materials bearing the Hayley Paige name, or any confusingly similar name, in the possession, custody or control of JLM;

(iv)   directing JLM to engage in corrective advertising, at its expense, at a scope commensurate with its advertising and promotion on Hayley's Accounts;

(v)   directing JLM to assign all registrations for Hayley Paige-formative marks, and similar marks, to Hayley;

(vi)     directing JLM to perform an equitable accounting of all sales, revenues, and Additional

Compensation in connection with products for which Additional Compensation is owed,

and Base Compensation that is owed to Hayley pursuant to the Employment Agreement.

(vii)    directing JLM to file with the Court and serve upon counsel for Hayley, within thirty (30)

days after the entry of the equitable relief requested in this Counterclaim, a written report,

sworn to under oath, setting forth in detail the manner and form in which JLM has

complied with such order;

(viii)   awarding Hayley damages in an amount to be determined at trial;

(ix)     awarding statutory damages under the SCA;

(x)      awarding punitive damages;

(xi)     awarding exemplary damages;

(xii)    awarding treble damages;

(xiii)   awarding disgorgement of all amounts received by JLM as a result of the conduct

described in these Counterclaims;

(xiv)    awarding the costs, fees and expenses incurred in this action, including without

limitation, reasonable attorneys' fees to the extent permitted by law;

(xv)     liquidated damages, attorneys' fees and costs as permitted under federal, state, and city

labor laws;

(xvi)    awarding pre-judgment and post-judgment interest on all sums awarded in the Court's

judgment; and

(xvii)   awarding Hayley such other and further relief as the Court may deem just and proper.

DATED: March 22, 2021

HAYNES AND BOONE, LLP
*Attorneys for Defendant/Counterclaim-*
*Plaintiff Hayley Paige Gutman*

By:   s/ *Richard D. Rochford*
Richard D. Rochford
Joseph Lawlor
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Tel: (212) 659- 7300
Fax: (212) 918-8989
richard.rochford@haynesboone.com
joseph.lawlor@haynesboone.com

Tiffany Cooke*
2323 Victory Ave., Suite 700
Dallas, TX 75219
Tel: (214) 651-5849
Fax: (214) 200-0847
tiffany.cooke@haynesboone.com
*Admitted *pro hac vice*

MENKEN SIMPSON & ROZGER LLP
*Attorneys for Defendant/Counterclaim-*
*Plaintiff Hayley Paige Gutman*

By:   s/ *Bruce E. Menken*
Bruce E. Menken
80 Pine Street, 33rd Floor
New York, NY 10005
Tel: (212) 509-1616
Fax: (212) 509-8088
bmenken@nyemployeelaw.com