UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JLM COUTURE, INC.,

        Plaintiff,

   -v-                                          No.  20 CV 10575-LTS-SLC

HAYLEY PAIGE GUTMAN,

        Defendant.

-------------------------------------------------------x


AMENDED OPINION AND ORDER MODIFYING PRELIMINARY INJUNCTION



APPEARANCES:

ADELMAN MATZ P.C.
By:   Sarah Michal Matz, Esq.
       Barry Maxwell Golden, Esq.
       David Michael Marcus, Esq.
       Gary Philip Adelman, Esq.
1173A Second Ave, Ste 153
New York, NY 10065
*Attorneys for Plaintiff*

HAYNES AND BOONE, LLP
By:   Richard D. Rochford, Jr., Esq.
       Tiffany Marie Cooke, Esq.
       Joseph Craig Lawlor, Esq.
30 Rockefeller Plaza, 26th Flr
New York, NY 10112

MENKEN SIMPSON & ROZGER LLP
By:    Bruce Eric Menken, Esq.
80 Pine St., 33rd Flr.
New York, NY 10005-1702


*Attorneys for Defendant*

LAURA TAYLOR SWAIN, Chief United States District Judge

This Opinion and Order Modifying Preliminary Injunction, originally issued on July 25, 2022 (docket entry no. 404) is now reissued in amended form in accordance with the February 21, 2023 Order from the United States Court of Appeals for the Second Circuit directing this Court to "reissue" the July 25, 2022 Memorandum Order "excepting any aspects that have expired in the interim."  (See docket entry no. 426.)

Before the Court is Plaintiff's motion (docket entry no. 357) to modify the preliminary injunctive relief granted in this action.  (See docket entry nos. 109, 176, and 326 (the "Preliminary Injunction" or Preliminary Injunction Order").)  The Preliminary Injunction was first entered on March 4, 2021 (docket entry no. 109), and was clarified on June 2, 2021 (docket entry no. 176), and modified on February 14, 2022.  (Docket entry no. 326.)  Several provisions of the Preliminary Injunction will expire on August 1, 2022,[1] in connection with the conclusion of the stated employment term under the parties' agreement.  In anticipation of the upcoming expiration of the employment term and associated provisions of the current preliminary injunctive relief, JLM Couture, Inc. ("JLM"), has moved to modify the Preliminary

---

[1]     As noted in the opening paragraph, the original Opinion and Order was issued on July 25, 2022.

Injunction accordingly.  The Court has jurisdiction of this matter pursuant to 15 U.S.C. section 1121, and 28 U.S.C. sections 1331, 1338(a-b) and 1367(a).

The Court has reviewed carefully all of the parties' submissions and evidence proffered in connection with the current and previous Preliminary Injunction motion practice in this case, has had the opportunity to observe the demeanor and assess the credibility of the witnesses, and has heard oral argument.  In accordance with Federal Rules of Civil Procedure 52(a) and 65, this Opinion and Order constitutes the Court's findings of fact and conclusions of law.  To the extent any finding of fact includes a conclusion of law it is deemed a conclusion of law, and vice versa.

For the following reasons, the Court grants in part and denies in part Plaintiff's motion for modification of the Preliminary Injunction.

### FINDINGS OF FACT

The Court assumes the parties' familiarity with the factual background and procedural history of the case and adopts the findings of fact previously set forth in its March 4, 2021, Memorandum Opinion and Order granting the Preliminary Injunction (docket entry no. 109); June 2, 2021, Memorandum Opinion and Order clarifying the Preliminary Injunction (docket entry no. 176); September 8, 2021, Memorandum Opinion and Order finding Ms. Gutman in contempt of the Preliminary Injunction (docket entry no. 234); and February 14, 2022, Memorandum Opinion and Order modifying the Preliminary Injunction (docket entry no. 326).  To the extent any previously made factual findings are repeated or elaborated upon in this decision, it is for the purpose of clarity.  Further factual findings are set forth here and in connection with the Conclusions of Law presented below.

Ms. Gutman entered into an employment agreement (the "Contract"[2]) dated July 13, 2011, by which she agreed to work for JLM Couture ("JLM"), a company in the luxury bridal design and manufacturing industry, as a designer of brides', bridesmaids', and evening wear and related apparel.  (Docket Entry No. 14 ¶¶ 3, 6; docket entry no. 106 ("P.I. Tr.") 129:19-24.)  The employment term under the Contract concludes on August 1, 2022.

The Contract provisions that are material to this preliminary injunction motion practice read in pertinent part as follows:

> Section 9(a).  <u>Covenant not to Compete</u>.  Employee covenants and agrees that during the period of her employment with the Company, Employee shall not compete with the Company, directly or indirectly. For purposes of this Agreement, Employee shall be deemed to compete with the Company if she engages in, or is associated with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids, mother of the bride and flower girls and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by the Company.
>
> Section 9(c). The Employee covenants and agrees that she will not, directly or indirectly, during or after the term of employment disclose to any person not authorized by the Company to receive or use such information . . . any of Company's Confidential Information . . . . Confidential information means any financial information, marketing plans, . . . customer lists or other proprietary information of the Company or its affiliates.
>
> Section 10(a). <u>Exclusive Right to the Designer Name</u>. The Employee hereby grants to the Company the exclusive world-wide right and license to use her name 'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Paige' or any derivative thereof (collectively the 'Designer's Name') in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including any and all good will associated therewith, throughout the Term (including any extension of the Term), plus a two

---

[2]     The "Contract," as the term is used herein, comprises the 2011 employment agreement (Docket Entry No. 14, Ex. 2), as amended by the 2014 amendment extending that agreement through August 1, 2019 (<u>id.</u>, Ex. 62), and the February 12, 2019, notice letter exercising Plaintiff's option to further extend Defendant's employment term by three years through August 1, 2022.  (<u>Id.</u>, Ex. 66.)

(2) year period following the Term or any extension thereof, provided Employee has substantially participated in the design or creation of such clothing or related items during her employment by the Company.

Section 10(b).   [Trademark Rights.]   The Employee hereby irrevocably sells, assigns, and transfers all right, title and interest to the Company that now exists or may exist during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s) thereof as trademarks or service marks (the 'Trademark' or 'Trademarks') . . . . The Trademarks shall in perpetuity be the exclusive property of the Company, the Employee having consented to it being filed by the Company and the Employee thereof shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce during the Term or any time thereafter without the express written consent of the Company. The Company shall be solely permitted to license the Trademarks to a third party.

Section 10(e). [Post Contractual-Term Covenant.]   In the event that the Company files an application to register the Trademark or Trademarks, Employee agrees that for a period of five years following termination of her employment, she shall not be identified to the trade or consuming public as the designer, and her role as designer shall not be used to promote the sale, of any goods in competition with goods manufactured and sold by the Company.

Section 11.  Designs and Intellectual Property.  The parties expressly agree that all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Employee in connection with her employment with the Company involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by the Company through the Term of the Employment Agreement and any extensions thereof (collectively, the 'Designs'), are works for hire, and ownership of any intellectual property arising from or related to the Designs shall be the sole and exclusive property of the Company . . . . If, for any reason the Designs, or any portion thereof, are deemed not to be a work made for hire, then the Employee irrevocably, absolutely and unconditionally assigns to the Company (a) all of right, title and interest in and to the Designs and/or any portion thereof (whether arising under copyright law, trademark law, or otherwise), including to the extent applicable, but not limited to, the exclusive rights enumerated in l U.S.C. Section 106, and all extensions and renewals thereof, and (b) all moral rights with respect to the Designs, including but not limited to, any and all rights of identification of authorship and any and all rights of approval, restriction or limitation on use or subsequent modifications relating to the Designs.

After entering into the Contract, Ms. Gutman opened an account on Pinterest (the "Pinterest Account") on or about November 3, 2011, and an account on Instagram (the

"Instagram Account") (together, the "Accounts") on or about April 6, 2012, both bearing the handle @misshayleypaige.  (Docket entry no. 370 ("Gutman Decl.") ¶ 45; docket entry no. 361 ("Murphy Decl.") ¶ 8.)  Ms. Gutman proffers that "Miss Hayley Paige" is a term of endearment for Defendant used by her mother.  (Gutman Decl. ¶ 44.)  "Miss Hayley Paige" is, however, a version of the Designer's Name.  (Docket entry no. 109 at 20 (explaining "misshayleypaige" and "@misshayleypaige" are derivatives of "Hayley Paige").)

            The biographical information displayed on the Instagram and Pinterest Accounts has changed over time.  The evidence of record shows that the Instagram Account has included links to www.hayleypaige.com, popuppaige.com, www.heartsonfire.com, and to www.jlmcouture.com/trunkshows.  (Docket entry no. 14 ¶¶ 23-24, Exs. 19, 56, 58-60; Gutman Decl. ¶¶ 106, 145.)  The Instagram Account also "regularly included references" to the JLM email address pr@jlmcinc.com (Gutman Decl. ¶ 106; docket entry no. 14, Ex. 58), was linked to JLM's Facebook page for a period of time until Ms. Gutman removed the link (Murphy Decl. ¶¶ 28, 87; docket entry no. 394 ("Murphy Reply Decl.") ¶ 25, Gutman Decl. ¶¶ 95, 98), and at times included links to "Free download @ holymatrimoji" (docket entry no. 14, Ex. 59), which referred to the "JLM-owned Holymatrimoji App"  (Gutman Decl. ¶ 137), and "Hayley Paige+@heartsonfireco" (Murphy Decl. Ex. 59), which referred to a collaboration between JLM and the jewelry company, Hearts On Fire.  (Docket entry no. 14 ¶ 53; Gutman Decl. ¶ 23.)  In or around November 2019, the Instagram Account included the description, "Designer/Creator/Emoji-maker." (Gutman Decl. ¶ 69; Murphy Decl., Ex. 59.)  In or around February and November 2020, the Instagram Account's description included the phrase, "Personal & Creative account of designer Hayley Paige".  (Gutman Decl. ¶ 145; docket entry no. 14 ¶ 62, Ex. 60.)  The Account was also verified by Instagram as the account of a "Public

Figure" in or around January 2017.  (Murphy Reply Decl. ¶ 23, Ex. 83.)  After the TRO was

issued in December 2020, JLM removed Ms. Gutman's image from the profile picture of the

Instagram Account (Murphy Reply Decl. ¶ 26, Gutman Decl. ¶ 163), changed the biographical

section of the Account by replacing the "Public Figure" designation with "Clothing (Brand)"

(Gutman Decl. ¶ 163; docket entry no. 109 at 13 (citing docket entry no. 75, Ex. 47)), deleted

Defendant's self-description, and reinstated Plaintiff's website and PR email address link.

(Docket entry no. 109 at 13 (citations omitted); Gutman Decl. ¶ 162.)  JLM also changed the

title of the Pinterest Account from "Hayley Paige" to "Hayley Paige Bridal."  (Murphy Reply

Decl. ¶ 41, Gutman Decl. ¶ 167.)  A current version of the Pinterest Account reveals that it

remains under the handle @misshayleypaige, maintains a profile picture of Ms. Gutman in a

white gown, links to jlm.couture.com/Hayley-Paige, and contains the description, "Hi, I'm

Hayley Paige!  I'm a designer, content creator, and podcast co-host for All That Glitters, but

mostly I'm just grateful . . . ."  (Gutman Decl., Ex. 23.)

 Ms. Gutman proffers that she was an "early adopter" of social media and opened

the Pinterest Account and Instagram Account on her own accord for her own personal reasons.

(Gutman Decl. ¶¶ 44, 46.)  With respect to the Instagram Account, Ms. Gutman submits that she

opened the Account based on the suggestion of her friend, Cassidy Willingham, who told her

about the platform "and how much she loved using it" and sent Ms. Gutman a link to download

the Instagram Application so she could open her own account.  (Id. ¶¶ 49-51; docket entry no.

375 ("Ozowara Decl.") ¶¶ 3-5, Ex. 1.)  Ms. Gutman linked the Instagram Account to her

personal Gmail account, hayleypaige@gmail.com, and her personal cell phone number, and

created her own password.  (Gutman Decl. ¶ 52.)  Defendant also linked the Pinterest Account

to her hayleypaige@gmail.com email address.  (Id. ¶ 54.)  Ms. Gutman used her

hayleypaige@gmail.com email address for business purposes, including correspondence related to her work with JLM.  (See id. ¶ 52 n. 14 ("Due to various issues I had with [the JLM-provided] email account on my phone and difficulties sending large artwork files, I had all my emails from my hayley@jlminc.com email forwarded to my personal Gmail."); Murphy Decl. ¶ 8 and Exs. 5, 7, 11 (showing emails from Hayley Paige to JLM employees that were sent from Ms. Gutman's Gmail account, hayhaypaige@gmail.com).)

The evidence shows that the Instagram Account was utilized to showcase JLM's products almost immediately after its creation.  (Murphy Reply Decl. ¶ 21 (explaining Accounts "were used by JLM from the moment they were created")).)  Mr. Murphy, the President and CEO of JLM, proffered credible testimony that the opening of the Instagram Account in April of 2012 "was timed to coincide with the week of the Fall 2012 New York bridal market, which is the largest and most important market in the industry and to JLM" where "brands showcase new collections to bridal retailers from around the world."  (Id.; see also Murphy Decl. ¶ 9 ("When the [Instagram] Account was first created, in April of 2012, Gutman was working on her Fall 2012 collection.").)  The accompanying collection of posts to the Instagram Account reveals that Ms. Gutman posted several photos of bridal gowns within two weeks after the creation of the Account in April 2012, including two photos of a bridal gown on April 19, 2012; one photo of a bridal gown on April 20, 2012; and two photos of bridal gowns on April 21, 2012.  (Docket entry no. 61, Ex. T, pp. 651-53.)  Several of the first photos posted to the Instagram Account were from photo shoots and trunk show events where the Hayley Paige dresses were being sold.  (Murphy Decl. ¶ 9.)  The proffered collection of posts to the Instagram Account within the first year of the account's creation also confirms Mr. Murphy's testimony that there was a "break in posts" between July 1, 2012, where the last post showed a sparkly

handbag, and October 13, 2012, where the first post after a three-month hiatus showed a rack of bridal gowns.  (Id.; docket entry no. 61, Ex. T, pg. 651.)  Mr. Murphy explains that the renewed effort to post in October of 2012 coincided with the time in which "the Spring 201[3][3] collections were being launched at New York Bridal Fashion Week," and that, at that time, "having content to post again, [Ms.] Gutman began posting about the Spring 2013 collections." (Murphy Decl. ¶ 9 (citing docket entry no. 61, Ex. T pp. 649-651).)  Indeed, twenty posts displayed in chronological order from October 13, 2012, through October 16, 2012, showcase wedding gowns, including photos of models wearing the gowns, and what appear to be behind-the-scenes looks at the photo shoots.  (Docket entry no. 61, Ex. T. pp. 649-651.)

The Court reaffirms its previous finding that the Instagram and Pinterest Accounts served as critical advertising platforms for JLM's products affiliated with the Hayley Paige brands ("HP brands").  (See docket entry no. 109 at 9 ("Plaintiff made social media, including the Account itself, a part of its efforts to market the Hayley Paige brand."); docket entry no. 326 at 9 ("JLM promoted the HP brands across various social media platforms as an important part of its advertising efforts.").)  As the Court has already found, this approach included featuring pictures of "'behind-the-scenes' activity at Plaintiff's photo shoots and events" and also displaying pictures of vendors selling or brides wearing Plaintiff's gowns. (Docket entry no. 109 at 7-8 (citing P.I. Tr. 17:10; id. 62:20-21; docket entry no. 15 ¶ 9).)  The Pinterest Account includes collections of pins showcasing particular collections, including Blush by Hayley Paige, as well as collections focused on individual gown designs.  (Gutman

---

[3]     Mr. Murphy describes the posts in October of 2012 as correlating to the launch of the "Spring 2014 collections" and the "Spring 2013 collections."  The Court construes the reference to "Spring 2014" as a typographical error, due to the timing of the posts in October 2012 and the corrected reference to "Spring 2013" in the following sentence. (Murphy Decl. ¶ 9.)

Decl., Ex. 23 (providing a current copy of the Pinterest Account and reflecting Pinterest boards curated over multiple years, including prior to the issuance of the TRO, focused on particular gowns and collections).)  JLM also identified its goods with reference to its social media platforms by putting "@misshayleypaige" on the hang tags of the physical garments and including social media reference information in print advertisements.  (Docket entry no. 109 at 9-10 (citing docket entry no. 14 ¶ 10, Exs. 20-32, 42); see also Murphy Decl. ¶ 28).)

Ms. Gutman expressed a desire early on in her employment at JLM to assist in leveraging social media to market the HP brands.  On September 27, 2011, a little more than two months after entering into the Contract, over one month before she opened the Pinterest Account, and several months before she opened the Instagram Account, Ms. Gutman sent an email to a JLM employee asking them to "let me know when I can start helping with the FB and Twitter pages, as well as the bloggybloggin' . . . ."  (Murphy Decl. ¶ 7; docket entry no. 60, Ex. 115.)  In another email exchange between Ms. Gutman and Mr. Murphy, from December 11, 2014, Ms. Gutman expressed her desire to "take a class in video editing[,]" because "our generation is responding to people that really work the social media angle" and the classes "could really give us a leg up on other bridal companies and help us drive more traffic to our website/store in LA/Pinterest/Instagram pages."  (Murphy Decl., Ex. 3.)  Ms. Gutman explains that she decided to assist JLM in "in implementing a social media strategy because JLM's efforts were subpar and disorganized" and, through her efforts, they "would mutually benefit from more exposure."  (Gutman Decl. ¶ 115.)

Ms. Gutman and JLM employees worked together to strategize as to how best to leverage the social media platforms to market the HP brands.  For example, Ms. Gutman participated in discussions with JLM employees about how best to use social media to boost

sales, promote trunk shows for Hayley Paige dresses, and increase brand visibility.  In one email exchange from June 7, 2019, Ms. Gutman wrote to JLM employees: "In effort (sic) to help sales, I would like to implement a more efficient method for aligning trunk shows and stock hitting stores with our posts on Instagram" and expressed her views that (1) "our stores need a little more help/boost on social for filling appointments and getting HP-specific brides to their stores"; (2) an individual "on board [at JLM] . . . can coordinate with our sales team on a weekly basis for things to post throughout the week"; and (3) "it's important that we can continue the current action of posting Trunk Shows on Tuesdays to the HP and Blush instagrams[.]"  (Murphy Decl., Ex. 8.)  In other examples, Ms. Gutman discussed the strategy of changing the "standard trunk show post[s]" to potentially include a "swipe up link" on the "instastories" "to our website to view the whole collection" (id. ¶ 17 and Ex. 7), and weighed in on how "promo codes should be . . . used on Instagram for limited time periods" only.  (Id. ¶ 22 and Ex. 12.)  With respect to the Pinterest Account, Ms. Gutman discussed strategies for "pinning . . . PR clips/mentions[,]" "pinning trunk show posts . . . on our @misshayleypaige and @jlm Pinterest pages" while also "linking to the store directly for trunk show info[,]" and "organizing [Pinterest] boards" including by "having the newest dresses toward the top." (Murphy Decl., Ex. 5.)

The Instagram Account, which permitted account followers to send messages about the account's content, was also utilized to communicate with actual and potential customers.  Followers saw pictures of dresses on the Instagram Account and messaged the account to inquire further about potential design changes, prices, and where they could find JLM's products.  (See Gutman Decl. ¶ 120 ("After a trunk show or during bridal market, I received a large number of sales related questions on my Personal Instagram . . . . [I]t is simply

the way many brides chose to reach out with sales questions."); Murphy Decl. ¶ 27, Ex. 74

(October 17, 2019 email thread in which Ms. Gutman wrote that a store representative reached

out to her via "Instagram" and "[t]he majority of questions are sales" including "[s]ales stuff,

gown stuff, bride stuff, and favors!"); id., Ex. 25 (November 4, 2019 email thread in which Ms.

Gutman asked JLM employee if they "have any interns this week?  I would love if they could

go through my last 5 Insta posts and answer any necessary sales questions (there is a lot asking

about the names of gowns and where to find them!)"); id., Exs. 61-63 (showing inquiries from

followers including "What dress is this ?!"; "[C]an this be done without the sleeves?!"; "I'm

currently in NC and I'm wondering if you know any good stores with your dresses here?").)  In

response, customers were provided with answers to their questions about JLM's products or

directed to JLM resources, including the email addresses of JLM staff members and links to

JLM's websites, such as a link showcasing JLM's upcoming trunk shows.  (See id. (replying

"Hennessy gown"; "Yassss"; and "Email Elyse@jlmcinc.com for NC stores near you!"

respectively to inquiries above); see also Murphy Decl., Ex. 70 (Ms. Gutman emailed JLM

employees that she "answered 250 messages today alone . . . I actually sent this bride to the hp

email . . . . I'm only sending the best brides that seem serious about shopping or want to order

your way").)  Ms. Gutman also utilized the Instagram Account to garner customer information

and provide customer service.  In one email exchange, Ms. Gutman reached out to JLM

employees about a "super unhappy instagrammer that ordered the Kandence sketch[,]" which

was "not correct and was damaged[.]"  (Murphy Decl., Ex. 68.)  Ms. Gutman reported that she

"need[ed] to do a new sketch[,]" asked "Whoa (sic) can help with address and make sure it goes

out tomorrow[,]" and noted that "[i]f we don't have address on file, I can ask her via instagram .

. . ."  (Id.)

Ms. Gutman "approached social media at JLM in an inclusive way and often involved JLM employees in [her] decisions[.]" (Gutman Decl. ¶ 114; see also id. ¶ 119 ("I do not dispute that I occasionally sought JLM's input on posts.").) Ms. Gutman proffers that she requested JLM's "input and guidance" for content that was "either particularly sensitive or directly impacted JLM" so that Ms. Gutman "could represent JLM's needs and wants in an agreeable way." (Gutman Decl. ¶¶ 121, 123.) For instance, a JLM employee emailed Ms. Gutman, directing her to a website and noting "they added a sash to the dress[,]" to which Ms. Gutman replied, "WOW. Can I share on insta or is that too risky?" (Murphy Decl., Ex. 30.) As the Court has previously found, Mr. Murphy suggested that Ms. Gutman "say something about the Manchester event" in the aftermath of a terror attack in England, provided a draft caption, and told Ms. Gutman to "wait on IG to do anymore posts till England wakes up." (Docket entry no. 109 at 9 (citing docket entry no. 98, Ex. P-192).)

The record also demonstrates amply that JLM exercised a degree of influence over Ms. Gutman's social media activity beyond "particularly sensitive" situations (Gutman Decl. ¶ 123), including in general promotional efforts. For example, JLM employees provided Ms. Gutman with directions about the content she should post in accordance with a week-long promotional event held by JLM. (See Murphy Decl. ¶ 25, Ex. 15 (May 2019 email in which JLM employee told Ms. Gutman they "need face to face individual videos for each day" of the week including a Monday video in which "You will announce that we will be having 4 days of promotions on popuppaige.com and that they need to stay tuned to your IG Stories each day to see what they are" and including the promo codes Ms. Gutman was to promote throughout the week and to which Ms. Gutman responded, "can we make the promo for today for ALL athleisure instead?"). In another example, when discussing a "styled shoot" and the need for a

model, Ms. Gutman acknowledged that she "would love to find a real bride or an influencer on Instagram" and "wouldn't be opposed to doing a post on social media to ask if anyone is interested . . . but we would need Joe to weigh in on how to do it properly."  (Murphy Decl. ¶ 58, Ex. 47.)  The Court also previously found that Ms. Gutman corrected an Instagram post to include a boutique selling JLM's goods at Plaintiff's request (Docket entry no. 109 at 9 (citing docket entry no. 69, Ex. 93)) and, in another instance, texted Mr. Murphy to ask his permission to "post on insta" or "wait?"  (Docket entry no. 109 at 9 (citing docket entry no. 98, Ex. P-194); see also docket entry no. 98, Ex. P-194 (asking whether to post "The first one Lana sent me or the one you sent me ?").)

During at least some periods prior to late 2019, JLM employees directly accessed the Instagram and Pinterest Accounts and participated in the management of the accounts. Between approximately 2017 and 2019, Ms. Gutman granted access to the Instagram Account to at least two JLM employees, Brittany Noe and Lisa Radwanski.  (Gutman Decl. ¶¶ 102-103.) Ms. Gutman emailed Ms. Noe and Ms. Radwanski, along with other JLM employees, in order to discuss and delegate potential assignments for leveraging the Instagram and Pinterest Accounts. (See, e.g., Murphy Decl., Ex. 21 ( "Could we also have Lisa check in on all Instagram questions (in the comments) AND log into my account for the messages . . . they are piling up again!"); id., Ex. 25 ("I've noticed we are STILL not utilizing our daily press mentions enough in our Instagram stories . . . Brittany/Katie – do you think we can commit to just ONE a day in stories or if that's too much, at least 3 a week . . . . It would be amazing if we can do this on all designated Instagram accounts . . . ."); id., Ex. 28 (discussing "Dropbox folders" and asking, "Brittany, do you think we could do this for social media?!  We could just add a folder to this that says 'CONTENT FOR INSTAGRAM' . . . we just need to make sure to include only

the best images (from Lana's BTS stuff) and any necessary tags.  It's great to have the folders saved through Instagram direct, but this can be stuff from our company or things we get from press people . . . . Maybe even knew (sic) content posts and caption ideas that we have the interns work on!").)   For example, on February 8, 2018, Ms. Gutman emailed Ms. Noe, Ms. Radwanski, and other JLM employees noting that she had "broken down some assignments below" and asking the employees to "let me know if you have any issues or don't feel you can participate in these social media tasks[.]"  (Murphy Decl., Ex. 5.)  With respect to Instagram, Ms. Gutman allocated the following tasks: (1) "posting – HAYLEY with Brittany contributing Bridesmaids and Lisa contributing Trunk Show posts"; (2) "checking all DM's – Brittany and HAYLEY"; (3) "checking all comments within each post – Lisa"; and (4) "reaching out to engaged influencers/celebrities and stylists – Brittany".  (Id.)  With respect to Pinterest, Ms. Gutman allocated the following tasks: (1) "pinning at least one image from every PR clips/mentions Brittany sends every morning – Brittany"; (2) "pinning trunk show posts – Lisa, would love to use the same post you create for Facebook on our @misshayleypaige and @jlm Pinterest pages"; and (3) "organizing boards – interns".  (Id.)  Regarding the participation of the interns, Ms. Gutman cautioned, "if we delegate anything to any interns, they are not allowed to know our passwords . . . you will have to login for them."  (Id.)  On at least one occasion, Ms. Gutman noted her preference that JLM employees send her draft posts for approval, but gave them the discretion to go ahead and publish the posts should she not respond timely.  (See Murphy Decl., Ex. 25 ("Would LOVE if you could just send me a quick text for approval . . . but if I don't get back to you in time, feel free to post").)

Ms. Gutman expressed her preference that JLM employees manage engagement with followers and content related to advertising her designs while she focused her energy on

creating posts reflecting her personality.  (Murphy Decl. Ex. 26 ("The BIGGEST help of all for me is staying on top of liking/commenting and engaging with our brides as much as possible . . . . DM's, comments/questions in our feedposts (sic) and also hunting for unique content/images . . .").)  Ms. Gutman asked for assistance with "informative posts" focused on "helping out our stores when we can (more product, store, sales, and press driven content)" but cautioned that she would like to "handle all the brand driven/personality posts[.]"  (Id.)  In 2019, Ms. Gutman advocated for JLM to hire a social media director to assist her with the promotional efforts on the Instagram and Pinterest accounts.  In an email to Mr. Murphy, Ms. Gutman explained her rationale, noting "I feel my effort @misshayleypaige gets distracted in having to comment/respond/keep up with DM's (which Brittany does help with)," when she "would like to reserve [her] focus on the more 'personalized face-to-camera posts' that take a while to create."  (Docket entry no. 14, Ex. 53.)

Ms. Gutman's blending of her personality with the promotional efforts on the Accounts embodied the overall marketing strategy for the HP brands.  JLM's approach to the bridal industry is to work with designers to "build and promote namesake collections." (Murphy Reply Decl. ¶ 10.)  This has been referred to by JLM as the "personal glimpse" strategy in which social media accounts, "where a brand name is linked to an individual, such as [Ms.] Gutman, often incorporate posts more personal in nature."  (Murphy Decl. ¶ 72.)  As the Court previously found, Ms. Gutman and Mr. Murphy adopted this approach and worked together to "combine the personality with the brand."  (Docket entry no. 109 at 7 (citing P.I. Tr. 41:10-11 and docket entry no. 14, Exs. 45-51).)  The Instagram and Pinterest Accounts reflected a mixture of promotional content for JLM products and posts reflecting Ms. Gutman's personality and interests.  (Id. at 6 (noting that Ms. Gutman "used the Account to display

aspects of her life and her personality, posting images, text, and videos that focused on her

parents, her travels and her hobbies"); Gutman Decl. ¶ 85 (noting Pinterest Account contained

images related to "travel, architecture, color, design, food, and of course, bridal design").  In

discussions about the social media platforms, Ms. Gutman emphasized the importance of

ensuring that the Accounts were not focused solely on promotional material, but also reflected

her personality.  (See Murphy Decl., Ex. 34 ("I think it is so important that we keep the content

engaging, unique, and not to sales-y.  The personality is key!"); docket entry no. 14, Ex. 53 ("I

think it's important that we do not dilute this Instagram with too much promotion/advertisement

so that we can maintain the aesthetic and personality of the brand[.]"); Gutman Decl. ¶ 82

("While I am ecstatic that brides love my dresses, I believe that it is my personal approach that

made my Personal Instagram successful . . . I have received many direct messages from

followers . . . stating that is why they followed me. . . .").)

       The Court has previously detailed the breakdown in the parties' relationship

throughout the course of contract negotiations in 2019 and 2020.  (See, e.g., docket entry no.

109 at 12.)  As the Court has previously found, Ms. Gutman changed the access credentials for

the Instagram Account in November 2019 and did not share them with JLM.  (Id. (citing docket

entry no. 14 ¶¶ 42, 64).)  At or around that time, Ms. Gutman also changed the biography

section of the Instagram Account to read "Personal & Creative Account" and removed the

references and links to JLM's resources.  (Docket entry no. 14 ¶ 62, Ex. 60; Gutman Decl.

¶ 145.)  On November 23, 2020, Ms. Gutman informed Plaintiff that she would "not [be]

posting any JLM related business" to the Account.  (Docket entry no. 109 at 12 (citing docket

entry no. 14, Ex. 75).)  Ms. Gutman also changed the password for the Pinterest Account,

blocking JLM's access to that social media platform.  (Docket entry no. 326 at 11-12 (citing

docket entry no. 14 ¶ 21).)  Prior to the Court's issuance of the TRO in December 2020, Ms. Gutman deleted many JLM-related posts from the Instagram Account.  (Docket entry no. 14 ¶ 70.)

After the Preliminary Injunction was issued, the parties' relationship deteriorated further and JLM requested that the Court hold Ms. Gutman in civil contempt of the Preliminary Injunction Order.  JLM's request was based on Ms. Gutman's activities on her Instagram @allthatglittersonthegram account (hereinafter "ATG Account"), including her announcements that she planned to reveal her "new brand name very soon" and reenter the bridal industry in August of 2022.  (Docket entry no. 234 at 4-6 (citation omitted).)  The Court found that JLM proffered clear and convincing evidence that Ms. Gutman failed to comply with paragraph 3(b) of the Preliminary Injunction Order, which incorporates Ms. Gutman's contractual obligation not to compete with JLM during the Contractual term, by marketing her future bridal brand and cultivating excitement for her return to the bridal industry among her followers, who expressed their excitement and their willingness to wait until August of 2022 to purchase bridal wear from Ms. Gutman's forthcoming collection.  (Id. at 8-9.)

JLM'S REQUESTED MODIFICATIONS

JLM has moved to modify the Preliminary Injunction that is currently in effect.

First, JLM seeks to extend the temporal reach of paragraphs one and two of the Preliminary Injunction, which govern Ms. Gutman's conduct vis-à-vis the social media accounts.  Paragraph one currently prevents Ms. Gutman, until August 1, 2022, from "making any changes" to the social media accounts that are inconsistent with her duties under the Contract, without the "express written permission of Plaintiff's chief executive officer, Joseph L. Murphy."  Paragraph two of the Preliminary Injunction Order currently prohibits Ms.

Gutman from, until August 1, 2022, taking "any action, other than a properly noticed application to the Court, to gain exclusive control" over the social media accounts.  The relief granted in these provisions was tied to enforcement of the Contract, the employment term of which expires on August 1, 2022.  JLM requests that the Court evaluate its likelihood of succeeding on the merits of its property-based claims for conversion and unlawful trespass to chattels in support of its request to extend the temporal reach of these provisions past the term of the Contract, until the merits of the claims are resolved in the litigation.

Second, JLM seeks new injunctive relief incorporating the post-employment term covenant embodied in Section 10(e) of the Contract that prohibits Ms. Gutman from "identif[ying] [herself] to the trade or consuming public as the designer" of "any goods in competition with goods manufactured and sold by" JLM for a period of five years follow the conclusion of the Contractual employment term on August 1, 2022.

Third, JLM seeks to extend the relief in paragraph 3(b) of the Preliminary Injunction Order, which currently reflects the obligations set forth in paragraph 9(a) of the Contract and prohibits Ms. Gutman, until August 1, 2022, from competing with JLM by "engaging in, or being associated with . . . any person, organization or enterprise which engages in the design, manufacture, marketing or sale of" any "category of goods designed, manufactured, marketed, licensed or sold by JLM."  JLM requests that the Court extend the temporal reach of the relief granted in paragraph 3(b) as an equitable remedy, in order to compensate for Ms. Gutman's allegedly wrongful conduct, including her decision to compete with JLM by marketing her own future bridal brand, which the Court held was contemptuous of paragraph 3(b) of the Preliminary Injunction Order.  (See docket entry no. 234.)

Fourth, JLM seeks new injunctive relief incorporating Ms. Gutman's obligations pursuant to Section 9(c) of the Contract to not "disclose to any person not authorized by the Company . . . any of Company's confidential information" including "customer lists."

<u>CONCLUSIONS OF LAW</u>

A party seeking a preliminary injunction must demonstrate: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor;" and (4) that the "public interest would not be disserved" by the issuance of a preliminary injunction. <u>Salinger v. Colting</u>, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotations and citations omitted).  A different, more demanding standard applies where a proposed preliminary injunction would impose affirmative obligations upon a defendant. Such a mandatory injunction is warranted only upon a "clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."[4]  <u>Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.</u>, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).

---

[4]    Ms. Gutman argues that "JLM seeks a 'mandatory injunction'" and that the Court must conclude that JLM makes a higher "clear showing" of likelihood of success to obtain the relief sought.  (Docket entry no. 368 ("Gutman Opp.") at 2.)  As further explained below, Ms. Gutman's position is not well taken.  The preliminary injunctive relief sought by JLM is prohibitory in nature, and would preserve the status quo with respect to JLM's access to and control over property – the social media accounts – that it has shown it likely owns.  <u>See</u> <u>Lazor v. Univ. of Conn.</u>, 560 F. Supp. 3d 674, 678 (D. Conn. 2021) (explaining the status quo is the "last actual, peaceable uncontested status which preceded the pending controversy" (citation omitted)).  The injunction would restore exclusive control to JLM and its employees (among whom Ms. Gutman will no longer even arguably be numbered after August 1, 2022).  The Court notes, however, that even were the higher "clear showing" standard applicable here, JLM has met that standard.

<u>JLM's Requested Modifications to Paragraphs (1) and (2) of the Preliminary Injunction</u>

JLM seeks to extend the relief currently embodied in paragraphs one and two of the Preliminary Injunction, which is set to expire on August 1, 2022.  As previously discussed, these provisions govern Ms. Gutman's conduct vis-à-vis the social media accounts affiliated with the HP brands.  On February 14, 2022, after reflecting on the Second Circuit's January 25, 2022, decision vacating the first two paragraphs of the original Preliminary Injunction Order and remanding the case to this Court for further proceedings, the Court reinstated the provisions in a modified form, tying their effectiveness to the Contractual term, finding that JLM had demonstrated "a 'clear and substantial likelihood of success in establishing that Defendant breached her duty to assist with advertising programs' under Section 2 of the Contract" and that JLM had also "demonstrated that it would suffer irreparable harm" should it not be able to access the social media accounts at issue.  (Docket entry no. 326 at 11-12 (internal quotations and citations omitted).)

The Court has not previously addressed the issue of whether JLM is likely to succeed on its conversion and trespass to chattels claims.  (<u>See</u> docket entry no. 326 at 4, 7-13 (explaining that the Court had refrained from evaluating the claims for conversion and trespass to chattels, and grounding the modified relief in the Court's findings related to JLM's contract claims).)  With the Contract term and paragraphs one and two of the Preliminary Injunction expiring on August 1, 2022, JLM now requests that the Court evaluate the merits of the unaddressed claims.  The Court agrees that evaluation of JLM's likelihood of success on its property-based claims, which turn on the novel question of ownership of social media accounts, is necessary and appropriate at this time.

    1.    JLM's Likelihood of Success on the Merits: Conversion and Trespass to Chattels Claims

To state a claim of conversion under New York law, a plaintiff "must establish that '[i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff had ownership, possession[,] or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" Brown v. Twitter, No. 19-CV-6328-KPF, 2021 WL 3887611, at *9 (S.D.N.Y. Aug. 31, 2021) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Serv., Inc., 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011)).  Neither party disputes that "intangible property such as websites and account information can be the object of conversion under New York law." Id. at *10 (collecting cases); Salonclick LLC v. SuperEgo Mgmt. LLC, No. 16-CV-2555-KMW, 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017) (finding that plaintiff stated a claim for "conversion of its domain name and social media accounts under New York law").  Claims of trespass to intangible property, such as social media accounts, have been treated as claims for trespass to chattels by courts applying New York law. See, e.g., Salonclick, 2017 WL 239379 at *4.  To state a claim for trespass to chattels, Plaintiff must allege that the Defendant's actions "cause[d] harm to 'the [owner's] materially valuable interest in the physical condition, quality, or value of the chattel, or [] the [owner] is deprived of the use of the chattel for a substantial time.'" Id. (quotation omitted).

The issue of ownership of a social media account is novel, and few courts have examined the question.  In its papers in support of its motion, JLM cites two decisions that provide helpful guidance for resolving the instant motion.  (Docket entry no. 358 ("JLM Mem.") at 19-20.)  In In re CTLI, LLC, 528 B.R. 359 (Bank. S.D. Tex. 2015), the issue was whether a Facebook account and Twitter account, created by the former majority owner of a Chapter 11 corporate debtor, belonged to the individual former owner or to the reorganized

debtor.  The court conducted a detailed analysis to determine whether the accounts were
personal or business assets.  Turning first to the Facebook page, the court emphasized the
following factors: (1) the Facebook page was titled "Tactical Firearms," the name of the
corporate debtor, and was a Facebook "Page" for "businesses, brand and organizations," not
"individual people"; (2) the account was "directly linked to the Tactical Firearms web page";
(3) the former majority owner utilized the account "to post Status Updates on behalf of 'Tactical
Firearms'" including many "expressly business-related" posts advertising the store, its "Black
Friday sale and new inventory" and included phrases such as "on behalf of myself and the
Tactical Firearms family"; and (4) the former majority owner granted a Tactical Firearms
employee access to post content promoting the company's products on the Facebook page
directly, the purpose of which posts "was clearly to generate revenues for the company."  In re
CTLI, 528 B.R. at 367-68; see also id. at 369 (The "fact that the . . . Facebook Page was created
in the name of the business, was linked to the business's web page, and was used for business
purposes places it squarely in the category of property of the Debtor's estate and *not* personal
property.").  The CTLI court concluded that the account was the property of the reorganized
debtor.

        In reaching its conclusion, the CTLI court explicitly rejected the former majority
owner's argument that he had demonstrated that the Facebook page was a personal account by
proffering evidence that he "started the page for personal reasons, used it to share personal
posts, and accessed it through his personal Profile."  528 B.R. at 368.  The court noted that "[a]t
most, this evidence establishes that [the former owner] conceived of the Tactical Firearms
business as an extension of his personality" and was "utterly insufficient to overcome the
presumption that the Facebook page entitled 'Tactical Firearms' . . . was anything other than

what it appeared to be: a business Facebook Page for the business known as Tactical Firearms."
Id.

After conducting a similar evaluation of the Twitter account, the Court held that the Twitter account was also a business asset.  The Court recognized that the "fact that the Twitter account was named after the business" – bearing the Twitter Handle @tacticalfirearm –, "included a description of the business, and was linked to the business's web page raise[d] a presumption that the Twitter account has always been a business account."  Id. at 372.  For the second time, the Court rejected the former owner's "definitions of 'personal' versus 'business-related' posts," explaining that "[t]he very nature of social media dictates that its best use for business is somewhat more subtle than other forms of marketing" and that "[a] Tweet advertising the fact that the owner of a gun store is at a gun show," which was one of the examples proffered by the individual owner, "is a perfect example of this kind of subtle marketing" as it "most assuredly served to develop [the individual's] reputation as being a well-informed, connected insider in the gun-buying community, a reputation that would attract consumers to the business of Tactical Firearms that he was running at the time he issued this Tweet."  Id. at 370-71.

JLM also points to the factors relied upon by the court in Int'l Bhd. Teamsters Loc. 651 v. Philbeck, 464 F. Supp. 3d 863 (E.D. Ky. 2020), in its evaluation of whether a Facebook page and union member group on social media, both created by a former Union president, belonged to the former president or to the Union.  In granting the Union's motion for summary judgment on its conversion claim, the court relied on the CTLI decision and held that the accounts were owned by the Union because they were "created to communicate with Union members, held out as official Union pages, promoted on [Union] business cards, and the official

website, and other members of the Union had administrative privileges." Philbeck, 464 F. Supp. 3d at 872-73. After finding that the former Union president had "removed administrators and banned certain Union members" from the social media accounts, which "interfere[d] with the [Union's] right to use and enjoy the social media accounts" and "communicate with the Union members[,]" the court determined that the Union was entitled to summary judgment on its conversion claim. Id.

   The CTLI and Philbeck courts' analyses focused on common factors pertinent to the determination of whether a business or organization-related social media account belongs to the entity or to the individual who created it. Those factors include: (1) whether the account handle reflects the business or entity name; (2) how the account describes itself; (3) whether the account was promoted on the entity's advertisements or publicity materials; (4) whether the account includes links to other internet platforms of the entity; (5) the purpose for which the account was used, including whether it was tied to promotional or mission-oriented activities of the entity; and (6) whether employees or members of the entity had access to the account and participated in its management. The Court concurs that these factors, although not necessarily exclusive, identify issues that are at the core of a proper social media account ownership inquiry. The Court also concurs in the CTLI and Philbeck courts' conclusion that use of the business or entity name to identify an account to the public weighs heavily in favor of finding the account is owned by the entity rather than by the individual creator or registrant. See CTLI, 528 B.R. at 367-68, 372 (explaining fact that Facebook page was "entitled 'Tactical Firearms' raise[d] a presumption" that account was property of debtor and the "fact that the Twitter account was named after the business" weighed heavily in favor of finding account to be a business account). The factors can be distilled into three overarching categories: (1) the manner

in which the account is held out to the public; (2) the purpose for which the account has been utilized; and (3) whether employees of the business accessed the account in furtherance of business interests.

Ms. Gutman posits that her creation of the Accounts,[5] combined with her subjective intention that they be utilized for personal reasons, is determinative of the ownership inquiry.  (Gutman Opp. at 23-26.)  She argues that "activities" that "post-date the creation" of the Accounts are entirely irrelevant to the Court's analysis.  (Id. at 26.)  Ms. Gutman does not point the Court to any legal authority supporting her position, nor does she differentiate, or even reference, the CTLI and Philbeck decisions.  Ms. Gutman's unsupported, self-serving position is unpersuasive.  The Court adopts the multi-factored approach utilized by the CTLI and Philbeck courts, which reflects careful and thoughtful deliberation by both courts as to the ownership issue, in evaluating the parties' likelihood of success on their respective claims of ownership of the accounts at issue here.  Ms. Gutman's attempt to narrow the Court's inquiry to the moment the accounts were created is overly simplistic, and the dynamics of social media warrant a much fuller examination of how the accounts were held out to the public, the purposes for which the accounts were used, and the methods by which the accounts were managed.  For the following reasons, the Court concludes that JLM has established clearly that it is likely to succeed in proving that it owns, or at a minimum has a right superior to any such right of Gutman's to use and control, the accounts at issue.

---

[5]      Ms. Gutman argues that the fact that she created the Accounts using her personal email address and personal phone number weighs heavily in her favor.  Ms. Gutman concedes, however, that she utilized her "personal email address" at Gmail.com for JLM-related business, instead of the email address JLM provided to her.  (Gutman Decl. ¶ 52 n. 14.)  The evidence also shows that Ms. Gutman texted Mr. Murphy about JLM-related business.  (Docket entry no. 98, Exs. P-192, P-193; P.I. Tr. 167:19-25.)

First, the Accounts were held out as official accounts of JLM.  Ms. Gutman created both the Instagram and Pinterest Accounts utilizing the handle @misshayleypaige, shortly after she signed the Contract (which transferred to JLM the exclusive right to use such a variation of her name for commercial purposes) and a trademark registration acknowledgement form assigning the rights in her name to JLM.  (See docket entry no. 109 at 21 (describing Sections 10(a) and 10(b) of Contract); docket entry no. 14 ¶ 14, Ex. 3 (showing that Ms. Gutman executed a trademark registration acknowledgement prior to opening the Accounts, in which she "consent[ed] to [JLM's] registration of the Trademark" in her name).)[6]  Ms. Gutman's use of the handle, @misshayleypaige, for both Accounts, incorporating the Designer's Name that she had sold to JLM in aid of the creation and promotion of an eponymous line of bridal wear, constituted use of a business name to identify the Accounts, notwithstanding any use of the name as a term of endearment.  (Docket entry no. 109 at 21; Gutman Decl. ¶¶ 15, 44-45.)  This factor weighs heavily in favor of finding that the Accounts are business assets owned by JLM.  JLM also utilized the Accounts to identify its products, incorporating the Accounts' handle "@misshayleypaige" on hang tags of its physical garments in the Hayley Paige lines, in print advertisements, and on its website.  (Murphy Decl. ¶ 28; docket entry no. 14, Exs. 20-32, 42; id. at ¶¶ 10, 24.)

The descriptions displayed on the Instagram and Pinterest Accounts referenced the Hayley Paige brand and linked to JLM's other Internet platforms.  The Instagram Account was linked to JLM's Facebook Account for periods of time prior to December 2020 (Murphy

---

[6]     (See also Gutman Decl. ¶ 15 ("In the 2011 Agreement, I agreed to allow JLM to use my name in connection with bridal dresses and accessories that I created" and "I launched a collection in my name in October 2011.").)

Decl. ¶¶ 28, 87; Gutman Decl. ¶¶ 95, 98), regularly included a link to JLM's website www.hayleypaige.com, including as early as 2015 (docket entry no. 14 ¶¶ 23-24, Exs. 19, 56, 59), and frequently featured the email address of JLM's Public Relations Department (pr@jlmcinc.com), including as early as May 27, 2016.  (Gutman Decl. ¶ 106; docket entry no. 14 ¶ 45, Ex. 58.)   At times, the Instagram Account also linked directly a to specific page of JLM's website to allow followers to access information about upcoming trunk shows, as well as to JLM's other Internet presences featuring its projects and collaborations.  (Docket entry no. 14, Exs. 19, 56, 58-59; Gutman Decl. ¶¶ 106, 145.)  The Pinterest Account also shows that images pinned to the Pinterest Account prior to the issuance of the TRO were linked to JLM's website.[7]

Ms. Gutman argues that the biographic descriptions used on the Instagram Account support her position that she owns the account.   Ms. Gutman points to a photograph of the Account from February 22, 2020, and argues that her inclusion of the phrase, "Personal & Creative account of designer Hayley Paige," in the Instagram Account's description demonstrates that the Instagram Account is her personal asset.  (Gutman Decl. ¶ 145.)  The Court, however, finds this language to be of little significance in light of the 2019 breakdown of the parties' business relations during their ongoing contract negotiations, leading to Ms. Gutman's change of the Instagram Account's password to block JLM's access in November 2019.  (Docket entry no. 14 ¶ 62; Gutman Decl. ¶ 145.)  Furthermore, the image proffered by Ms. Gutman showing this Instagram Account's description, after she changed the password to

---

[7]     See https://www.pinterest.com/misshayleypaige/ (last accessed July 25, 2022) (showing JLM's website linked to images pinned prior to December 2020).  Counsel further elaborated at oral argument on Plaintiff's motion to modify the Preliminary Injunction, explaining that, due to the different nature of the Pinterest Account, the pictures themselves were directly linked to JLM's website.

the account, still includes numerous other references to JLM including two of JLM's website URLs (www.hayleypaige.com and www.jlmcouture.com/trunk-shows), the phrase "bridal collections," and JLM's collaboration with "@heartsonfireco diamonds[.]"  (Id.)  Her identification of herself as a "designer" also acknowledges her role as a JLM employee.  (Id.; see also id. ¶ 69 (showing that, in late 2018 and/or 2019, the Instagram Account displayed Ms. Gutman's JLM roles as "Designer/Creator/Emoji-maker").[8])  Ms. Gutman also argues that the Instagram Account's verification in 2017 as the account of a "Public Figure" demonstrates that the account's description indicated she owned the account.  (Gutman Opp. at 20.)  The record, establishes, however that this status was achieved as a result of an invitation by Instagram, likely prompted by the promotional activities on the Account.[9]

---

[8]     The current version of the Pinterest Account incorporates a reference to Ms. Gutman's role as a "podcast co-host for All That Glitters,"  which was separate from her employment with JLM.  (Gutman Decl. ¶ 46 n.11, Ex. 23.)  Because the exhibit submitted by Ms. Gutman depicts the present-day version of the Pinterest Account (id. Ex. 23), the Court cannot determine how long this description has been present. Moreover, this reference to one of Ms. Gutman's roles outside of her employment at JLM is insufficient to overcome the vast amount of evidence that the Pinterest Account was held out as a JLM-related platform, including by linking pinned photos to JLM's website on the account, the name of the account reflecting the name of the designer – to which JLM assumed ownership rights under the Contract –, and the content and purposes of the Pinterest Account, which will be discussed infra.  Ms. Gutman's promotion of her personal life, including activities she undertook to connect with the public, were intertwined with her role as serving as the "face" of JLM's brand.  (Murphy Decl. ¶ 92; Murphy Reply Decl. ¶¶ 6-7, 32.)

[9]     On January 20, 2017, Ms. Gutman emailed Mr. Murphy, informing him that the account "got the 'verification invitation' on Instagram."  (Murphy Reply Decl. ¶ 23, Ex. 83.) Ms. Gutman explained that she "tried to do some investigative work as to 'how that happened' and apparently it's by invitation only and some unknown society within Instagram decides who gets it."  (Id., Ex. 83)  This document, reflecting Ms. Gutman's lack of awareness of how the verification invitation came to be, contradicts Ms. Gutman's testimony that she personally sought out the verification status and renders her testimony incredible.  (Gutman Decl. ¶ 69.)  Furthermore, Ms. Gutman informed Mr. Murphy that she learned the verification status may have "to do with advertising dollars and becoming more of a partner with Instagram[,]" and also that she was "hoping that this verification can open some doors for us regarding social media advertising" which

Based on the foregoing, the Court finds that the evidence strongly supports the conclusion that the Accounts were held out as business accounts marketing JLM's Hayley Paige brand. The facts that (1) the Accounts were created using the brand name, the rights to which were assigned from Ms. Gutman to JLM; and (2) the Accounts incorporated links to JLM's Internet presences and references to JLM's products and projects, constitute particularly compelling evidence supporting JLM's assertion that it owns the Accounts as business assets.

Second, the evidence shows clearly that the Accounts were regularly utilized to promote JLM's business. The Instagram and Pinterest Accounts regularly featured JLM products, including the wedding dresses designed by Ms. Gutman for the Hayley Paige brand (Murphy Decl. ¶ 9; id., Ex. 5; docket entry no. 61, Ex. T; Gutman Decl., Ex. 23 (showing Pinterest boards organized for years to individually feature Hayley Paige dress designs and other HP-brand products including an "athleisure" collection)) and included links through which followers could access further information on JLM's website about the HP brands (docket entry no. 14, Exs. 19, 56, 58-59; Murphy Decl., Ex. 5). Information included on the Instagram and Pinterest Accounts also pointed followers to related JLM projects or collaborations. (Docket entry no. 14, Ex. 59 (@holymatrimoji and "heartsonfireco"); Gutman Decl. ¶ 145 (@heartsonfireco diamonds); id. Ex. 23 (showing Holy Matrimoji board with time stamp of pins four years ago).) Ms. Gutman and other JLM employees frequently collaborated on strategies in which the Accounts could be effectively leveraged to advertise trunk shows (Murphy Decl.,

---

was "good timing with our new emoji projects coming up." (Murphy Decl., Ex. 83.) Ms. Gutman's statements suggest that the verification procedure may have been tied, in part, to JLM's promotional activities on the Instagram Account, and that Ms. Gutman hoped to leverage the verified status in connection with JLM's advertising efforts and an upcoming JLM project. Mr. Murphy also provided testimony that he believes JLM reimbursed the expenses for obtaining verification. (Id. ¶ 23.)

Exs. 5, 7-8), promote stores selling HP brands (id.), and inform followers about promotional codes or sales events.  (Murphy Decl. ¶ 22, Ex. 12; id., Exs. 5, 15.)  These efforts were directly tied to the corporate goals of promoting brand visibility and increasing sales and revenues.  As Ms. Gutman concedes, promoting the HP brands on social media "would mutually benefit" both her and JLM, given that she "had a financial interest" in ensuring the popularity of the brands and would benefit from the increased compensation earned from increased sales.  (Gutman Decl. ¶ 115.)

        The evidence demonstrates clearly that the Instagram Account also played a critical role as a communication platform for JLM's actual and potential customers, for both sales-related inquiries and customer service.  Followers reached out, through direct messages, to ask about the designs featured on the Instagram Account, including the names of dresses showcased in posts and whether they could be altered based on individual taste.  (Murphy Decl., Exs. 61-63.)   In other instances, customers or potential customers sent messages requesting information about the costs of Hayley Paige dresses and the locations of stores where Hayley Paige products could be purchased in a particular area.  (Id.)  These individuals were often provided immediate answers to their inquiries, or they were given the links to JLM's websites and the email addresses of JLM employees to obtain further information.  (Id.)  The evidence also demonstrates that Ms. Gutman directed followers to email JLM if they seemed serious about placing orders and also utilized information learned through customer messages to rectify customer dissatisfaction.  (Id., Exs. 68, 70.)

        In support of her position, Ms. Gutman proffers conclusory arguments, based on piecemeal selections of content from the accounts, that the "vast majority" of the accounts' content reflected "personal content."  (Gutman Decl. ¶¶ 75, 85-86.)  The record does not

support the contention that the vast majority of the content could properly be characterized as personal; much of it was related to or depicted JLM products, and Ms. Gutman's strained attempt to characterize such material as "personal" is self-serving in the context of her contractual relationship with JLM.  Ms. Gutman asserts, for instance, that, "[e]ven when I post about my work (which is a big part of who I am), that is still a personal post with a caption I personally wrote in the first person."  (Gutman Decl. ¶ 75).  Posts featuring JLM's designs, upcoming trunk shows, and promotional codes, as described above, can hardly be labeled "personal" content when they are inextricably tied to boosting JLM's sales, revenues, and brand visibility, and invited customer inquiries about JLM's products.  Moreover, many of the other posts Ms. Gutman classifies as personal, including items showcasing her fashion interests or events going on in her life – including her engagement – reflect the "kind of subtle marketing" social media is known for, In re CTLI, 528 B.R. at 371-72, promoting Ms. Gutman as a designer who can connect with brides who share her tastes and are experiencing the same life milestones. (Murphy Decl. ¶ 72, Gutman Decl. ¶¶ 67, 77.)  Indeed, Mr. Murphy's credible testimony explained that this sort of "personalized touch . . . [of] somebody . . . close to the same age as [the] brides" in JLM's marketing demographic was a key feature of the marketing approach for the HP brands. (P.I. Tr. 41:4-25.)  Ms. Gutman admits that the approach of combining JLM's products with her personality is what "made [the Instagram Account] successful" and what attracted followers to the Instagram Account.  (Gutman Decl. ¶ 82.)[10]

---

[10]     Indeed, declarations Ms. Gutman submitted in support of her opposition confirm that the personalized marketing strategy, in which followers felt as if they became acquainted with the designer of JLM's products on a personal level, contributed to the success of the marketing efforts.  (See docket entry no. 376 ("Gilreath Decl.") ¶ 6 ("Because Hayley connected with her followers in such a genuine way . .. they fell in love with her and felt like they knew her.  I was told this on many occasions by retail consultants, brides, or even individuals completely outside of the wedding industry."); docket entry

The Court recognizes that some of the featured content, and engagement between Ms. Gutman and account followers, was more attenuated from her role as a designer at JLM, and incorporated references to her family and friends.  (See, e.g., Gutman Decl. ¶ 65 (showing photo of Ms. Gutman and her father, highlighting his role as a physician, and which prompted a comment from a follower that "Your dad helped take care of me . . . . Please tell Dr. Gutman thank you!!"); id. ¶ 72 (explaining how the Instagram Account was mentioned by Ms. Gutman's personal acquaintances, including in connection with postings of pictures of her out with friends).)  When the content of the Account is examined holistically, however, the content of a more personal character does not outweigh the content geared toward Ms. Gutman's marketing of JLM's products, nor the type of subtle marketing in which she associated the girly, whimsical aspects of her personality with JLM's Hayley Paige brand.  Rather, the clear weight of the evidence establishes that Ms. Gutman "conceived of [her role as a designer at JLM] as an extension of [her] personality," In re CTLI, 528 B.R. at 368, and leveraged her personality in order to successfully market JLM's products and build the overall brand for Hayley Paige goods.  Thus, the evidence of the purposes for which the Accounts were utilized strongly supports JLM's position that the Accounts were business in nature.

Third, the evidence demonstrates clearly that JLM's employees were involved in formulating the marketing strategy for the Accounts and directly participated in the management of the Accounts in support of JLM's business interests.  Mr. Murphy, JLM's President and CEO, provided Ms. Gutman with explicit directions about the content and timing

---

no. 372 ("Kienzle Decl.") ¶¶ 5-6 (stating that Ms. Gutman's strategy of creating "personal relationships with brides through her social media accounts" and engaging with followers is "what made Hayley a marketing genius and set her apart from other designers").)

of social media activities (see docket entry no. 109 at 9 (citing docket entry no. 98, Exs. P-192, P-193, and P-194)), and the evidence reveals Ms. Gutman recognized the need to permit Mr. Murphy and other JLM employees to weigh in on decision-making for promotional efforts on the Accounts.  (See Murphy Decl., Exs. 15, 30, 47; Gutman Decl. ¶ 123.)  Utilizing the assistance of other JLM employees in managing the Accounts, Ms. Gutman provided them with log-in information, permitted them to access the Accounts directly, and delegated specific roles to other employees in connection with the promotional use of the Accounts.  (Murphy Decl., Exs. 5, 9, 20-21, 25, 26, 28; Gutman Decl. ¶ 100, 102-103.)  The Court finds it particularly telling that Ms. Gutman advocated for JLM to hire a Social Media Direct Strategist to "develop[] on-brand content to reach target audiences, keep track of engagement/process . . . , and implement NEW strategies to increase growth and visibility" on the Instagram and Pinterest Accounts.  (Docket entry no. 14, Ex. 53; Murphy Decl., Ex. 53 (email showing Ms. Gutman coordinating with JLM employee to develop a "wishlist" including "bring[ing] in someone that will support Hayley's social media efforts AND will be able to come up with new ways of building brand recognition and reaching new stores and brides.  Right now, marketing and social media is an 'extra' piece to everyone's job . . . .").)  Ms. Gutman's active efforts to shift greater responsibility for account management to a potential JLM employee who would work as the social media manager, a role she proposed and expected would be created by JLM and dedicated to building her brand, is particularly revealing as to the parties' views of the Accounts and their purpose.  See In re CTLI, 528 B.R. at 367 (noting that while a "property interest in an individual Profile would likely not become property of the estate[,]" the "official Page of a celebrity or public figure that is managed by employees might be treated differently").

Although Ms. Gutman actively participated in creating content for the Accounts, engaged with the Instagram Account's followers, and maintained the Accounts' log-in information, the Court finds that such evidence indicates, at most, that Ms. Gutman acted as JLM's project lead for management of those Accounts, just as she was lead designer for the HP brands, which were deliberately associated with her style and personality. The evidence shows that Ms. Gutman often served as the point person for the Accounts, brainstorming ways in which the Accounts could be leveraged to promote the HP brands (Murphy Decl., Exs. 7-8, 12, 34), delegated assignments among her team members for account management (id., Exs. 5, 21, 25, 28, 45), and advocated for the Accounts' importance to JLM (docket entry no. 14, Ex. 53). Ms. Gutman also brought a unique vision to the Accounts and expressed her desire to continue featuring her personality as a designer alongside JLM's products. (Murphy Decl., Exs. 9, 34; docket entry no. 14, Ex. 53; Gutman Decl. ¶ 82.) She also expressed her preference that JLM employees seek her approval of content, if possible, before posting. (Murphy Decl., Ex. 25.) This evidence is insufficient to establish Ms. Gutman's ownership of the Accounts and, rather, shows clearly that she oversaw the Accounts' management and activity in stewardship of JLM's interests, which were inextricably tied to her own.

The Court therefore concludes, based on its analysis of the above factors, that JLM has established its clear likelihood of success in demonstrating that it owns the Instagram Account and Pinterest Account or (to the extent Ms. Gutman or the relevant platforms may hold title to the Accounts) has a right to use and control the Accounts vastly superior to any such right of Ms. Gutman. To the extent that Ms. Gutman relies on arguments outside of the multi-factor framework the Court has used to analyze the ownership issue, the Court has considered such arguments and finds them unavailing. Ms. Gutman posits that JLM's employees "referred

to" the Accounts as "Hayley's personal accounts[,]" confirming that she owns them.  (Gutman Opp. at 21.)  The Court does not find persuasive the examples proffered by Ms. Gutman of employee references to the Accounts.  The entirety of the evidence shows that the Accounts were referred to differently in various contexts, including by Ms. Gutman as both "our" accounts (Murphy Decl., Exs. 45-46; docket entry no. 14, Ex. 53) and "my" accounts (see, e.g., Gilreath Decl., Ex. 2; Gutman Decl., Ex. 13), and that, in one of the email threads, a reference to "Hayley's personal Instagram" was made in the context of dividing assignments on the account among JLM employees, highlighting its business-related use.   (Gilreath Decl., Ex. 2.)  The Court declines to attribute significant weight to the descriptive labels used to refer to the Accounts.  In addition, to the extent Ms. Gutman argues that JLM's use of the Accounts after the TRO was issued in December 2020, which has skewed toward standard product marketing content and suppressed certain aspects of customer engagement, undermines JLM's position that the prior showcasing of Ms. Gutman's personality and activities was a key aspect of JLM's marketing program, the Court finds the shift to be of very limited, if any, probative value because Gutman made herself unavailable to cooperate in the original program and actively worked to undermine the market appeal of JLM's products after the TRO was issued.  (Gutman Opp. at 22-23.)  Shortly after the TRO was entered, Ms. Gutman issued a public announcement that she would no longer render services to JLM, and has since issued statements portraying JLM in a negative light and announced her plans to compete after the term of the Contract expires.  JLM therefore has a legitimate business interest in taking steps to manage the Accounts in ways that respond to these events, manage its reputation, and promote its products.

Ms. Gutman's argument that JLM cannot establish ownership of the Accounts because "there is no provision in the Employment Agreement . . . that provide (sic) for JLM to

receive ownership over social media accounts created by Hayley" is contradicted by the language of the Contract. (Gutman Opp. at 24-25.)  As the Court has previously found, JLM has demonstrated that the content on the Instagram Account constitutes a "work for hire pursuant to Section 11 of the Contract" because Ms. Gutman developed the Account "in connection with her employment" under a "handle that incorporated the name to which she had already granted Plaintiff the exclusive right and license to use in commerce related to its bridal goods that she designed" and she used the Account "to attract the public to the gowns and apparel she created." (Docket entry no. 109 at 28-29.)  This analysis also applies to the compilations of content featured on the Pinterest Account.  Having examined the question of ownership in light of the factors identified above and considered the language of Section 11 in light of the facts of record, the Court further finds that JLM is clearly likely to succeed in demonstrating that it owns the Instagram and Pinterest Accounts themselves – and not just their featured content – pursuant to Section 11 of the Contract.  Section 11 provides that if, for any reason, the Designs (defined as "all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and underlying other works conceived of or developed by Employee in connection with her employment with the Company," are "deemed not to be a work made for hire, then the Employee irrevocably, absolutely, and unconditionally assigns" to JLM "all of (sic) right, title and interest in and to the Designs and/or any portion thereof . . . ."  (Contract ¶ 11 (emphasis added).)  Ms. Gutman's creation of the Accounts during and in connection with her employment at JLM and in the name of JLM's product line, in combination with her active collaboration to utilize the Accounts in furtherance of JLM's business interests, is likely amply sufficient to establish that any ownership rights she possessed in the Accounts, including any she obtained

when she first created the Accounts, were assigned automatically to JLM pursuant to Section 11 of the Contract as "other works."

The Court also concludes that JLM has established a clear likelihood of succeeding on the merits of its conversion claim. As this Court has previously found, Ms. Gutman changed the access credentials for the Instagram Account and the Pinterest Account, refused to share the new log-in information with JLM, and informed JLM that she would "not [be] posting any JLM related business to the Account," thereby blocking JLM's access to its critical marketing platforms for the HP brands. (See generally docket entry no. 109 at 12; docket entry no. 326 at 11-12.) The evidence of record demonstrates that Ms. Gutman exercised an "unauthorized dominion" over the Accounts JLM owns, to the "exclusion of [JLM's] rights." Brown, 2021 WL 3887611, at *9 (citation omitted). Because JLM's likely success on its conversion claim supports the relief granted as to the Instagram and Pinterest Accounts, the Court need not conduct a separate analysis of the related trespass to chattels claims at this juncture.[11]

The Court will, however, modify JLM's proposed relief with respect to paragraphs one and two of the Preliminary Injunction to limit it to the Instagram and Pinterest Accounts, rather than granting it as to all of the social media accounts listed in Addendum One to the current Preliminary Injunction. JLM does not allege in connection with this motion practice that Ms. Gutman currently has control over any of the other social media accounts listed in Addendum One, which the Court has previously determined serve as marketing

---

[11]    Having determined that JLM has shown it is clearly likely to succeed in proving that it owns the Instagram and Pinterest Accounts themselves, the Court need not consider JLM's argument in the alternative that it is entitled to control of the Accounts due to its ownership of the *constituent parts* of the Accounts, and Ms. Gutman's alleged conversion as to those parts.

platforms for the HP brands (see docket entry no. 326 at 8-13), nor that she gained unauthorized dominion over those accounts to the exclusion of JLM's rights.  Therefore, the Court finds injunctive relief as to those remaining accounts to be unwarranted, and unnecessary, at this juncture.

        2.        Irreparable Harm Absent Injunctive Relief

        In addition to demonstrating a likelihood of success on the merits, Plaintiff must show that it is likely to suffer irreparable injury in the absence of an injunction.  See Salinger, 607 F.3d at 79-80.  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (internal quotations and citation omitted).  "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotations and citation omitted).

        Here, JLM has demonstrated that it will suffer irreparable harm should the Court not grant JLM exclusive access and control over the Accounts.  The Pinterest and Instagram Accounts serve as powerful advertising platforms through which JLM displays and identifies its products, promotes new designs and brand-related events, and captures the interest of both potential and actual customers.  To remain competitive, JLM needs to be able to continually modify and update the content on the Instagram and Pinterest Accounts to showcase its goods, draw interest from Account followers, and direct viewers to the other key platforms through which JLM shares information.  See Ardis Health, LLC v. Nankivell, No. 11-CV-5013-NRB,

2011 WL 4965172, at *2-3 (S.D.N.Y. Oct. 19, 2011) (finding plaintiffs would be irreparably harmed if they were not permitted to recover the access information to their websites and social media accounts where "Plaintiffs depend[ed] heavily on their online presence to advertise their businesses" and their "inability to do so unquestionably ha[d] a negative effect on [their] reputation and ability to remain competitive, and the magnitude of that effect [was] difficult, if not impossible, to quantify in monetary terms").  The Accounts, which are advertising platforms, have become inextricably linked with the identity of the Hayley Paige brand, as followers are directed to JLM's websites or other Internet presences linked to the Accounts, and the Accounts' handles are used to identify JLM's physical goods, both on the hang tags of its products and in other advertising materials.  The Accounts have therefore become symbolic of the brand, and they are associated by potential and actual customers with JLM's products.

JLM's ability to control the content of the Accounts is critical to maintaining the strong Internet presence of the HP brands, JLM's reputation, and the goodwill JLM has created among potential and actual customers who follow the Accounts.  Ms. Gutman has publicly announced her desire to compete with JLM and reenter the bridal industry on August 1, 2022, and has shared numerous posts and videos on her ATG Account in which she portrays JLM in a negative light.  Ms. Gutman has taken these actions even though she still remains bound by the terms of the Contract, which includes obligations to assist with JLM's advertising efforts and refrain from competing with JLM.  Should JLM be required to share access to the Accounts with Ms. Gutman (or, as she demands, cede complete access to her) after the Contractual employment term expires and she is no longer bound by certain provisions of the Contract, JLM is likely to suffer irreparable harm to the reputation and image of the Company as a whole, and of the Hayley Paige brand specifically.  JLM's control over the Accounts is critical to ensuring

that its key advertising platforms accurately reflect the Hayley Paige brand and to maintaining the goodwill it has built in the Accounts.  See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F.Supp.2d 305, 343 (S.D.N.Y.2010) (finding "[p]rospective loss of . . . goodwill alone" to be "sufficient to support a finding of irreparable harm" and noting plaintiff's loss of "the ability to control its reputation").

Furthermore, should JLM not have control over the Accounts that it owns, it will suffer irreparable harm because it will lose one of its primary methods for communicating directly and easily with potential and actual customers.  The Instagram Account serves as a significant communication platform through which JLM not only promotes its products, but also engages directly with potential and actual customers to provide immediate answers to customer inquiries about its goods, deliver customer service, promote the brand, and create a personalized relationship between JLM and the brides who purchase Hayley Paige gowns.  Customers have been utilizing the Instagram Account for years to reach out to JLM with their sales-related questions, and were JLM to lose control over the account, customer confusion would result and JLM's reputation and competitive edge would suffer in immeasurable ways.

The balance of equities also tips in JLM's favor.  The Accounts, which were created using the Hayley Paige brand name, incorporate links to JLM's other Internet platforms, feature years' worth of advertising content for JLM's products and collaborations, and are the product of JLM's intense marketing efforts and investments to build the popularity and success of the Hayley Paige brand.  Although Ms. Gutman, as the lead designer and face of the Hayley Paige brand, collaborated with JLM on the Accounts, her role was best akin to the project lead or administrator for the Accounts, and she actively advocated for JLM's increased involvement and investment in these platforms, including increased delegation of responsibility for the

Accounts to existing JLM employees and a potential new hire who would fulfill the role of a social media director.  Ms. Gutman, after relying on JLM's input, strategies, and resources in building the Accounts' image around the JLM-owned Hayley Paige brand, cannot now claim company property as her own.

The balance of the equities and public interest tip even further in JLM's favor based on examination of the Contract at issue.  The public has an interest in ensuring the enforcement of valid contracts.  Ms. Gutman signed the Contract with JLM, pursuant to which she agreed to "unconditionally assign[]" to JLM all "right, title and interest" to "any other works conceived of or developed by [Ms. Gutman] in connection with her employment with the Company[.]"  (Contract ¶ 11.)  As "other works" Ms. Gutman developed during the term of her employment, the Accounts are Company-owned property over which Ms. Gutman should not be permitted to assume or exert control.

Ms. Gutman's conduct further demonstrates that the balance of equities and the public interest weigh in JLM's favor.  Since the parties' relationship broke down in 2019, Ms. Gutman has demonstrated her willingness to act adversely to JLM's interests vis-à-vis the Accounts, harm the reputation of JLM and the Hayley Paige brand, and willingly violate the Contract and this Court's orders.  Ms. Gutman voluntarily chose to breach the Contract by refusing to render her services to JLM in December 2020, over one and one-half years before the Contractual employment term was due to expire.  To permit Ms. Gutman access to and control over JLM's business assets at this juncture would be entirely inequitable, as it would convey Ms. Gutman a benefit that she did not bargain for, after she refused to perform under the parties' Contract.  In addition, granting her access now, when the Contract term is about to expire, Ms. Gutman is no longer obligated to assist JLM in performing her duties, and Ms.

Gutman has been vocal about preparing to compete with JLM, would grant Ms. Gutman the ability to transfer her ongoing negative campaign against JLM's reputation, and her efforts to compete against its brands, directly to the Accounts that have served as critical marketing and communication platforms for JLM.  Permitting Ms. Gutman this opportunity would likely cause incalculable damage to JLM's reputation and goodwill.

Ms. Gutman, on the other hand, freely bargained for the Contract with all of its burdens and benefits, and is not prohibited by paragraphs one and two from working as a bridal designer.  She simply will not be able to use the Accounts in aid of her personal or new business interests, nor will she be able to divert the goodwill built for, and in the context of, the brands built under the name she sold to JLM.

Accordingly, for the reasons discussed herein and in the Court's prior decisions on the Preliminary Injunction Order, Plaintiff has demonstrated a clear likelihood of success on the merits of its conversion and related ownership claims regarding the Accounts, irreparable injury in the absence of injunctive relief maintaining its control of the Accounts, a balance of hardships tipping in its favor, and that the public interest would not be disserved by the issuance of preliminary injunctive relief prohibiting Ms. Gutman from making any changes to the Instagram or Pinterest Accounts or taking steps to assume exclusive access over those Accounts.

<u>Requested Relief Pursuant to Section 10(e) of the Contract</u>

JLM requests that the Court impose new preliminary injunctive relief incorporating the obligations imposed on Ms. Gutman by Section 10(e) of the Contract.  Section 10(e) provides that, if

> the Company files an application to register the Trademark or
> Trademarks, Employee agrees that for a period of five years
> following termination of her employment, she shall not be
> identified to the trade or consuming public as the designer, and
> her role as a designer shall not be used to promote the sale, of any
> goods in competition with goods manufactured and sold by the
> Company.

(Contract ¶ 10(e).)  Neither party disputes the fact that JLM applied for and received

registrations for the Trademarks defined in the Contract.  (See docket entry no. 14, Exs. 4-13.)

The parties, however, disagree as to the meaning and scope of this contractual provision.

       1.     JLM's Likelihood of Success in Establishing Ms. Gutman's Conduct Constitutes
            a Breach of the Contract

       "[W]hether the language of a contract is unambiguous, and, if so, what

construction is proper, are legal questions."  Seiden Assocs., Inc. v. ANC Holdings, Inc., 959

F.2d 425, 429 (2d Cir. 1992); see also JA Apparel Corp. v. Abboud, 568 F.3d 390, 396-97 (2d

Cir. 2009).  Ambiguity is determined by looking within the four corners of the Contract, not to

outside sources.  Kass v. Kass, 91 N.Y.2d 554, 566 (1998).  Only if a contract is ambiguous

may a court look to extrinsic evidence to determine the parties' rights.  Metropolitan Life Ins.

Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990).  Accordingly, the Court must first

examine the Contract to determine whether Section 10(e) is ambiguous.

       Contract language is not ambiguous if it has "a definite and precise meaning,

unattended by danger of misconception in the purport of the [contract] itself, and concerning

which there is no reasonable basis for a difference of opinion."  Hunt Ltd. v. Lifschultz Fast

Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (citation omitted).  "Language whose meaning

is otherwise plain does not become ambiguous merely because the parties urge different

interpretations in the litigation."  Id.  Instead, "[a]mbiguous language is language that is capable

of more than one meaning when viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) (internal quotation and citation omitted).

The Court's analysis therefore begins with the text of Section 10(e).  This provision unambiguously prohibits Ms. Gutman, the "Employee," from identifying herself to the trade or to the consuming public as the designer of any goods in competition with those manufactured and sold by JLM and from permitting her identity to be used by others to promote the sale of competitive goods.  Ms. Gutman's argument that the scope of Section 10(e) is limited to Ms. Gutman's use of "the Hayley Paige name, or any derivatives thereof" and that Section 10(e) would not be implicated if she were to "compet[e] with JLM, publicly or otherwise, under a different (non-'Hayley Paige') name" (Gutman Opp. at 11-12), ignores the plain language of Section 10(e).  Section 10(e) does not limit itself to identification via the "Designer's Name," but rather prohibits entirely the identification of the "Employee" as a designer in connection with competitive goods.   The use of the broader term, "Employee," refers to Ms. Gutman, JLM's counterparty to the Contract, as a human being, incorporating her whole identity and not just the name by which she has until now been identified, both personally and in connection with her design work at JLM.

Section 10(e)'s unambiguous prohibition of Ms. Gutman's public identification as a designer in connection with a competitive enterprise, under any name, is made even clearer when it is considered in the context of the language of the Contract as a whole.  As Ms. Gutman concedes, her proffered interpretation of Section 10(e), in which the scope of the provision would be limited to the use of the Designer's Name, would render Section 10(e) duplicative of

Sections 10(a), 10(b), and 12 of the Contract.  (See Gutman Opp. at 11-12 (asserting that "any relief based on Section 10(e) is redundant, because the Court has already entered relief prohibiting [Ms. Gutman] from using her own birth name, 'Hayley Paige,' in *all* trade or commerce" and citing paragraphs 3(a), 3(c), and 4 of the Preliminary Injunction Order).) Sections 10(a) and 10(b) of the Contract assign to JLM the right to use and control the use of the Designer's Name and provide that Ms. Gutman may not make commercial use of the Trademarks that JLM has registered, or the Designer's Name, without JLM's consent.  Section 12 prohibits Ms. Gutman from using the Trademarks owned by JLM in "trade or commerce for any purpose whatsoever" after the term of her employment ends.  Therefore, in order to have independent meaning, Section 10(e) must be understood literally, to go beyond the Designer's Name and prohibit Ms. Gutman, as an individual, from publicly identifying as the designer of competing goods for five years after the term of the Contract expires on August 1, 2022.

The Court has considered the remainder of Ms. Gutman's arguments that the scope of Section 10(e) is limited to the Designer's Name, as a "trademark protection mechanism," and finds them to be unavailing.[12]  (Gutman Opp. at 10-12.)  Ms. Gutman asserts that, because Section 10(e) is "only triggered if JLM files an application to 'register the

---

[12]     To the extent Ms. Gutman argues that JLM breached the Contract and is therefore precluded from seeking injunctive relief pursuant to Section 10(e) (Gutman Opp. at 15), her position is unavailing because the Court has already denied Ms. Gutman's May 2021 and June 2022 motions asserting this argument and seeking to dissolve the Preliminary Injunction.  (See docket entry no. 176 (June 2, 2021, decision) and docket entry no. 403 (July 25, 2022, decision) (concluding Ms. Gutman failed to demonstrate that JLM breached its obligations under the Contract).)  The Court respectfully refers the reader to those decisions, which set forth its relevant findings and conclusions.  Moreover, to the extent Ms. Gutman argues that JLM is not entitled to injunctive relief because it has "failed to offer facts showing that it will comply with its Employment Agreement obligations going forward," such argument is misplaced.  (Gutman Opp. at 15.)  JLM need not establish that it adopts Ms. Gutman's construction of disputed contract provisions in order to obtain preliminary injunctive relief.

Trademark or Trademarks'" (id. at 11), the scope of Section 10(e)'s limitations on Ms. Gutman must also be limited to the subject of JLM's Trademarks – the Designer's Name.  (Id.)  The registration of the trademarks is the condition precedent that must be satisfied for Section 10(e) to take effect.  Once it is effective, however, nothing in the language of Section 10(e) limits the scope of the parties' agreement to identification by use of trademarks or the Designer's Name. In addition, Ms. Gutman's argument that her interpretation of Section 10(e) is accurate because the provision falls within Section 10 of the Contract, entitled "Exclusive Right to the Designer Name" (id.), ignores Section 20 of the Contract, which provides that the "paragraph headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof."[13]  Section 10(e) is thus unambiguous, and resort to the parties' declarations concerning their subjective intentions with respect to the scope of the provision is therefore neither necessary nor proper.

JLM has also established a clear likelihood of success on the merits of its claim that that Ms. Gutman's intended launch of a competitive brand would breach the restriction imposed by Section 10(e) of the Contract if her design role were in any way featured in connection with the brand.  Ms. Gutman concedes that she is "ready and willing to use [a] new name in connection with any future brand, collection, or business endeavor" and has "expressed this desire publicly . . . to re-enter the bridal industry under a different name."  (Gutman Decl.

---

[13]     The Court need not engage at this point with Ms. Gutman's suggestion that the full temporal scope of Section 10(e) may exceed the bounds of a reasonable restrictive covenant, because the Court is merely granting preliminary injunctive relief to require Ms. Gutman's compliance with the plain language of the Contract pending a prompt resolution of the merits of this case.  Moreover, Section 10(e) is limited in scope and only prevents Ms. Gutman from  identifying, or authorizing others to identify her, as the designer of competing goods to the trade or the consuming public.  It does not prevent her from designing goods for a competitor.

¶ 36.)  Indeed, Ms. Gutman posted a video on her ATG Account on June 7, 2021, in which she announced her intention to reenter the bridal industry under a different brand name in August 2022.  (Docket entry no. 360 ("Matz Decl.") ¶ 2, Exs. A, A-1.)  Specifically, Ms. Gutman, whose face and reputation are well known in the bridal industry through the Accounts, print media, and personal appearances in connection with the marketing of JLM's products, stated that she planned to "announce [her] new brand name very soon" and return to "the industry [she] love[s] so much" in "August of 2022" and in the meantime, was "plan[ning] a gorgeous return to the work [she] love[s]."  (Id.)  Ms. Gutman's plans to return to the industry and publicly identify herself as the designer of a competitive brand demonstrate that she intends to engage in conduct that is likely to constitute a breach of Section 10(e) of the Contract.  JLM has proffered evidence that customers seeking her designs have expressed a desire to direct their purchases specifically to a new brand that she designs, and that shops that carried the JLM HP lines have indicated that they would instead carry goods designed by her for a different company. (Docket entry no. 197, Exs. B, I.)  Where, as here, an individual's public reputation has carefully been built and widely publicized as a designer of specific types of goods and the person has served as the face of a namesake brand, implicit identification as a designer through identification with a brand of competing goods can be as effective for marketing – and as damaging to the counterparty's contract rights and goodwill – as explicit identification as the designer of specific goods or a specific line, no matter what title she might claim in connection with a new venture or new employment.  The Court will not require JLM to wait until Section 10(e) comes into effect and has already been breached to seek injunctive relief, as doing so would undermine the very purpose of such relief – to avoid imminent and irreparable harm.

2.      Irreparable Harm Absent Injunctive Relief

In addition to demonstrating that JLM is likely to succeed on the merits of its claim that Ms. Gutman's planned conduct will constitute a breach of Section 10(e) of the Contract, JLM has also established that it will suffer irreparable harm should the Court not grant injunctive relief incorporating the relief set forth in Section 10(e).  JLM's business model is to work with designers to "build and promote namesake collections" (Murphy Reply Decl. ¶ 10), and JLM adopted this approach to build multiple product lines featuring Ms. Gutman as the "lead designer and face" of the Hayley Paige brand.  (Murphy Decl. ¶ 92.)  In support of this strategy, JLM worked "to build and promote [Ms. Gutman's] designer persona" including by obtaining placement for Ms. Gutman on television programming and "magazine covers" and by "sen[ding] her as a brand representative to industry summits, events, [and] trunk shows[.]" (Murphy Reply Decl. ¶ 6.)  In order to permit JLM time to rebuild its brand, develop a new strategy and distance its products from Ms. Gutman, whose persona was intimately tied to the eponymous brand, the Contract restricts Ms. Gutman's public activity as a designer for a significant period of time.  Injury to JLM's goodwill and interests in its intellectual property would be irreparable in the absence of such protection.

Ms. Gutman has announced publicly her intention to reenter the bridal industry, in competition with JLM, on August 1, 2022, in the absence of an injunction.  Her public announcement of her upcoming competitive brand in June 2021 prompted a strong, positive response from followers on her ATG Account, who expressed their intention to wait for her new product line to be released instead of purchasing goods from JLM.  Should Ms. Gutman be permitted to implement these plans, JLM would suffer from loss of sales and loss of goodwill in the Hayley Paige brand which would be nearly impossible to quantify.  Moreover, JLM's ability

to market its Hayley Paige brand to vendors and consumers would be irreparably harmed, as vendors and consumers would immediately begin to identify the person they recognize as Hayley Paige, who was the featured persona of JLM's brand, with her forthcoming collection or endeavors, no matter what new name she used to identify herself or a new business.  The extensive public promotion of Ms. Gutman as the lead designer and face of the Hayley Paige brand in accordance with the Contract, including by associating the branded products with her name, her tastes, her voice, her vision, her face, and her mannerisms, makes it likely in the short term that customers of the Hayley Paige brand would be very likely to seek out products designed and promoted by, for instance, "A girl you might know"[14] in the immediate aftermath of the expiration of the current preliminary injunction if Section 10(e) were not enforced with injunctive relief.

The balance of the equities and the public interest also weigh in favor of granting JLM injunctive relief to enforce the terms of Section 10(e).  Section 10(e) is a product of the parties' arm's-length negotiations of the Contract, and it is in the public interest for the Court to enforce the bargain that the parties reached.  Section 10(e) protects JLM's ability to continue to build its product lines and brand that were established in association with Ms. Gutman for a period of time after the term of the Contract, while permitting Ms. Gutman the ability to continue to use her talents as an uncredited designer of competitive goods or the (new) name and face of non-competing goods during the restricted period.  To deny JLM the benefit of its

---

[14]     Ms. Gutman has proffered that she has "been identifying herself" as "a girl you might know" due to the limitations on the use of her birth name imposed by the Contract and the Preliminary Injunction Order.  (Docket entry no. 213 ¶ 9; see id. ¶ 23 ("Following entry of the Court's PI Order on March 4, 2021, we immediately stopped referring to me as 'Hayley.' . . . Now, we resort to calling me 'a girl you might know' or simply nothing at all.").)

bargain would be inequitable.  The equities tip even more strongly in JLM's favor when the Court considers the fact that that Ms. Gutman refused to render her services to JLM throughout a substantial portion of the bargained-for Contractual term, from December 2020 through August 1, 2022, and instead, over the past year, has publicly shared negative comments about JLM and announced her plans to compete with JLM, redirecting support from JLM's potential market to her own.  JLM has had to devote time and resources to repairing its reputation and revamping marketing efforts around the Hayley Paige brand as a result of Ms. Gutman's actions, and JLM is entitled to the protection it bargained for to have time to strategize the best way forward.

Accordingly, JLM has established it is likely to succeed on the merits of its claim that Ms. Gutman's planned conduct will breach section 10(e) of the Contract, and preliminary injunctive relief enforcing such provision is necessary to prevent irreparable harm and is equitable and in the public interest.[15]

Request for Extension of Relief Under Paragraph 3(b) of the Preliminary Injunction

JLM seeks to extend the terminal date of the relief granted in paragraph 3(b) of the Preliminary Injunction by one year and eight months, replicating the period of time from the issuance of the TRO in December 2020 until August 1, 2022.  Paragraph 3(b) of the Preliminary Injunction Order was "imposed to prevent imminent and irreparably harmful violations of paragraph 9(a) of the Contract[,]" which prohibits Ms. Gutman from competing with JLM during the Contractual term.  (Docket entry no. 176 at 12.)  JLM argues that an extension of the

---

[15]     To the extent Ms. Gutman objects to the issuance of preliminary injunctive relief in the absence of an increased bond (Gutman Opp. at 33-34), the Court denies Ms. Gutman's request, largely for the reasons set forth in JLM's Reply Memorandum of Law.  (See docket entry no. 392 at 17-18.)

relief set forth in paragraph 3(b) is warranted as an equitable remedy "based on [Ms.] Gutman's conduct after the [Preliminary Injunction Order] was entered" (JLM Mem. at 34), which included her efforts to market her future brand in violation of paragraph 3(b) of the Preliminary Injunction Order.

The Court denies JLM's request for an extension of paragraph 3(b) of the Preliminary Injunction past the August 1, 2022, expiration date, which coincides with the expiration of the employment term under the Contract.  In its September 8, 2021, decision, the Court held Ms. Gutman in civil contempt of the Preliminary Injunction Order, finding that her efforts to promote her future bridal brand violated the terms of paragraph 3(b).  In that decision, the Court determined and imposed the appropriate sanction for Ms. Gutman's breach of the Preliminary Injunctive Order.  The Court therefore declines to impose an additional sanction for Ms. Gutman's past misconduct.  Moreover, as discussed above, Section 10(e) of the Contract, which the Court will enforce with injunctive relief, provides substantial protection to JLM against competitive design activity in the bridal space.

Request for Injunctive Relief Enforcing Section 9(c) of the Contract

The Court also declines to impose preliminary injunctive relief incorporating the requirements of Section 9(c) of the Contract.  JLM's argument in favor of additional relief incorporating Ms. Gutman's obligation under Section 9(c) not to disclose confidential information is based on Ms. Gutman's potential misuse of information garnered through her access to the Instagram and Pinterest Accounts.  Because the Court now grants JLM exclusive control of the Accounts, relief incorporating Section 9(c) is unwarranted and unnecessary at this juncture.  JLM has made no showing Ms. Gutman is likely to disclose confidential information apart from her use of the Accounts.

<u>Conclusion</u>

For the foregoing reasons, and those set forth in the Court's earlier decisions regarding the Preliminary Injunction in this action, effective immediately, the Preliminary Injunction Order is modified to read in its entirety as follows:

During the pendency of this action, Ms. Gutman, along with her officers, agents, servants, employees, and attorneys and all other persons who are in active concert or participation with her and them, are enjoined pursuant to Federal Rule of Civil Procedure 65 from taking any of the following actions:

1.  Making any changes to the Instagram Account or Pinterest Account identified in **Addendum 1**, including but not limited to changing the name of the handles on the accounts, deleting or altering any content located therein, transferring any such accounts or the right to use any such accounts from Defendant to any person or entity other than JLM, communicating with third parties through the same for non-JLM promotional purposes, and posting content or communicating with third parties in connection with any non-JLM commercial venture, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy;

2.  Taking any action, other than a properly noticed application to the Court, to gain control over the Instagram Account or Pinterest Account;

3.  Breaching the employment Contract, dated July 13, 2011, together with the amendments and extensions thereto, by:

a.  using, or authorizing others to use, "Hayley", "Paige", "Hayley Paige

Gutman", "Hayley Gutman", "Hayley Paige" or any derivative

thereof, including misshayleypaige (collectively the "Designer's

Name"), trademarks in the Designer's Name, including but not

limited to the trademarks identified at **Addendum 2 hereto**

(collectively, the "Trademarks"), or any confusingly similar marks or

names in trade or commerce, without the express written permission

of Plaintiff's chief executive officer, Joseph L. Murphy;

b.  ~~Until August 1, 2022 (or such earlier date as may be specified in a~~

~~further order of the Court), directly or indirectly, engaging in, or~~

~~being associated with (whether as an officer, director, shareholder,~~

~~partner, employee, independent contractor, agent or otherwise), any~~

~~person, organization or enterprise which engages in the design,~~

~~manufacture, marketing or sale of: (i) bridal apparel, including~~

~~bridesmaids', mother of the bride and flower girls' apparel and related~~

~~items; (ii) bridal accessories and related items; (iii) evening wear and~~

~~related items; and/or (iv) any other category of goods designed,~~

~~manufactured, marketed, licensed or sold by JLM;~~[16]

c.  using or authorizing others to use any Designs,[17] or any of the

Trademarks or any variations, versions, representations or

---

[16]     This provision of the Preliminary Injunction has since expired and is thereby stricken in
accordance with the Second Circuit's February 21, 2023 Order.  (See docket entry no.
426.)

[17]     "Designs", as used here, means designs, drawings, notes, patterns, sketches, prototypes,
samples, improvements to existing works, and any other works conceived of or

confusingly similar facsimiles thereof, in trade or commerce without the express written permission of Plaintiff's chief executive officer; and

d. until August 1, 2027 (or such earlier date as may be specified in a further order of this Court), (i) being identified to the trade or consuming public as the designer of any goods in competition with goods manufactured and sold by JLM; or (ii) using, or authorizing others to use, Gutman's role as designer, to promote the sale, or any goods in competition with goods manufactured and sold by JLM;

4. Using, or authorizing others to use, any of the Designer's Names, Trademarks or any confusingly similar term, name, symbol or device, or any combination thereof, in commerce in connection with any goods or services, including to endorse, advertise or promote the products and/or services of herself or others directly or indirectly, including but not limited to on social media or in television or media appearances, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy.

It is further ordered pursuant to Federal Rule of Civil Procedure 65 that, during the pendency of this action, Gutman shall take any action necessary to enable JLM to maintain access to and control of the Instagram Account and Pinterest Account.

This case remains referred to Magistrate Judge Cave for general pretrial

---

developed by Employee in connection with her employment with Plaintiff involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by Plaintiff through the Term of the Contract.  The term includes but is not limited to content created or compiled for the JLM HP Social Media Accounts.

management.  This Opinion and Order resolves docket entry no. 357.

      SO ORDERED.

Dated: New York, New York
      March 14, 2023

                               /s/ Laura Taylor Swain
                               LAURA TAYLOR SWAIN
                               Chief United States District Judge

## Addendum 1

| Brand | Platform | Handle | Account Link |
|---|---|---|---|
| Hayley Paige | Instagram | misshayleypaige | https://www.instagram.com/misshayleypaige/ |
| Hayley Paige | Pinterest | misshayleypaige | https://www.pinterest.com/misshayleypaige/_saved/ |

## Addendum 2

| Trademark | Country | Registration No. | Registration Date | Classes |
|---|---|---|---|---|
| BLUSH BY HAYLEY PAIGE | USA | 6141381 | 09/01/2020 | 25 Int. |
| HAYLEY PAIGE | USA | 5858534 | 09/10/2019 | 14 Int. |
| HAYLEY PAIGE | USA | 4161091 | 06/19/2012 | 25 Int. |
| HAYLEY PAIGE + DESIGN | USA | 5368112 | 01/02/2018 | 25 Int. |
| HAYLEY PAIGE + DESIGN | USA | 5858703 | 09/10/2019 | 14 Int. |
| HAYLEY PAIGE OCCASIONS | USA | 5276982 | 08/29/2017 | 25 Int. |
| JUST GOT PAIGED | USA | 5728141 | 04/16/2019 | 41 Int. |
| LA PETITE HAYLEY PAIGE | USA | 5698436 | 03/19/2019 | 25 Int. |
| LA PETITE HAYLEY PAIGE + DESIGN | USA | 5698444 | 03/12/2019 | 25 Int. |
| OCCASSIONS BY HAYLEY PAIGE | USA | 4914471 | 03/08/2016 | 25 Int. |