

David Marcus
Partner
david@adelmanmatz.com
Dir: (646) 915-1190

February 23, 2024

**VIA ECF**

Hon. Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street – Room 17C
New York, New York 10007-1312

    Re:   *JLM Couture, Inc. v. Hayley Paige Gutman* Case No. 1:20-cv-10575

Hon. Judge Swain:

    Plaintiff JLM Couture, Inc. ("JLM") and Defendant Hayley Paige Gutman ("Gutman" or "Hayley") submit this joint status letter concerning the Second Circuit's decision, dated January 17, 2024 (the "Decision") pursuant to Your Honor's Order dated February 9, 2024. [Dkt No. 472]. Below are the parties' respective positions:

### A. JLM's Position and Next Steps

#### 1. Issues on Remand

    The issues on remand are narrow. The first issue on remand concerns JLM's right to enforce its conversion and trespass to chattels claims. On remand, the Second Circuit directed the Court to determine the ownership of the Accounts at Issue, whether JLM has rights in the Accounts at Issue that are superior to Gutman's, or whether Gutman transferred the Accounts at Issue to JLM if she ever owned them.[1] The second issue on remand concerns the enforcement of Section 10(e) of the Contract.[2] On remand, this Court is to consider whether (1) Paragraph 10(e) of the Contract is reasonable in duration, (2) whether JLM made a sufficient showing that it has a legitimate interest warranting enforcement of a restrictive covenant; and (3) whether the Court's interpretation of Paragraph 10(e) is reasonable in scope and not overly burdensome on Gutman.

---

[1] The @misshayleypaige Instagram account is referred to as the "Account." The Account, as well as the @misshayleypaige Pinterest account (the "Pinterest Account"), are sometimes collectively referred to as the "Accounts at Issue".

[2] The term "Contract" is used here as defined at footnote 1 of the Court's 7/25 PI Order.

The Second Circuit did not disturb any of this Court's factual or legal findings in its July 25, 2022 modified PI Order [Dkt. No. 404] (the "7/25 PI Order") that Gutman's conduct would constitute conversion or trespass to chattels if JLM owned the Accounts at Issue or had superior rights therein, regarding the interpretation of Paragraph 10(e) or that JLM established irreparable harm, the balances of the equities and that the public interest is best served by an injunction with respect to the Accounts at Issue or the enforcement of 10(e). As such, these issues need not be re-addressed.

### 2. JLM's Position on Next Steps

JLM requests that the Court permit limited expedited briefing only on the remand issues concerning, without any additional evidentiary submissions.[3] To address these issues, JLM requests an expedited briefing schedule that permits JLM and Gutman, if she chooses, to submit supplemental briefing as follows: (a) each parties' opening memo, not exceeding 15-pages, within 10 days of the Court's order granting supplemental briefing; (b) opposition memos within 7 business days thereafter; and (c) a reply memo, not to exceed 10 pages, if applicable

In the event that the Court denies JLM's request, or limits JLM's briefing to specific issues that the Court would like JLM to address, JLM respectfully refers to the Court its argument that Paragraph 10(e) of the Contract is reasonable as Gutman was a "unique employee", 10(e) does not forbid her from working as a designer[4] and that the injunction was necessary and reasonable. [Dkt No. 358 (p. 12-13, 31-33); Dkt No. 359 (¶¶92-105); Dkt No. 389 (pp. 10-12); Dkt No. 391(¶¶6-19)]. Further, JLM argued that courts in New York will enforce a restrictive covenant where, as here, the restriction protects the transfer of goodwill in a business or trademark. [Dkt No. 358 (p. 33); 389 (pp.11-12)]. Finally, JLM provided legal authority that courts in New York will enforce a restrictive covenant, as written, when the terms are the product of the parties negotiations, which was the case here. [Dkt No. 389 (p.11)]. JLM, however, requests leave to supplement its briefing to address *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389-91 (1999),[5] which is key case that the

---

[3] During a meet and confer between the parties' counsel on February 22, 2024, Gutman's counsel indicated that Gutman would not seek to introduce new evidence and would not seek to leave to submit supplemental briefing.

[4] JLM also provided evidence that the majority of designers do their work anonymously, and not as the name of the brand. Gutman contracted away that right temporarily in order for JLM to protect the goodwill in its trademarks during the transition period from when Gutman was no longer working for JLM.

[5] In *BDO Seidman*, the Court of Appeals held that the "Court's rationale for giving wider latitude to covenants between members of a learned profession because their services are unique or extraordinary [] does not realistically apply to the actual context of the anti-competitive agreement here" as defendant was not a unique employee despite being an accountant, in part, because there was no "proof that defendant possessed any unique or extraordinary ability as an accountant that would give him a competitive advantage over BDO"). *Id.*

Second Circuit relied upon in its Decision.[6] JLM would also like to address additional legal authority supporting JLM's argument that a restrictive covenant that protects the goodwill in the sale of a business and/or trademarks from the seller's solicitation of the buyer's customers. *See e.g. Mohawk Maintenance Co., Inc. v Kessler*, 52 N.Y.2d 276, 281-87 (1981).

Regarding the Accounts at Issue, in the event that the Court does not allow JLM additional briefing, JLM respectfully refers the Court to its prior briefings and submissions, which establish that (a) JLM was the owner of the Accounts at Issue at inception,[7] or the constituent parts thereof,

---

[6] Gutman did not argue this case in her opposition to JLM's modification motion and would like to address it briefly in a supplemental brief or letter. JLM believes that it can show, through *BDO Seidman* and other cases, that JLM's need to protect its business and good will was necessary and reasonable, in part, based on Gutman's knowledge of JLM's business, Gutman's unique position as the lead designer of a name-sake brand and in order to prohibit Gutman from competing with JLM. *See e.g. Gelder Med. Group v Webber*, 41 N.Y.2d 680, 685 (1977) (enforcing a 5-year non-compete against a physician), which the Court in *BDO Seidman* distinguished as the defendant in *BDO Seidman* was not unique and his employment provided no competitive harm. S*ee also Albany Med. Coll. v Lobel*, 296 A.D.2d 701, 701-03 (3d Dep't 2002) (finding that a physician's 5-year covenant not to compete was enforceable).

[7] For example, JLM submitted substantial evidence, much of which the Court included in its factual findings in its March 4, 2021 PI Order [Dkt No. 109], the February 14, 2022 Modified PI Order [Dkt No. 326 at pp 7-11); 7/25 PI Order (pp. 3-18)]. This evidence includes, but is not limited to that the (i) Contract was executed before the Accounts at Issue were created; (ii) Gutman's responsibilities at JLM included assisting in advertising to promote JLM's HP Brands, including on social media (Gutman on September 27, 2011 wrote to JLM's Joe Murphy "let me know when I can start helping with FB and Twitter pages, as well as the blogybloggin"); (iii) Gutman transferred a domain name she owned at URL hayleypaige.com to JLM on September 27, 2011 in recognition that JLM now owned the account, even though the Contract was silent on ownership of the domain name; (iv) the first posts on the Account related to JLM, as well as personal glimpse posts of an by Gutman that was part of JLM's marketing strategy; (v) although Gutman used her Gmail account to create the Account, Gutman historically used her Gmail account for work emails and the Account was linked to JLM's corporate Facebook account; (vi) JLM expended large sums of money in creating content for the Accounts at Issue, paid to have the Account verified, paid to boost traffic to the Account and paid JLM employees to post on and maintain the Account (including a social media marketing director to run the Accounts at Issue), which resulted in the Account growing to 1.1 million followers, while there is absolutely no evidence that Gutman expended any of her own money to create, maintain or promote the Accounts at Issue; (vii) from 2012 through 2020, JLM spent $4,068,000 to advertise and market the Hayley Paige Brand, which also led to the increase in the Account's follows; (viii) at least 95% of the content on the Account related to the Hayley Paige Brand, even after Gutman had deleted portions of the Account's JLM related content during the time she converted it; (ix) JLM historically used the Account as its primary tool to communicate with customers and brides, which Gutman acknowledged in emails; (x) Gutman actively assisted in posting on, writing content for Accounts at Issue related to JLM's HP Branded goods, and actively coordinated with JLM's other employees to do the same and to manage the Accounts at Issue; (xii) JLM had the passwords to the Accounts at Issue until Gutman

or at least has superior rights in the Accounts at Issue than does Gutman.  *See* JLM's briefing at [Dkt No. 358 (pp. 3-11, 13, 16-31); Dkt No. 389 (pp. 1-8)].[8]

---

surreptitiously changed them; (xiii) Gutman acknowledged that the primary purpose of social media, and the Account in particular, was to drive sales of HP Branded Goods; (xiv) JLM, by way of Joe Murphy, exercised control over the Account and its content, and Gutman would seek permission from Murphy or correct tags and posts when Murphy asked her to; (xv) customers, such as brides and stores, used the Account to communicate with JLM; (xvi) JLM's marketing efforts using the Account resulted in sales of the HP Brands in excess of $220,000,00; (xvii) JLM has historically advertised the HB-Brands and the Accounts at Issue in print mediums, including advertisements in bridal magazines and on hangtags on its goods as a source indicator; (xviii) the hang tags on JLM's HP branded goods were used in JLM's trademark filings as evidence of use in commerce; (xix) Section 11 of the Contract and JLM's employee handbooks provide that any intellectual property created by Gutman, including photographs, written posts and databases therein is JLM's property that Gutman has no right to use; (xx) that Gutman's declarants alleging that the Account was Gutman's personal account were contradicted by their own prior emails that showed otherwise; (xxi) that Instagram's rules and terms of service would have precluded Gutman from owning the Account at inception because it's handle incorporates the "Designer's Name"; and (xxii) Joe Murphy and Gutman discussed from the beginning, before he Accounts at Issue were opened, the importance of social media to promote and market JLM's HP Branded Goods, that the Accounts at Issue were to be used for that purpose and that Gutman opened the Accounts at issue on JLM's behalf as part of her job responsibilities, and that the creation of the Account was "timed to coincide with the week of the Fall 2012 New York bridal market."  [Dkt No. 14; Dkt No. 14-1 to 14-67, 14-74; Dkt No. 15; Dkt No. 16; Dkt No. 16-1 to 16-2; Dkt No. 17-2; Dkt No. 60-1 to Dkt No. 60-7 to 60-52; Dkt No. 61; Dkt No. 61-1 to 61-94; Dkt No. 98-1 to 98-6; Dkt No. 106; Dkt No. 111-1 to 111-14; [Dkt No. 317-1; Dkt No. 358 (pp 4-14, 24-25); Dkt No. 359 (¶¶5-86); Dkt No. 359-1 to 359-75, 359-78-359-79; Dkt No. 389 (pp. 2-7); Dkt No. 391 (¶¶20-42); Dkt No. 391-2 to 391-8].  JLM also provided evidence that it owns and uses the Miss Hayley Page handle for its Youtube channel, an account that Gutman posted on for JLM and does not seek ownership of. [Dkt 14-17; 14-33].  The above list is not exhaustive and JLM respectfully refers to the Court to the robust evidentiary record that support a finding that JLM owns the Accounts at Issue, JLM owns the constituent parts in the Accounts at Issue or has superior rights to Gutman therein.

[8] JLM would like to address some of the findings by the Second Circuit that Gutman misrepresents.  For example, the Second Circuit stated that it "should [not] normally matter to the question of ownership wither an account owner permits others to assist in managing the account, or whether one or the other party holds itself out as owning it."  Decision (p18).  The Second Circuit did not explicitly state that JLM's evidence that JLM's employees managed the account could not be considered.  Moreover, the evidence shows that JLM's employees did much more than simply manage the accounts.  The evidence shows that Gutman, a JLM employee and other JLM employees, used the Accounts at Issue in a manner consistent with the fact that they were JLM's property.  The Second Circuit's citation to *Meisels v Meisels*, 630 F.Supp.3d 400 (E.D.N.Y. 2022) does not support Gutman.  In that case, the court found that defendant's claim that he managed the property at issue was not the same as ownership, as property management and ownership are different.  *See id.* at 411-12.  Here, JLM is not in the business of managing other's social media

Pending the Court's decision on remand, JLM should retain access to the Accounts at Issue. The Decision did not direct JLM to deliver the Accounts at Issue to Gutman.[9] As such, if the Court finds that an interim order is necessary to maintain injunctive relief with respect to the Accounts at issue, JLM respectfully requests that such an order be issued in its favor to maintain the status quo until the remand issues are decided. Based on the Court's prior findings of irreparable harm to JLM if Gutman were to gain access to the Accounts at issue given her history of her use and changing of the accounts' content, as well as JLM losing access to its 1.1 million customers and potential customers, giving Gutman the Accounts at Issue now to Gutman will cause JLM the exact irreparable harm that this Court previously determined.[10] For this reason alone, JLM satisfied the mandatory injunction standard. *See Tom Doherty Assoc., Inc. v Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) ("[A] mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, **or where extreme or very serious damage will result from a denial of preliminary relief**.'") (emphasis added). JLM should be given continued access to use the constituent parts of the Accounts at Issue, including the handle, the customer/subscriber/follower lists and data, access to 1.1 million customers and potential customers, and content and engagement on same, for its marketing purposes. As there is no way to separate these parts from the Accounts at Issue, JLM should be allowed to continue accessing the Accounts at Issue during the pendency of this lawsuit, and at

---

accounts and the vast evidence supports that they were being used as JLM's property and for JLM's business purposes.

[9] The Second Circuit made no finding that JLM does not own the Accounts at Issue. The Second Circuit merely found that "if a claimant is not the original owner and cannot locate their claim in a chain of valid transfers, they do not own the account." Decision at 21. Further, the Second Circuit made no finding regarding JLM having superior rights.

[10] For example, the Court previously found that JLM would suffer irreparable harm if JLM does not have access the Accounts at issue due to "'loss of control of its reputation and goodwill'" therein "as well as the loss of access to actual and potential customers that may result." [Dkt No . 326 (p. 12)]. The Court also held that "JLM's ability to control the content of the Accounts is critical to maintaining the strong Internet presence of the HP brands, JLM's reputation, and the goodwill JLM has created among potential and actual customers who follow the Accounts. " [Dkt No. 404 (p.40)]. The Court also found that JLM owned the Account at Issue's content (Dkt No. 404 (7/25 PI Order)(pp 36-37) and further held that "to remain competitive, JLM needs to be able to continually modify and update the content on the Instagram and Pinterest Accounts to showcase its goods, draw interest from Account followers, and direct viewers to the other key platforms through which JLM shares information."   [Dkt No. 404 (7/25 PI Order) (pp. 39-40)]. These findings were not disturbed. Further, as JLM argues that the followers of the Accounts at Issue are its customers and potential customers that belong to JLM, that JLM owns goodwill in the accounts and that JLM owns the content on these accounts, JLM will be irreparably harmed if it is required to turnover the Accounts at Issue to Gutman as it will lose access to its customers and customer lists and the accounts' content. JLM would further suffer irreparable harm if the accounts' content is deleted by Gutman and the nature the accounts are changed. This will also destroy JLM's goodwill that it created in the accounts.

least until the remand issues are decided.[11]  Conversely, if Gutman is given the Accounts at Issue, the harm to JLM's business and to the accounts will be irreversible.  Also, as Gutman has indicated that she is in massive debt to her attorneys, she will likely have no means to compensate JLM for this harm.  Conversely, JLM's $200,000 undertaking that the Court directed when it granted the TRO is still on deposit with the Court, which means that in the event the Court finds in Gutman's favor on the issue of ownership, then she will be compensated.[12]

The Court may also exercise its discretion and treat JLM's portion of this letter as requesting reinstatement of Sections I(i), A(ii) and B of the TRO without further briefing.  *See e.g*. *TransFirst Group, Inc. v Magliarditi*, 2017 WL 1158072, at *3-5 (D Nev Mar. 28, 2017) (where the court considered plaintiffs' oral application to reinstate the TRO that had dissolved on its own terms by considering the papers and evidence already submitted).  In *TransFirst Group, Inc*. the court, utilizing a mandatory injunction standard in its analysis, reinstated the TRO as the plaintiffs "present[ed] evidence to support their contention that there is a substantial risk that, absent a restraining order, assets…will continue to be transferred and dissipated, and that prompt action is required."

Pending the Court's decision on remand, JLM respectfully requests that the Court issue an interim order prohibiting Gutman from violating Paragraph 10(e) pending the Court's decision on Remand.  The Court's finding of irreparable harm absent the injunction ([Dkt No. 404 (pp 48-49)]) were not modified of vacated by the Second Circuit.  The Second Circuit did not find that Gutman may now violate Paragraph 10(e) and the Court should not find otherwise.  Further, with respect to the enforcement of Paragraph 10(e) of the Contract, the Second Circuit's primary issue was the duration of the 5-year restriction.  Paragraph 3(b) of the 7/25 PI Order, i.e. the enforcement of Paragraph 10(e), has only been in effect for approximately one and ½ years (since August 1, 2022).

---

[11] JLM cannot simply remove the content and post it on a new account, as the account would not have the handle that consumers have come to recognize, the followers or the history of content and engagement therewith, i.e., likes, comments and other activity. [Dkt. No. 359 (¶¶88-90)].  The new account will also not contain JLM's customer list, i.e. the followers of the Account.  Although the Second Circuit noted that ancillary content like DMs, captions, profile pictures, etc. may not be indicative of ownership (Decision (p. 18 fn 7)), JLM owns this content and simply giving it to Gutman would constitute conversion.

[12] Ultimately, if the Court were to find that the Accounts at Issue belong to Gutman, JLM would be entitled to recover its massive expenditures, under an unjust enrichment or fraud theory.  Not only has JLM always believed that it was the owner of the Accounts at Issue, but Gutman led JLM to believe that was the case, which resulted in JLM's efforts and expenditures to grow the Account from having no followers to 1.1 million followers for JLM's sole benefit.  Indeed, Gutman's well-documented actions should estop her from claiming ownership of the Accounts at Issue.  Matter of Shondel J. v Mark D., 7 N.Y.3d 320, 326 (2006) ("The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position" (citation omitted)).

As most New York courts will enforce at least a 2 year non-compete when the restriction is necessary and reasonable as it is here, retaining this injunction until the remand issues are decided is reasonable.[13] If the Court were to issue an interim order retaining Paragraph 10(e) of the Contract, the short amount of time that the Court will need to decide the remand issues will certainly cause not trigger the 2nd Circuit's concerns regarding a 5-year duration of 10(e). Again, conversely, if Gutman is permitted to violate Paragraph 10(e) now the harm to JLM's business will be irreparable.

### B. Defendant/Counterclaim-Plaintiff Hayley Paige Gutman's Position

The Second Circuit's thorough analysis and holdings make clear that the subject social media accounts should be returned to Hayley since JLM "is not the original owner and cannot locate their claim in a chain of valid transfers" and that any further non-compete restricting Hayley is unreasonable under New York law. Second Circuit Opinion ("Opinion"), pp. 21, 24. Accordingly, Hayley respectfully requests that the Court enter an Order consistent with the Second Circuit's Opinion that: (i) confirms this Court's preliminary injunction ordering Hayley to transfer and allowing JLM to use/control the @misshayleypaige Instagram and Pinterest accounts (the "HPG Accounts") is no longer in effect, including Paragraphs 1 and 2 of this Court's July 25, 2022 Order (Doc. No. 404) (the "Modified PI Order"); (ii) orders JLM to promptly take all steps to transfer sole access and control of the HPG Accounts to Hayley; and (iii) confirms that this Court's preliminary injunction restricting Hayley's competition with JLM and Hayley speech, Paragraph 3(d) of the Modified PI Order, is no longer in effect and there are no restrictions on Hayley's commercial competition with JLM.

Pursuant to this Court's February 9, 2024, Order (Doc. No. 472), Hayley offers the below summary "addressing the Second Circuit's decision and [her] positions as to next steps in this litigation":

### 1. The Second Circuit Vacated the Improper Transfer of the HPG Accounts

Hayley has been stripped of her exclusive use and control of the valuable HPG Accounts since December 2020—over three years—despite two decisions of the Second Circuit vacating preliminary injunctions transferring those accounts to JLM. Accordingly, JLM should be immediately ordered to return the @misshayleypaige Instagram and Pinterest accounts to their rightful owner, Hayley. The Second Circuit's ruling makes clear that the owner of the HPG Accounts can only be determined by assessing who created those accounts and whether that account creator ever transferred ownership. Critically, the Second Circuit also ruled that in seeking a preliminary injunction with respect to the HPG Accounts, JLM was attempting to alter the status quo, which requires JLM to meet the mandatory injunction standard of a "clear or substantial likelihood of success." Opinion, p. 22, n.11.

All of the record evidence supports a finding that Hayley is the owner of the HPG Accounts, and that JLM has failed to establish a "clear likelihood of success" of establishing JLM's

---

13 JLM does not conceded that 10(e) is a typical non-compete. The non-compete provision of the Contract, Section 9(a) expired on July 31, 2022. Gutman can design provided she does not violate Paragraph 10(e).

ownership. As a threshold matter, the Second Circuit has already found that "Gutman created the [HPG] Accounts." Opinion, p. 17. Further, the undisputed record evidence—including the below express holdings by the Second Circuit that bind this Court—demonstrate that Hayley owned the HPG Accounts at the time of their creation:

> ***Gutman created the Pinterest Account on November 3, 2011 and the Instagram Account on or about April 6, 2012***. For both, she used the handle "@misshayleypaige," a derivative of her name that she had used for other social-media profiles not in dispute, including several that were created before her employment with JLM. The Disputed Accounts were created using Gutman's name, personal cell phone number, and a personal email account that she also used for work purposes. She created her own passwords.
>
> ***JLM did not direct Gutman to open the accounts***.

Opinion, p. 5. Hayley has also provided the Court with contemporaneous emails from her personal friend, Cassidy Ozowara, encouraging Hayley to open the Instagram account so that Hayley could "Check out [Cassidy's] photos" and "so that [Hayley] could share her life with others." *Id*. JLM has provided *zero* documentary evidence showing it played any part in the creation of these accounts. Simply put—as the Second Circuit has already found—JLM has no evidence that it was the owner of the HPG Accounts at the time of their creation and certainly has not met the "clear likelihood of success" standard necessary for a mandatory injunction.

JLM has also failed to identify any transfer of ownership from Hayley to JLM. The Second Circuit evaluated JLM's contract arguments and found that Paragraph 11 conclusively does *not* effect any transfer of the HPG Accounts to JLM or otherwise provide JLM with ownership of the HPG Accounts. Opinion, p., 19 ("[T]he district court erred by concluding that JLM is likely to succeed in demonstrating ownership of the Disputed Accounts under Paragraph 11 of the Contract."). Further, the relevant agreement provides that it is the "entire agreement and understanding of the parties hereto," so no extracontractual transfer is permissible. Doc. No. 368, p. 24. The Second Circuit also specifically addressed and rejected each of the arguments set forth by JLM in support of its preliminary injunction request:

- "In evaluating the initial ownership of the Disputed Accounts, we note that Gutman's use of the "@misshayleypaige" username does not support a presumption that she created the account for business purposes." Opinion, p. 17, n.5.

- [T]he fact that Gutman transferred some or all of her rights in particular content posted on the Disputed Accounts does not by itself support an inference that she transferred ownership of the Disputed Accounts themselves." Opinion, p. 18.

- "Rights in the Disputed Accounts and rights in content posted on them—including ancillary content like direct messages, captions, profile pictures, and the like—need not be intertwined." Opinion, p. 18, n.7.

- "Nor should it ordinarily matter to the question of ownership whether an account owner permits others to assist in managing the account, or whether one or the other party holds itself out as owning it." Opinion, p. 18.

In order to implement the Second Circuit's Opinion, we request that this Court enter an Order that requires JLM to[14]:

1. Immediately provide to Hayley's counsel by email, the current username and password for each of the HPG Accounts; and

2. Provide such other assistance as necessary for Hayley to regain full control of the HPG Accounts (*e.g.*, forwarding any codes necessary for two-factor authentication).

### 2. The Second Circuit Vacated the Unreasonable Non-Compete

The Second Circuit also vacated Paragraph 3(d) of the Modified PI Order (the "Non-Compete") and found that "the district court impermissibly granted a preliminary injunction restricting her from identifying herself as a designer of certain products based on Paragraph 10(e) of the Contract." Opinion, p. 22. The Second Circuit vacated the Non-Compete, because the "district court failed to consider whether the restrictive covenant was likely to be enforceable under New York law." Opinion, p. 23. As set forth in the Second Circuit Opinion, "[i]n light of the 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood,' restrictive covenants are disfavored in New York and will be enforced only after careful analysis." *Id*. Importantly, the Second Circuit also cast doubt on whether "the mere label 'unique or extraordinary' is sufficient to constitute a legitimate interest after BDO Seidman." Opinion, p. 24, n.13.

The Second Circuit also provided clear guidance to this Court setting forth that only non-competes of one year in duration will be enforceable. *See* Opinion, p. 24, n.14 (citing *Maxon v. Franklin Traffic Serv., Inc.*, 689 N.Y.S.2d 559, 561 (4th Dep't 1999) (holding five-year noncompete unreasonable in duration); *Greenwich Mills Co. v. Barrie House Coffee Co., Inc.*, 459 N.Y.S.2d 454, 458 (2d Dep't 1983) (collecting cases striking three- and five-year restrictive covenants); *Asness v. Nelson*, 273 A.D.2d 165, 165 (N.Y. App. Div., 1st Dep't 2000) (holding a one-year noncompete reasonable in duration)). The Second Circuit's holding also guides this Court to remove any restrictions on Hayley's use of her "tastes, voice, vision, face, and mannerisms." Opinion, p. 25, n.16.

As a result of successive preliminary injunctions, Hayley has already been subject to a non-compete dating from March 4, 2021, to present. Doc. Nos. 109, 404. Thus, under the prevailing New York case law and guidance from the Second Circuit, this Court should immediately enter an

---

[14] The Court should also confirm that Hayley's use of those accounts, including under the account name @misshayleypaige, will not otherwise violate this Court's preliminary injunctions so as avoid any situation where this Court could find Hayley in contempt for using the accounts that the Second Circuit has already repeatedly ruled were improperly transferred to JLM.

order finding any further non-compete unreasonable under New York law and denying JLM's request for relief.

With respect to the broader litigation, Magistrate Judge Cave has stayed discovery, pending a March 15, 2024, joint status letter from the parties relating to the JLM bankruptcy. Hayley does not seek any modification of Magistrate Judge Cave's Order.

### 3. Additional Briefing is Unnecessary

Because this case has been briefed extensively to this Court and the Second Circuit and subject to multiple oral arguments before both courts, additional briefing is unnecessary and will only further drain the resources of the parties and this Court. However, if the Court allows any further submissions, the HPG Accounts must be returned to Hayley in the interim. Also, because the Preliminary Injunctions have been vacated, Hayley must have the full ability to work in the meantime.

The parties appreciate the Court's time and consideration, and should Your Honor need any additional information, we are available at the Court's convenience.

Respectfully submitted,

| ADELMAN MATZ P.C. | HAYNES BOONE LLP |
|---|---|
| *David Marcus* | *Michael Lambert* |
| David Marcus, Esq. | Michael Lambert, Esq. |