UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JLM COUTURE, INC.,

        Plaintiff,

  -v-                                No.  20-CV-10575-LTS-SLC

HAYLEY PAIGE GUTMAN, et al.,

        Defendants.

--------------------------------------------------------x

POST-REMAND MEMORANDUM OPINION AND ORDER
MODIFYING THE PRELIMINARY INJUNCTION

        This case is before the Court on remand from the United States Court of Appeals for the Second Circuit. (See docket entry no. 471 (the "Second Circuit Opinion").) The Second Circuit "affirm[ed] in part and vacate[d] in part the district court's March 14, 2023[,] order modifying its preliminary injunction and remand[ed] for further proceedings consistent with [its] opinion." (Id. at 25.) Following the issuance of the mandate, this Court entered its Order Requesting Additional Briefing and Modifying the Preliminary Injunction (docket entry no. 474), pursuant to which the parties have made additional submissions addressing questions raised by the Second Circuit Opinion.

        In making the determinations set forth in this decision, the Court has reviewed carefully the entire record in this case: the Court heard testimony and received evidentiary submissions in connection with the original application for, as well as prior modifications of, the preliminary injunction, and received additional argumentative and evidentiary submissions following the issuance of the Second Circuit Opinion. The Court also carefully considered its observations as to the demeanor and credibility of witnesses and its prior factual determinations.

In accordance with Federal Rules of Civil Procedure 52(a) and 65, this Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law.  To the extent any finding of fact includes a conclusion of law it is deemed a conclusion of law, and vice versa.

For the following reasons and as set forth below, the Court dissolves in part and modifies in part the Modified Preliminary Injunction entered on March 1, 2024.

FINDINGS OF FACT

The Court assumes the parties' familiarity with the factual background and procedural history of the case and adopts the findings of fact set forth in its March 4, 2021, Memorandum Opinion and Order granting the Preliminary Injunction (docket entry no. 109); June 2, 2021, Memorandum Opinion and Order clarifying the Preliminary Injunction (docket entry no. 176); September 8, 2021, Memorandum Opinion and Order finding Ms. Gutman in contempt of the Preliminary Injunction (docket entry no. 234); February 14, 2022, Memorandum Opinion and Order modifying the Preliminary Injunction (docket entry no. 326); and March 14, 2023, Amended Opinion and Order Modifying the Preliminary Injunction (docket entry no. 431).[1]  To the extent any previously made factual findings are repeated or elaborated upon in this decision, it is for the purpose of clarity.  Further factual findings are set forth here and in connection with the Conclusions of Law presented below.

Ms. Gutman entered into an employment agreement (the "Contract"[2]) dated July 13, 2011, under which she agreed to work for JLM Couture ("JLM"), a company in the luxury

---

[1]     The Second Circuit Opinion did not disturb these factual findings.

[2]     The "Contract," as the term is used herein, comprises the 2011 employment agreement (docket entry no. 14, Ex. 2), as amended by the 2014 amendment extending that agreement through August 1, 2019 (id., Ex. 62), and the February 12, 2019, notice letter exercising Plaintiff's option to further extend Defendant's employment term by three years through August 1, 2022.  (Id., Ex. 66.)

bridal design and manufacturing industry, as a designer of brides', bridesmaids', and evening wear and related apparel.  (Docket entry no. 14 ¶¶ 3, 6; docket entry no. 106 ("P.I. Tr.") 129:19-24.)  The employment term under the Contract, as extended from time to time, concluded on August 1, 2022.

The Contract provisions that are material to this preliminary injunction motion practice read in pertinent part as follows:

> Section 9(a).  Covenant not to Compete.  Employee covenants and agrees that during the period of her employment with the Company, Employee shall not compete with the Company, directly or indirectly. For purposes of this Agreement, Employee shall be deemed to compete with the Company if she engages in, or is associated with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids, mother of the bride and flower girls and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by the Company.

> Section 9(c). The Employee covenants and agrees that she will not, directly or indirectly, during or after the term of employment disclose to any person not authorized by the Company to receive or use such information . . . any of Company's Confidential Information . . . . Confidential information means any financial information, marketing plans, . . . customer lists or other proprietary information of the Company or its affiliates.

> Section 10(a).  Exclusive Right to the Designer Name.  The Employee hereby grants to the Company the exclusive world-wide right and license to use her name 'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Paige' or any derivative thereof (collectively the 'Designer's Name') in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including any and all good will associated therewith, throughout the Term (including any extension of the Term), plus a two (2) year period following the Term or any extension thereof, provided Employee has substantially participated in the design or creation of such clothing or related items during her employment by the Company.

> Section 10(b).  [Trademark Rights.]  The Employee hereby irrevocably sells, assigns, and transfers all right, title and interest to the Company that now exists or

may exist during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s) thereof as trademarks or service marks (the 'Trademark' or 'Trademarks') . . . . The Trademarks shall in perpetuity be the exclusive property of the Company, the Employee having consented to it being filed by the Company and the Employee thereof shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce during the Term or any time thereafter without the express written consent of the Company. The Company shall be solely permitted to license the Trademarks to a third party.

Section 10(e). [Post Contractual-Term Covenant.]  In the event that the Company files an application to register the Trademark or Trademarks, Employee agrees that for a period of five years following termination of her employment, she shall not be identified to the trade or consuming public as the designer, and her role as designer shall not be used to promote the sale, of any goods in competition with goods manufactured and sold by the Company.

Section 11.  Designs and Intellectual Property.  The parties expressly agree that all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Employee in connection with her employment with the Company involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by the Company through the Term of the Employment Agreement and any extensions thereof (collectively, the 'Designs'), are works for hire, and ownership of any intellectual property arising from or related to the Designs shall be the sole and exclusive property of the Company . . . . If, for any reason the Designs, or any portion thereof, are deemed not to be a work made for hire, then the Employee irrevocably, absolutely and unconditionally assigns to the Company (a) all of right, title and interest in and to the Designs and/or any portion thereof (whether arising under copyright law, trademark law, or otherwise), including to the extent applicable, but not limited to, the exclusive rights enumerated in 1 U.S.C. Section 106, and all extensions and renewals thereof, and (b) all moral rights with respect to the Designs, including but not limited to, any and all rights of identification of authorship and any and all rights of approval, restriction or limitation on use or subsequent modifications relating to the Designs.

On the same date that Ms. Gutman entered into the Contract, she also signed a form stating that she understood, acknowledged, and accepted that the terms of her employment at JLM were governed by JLM's Employee Handbook.  (Docket entry nos. 60-22 (the "Employee Handbook"), 60-23 (the "Acknowledgment Form").)  The Employee Handbook states, in pertinent part, that (i) "employees will use their time

during the workday solely for Company business, not personal use" (Employee Handbook § 4.10); (ii) "[a]ll internet usage is limited to job-related activities" (id. § 4.11); and (iii) "all Intellectual properties"—defined as "all designs, drawings, notes, patterns, sketches, programs, spreadsheets, databases, prototypes, samples, improvements to existing works, and any other works that an employee conceives or develops"—"shall be and remain the property" of JLM (id. § 1.11).

After entering into the Contract, Ms. Gutman opened an account on Pinterest (the "Pinterest Account") on or about November 3, 2011, and an account on Instagram (the "Instagram Account") (together, the "Disputed Accounts") on or about April 6, 2012, both bearing the handle @misshayleypaige.  (Docket entry no. 370 ("Gutman Decl.") ¶ 45; docket entry no. 361 ("Murphy Decl.") ¶ 8.)  Ms. Gutman proffers that "Miss Hayley Paige" is a term of endearment for Defendant used by her mother.  (Gutman Decl. ¶ 44.)  "Miss Hayley Paige" is also a version of the Designer's Name.  (Docket entry no. 109 ("March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction") at 20 (explaining that "misshayleypaige" and "@misshayleypaige" are derivatives of "Hayley Paige").)

Ms. Gutman proffers that she was an "early adopter" of social media and opened the Pinterest Account and Instagram Account on her own accord for her own personal reasons.  (Gutman Decl. ¶¶ 44, 46.)  With respect to the Instagram Account, Ms. Gutman submits that she opened the Account based on the suggestion of her friend, Cassidy Ozowara (née Willingham), who told her about the platform, enthused about "how much she loved using it[,]" and sent Ms. Gutman a link to download the Instagram Application so she could open her own account.  (Id. ¶¶ 49-51; docket entry no. 375 ("Ozowara Decl.") ¶¶ 3-5, Ex. 1.)  Ms. Gutman linked the Instagram Account that she created to her personal Gmail account, hayleypaige@gmail.com,

her personal cell phone number, and her personal Facebook page, and she created her own password.  (Gutman Decl. ¶¶ 52, 98 ("From approximately April 2012 to January 2016, I also had my Personal Instagram linked to my Personal Facebook account . . . and content posted on my Personal Instagram would be simultaneously posted on my Personal Facebook Account.").)  Ms. Gutman also linked the Pinterest Account to her hayleypaige@gmail.com email address.  (Id. ¶ 54.)  Ms. Gutman used her hayleypaige@gmail.com email address for business purposes, including correspondence related to her work with JLM.  (See id. ¶ 52 n. 14 ("Due to various issues I had with [the JLM-provided] email account on my phone and difficulties sending large artwork files, I had all my emails from my hayley@jlminc.com email forwarded to my personal Gmail."); Murphy Decl. ¶ 8 and Exs. 5, 7, 11 (showing emails from Hayley Paige to JLM employees that were sent from Ms. Gutman's Gmail account).)

Ms. Gutman proffers evidence that the earliest posts on the Instagram Account were "purely personal in nature: (1) a photo that [she] took of the New York Skyline, (2) a photo [she] took of bridal belts that [she] made while working at Priscilla of Boston, [a JLM competitor], and (3) [her] favorite quote from Steve Jobs."  (Gutman Decl. ¶ 57.)  The next two posts on the Instagram Account were similarly personal: "a photo of [Ms. Gutman's] apartment living room" and "a picture of [her] best friend" with a dog.  (Id. ¶ 58.)  The next post was "a photograph that [Ms. Gutman's] mom took of [Ms. Gutman] in [her] work showroom" during a visit to New York.  (Id.)

While JLM did not direct Ms. Gutman to create the Instagram Account, the evidence shows that the Instagram Account was utilized to showcase JLM's products beginning shortly after its creation.  (Murphy Reply Decl. ¶ 21 (explaining that Accounts "were used by JLM from the moment they were created").)  Ms. Gutman posted several photos of JLM bridal

gowns within two weeks after the creation of the Instagram Account in April 2012, including two photos of a bridal gown on April 19, 2012; one photo of a bridal gown on April 20, 2012; and two photos of bridal gowns on April 21, 2012.  (Docket entry no. 61, Ex. T, at 651-53.) Indeed, Mr. Murphy, the President and CEO of JLM, proffered credible testimony that the opening of the Instagram Account in April 2012 "was timed to coincide with the week of the Fall 2012 New York bridal market, which is the largest and most important market in the industry and to JLM," where "brands showcase new collections to bridal retailers from around the world."  (Id.; see also Murphy Decl. ¶ 9 ("When the [Instagram] Account was first created, in April of 2012, Gutman was working on her Fall 2012 collection.").)  Several of the first photos posted to the Instagram Account were from photo shoots and trunk show events where the Hayley Paige dresses were being sold.  (Murphy Decl. ¶ 9.)  JLM also proffers evidence that the Pinterest Account was used as an advertising platform soon after it was created: one of the first boards on the Pinterest Account—created on the same day as the Account—was entitled "The Wedding Wardrobist – Revisited", and the first pin created on the Pinterest Account— created on May 1, 2012, six months after the Pinterest Account was created—is titled "Hayley Paige Fall 2012—'Lulu' gown".  (Docket entry no. 485 ("Criccio Decl.") ¶¶ 7, 9.)

The Instagram and Pinterest Accounts were utilized throughout the remainder of Defendant's employment relationship with Plaintiff as critical advertising platforms for JLM's products affiliated with the Hayley Paige brands ("HP brands").  (See March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction at 9 ("Plaintiff made social media, including the Account itself, a part of its efforts to market the Hayley Paige brand."); docket entry no. 326 ("February 14, 2022, Memorandum Opinion and Order modifying the Preliminary Injunction") at 9 ("JLM promoted the HP brands across various social media

platforms as an important part of its advertising efforts.").)  As the Court has already found, this approach included featuring pictures of "'behind-the-scenes' activity at Plaintiff's photo shoots and events" and also displaying pictures of vendors selling or brides wearing Plaintiff's gowns. (March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction at 7-8 (citing P.I. Tr. 17:10; id. 62:20-21; docket entry no. 15 ¶ 9).)  The Pinterest Account includes collections of pins showcasing particular collections, including Blush by Hayley Paige, as well as collections focused on individual gown designs.  (Gutman Decl., Ex. 23 (providing a current copy of the Pinterest Account and reflecting Pinterest boards curated over multiple years, including prior to the issuance of the TRO, focused on particular gowns and collections).)  JLM also identified its goods with reference to the Disputed Accounts by printing "@misshayleypaige" on the hang tags of the physical garments and including social media reference information in print advertisements.  (March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction at 9-10 (citing docket entry no. 14 ¶ 10, Exs. 20-32, 42); see also Murphy Decl. ¶ 28.)

The biographical information displayed on the Instagram and Pinterest Accounts has changed over time.  The evidence of record shows that the Instagram Account has included links to the following JLM-owned domains: www.hayleypaige.com, popuppaige.com, www.heartsonfire.com, and www.jlmcouture.com/trunkshows.  (Docket entry no. 14 ¶¶ 23-24, Exs. 19, 56, 58-60; Gutman Decl. ¶¶ 106, 145.)  The Instagram Account also "regularly included references" to the JLM email address pr@jlmcinc.com (Gutman Decl. ¶ 106; docket entry no. 14, Ex. 58), was linked to JLM's Facebook page for a period of time until Ms. Gutman removed the link on April 28, 2020, during the period when JLM's relationship with Ms. Gutman began to break down (Murphy Decl. ¶¶ 28, 87; docket entry no. 394 ("Murphy Reply

Decl.") ¶ 25, Gutman Decl. ¶¶ 95, 98), and at times included links to "Free download @ holymatrimoji" (docket entry no. 14, Ex. 59), which referred to the "JLM-owned Holymatrimoji App" (Gutman Decl. ¶ 137), and "Hayley Paige+@heartsonfireco" (Murphy Decl. Ex. 59), which referred to a collaboration between JLM and the jewelry company, Hearts On Fire. (Docket entry no. 14 ¶ 53; Gutman Decl. ¶ 23.)  In or around November 2019, the Instagram Account included the description, "Designer/Creator/Emoji-maker." (Gutman Decl. ¶ 69; Murphy Decl., Ex. 59.)  In or around February and November 2020, the Instagram Account's description included the phrase, "Personal & Creative account of designer Hayley Paige". (Gutman Decl. ¶ 145; docket entry no. 14 ¶ 62, Ex. 60.)  The Account was also verified by Instagram as the account of a "Public Figure" in or around January 2017.  (Murphy Reply Decl. ¶ 23, Ex. 83.)  After the TRO was issued in December 2020, JLM removed Ms. Gutman's image from the profile picture of the Instagram Account (Murphy Reply Decl. ¶ 26, Gutman Decl. ¶ 163), changed the biographical section of the Account by replacing the "Public Figure" designation with "Clothing (Brand)" (Gutman Decl. ¶ 163; March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction at 13 (citing docket entry no. 75, Ex. 47)), deleted Defendant's self-description, and reinstated Plaintiff's website and PR email address link. (March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction at 13 (citations omitted); Gutman Decl. ¶ 162.)  JLM also changed the title of the Pinterest Account from "Hayley Paige" to "Hayley Paige Bridal."  (Murphy Reply Decl. ¶ 41, Gutman Decl. ¶ 167.)

         Ms. Gutman expressed a desire early on in her employment at JLM to assist in leveraging social media to market the HP brands.  On September 27, 2011, a little more than two months after entering into the Contract, over one month before she opened the Pinterest

Account, and several months before she opened the Instagram Account, Ms. Gutman sent an email message to a JLM employee asking them to "let me know when I can start helping with the FB and Twitter pages, as well as the bloggybloggin' . . . ."  (Murphy Decl. ¶ 7; docket entry no. 60, Ex. 115.)  In another email exchange between Ms. Gutman and Mr. Murphy, from December 11, 2014, Ms. Gutman expressed her desire to "take a class in video editing[,]" because "our generation is responding to people that really work the social media angle" and the classes "could really give us a leg up on other bridal companies and help us drive more traffic to our website/store in LA/Pinterest/Instagram pages."  (Murphy Decl., Ex. 3.)  Ms. Gutman explains that she decided to assist JLM in "in implementing a social media strategy because JLM's efforts were subpar and disorganized" and, through her efforts, they "would mutually benefit from more exposure."  (Gutman Decl. ¶ 115.)

Ms. Gutman and JLM employees worked together to strategize as to how best to leverage the social media platforms to market the HP brands.  For example, Ms. Gutman participated in discussions with JLM employees about how best to use social media to boost sales, promote trunk shows for Hayley Paige dresses, and increase brand visibility.  In one email exchange from June 7, 2019, Ms. Gutman wrote to JLM employees: "In effort (sic) to help sales, I would like to implement a more efficient method for aligning trunk shows and stock hitting stores with our posts on Instagram" and expressed her views that (1) "our stores need a little more help/boost on social for filling appointments and getting HP-specific brides to their stores"; (2) an individual "on board [at JLM] . . . can coordinate with our sales team on a weekly basis for things to post throughout the week"; and (3) "it's important that we can continue the current action of posting Trunk Shows on Tuesdays to the HP and Blush instagrams[.]"  (Murphy Decl., Ex. 8.)  In other messages, Ms. Gutman discussed a strategy of

changing the "standard trunk show post[s]" to potentially include a "swipe up link" on the "instastories" "to our website to view the whole collection" (id. ¶ 17 and Ex. 7), and weighed in on how "promo codes should be . . . used on Instagram for limited time periods" only.  (Id. ¶ 22 and Ex. 12.)  With respect to the Pinterest Account, Ms. Gutman discussed strategies for "pinning . . . PR clips/mentions[,]" "pinning trunk show posts . . . on our @misshayleypaige and @jlm Pinterest pages" while also "linking to the store directly for trunk show info[,]" and "organizing [Pinterest] boards" including by "having the newest dresses toward the top." (Murphy Decl., Ex. 5.)

The Instagram Account, which permitted Account followers to send messages about the Account's content, was also utilized to communicate with actual and potential customers.  Followers saw pictures of dresses offered by JLM on the Instagram Account and messaged the Account to inquire further about potential design changes, prices, and where they could find JLM's products.  (See Gutman Decl. ¶ 120 ("After a trunk show or during bridal market, I received a large number of sales related questions on my Personal Instagram . . . . [I]t is simply the way many brides chose to reach out with sales questions."); Murphy Decl. ¶ 27, Ex. 74 (October 17, 2019 email thread in which Ms. Gutman wrote that a store representative reached out to her via "Instagram" and "[t]he majority of questions are sales" including "[s]ales stuff, gown stuff, bride stuff, and favors!"); id., Ex. 25 (November 4, 2019 email thread in which Ms. Gutman asked JLM employee if they "have any interns this week?  I would love if they could go through my last 5 Insta posts and answer any necessary sales questions (there is a lot asking about the names of gowns and where to find them!)"); id., Exs. 61-63 (showing inquiries from followers including "What dress is this ?!"; "[C]an this be done without the sleeves?!"; "I'm currently in NC and I'm wondering if you know any good stores with your

dresses here?").)  In response, customers were provided with answers to their questions about JLM's products or directed to JLM resources, including the email addresses of JLM staff members and links to JLM's websites, such as a link showcasing JLM's upcoming trunk shows. (See id. (replying "Hennessy gown"; "Yassss"; and "Email Elyse@jlmcinc.com for NC stores near you!" respectively to inquiries above); see also Murphy Decl., Ex. 70 (Ms. Gutman emailed JLM employees that she "answered 250 messages today alone . . . I actually sent this bride to the hp email . . . . I'm only sending the best brides that seem serious about shopping or want to order your way").)  Ms. Gutman also utilized the Instagram Account to garner customer information and provide customer service.  In one email exchange, Ms. Gutman reached out to JLM employees about a "super unhappy instagrammer that ordered the Kandence sketch[,]" which was "not correct and was damaged[.]"  (Murphy Decl., Ex. 68.)  Ms. Gutman reported that she "need[ed] to do a new sketch[,]" asked "Whoa (sic) can help with address and make sure it goes out tomorrow[,]" and noted that "[i]f we don't have address on file, I can ask her via instagram . . . ."  (Id.)

Ms. Gutman, whose contractual duties as a JLM employee included "assisting with advertising programs" (Contract § 2), "approached social media at JLM in an inclusive way and often involved JLM employees in [her] decisions[.]"  (Gutman Decl. ¶ 114; see also id. ¶ 119 ("I do not dispute that I occasionally sought JLM's input on posts.").)  Ms. Gutman proffers that she requested JLM's "input and guidance" for content that was "either particularly sensitive or directly impacted JLM" so that Ms. Gutman "could represent JLM's needs and wants in an agreeable way."  (Gutman Decl. ¶¶ 121, 123.)  For instance, a JLM employee emailed Ms. Gutman, directing her to a website and noting "they added a sash to the dress[,]" to which Ms. Gutman replied, "WOW.  Can I share on insta or is that too risky?"  (Murphy Decl.,

Ex. 30.)  As the Court has previously found, Mr. Murphy suggested that Ms. Gutman "say

something about the Manchester event" in the aftermath of a terror attack in England, provided

a draft caption, and told Ms. Gutman to "wait on IG to do anymore posts till England wakes

up."  (March 4, 2021, Memorandum Order and Opinion Granting Preliminary Injunction at 9

(citing docket entry no. 98, Ex. P-192).)

        During at least some periods prior to late 2019, JLM employees directly accessed

the Instagram and Pinterest Accounts and participated in the management of the Accounts.

Between approximately 2017 and 2019, Ms. Gutman granted access to the Instagram Account

to at least two JLM employees, Brittany Noe and Lisa Radwanski.  (Gutman Decl. ¶¶ 102-103.)

Ms. Gutman emailed Ms. Noe and Ms. Radwanski, along with other JLM employees, to discuss

and delegate potential work leveraging the Instagram and Pinterest Accounts. (See, e.g.,

Murphy Decl., Ex. 21 ( "Could we also have Lisa check in on all Instagram questions (in the

comments) AND log into my account for the messages . . . they are piling up again!"); id., Ex.

25 ("I've noticed we are STILL not utilizing our daily press mentions enough in our Instagram

stories . . . Brittany/Katie – do you think we can commit to just ONE a day in stories or if that's

too much, at least 3 a week . . . . It would be amazing if we can do this on all designated

Instagram accounts . . . ."); id., Ex. 28 (discussing "Dropbox folders" and asking, "Brittany, do

you think we could do this for social media?!  We could just add a folder to this that says

'CONTENT FOR INSTAGRAM' . . . we just need to make sure to include only the best images

(from Lana's BTS stuff) and any necessary tags.  It's great to have the folders saved through

Instagram direct, but this can be stuff from our company or things we get from press people . . .

. Maybe even knew (sic) content posts and caption ideas that we have the interns work on!").)

On at least one occasion, Ms. Gutman noted her preference that JLM employees send her draft

posts for approval, but she ultimately gave them the discretion to go ahead and publish the posts should she not respond timely.  (See Murphy Decl., Ex. 25 ("Would LOVE if you could just send me a quick text for approval . . . but if I don't get back to you in time, feel free to post").)

Ms. Gutman also expressed her preference that JLM employees manage engagement with followers and content related to advertising her designs while she focused her energy on creating posts reflecting her personality.  (Murphy Decl. Ex. 26 ("The BIGGEST help of all for me is staying on top of liking/commenting and engaging with our brides as much as possible . . . . DM's, comments/questions in our feedposts (sic) and also hunting for unique content/images . . . .").)  Ms. Gutman asked for assistance with "informative posts" focused on "helping out our stores when we can (more product, store, sales, and press driven content)" but cautioned that she would like to "handle all the brand driven/personality posts[.]"  (Id.)  In 2019, Ms. Gutman requested that JLM hire a social media director to assist her with the promotional efforts on the Instagram and Pinterest accounts.  In an email to Mr. Murphy, Ms. Gutman explained her rationale, noting "I feel my effort @misshayleypaige gets distracted in having to comment/respond/keep up with DM's (which Brittany does help with)," when she "would like to reserve my focus on the more 'personalized face-to-camera posts' that take a while to create." (Docket entry no. 14, Ex. 53.)

Ms. Gutman's blending of her personality with the promotional efforts on the Accounts was consistent with the overall marketing strategy for the HP brands.  JLM's approach to the bridal industry is to work with designers to "build and promote namesake collections."  (Murphy Reply Decl. ¶ 10.)  This has been referred to by JLM as the "personal glimpse" strategy in which social media accounts, "where a brand name is linked to an individual, such as [Ms.] Gutman, often incorporate posts more personal in nature."  (Murphy

Decl. ¶ 72.)  As the Court previously found, Ms. Gutman and Mr. Murphy adopted this

approach and worked together to "combine the personality with the brand."  (March 4, 2021,

Memorandum Order and Opinion Granting Preliminary Injunction at 7 (citing P.I. Tr. 41:10-11

and docket entry no. 14, Exs. 45-51).)  The Instagram and Pinterest Accounts reflected a

mixture of promotional content for JLM products and posts reflecting Ms. Gutman's personality

and interests.  (Id. at 6 (noting that Ms. Gutman "used the Account to display aspects of her life

and her personality, posting images, text, and videos that focused on her parents, her travels and

her hobbies"); Gutman Decl. ¶ 85 (noting that Pinterest Account contained images related to

"travel, architecture, color, design, food, and of course, bridal design").)[3]  In discussions about

the social media platforms, Ms. Gutman emphasized the importance of ensuring that the

Accounts were not focused solely on promotional material, but also reflected her personality.

(See Murphy Decl., Ex. 34 ("I think it is so important that we keep the content engaging,

unique, and not to[o] sales-y.  The personality is key!"); docket entry no. 14, Ex. 53 ("I think

it's important that we do not dilute this Instagram with too much promotion/advertisement so

that we can maintain the aesthetic and personality of the brand[.]"); Gutman Decl. ¶ 82 ("While

I am ecstatic that brides love my dresses, I believe that it is my personal approach that made my

Personal Instagram successful . . . I have received many direct messages from followers . . .

stating that is why they followed me. . . .").)

        The Court has previously detailed the breakdown in the parties' relationship

throughout the course of contract negotiations in 2019 and 2020.  (See, e.g., March 4, 2021,

---

[3]        Ms. Gutman proffers that, in addition to pinning content reflecting her personal interests
to "public boards[,]"she had "secret boards" that were hidden from public view related
to "everything from cooking, DIY hacks, fitness routines, and party planning tips."
(Gutman Decl. ¶ 86.)

Memorandum Order and Opinion Granting Preliminary Injunction at 12.)  Ms. Gutman changed

the access credentials for the Instagram Account in November 2019 and did not share them with

JLM.  (Id. (citing docket entry no. 14 ¶¶ 42, 64).)  At or around that time, Ms. Gutman also

changed the biography section of the Instagram Account to read "Personal & Creative Account"

and removed the references and links to JLM's resources.  (Docket entry no. 14 ¶ 62, Ex. 60;

Gutman Decl. ¶ 145.)  On November 23, 2020, Ms. Gutman informed Plaintiff that she would

"not [be] posting any JLM related business" to the Instagram Account.  (March 4, 2021,

Memorandum Order and Opinion Granting Preliminary Injunction at 12 (citing docket entry no.

14, Ex. 75).)  Ms. Gutman also changed the password for the Pinterest Account, blocking JLM's

access to it.  (February 14, 2022, Memorandum Opinion and Order modifying the Preliminary

Injunction at 11-12 (citing docket entry no. 14 ¶ 21).)  On December 17, 2020, Ms. Gutman

informed JLM that she was resigning; she has not performed any work for JLM since that date.

(Gutman Decl. ¶ 29.)  Prior to the Court's issuance of the TRO in December 2020, Ms. Gutman

deleted many JLM-related posts from the Instagram Account.  (Docket entry no. 14 ¶ 70.)

       After the Preliminary Injunction was issued, the parties' relationship deteriorated

further and JLM requested that the Court hold Ms. Gutman in civil contempt of the Preliminary

Injunction Order.  JLM's request was based on Ms. Gutman's activities on her Instagram

@allthatglittersonthegram account (the "ATG Account"), including her announcements that she

planned to reveal her "new brand name very soon" and reenter the bridal industry in August

2022.  (Docket entry no. 234 ("September 8, 2021, Memorandum Opinion and Order finding

Ms. Gutman in contempt of the Preliminary Injunction") at 4-6 (citation omitted).)  The Court

found that JLM proffered clear and convincing evidence that Ms. Gutman failed to comply with

Paragraph 3(b) of the Preliminary Injunction Order, which incorporated Ms. Gutman's

contractual obligation not to compete with JLM during the Contractual term, by marketing her future bridal brand and cultivating excitement about her return to the bridal industry among her followers, who expressed their excitement and their willingness to wait until August 2022 to purchase bridal wear from Ms. Gutman's forthcoming collection.  (Id. at 8-9.)

Shortly thereafter, the Court modified the Preliminary Injunction to give both parties access to the Disputed Accounts through the term of the Contract and to prohibit Ms. Gutman from using the Disputed Accounts for any "non-JLM promotional purposes." (February 14, 2022, Memorandum Opinion and Order modifying the Preliminary Injunction at 17.)  Because the preliminary injunction terms giving JLM access to the Disputed Accounts were based on JLM's breach of contract claims, they were set to expire on August 1, 2022.  (Id. at 18.)  Ms. Gutman moved for dissolution of the Preliminary Injunction, and JLM cross-moved for several modifications to the Preliminary Injunction; the Court denied the motion to dissolve the injunction and granted two of JLM's requested modifications.  (Docket entry no. 431 (the "PI Order").)  The Court modified the preliminary injunction to give JLM exclusive control over the Disputed Accounts based on its finding as to JLM's likelihood of success on its claims for conversion and trespass to chattels. (Id. at 35.)  The Court also prohibited Ms. Gutman from "identifying herself" to the public as a designer of competing goods for five years, based on Paragraph 10(e) of the Contract, which the Court interpreted as a post-employment restrictive covenant.  (Id. at 51.)

Following Ms. Gutman's appeal of the PI Order, the Second Circuit Opinion vacated the PI Order in part, finding that that the Court (1) "erred by modifying its preliminary injunction to give JLM exclusive control over the Disputed Accounts" and (2) "impermissibly granted a preliminary injunction restricting [Ms. Gutman] from identifying herself as a designer

of certain products based on Paragraph 10(e) of the Contract" because the Court had not made an explicit determination regarding the reasonableness of the terms of the restriction.[4]  (Second Circuit Opinion at 15, 22.)  Finding that the Court had erred by not analyzing the original ownership of the Disputed Accounts as a predicate for giving JLM control of those Accounts, and by not addressing the reasonableness of the scope of the restrictive covenant at issue, the Second Circuit directed the Court to review JLM's likelihood of success on the merits as to each of the two issues.  (See id. at 21 (remanding "to analyze ownership of the Disputed Accounts under the framework discussed"), 24-25 (remanding to "consider" questions related to the reasonableness under New York law of the restrictions imposed by Paragraph 10(e)).)

## Conclusions of Law

A party seeking a preliminary injunction prohibiting a defendant from engaging in conduct ordinarily must demonstrate: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor;" and (4) that the "public interest would not be disserved" by the issuance of a preliminary injunction.  Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotations and citations omitted).  A different, more demanding standard applies where a proposed preliminary injunction would impose affirmative obligations

---

[4]   The Second Circuit did not disturb Paragraph 4 of the Preliminary Injunction, which enjoined Ms. Gutman from "[u]sing, or authorizing others to use, any of the Designer's Names, Trademarks or any confusingly similar term, name, symbol or device, or any combination thereof, in commerce in connection with any goods or services, including to endorse, advertise or promote the products and/or services of herself or others directly or indirectly, including but not limited to on social media or in television or media appearances, without the express written permission of Plaintiff's chief executive officer, Joseph L. Murphy."  That aspect of the Preliminary Injunction remains in place.

upon a defendant and/or would give the plaintiff substantially all of the relief that is sought in the litigation.  Such a mandatory injunction is warranted only upon a "clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).

<u>Control of the Disputed Accounts</u>

JLM seeks an extension of the relief currently embodied in Paragraphs 1 and 2 of the Preliminary Injunction, as set forth in the Order dated March 1, 2024 (docket entry no. 474) and Paragraph 3, as set forth in the March 14, 2023, PI Order (docket entry no. 431).  These provisions enjoin Ms. Gutman from (1) "[m]aking any changes to the Instagram Account or Pinterest Account[;]" (2) "[p]osting non-commercial personal content that disparages JLM or is otherwise inconsistent with the JLM-promotional nature of the dominant content of the Accounts;" and (3) "[t]aking any action. . . to gain control over the Instagram Account or Pinterest Account[.]"  (Order dated March 1, 2024 at 12-13.)  JLM thus seeks sole control of or, in the alternative, continued shared access to, the Disputed Accounts.  Ms. Gutman, for her part, requests sole control of the Disputed Accounts.  "[T]he burden is on JLM to demonstrate a clear or substantial likelihood of success" on its claims of conversion or trespass to chattels under the mandatory injunction standard to receive the relief it seeks.  (Second Circuit Opinion at 22 n.11.)

To state a claim of conversion under New York law, a plaintiff "must establish that '[i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff had ownership, possession[,] or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition

or to the exclusion of the plaintiff's rights.'" Brown v. Twitter, No. 19-CV-6328-KPF, 2021 WL 3887611, at *9 (S.D.N.Y. Aug. 31, 2021) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Serv., Inc., 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011)). Neither party disputes that "intangible property such as websites and account information can be the object of conversion under New York law." Id. at *10 (collecting cases); Salonclick LLC v. SuperEgo Mgmt. LLC, No. 16-CV-2555-KMW, 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017) (finding that plaintiff stated a claim for "conversion of its domain name and social media accounts under New York law"). Likewise, claims of trespass to intangible property, such as social media accounts, have been treated as claims for trespass to chattels by courts applying New York law. See, e.g., Salonclick, 2017 WL 239379, at *4. To state a claim for trespass to chattels, Plaintiff must allege that the Defendant's actions "cause[d] harm to 'the [owner's] materially valuable interest in the physical condition, quality, or value of the chattel, or [] the [owner] is deprived of the use of the chattel for a substantial time.'" Id. (quotation omitted).

The Second Circuit Opinion provides clear direction that, to support continuation of injunctive relief giving JLM control of the Disputed Accounts, JLM must establish its clear or substantial likelihood of success on the merits of its conversion or trespass to chattels claim by showing that it owned the Disputed Accounts, either from the time they were created or by virtue of a transfer of ownership of the Disputed Accounts thereafter. The Second Circuit Opinion frames the centrality of this issue to its analysis as follows:

> [T]he analysis of social-media-account ownership begins where other property-ownership analyses usually begin—by determining the account's original owner. The next step is to determine whether ownership ever transferred to another party. If a claimant is not the original owner and cannot locate their claim in a chain of valid transfers, they do not own the account.

(Id. at 21.)  The panel further observed that, "[w]hen Gutman created the Disputed Accounts, any associated property rights belonged to <u>someone</u>.  And if she created them using her personal information and for her personal use, then those rights belonged to her, no matter how the Disputed Accounts may have been used later."  (Second Circuit Opinion at 17 (emphasis in original).)

   To determine the answer to the first question—whether Ms. Gutman was the original owner of the Disputed Accounts—the Court must assess "whether [Ms.] Gutman had access to the Disputed Accounts because they were her property or only because she was an employee[.]"  (Second Circuit Opinion at 22 n.11.)  The proffered evidence does not support the inference that Ms. Gutman "only" had access to the Disputed Accounts because she was a JLM employee.  Instead, the record makes clear that Ms. Gutman herself opened the accounts, obtaining the rights to use the social media platforms to post information and communicate with others, in her own name using the @misshayleypaige handle, and that she was at least partially motivated to create the Disputed Accounts for her personal use even if she saw them as potentially useful in promoting Hayley Paige merchandise manufactured by JLM.  The following evidence of record is particularly significant in this regard:

   <u>First</u>, Ms. Gutman submits that she opened the Instagram Account based on the suggestion of her friend, Cassidy Ozowara (née Willingham), who told her about the platform in January 2012, enthused about "how much she loved using it[,]" and sent Ms. Gutman a link to download the Instagram Application so that she could open her own account.  (Gutman Decl. ¶¶ 49-51; Ozowara Decl. ¶¶ 3-5, Ex. 1.)  While JLM correctly points out that Ms. Ozowara did not work for JLM and was not privy to conversations between JLM and Ms. Gutman about social media strategy (<u>see</u> docket entry no. 492 ("JLM Opp.") at 19), her email is corroborative

of Ms. Gutman's contention that she was motivated to open an Instagram Account for her own personal use.

      <u>Second</u>, when Ms. Gutman first opened the Instagram Account, she linked it to her personal Facebook account.  (Gutman Decl. ¶ 98.)  The fact that she did not link the Instagram Account to JLM's Facebook account until nearly four years later indicates that she did not create the Instagram Account only in her capacity as a JLM employee.

      <u>Third</u>, the initial posts on the Disputed Accounts primarily reflect Ms. Gutman's personal interests and activities.  The first five posts on the Instagram Account were clearly personal in nature: "(1) a photo that [she] took of the New York Skyline, (2) a photo [she] took of bridal belts that [she] made while working at Priscilla of Boston, [a JLM competitor], . . . (3) [her] favorite quote from Steve Jobs[,]" (4) "a photo of [Ms. Gutman's] apartment living room[,]" and (5) "a picture of [her] best friend" with a dog.  (Gutman Decl. ¶¶ 57-58.) Similarly, early pins in the Pinterest Account contained images related to "travel, architecture, color, design, food, and of course, bridal design."  (Gutman Decl. ¶ 85.)  While the majority of these initial posts were also consistent with JLM's "personal glimpse" marketing strategy (<u>see</u> Murphy Decl. ¶ 72), posting a photo of bridal belts that Ms. Gutman designed for a JLM competitor was not consistent with a goal of marketing JLM's goods.  Likewise, the private nature of pins on "secret boards" that were hidden from public view on the Pinterest Account and related to "everything from cooking, DIY hacks, fitness routines, and party planning tips" indicate that Ms. Gutman had created the Pinterest Account, at least in part, for personal reasons.  (Gutman Decl. ¶ 86.)  Taken together, these facts suggest that Ms. Gutman created the Disputed Accounts for her personal use.

JLM's arguments that the "Accounts at Issue were created expressly for, and were used to assist with, JLM's advertising programs" (docket entry no. 487 ("JLM Mem."), at 4) and its evidence of discussions and consultations concerning social media use for advertising prior to and following the creation of the Accounts are insufficient to make the requisite clear or substantial showing of a likelihood of success in proving that the Disputed Accounts were created by Defendant solely as an agent for JLM and thus were JLM's property from the beginning.  To be sure, JLM has proffered many examples of how the Disputed Accounts were used—very successfully—as advertising tools.  (See id. at 11-14.)  However, the Court's task in light of the decision on appeal is to determine who owned the Disputed Accounts at their creation and whether the ownership of the Accounts was ever transferred to JLM, if JLM was not the original owner.  The Second Circuit Opinion holds that "how the Disputed Accounts may have been used" after the Disputed Accounts were initially created is not relevant to the ownership of the Accounts at creation.  (Second Circuit Opinion at 17.)  While the evidence of early discussions of use of social media in advertising and the use of a handle that is a derivative of names to which Defendant had just sold JLM commercial rights under the Contract shows that JLM's contention that the Disputed Accounts were created for advertising purposes is not frivolous, JLM has failed to demonstrate a clear or substantial likelihood of success on the merits of its contention that Ms. Gutman created the Dispute Accounts for JLM only.  JLM's evidence does demonstrate that Ms. Gutman used the Disputed Accounts to support JLM's advertising efforts, as she was responsible to do under Paragraph 2 of the Contract, but that later use is not dispositive of the question of initial account ownership.  Nor is it indicative of a legal transfer of the ownership of the Disputed Accounts to JLM in the course of Defendant's employment with JLM.  Indeed, Ms. Gutman's use of the Disputed Accounts as a tool that she

owned, but used for her duties as a JLM employee, is analogous to her use of a personal email address for business purposes, including correspondence related to her work with JLM.  (See Gutman Decl. ¶ 52 n. 14.)

The Second Circuit Opinion recognizes the transfer of rights to Defendant's name and derivatives under the Contract, but rejects use of the "@misshayleypaige" handle as a basis for a finding that JLM owned the Disputed Accounts at the time of their creation, stating that, while Ms. "Gutman had licensed her name and its derivatives to JLM for use only in trade or commerce[,] [s]he was entitled to continue using her name for noncommercial purposes, including personal social media accounts."  (Second Circuit Opinion at 17 n.5 (citation omitted)); see also Pirone v. MacMillan, Inc., 894 F.2d 579, 583 (2d Cir. 1990) ("The act of registering a proper noun as a trademark, however, 'does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant.'" (citations omitted)).  This logic also requires rejection of JLM's argument that use of the handle to create the Disputed Accounts necessarily violated Instagram's terms of use requiring account holders to represent that they do not "violate the privacy rights, publicity rights, copyrights, contract rights, intellectual property rights or other rights of any person" by using Instagram.  (See docket entry no. 484 ("Marcus Decl."), Exs. 12-13.)[5]  That said, Ms. Gutman's use of the handle—a derivative of the

---

[5]    JLM has proffered screenshots and a PDF printout of Instagram's terms of use that were in effect in April 2012, when the Instagram Account was created, using the Internet Archive's Wayback Machine.  (Docket entry no. 484 ("Marcus Decl.") ¶¶ 3-4.)  Ms. Gutman argues that this version of Instagram's Terms of Service should not be considered because "[n]either JLM nor its declarants have any firsthand knowledge regarding whether the contents of those submissions are true and accurate."  (Docket entry no. 488 ("Gutman Opp.") at 12-13.)  Federal courts regularly take judicial notice of web pages made available using the WayBack Machine pursuant to Federal Rule of Evidence 201.  See Pohl v. MH Sub I, LLC, 332 F.R.D. 713, 716 (N.D. Fla. 2019) (collecting cases from other districts); UL LLC v. Space Chariot, Inc., 250 F. Supp. 3d

Designer's Name for which she had assigned commercial rights to JLM, in connection with a

commercial endeavor, rather than simply for personal information and communications—

suggests that she had JLM's permission to engage in commercial activity under those handles

on the Disputed Accounts.  The Court notes that the work-for-hire provisions of the Contract

and the Employee Handbook are significant as to questions regarding the ownership of content

developed for and posted on the Disputed Accounts— although apparently not to questions of

ownership of the Disputed Accounts themselves.[6]

       JLM's argument that the Disputed Accounts were its property ab initio as "works

for hire" is also insufficient to demonstrate a clear or substantial likelihood of success on its

trespass and conversion claims insofar as it is directed to ownership and control of the Disputed

Accounts themselves.  The Second Circuit Opinion holds that Paragraph 11 of the Contract—

providing that all "designs, drawings, notes, patterns, sketches, prototypes, samples,

improvements to existing works, and any other works conceived of or developed by [Ms.

Gutman] in connection with her employment with the Company involving bridal clothing,

bridal accessories and related bridal or wedding items," are works for hire and the exclusive

property of JLM—did not govern ownership of the Disputed Accounts.  (Second Circuit

Opinion at 19-21.)  This is, the panel explained, because social media accounts "share none of

[the] core attributes" of the specific terms in the work-for-hire list, which "describe steps in the

_____

596, 604 n.2 (C.D. Cal. 2017) (rejecting argument that the declarant lacked personal
knowledge regarding the WayBack Machine and how the website at issue was archived).

[6]   See Second Circuit Opinion at 18 & n.7 (stating that "the fact that Gutman transferred
some or all of her rights in particular content posted on the Disputed Accounts does not
by itself support an inference that she transferred ownership of the Disputed Accounts
themselves" and that "[r]ights in the Disputed Accounts and rights in content posted on
them—including ancillary content like direct messages, captions, profile pictures, and
the like—need not be intertwined").

process of fashion design . . . and appear to be presumptively copyrightable." (Id. at 20.)  This

Court is not persuaded that the somewhat broader work-for-hire provision in JLM's Employee

Handbook in effect at the time the accounts were created, covers the Disputed Accounts either.[7]

While the work-for-hire list in the Employee Handbook also includes "programs, spreadsheets,

[and] databases" (Employee Handbook § 1.11), those terms are likewise references to

copyrightable material and do not appear to embrace the rights obtained when creating a social

media account, which consist principally of the ability to use the platform's tools to display

content and communicate with others.

JLM also argues that the voluminous record evidence of Ms. Gutman's activity

in creating and posting content to the Disputed Accounts during work hours demonstrates that

the accounts are JLM's property because the Employee Handbook required that (i) "employees

. . . use their time during the workday solely for Company business, not personal business"

(Employee Handbook § 4.10) and (ii) that "[a]ll internet usage is limited to job-related

activities" (id. § 4.11).  This evidence is also insufficient to demonstrate that the Disputed

Accounts themselves—the rights to use the Instagram and Pinterest platforms to post content

and communicate and receive information—are JLM's property.  As noted above, the Second

---

[7]    Ms. Gutman argues that the Court should not consider the Employee Handbook because
the Contract includes a merger clause.  (Gutman Mem. at 14 ("JLM cannot unilaterally
enact an employee handbook to alter the terms of the parties' contractual agreement, and
the merger/integration clause 'precludes extrinsic proof to add to or vary' the
agreement's terms." (quoting Primex Int'l Corp. v. Wal-Mart Stores, 89 N.Y.2d 594,
599-600 (1997)).)  The merger clause, however, only precludes the Court from
considering pre-execution negotiations to interpret the Contract; it does not preclude the
Court from considering a written modification of an agreement or a new agreement.  Cf.
Gedula 26, LLC v. Lightstone Acquisitions III LLC, 184 N.Y.S.3d 4, 6 (1st Dep't 2023)
("[A] merger clause will not 'preclude a breach of contract claim based on a subsequent
additional agreement.'" (citations omitted)).  The Court, therefore, considers JLM's
arguments relating to the Employee Handbook, which JLM represents that Defendant
received and acknowledged on the day she signed the initial Contract document.

Circuit Opinion observed that Ms. Gutman could have used her own personal property to support JLM's advertising efforts.  (See Second Circuit Opinion at 17.)  Such use would clearly be consistent with the Employee Handbook's requirements.  But even if Ms. Gutman violated the Employee Handbook in some way, neither it nor the Contract provides for the transfer of her property to JLM as a consequence.  The evidence regarding the creation of material posted to the Disputed Accounts does, however, suggest strongly that JLM has legitimate claims of rights under work-for-hire and other provisions of the Contract and Employee Handbook in content created and posted to the Dispute Accounts by Ms. Gutman and other JLM employees in connection with the marketing of goods sold under the Designer's Name.[8]  That said, the Instagram and Pinterest terms of service take no position on whether the account holder owns what is posted on the accounts; instead, the terms of service state only that the user represents that it has rights or permission to post the material.  (See docket entry nos. 484-2 ("Instagram TOS") at 3 (requiring users to represent and warrant that "you own the Content posted by you on or through the Instagram Services or otherwise have the right to grant the license" to Instagram); 490-1 ("Pinterest TOS") at 3 (prohibiting users from posting conduct that "infringes, misappropriates, or violates a third parties'" intellectual property rights).)  For this reason, evidence that Ms. Gutman assisted in advertising activity on the Disputed Accounts is insufficient to carry JLM's burden on this motion practice of showing a clear or substantial likelihood of success on its claim of ownership of the Disputed Accounts.

---

[8]     Section 10(a) of the Contract defines the "Designer's Name" as "'Hayley', 'Paige', 'Hayley Paige Gutman', 'Hayley Gutman', 'Hayley Paige' or any derivative thereof . . . in connection with the design, manufacture, marketing and/or sale of bridal clothing, bridal accessories and related bridal and wedding items, including any and all good will associated therewith[.]"

Because JLM has not pointed to evidence sufficient to establish a clear or substantial likelihood that it owned the Disputed Accounts at their inception, JLM must locate its claim in a chain of valid transfers in order to claim ownership of the Disputed Accounts. (Second Circuit Opinion at 21.)  This it has not done, and the record suggests that it cannot do so.  As an initial matter, Instagram's current terms of service prohibits users from selling or otherwise transferring any aspect of an account.  (Instagram TOS at 3.)  Moreover, JLM's argument that the Section 1.11 of the Employee Handbook contained an irrevocable assignment of "programs" fails for the reasons stated above; moreover, the Second Circuit has already held that the Disputed Accounts are not "Designs" created as works for hire.

Nor, in light of the analytical framework laid out in the Second Circuit Opinion, does JLM's evidence indicate a clear or substantial likelihood that JLM will be able to establish that it has a superior possessory interest in the Disputed Accounts themselves.  Specifically, JLM argues that, because it owns the good will and customer lists associated with the Disputed Accounts due to its investment in those Accounts, allowing Ms. Gutman to retain them would constitute unjust enrichment.  (JLM Mem. at 16-17.)  However, JLM cites no cases, nor is the Court aware of any, that recognize unjust enrichment as a potential source of superior possessory rights to property within which another entity's valuable property resides, or within which the other entity has built goodwill.  Likewise, JLM urges the Court to find that Ms. Gutman is estopped from claiming ownership of the Disputed Accounts because JLM reasonably relied on, and made investments in the maintenance and content of the Accounts based on its understanding that it owned the Disputed Accounts, which in turn was based on actions by Ms. Gutman that were consistent with her duties under her Contract, her requests for company support of the accounts, and her references to the accounts as JLM's or "ours".  (Id. at

17-20.)  JLM's argument fails, however, to identify "a clear and unambiguous promise" by Ms. Gutman on which it relied; this element is required to establish promissory estoppel.  Esquire Radio & Elecs., Inc. v Montgomery Ward & Co., Inc., 804 F.2d 787, 793 (2d Cir. 1986).  In any event, because the Court is not aware of any court that has found that promissory estoppel can create a possessory interest in property, the Court declines to do so here.  (See Second Circuit Opinion at 17 ("The Disputed Accounts should be treated in the first instance like any other form of property.").)

In sum, having used the framework outlined in the Second Circuit Opinion to analyze JLM's application for an injunction giving it control of the Disputed Accounts, the Court concludes that JLM has failed to carry its burden of demonstrating a clear or substantial likelihood of success in establishing that it was the original owner or transferee of the Accounts, and thus it has failed to show a clear or substantial likelihood that it can establish a crucial element of its conversion and trespass to chattels claims concerning the Accounts.

Paragraphs 1 and 2 of the Preliminary Injunction, as set forth in the Order dated March 1, 2024 (docket entry no. 474) must therefore be dissolved.

The foregoing determinations concerning rights associated with ownership and possession of the Disputed Accounts themselves are without prejudice to the parties' positions regarding ownership and permissible uses of the Accounts' handles, content, "follower" contacts and related goodwill.

Preliminary Injunction Enforcing Paragraph 10(e) of the Contract

JLM requests that the Court keep in place the preliminary injunctive relief imposed by Paragraph 4(c) of the March 1, 2024, Order, which incorporates the obligations imposed on Ms. Gutman by Paragraph 10(e) of the Contract.  Paragraph 10(e) provides that, if

> the Company files an application to register the Trademark or
> Trademarks, Employee agrees that for a period of five years following
> termination of her employment, she shall not be identified to the trade or
> consuming public as the designer, and her role as a designer shall not be
> used to promote the sale, of any goods in competition with goods
> manufactured and sold by the Company.

(Contract § 10(e).)

The Second Circuit's determination that the Court had erred in enforcing this provision centered on the Court's failure to make an explicit analysis of the reasonableness, under New York law, of the restriction, including as to its temporal and geographic scope. (Second Circuit Opinion at 23.)  Because the Second Circuit did not disturb the Court's conclusions regarding JLM's sufficient showing of irreparable harm in the absence of an injunction enforcing the provision, balance of the hardships, or public interest (see PI Order at 49-51), the Court need not reanalyze those issues here.

The Court turns now to the question of JLM's likelihood of success in establishing that the breadth and temporal scope of the restrictions imposed by Paragraph 10(e) of the Contract are reasonable and therefore enforceable under New York law.  Determining the reasonableness of a covenant not to compete requires the Court to "apply a three prong test," assessing whether a "restraint . . . (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public."  BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89 (1999) (citations in original).  The Second Circuit Opinion instructed the Court to consider, in evaluating JLM's likelihood of success on the merits, "(1) whether Paragraph 10(e)'s five-year term is reasonable in duration; (2) whether JLM has made a sufficient showing that it has a legitimate interest warranting enforcement of a restrictive covenant; and (3) whether its interpretation of the prohibition in Paragraph 10(e) is reasonable in scope and not overly

burdensome on Gutman." (Second Circuit Opinion at 24-25 (footnotes omitted).)

<u>Legitimacy of Interest to be Protected</u>

JLM has demonstrated that it has at least two legitimate interests warranting protection through enforcement of the covenant in Paragraph 10(e) of the Contract: (1) the Company's goodwill associated with the high-profile product lines that were built in conjunction with Defendant during her employment around the Designer's Name that she transferred to JLM under the contract, and (2) its interest in a reasonable period of protection against unfair competition by an employee whose services, including service as both designer and public face of its main product line, were unique and extraordinary. The evidence of collaborative sales and marketing activities during Ms. Gutman's employment under the Contract and the success of those efforts shows that JLM is likely to be able to establish that it has a strong cognizable interest in enforcing the restrictive covenant because "the employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." <u>BDO Seidman</u>, 93 N.Y.2d at 392. The evidence of record also shows that JLM is likely to be able to establish that Ms. Gutman, whose creative talents, trademarked name and personal appeal were parlayed during the term of the Contract into a successful and recognizable brand intimately intertwined with her image that was JLM's leading product line, was a unique and extraordinary employee who, unlike anonymous designers or ordinary marketing personnel, could have an unfair competitive advantage over JLM should she appeal to customers and prospective customers to abandon JLM for another manufacturer in the immediate wake of the termination of her employment

relationship with JLM.

Duration and Geographic Scope

"The 'durational reasonableness of a non-compete agreement is judged by the length of time for which the [legitimate interest the employer seeks to protect] will be competitively valuable." Flatiron Health, Inc. v. Carson, No. 19-CV-8999-VM, 2020 WL 1320867, at *22 (S.D.N.Y. Mar. 19, 2020) (quoting Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 180 (S.D.N.Y. 2006)).

There is no doubt that five years is a significant period of time; as Ms. Gutman correctly points out, New York courts have often determined that non-competes of this length are unreasonable when assessed against the facts of particular cases. See, e.g., Maxon v. Franklin Traffic Serv., Inc., 261 A.D.2d 830, 832 (4th Dep't 1999) (finding five-year non-compete unreasonable in duration). "The reasonableness of the clause must be measured by the circumstances and the context in which enforcement is sought." Bus. Intel. Servs., Inc. v. Hudson, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984). As the Court found in granting the modified PI:

> JLM's business model is to work with designers to "build and promote namesake collections" . . ., and JLM adopted this approach to build multiple product lines featuring Ms. Gutman as the "lead designer and face" of the Hayley Paige brand. . . In support of this strategy, JLM worked "to build and promote [Ms. Gutman's] designer persona" including by obtaining placement for Ms. Gutman on television programming and "magazine covers" and by "sen[ding] her as a brand representative to industry summits, events, [and] trunk shows[.]"

(PI Order at 49 (citations omitted).) In this context, the Court concludes that five years from the end of JLM's employment relationship with Ms. Gutman is a reasonable amount of time, and no greater than is necessary for JLM "to rebuild its brand, develop a new strategy and distance its products from Ms. Gutman, whose persona was intimately tied to the eponymous brand. . . ."

(Id.)[9]  The Court concludes that Paragraph 10(e)'s five-year term is reasonable in duration.  The

worldwide scope of the restriction is also reasonable because JLM's "business is worldwide."

Hudson, 580 F. Supp. at 1073.

Scope of Paragraph 10(e) Restriction

New York courts must also determine that a covenant not to compete "does

not impose undue hardship on the employee" in connection with an order enforcing such a

covenant.  BDO Seidman, 93 N.Y.2d at 388-89.  The Court concludes that the prohibition in

Paragraph 10(e) is reasonable in scope and not overly burdensome on Ms. Gutman because it

permits "Ms. Gutman the ability to continue to use her talents as an uncredited designer of

competitive goods or the (new) name and face of non-competing goods during the restricted

period."  (PI Order at 50.)  Contrary to Ms. Gutman's assertions, enforcing Paragraph 10(e)

would not "lock [Ms. Gutman] out of her industry."  (Gutman Mem. at 13.)  Nor would

enforcement prevent Ms. Gutman from using her "tastes, her voice, her vision, her face, and her

---

[9]     To the extent there is any ambiguity as to whether the restrictive covenant in Paragraph 10(e) runs from the end of the Contract term, which expired on August 1, 2022, or from the actual cessation of Ms. Gutman's services under the Contract, it is undisputed that Ms. Gutman has not designed products or otherwise performed work for JLM since her resignation on December 17, 2020.  Because JLM was on notice of its need to rebuild its brand, develop a new strategy, and distance its products from Ms. Gutman on that date, it would not be reasonable to bind Ms. Gutman to the requirements of Paragraph 10(e) for an additional year and five months beyond the five years the parties agreed to in the Contract.  (See docket entry no. 483 ("Gutman Mem.") at 13.)  Because "[c]ourts have the power to 'blue pencil'—shorten or amend—restrictive covenants to make them enforceable[,]" the Court concludes that JLM has established a likelihood of success on the merits to the extent that it would be reasonable to enforce Paragraph 10(e) until December 17, 2025—five years after Ms. Gutman cease work under her Contract, and grants the request for extension of injunctive relief through that date only.  Frantic, LLC v. Konfino, No. 13-CV-4516-AT, 2013 WL 5870211, *2 (S.D.N.Y. Oct. 30, 2013); see also Estee Lauder Co., Inc. v. Batra, 430 F. Supp. 2d 158, 181-82 (S.D.N.Y. 2006) (shortening the term of a non-compete from twelve to five months in order to render the clause reasonable under New York law).

mannerisms" for purposes that are unrelated to the promotion of competing products.  (Id. at

16.)  Paragraph 10(e) only prohibits Ms. Gutman from (i) being identified to the trade or

consuming public as the designer of any goods in competition with goods manufactured and

sold by JLM, or (ii) using, or authorizing others to use, Ms. Gutman's role as designer, to

promote the sale, or any goods in competition with goods manufactured and sold by JLM.

These restrictions limit Ms. Gutman's conduct in a narrow (albeit potentially lucrative) portion

of the clothing and accessories field and are tailored to protect JLM's goodwill in the Designer's

Name, which Ms. Gutman assigned to JLM for commercial purposes pursuant to Paragraph

10(a-b) of the Contract.

In sum, the evidentiary record and JLM's legal arguments are sufficient, under

the analytical framework prescribed for these determinations by the Second Circuit Opinion, to

establish JLM's likelihood of success on the merits of its claim under Paragraph 10(e) of the

Contract.  Paragraph 4(c) of the Preliminary Injunction entered on March 1, 2024, is

accordingly modified such that its duration is through December 17, 2025, the fifth anniversary

of Ms. Gutman's resignation from her employment by JLM.

## CONCLUSION

For the foregoing reasons, and those set forth in the Court's earlier decisions and

the Second Circuit Opinion regarding the Preliminary Injunction in this action, effective

immediately, JLM is directed to provide the current username and password for each of the

Disputed Accounts, as well as any other assistance necessary to access and gain sole control

over the Disputed Accounts, to Ms. Gutman, through her counsel, by **5:00 p.m. Eastern

Standard Time, on May 15, 2024**, and the Court issues the following modified Preliminary

Injunction Order, which supersedes the order issued on March 1, 2024 (docket entry no. 474):

> During the pendency of this action, Ms. Gutman, along with her officers, agents, servants, employees, and attorneys and all other persons who are in active concert or participation with her and them, are enjoined pursuant to Federal Rule of Civil Procedure 65 from taking any of the following actions:

1. Breaching the employment Contract, dated July 13, 2011, together with the amendments and extensions thereto, by:

    a. using, or authorizing others to use, "Hayley", "Paige", "Hayley Paige Gutman", "Hayley Gutman", "Hayley Paige" or any derivative thereof, including misshayleypaige (collectively the "Designer's Name"), trademarks in the Designer's Name, including but not limited to the trademarks identified at **Addendum 1 hereto** (collectively, the "Trademarks"), or any confusingly similar marks or names in trade or commerce, without the express written permission of Plaintiff's chief executive officer;

    b. using or authorizing others to use any Designs,[10] or any of the Trademarks or any variations, versions, representations or confusingly similar facsimiles thereof, in trade or commerce without

---

[10]    "Designs", as used here, means designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by Employee in connection with her employment with Plaintiff involving bridal clothing, bridal accessories and related bridal or wedding items, either alone or with others, from the commencement of her employment by Plaintiff through the Term of the Contract.  The term includes but is not limited to content created or compiled for the JLM HP Social Media Accounts by JLM or its employees (including Defendant prior to her resignation or the end of the Contract term) or agents.

the express written permission of Plaintiff's chief executive officer; and

c.   through **December 17, 2025**, (i) being identified to the trade or consuming public as the designer of any goods in competition with goods manufactured and sold by JLM; or (ii) using, or authorizing others to use, Gutman's role as designer, to promote the sale, or any goods in competition with goods manufactured and sold by JLM;

2.   Using, or authorizing others to use, any of the Designer's Names, Trademarks or any confusingly similar term, name, symbol or device, or any combination thereof, in commerce in connection with any goods or services, including to endorse, advertise or promote the products and/or services of herself or others directly or indirectly, including but not limited to on social media or in television or media appearances, without the express written permission of Plaintiff's chief executive officer.

This case remains referred to Magistrate Judge Cave for general pretrial management.

SO ORDERED.

Dated: New York, New York
         May 8, 2024

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge

**Addendum 1**

| Trademark | Country | Registration No. | Registration Date | Classes |
|---|---|---|---|---|
| BLUSH BY HAYLEY PAIGE | USA | 6141381 | 09/01/2020 | 25 Int. |
| HAYLEY PAIGE | USA | 5858534 | 09/10/2019 | 14 Int. |
| HAYLEY PAIGE | USA | 4161091 | 06/19/2012 | 25 Int. |
| HAYLEY PAIGE + DESIGN | USA | 5368112 | 01/02/2018 | 25 Int. |
| HAYLEY PAIGE + DESIGN | USA | 5858703 | 09/10/2019 | 14 Int. |
| HAYLEY PAIGE OCCASIONS | USA | 5276982 | 08/29/2017 | 25 Int. |
| JUST GOT PAIGED | USA | 5728141 | 04/16/2019 | 41 Int. |
| LA PETITE HAYLEY PAIGE | USA | 5698436 | 03/19/2019 | 25 Int. |
| LA PETITE HAYLEY PAIGE + DESIGN | USA | 5698444 | 03/12/2019 | 25 Int. |
| OCCASSIONS BY HAYLEY PAIGE | USA | 4914471 | 03/08/2016 | 25 Int. |